1   Sandford L. Frey (State Bar No. 117058)
    Dennette A. Mulvaney (State Bar No. 133423)
2   **LEECH TISHMAN FUSCALDO & LAMPL, INC.**
    200 S. Los Robles Avenue, Suite 210
3   Pasadena, California 91101
    Telephone: (626) 796-4000; Facsimile: (626) 795-6321
4   E-mail: *sfrey@leechtishman.com*
            *dmulvaney@leechtishman.com*
5

6   (Proposed) Reorganization Attorneys for
    Hawkeye Entertainment, LLC,
7   Debtor and Debtor-in-Possession

8
                    **UNITED STATES BANKRUPTCY COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10
                    **[SAN FERNANDO VALLEY DIVISION]**
11
    In re                              │  CASE NO.: 1:19-bk-12102-MT
12
    **HAWKEYE ENTERTAINMENT, LLC,**    │  Chapter 11
13
                                       │  NOTICE OF MOTION AND MOTION OF
14          Debtor and Debtor-in-Possession.  │  HAWKEYE ENTERTAINMENT, LLC,
                                       │  DEBTOR AND DEBTOR-IN-POSSESSION
15                                     │  FOR AN ORDER (1) AUTHORIZING THE
                                       │  ASSUMPTION OF NON-RESIDENTIAL
16                                     │  REAL PROPERTY LEASE AND
                                       │  SUBLEASE, (2) DETERMINING THE
17                                     │  DEBTOR AND SUBLESSOR NOT TO BE
                                       │  IN BREACH OR DEFAULT, THEREBY
18                                     │  DEEMING THEM IN COMPLIANCE
                                       │  WITH BANKRUPTCY CODE §
19                                     │  365(b)(1)(A) AND EXCUSING THE
                                       │  DEBTOR FROM ANY ADDITIONAL
20                                     │  COMPLIANCE WITH § 365(b)(1)(B) AND
                                       │  (C), AND (3) AUTHORIZING THE
21                                     │  DEBTOR TO ENTER INTO A REVISED
                                       │  SUBLEASE THAT AMENDS AND
22                                     │  EXTENDS THE SUBLEASE; OR
                                       │  ALTERNATIVELY, EXTENDING THE
23                                     │  TIME PERIOD WITHIN WHICH THE
                                       │  DEBTOR MAY ASSUME OR REJECT
24                                     │  UNEXPIRED NON-RESIDENTIAL
                                       │  LEASES AND EXECUTORY
25                                     │  CONTRACTS;
                                       │  MEMORANDUM OF POINTS AND
26                                     │  AUTHORITIES; DECLARATIONS AND
                                       │  EXHIBITS IN SUPPORT
27
                                       │  *Date:*  November 6, 2019
28                                     │  *Time:*  10:00 a.m.
                                       │  *Ctrm:*  302

                                       1

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1  **TO THE HONORABLE MAUREEN A. TIGHE, UNITED STATES BANKRUPTCY JUDGE;**

2  **THE UNITED STATES TRUSTEE; LESSOR, SMART CAPITAL INVESTMENTS I, LLC,**

3  **SMART CAPITAL INVESTMENTS II, LLC, SMART CAPITAL INVESTMENTS III, LLC,**

4  **SMART CAPITAL INVESTMENTS IV, LLC, AND SMART CAPITAL INVESTMENTS V,**

5  **LLC, AS SUCCESSOR-IN-INTEREST TO NEW VISION HORIZON, LLC; AND OTHER**

6  **PARTIES ENTITLED TO NOTICE:**

7  **PLEASE TAKE NOTICE** that on November 6, 2019, at 10:00 a.m., or soon thereafter as

8  the matter can be heard before the Honorable Maureen A. Tighe, United States Bankruptcy Judge, in

9  Courtroom 302 of the United States Bankruptcy Court, located at 21041 Burbank Boulevard,

10  Woodland Hills, California 91367, Hawkeye Entertainment, LLC, Debtor and Debtor-in-Possession

11  ("Debtor") will and does hereby move the Court for an Order:

12  **(1)** Granting the assumption of:

13  **(A)** the *Lease Agreement*, dated July 27, 2009, attached to this Motion as ***Exhibit A*** ("2009

14  Lease") as modified by the *First Amendment to Lease Agreement*, dated August 19, 2014

15  attached to this Motion as ***Exhibit B*** ("First Amendment"), and any and all options and

16  extensions thereunder and related thereto ("Options" and together with the 2009 Lease and

17  First Amendment, the "Lease"), between (i) Lessor, Smart Capital Investments I, LLC, a

18  California limited liability company, Smart Capital Investments II, LLC, a California limited

19  liability company, Smart Capital Investments III, LLC, a California limited liability

20  company, Smart Capital Investments IV, LLC, a California limited liability company, and

21  Smart Capital Investments V, LLC, a California limited liability company, as successor-in-

22  interest to New Vision Horizon, LLC (successor-in-interest to PAX America Development,

23  LLC) (collectively "Landlord") and (ii) the Debtor for the premises described in the Lease on

24  the real property located at 618 South Spring Street, Los Angeles, California ("Premises")

25  (the whole of which is sometimes referred to as the "Building"); and

26

27  **(B)** the *Standard Sublease*, dated October 1, 2009 attached to this Motion as ***Exhibit C*** and

28  any and all extension thereto ("Sublease") between the Debtor and W.E.R.M. Investments,

LLC ("WERM") for the Premises;

**(2)** Determining, as part of assumption of such Lease and Sublease, that the Debtor and WERM, as applicable, are not in breach of, and/or monetary or nonmonetary default under, the Lease and/or Sublease, thereby deeming them in compliance with Bankruptcy Code § 365(b)(1)(A) and excusing the Debtor from any additional compliance with § 365(b)(1)(B) and (C); and

**(3)** Authorizing the Debtor to enter into an amendment to the Sublease that amends and extends the Sublease with WERM.

Alternatively, the Debtor will and hereby does move this Court for an Order extending the time period within which the Debtor has to assume or reject non-residential unexpired leases and executory contracts through and including March 18, 2020 pursuant to Section 365 of Title 11 of the United States Code ("Bankruptcy Code") and Rule 9013-l (c) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR"). Currently, the Debtor has through and including December 19, 2019 within which to assume or reject its unexpired non-residential leases and executory contracts.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based upon this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting Declarations; Exhibits in Support Thereof; the Court's record in this case; and such other oral and documentary evidence as the Court will permit prior to, or at the time of, the hearing.

**PLEASE TAKE FURTHER NOTICE** that LBR 9013-1 (f)(1) requires that a formal written response to the Motion be filed at least fourteen (14) days before the hearing on the Motion and served upon (i) Leech Tishman Fuscaldo & Lampl, Inc, proposed reorganization counsel for the Debtors, at 200 South Los Robles Avenue, Suite 210, Pasadena, California 91101, Attn: Sandford L. Frey; and (ii) the United States Trustee.

**PLEASE TAKE FURTHER NOTICE** that in accordance with LBR 5005-2(d), a paper copy of any such opposition must be marked "Judge's Copy" and must be served on the chambers of the Honorable Maureen A. Tighe, located at the United States Bankruptcy Court, 21041 Burbank Boulevard, Woodland Hills, California 91367, and, (a) must meet the requirements of LBR 9004-1 (a), with exhibits on the Judge's Copy tabbed, (b) the proof of service must indicate the method of

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

service of the Judge's Copy, and (c) if such opposition is filed electronically, the Judge's Copy must be accompanied by a copy of the NEF confirming the filing.

**PLEASE TAKE FURTHER NOTICE** that pursuant to LBR 9013-l (h), the failure to timely file and serve any opposition to the Motion may be deemed by the Court to be consent to the granting or denial of the relief requested.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order:

1.      Authorizing the Debtor to assume the Lease, as modified by the First Amendment and any and all options and extensions thereunder and related thereto for the Premises;

2.      Authorizing the Debtor to assume the Sublease and any extension thereto for the Premises;

3.      Determining, as part of the assumption of such Lease and Sublease, that the Debtor and WERM, as applicable, are not in breach of, and/or in monetary or nonmonetary default under, the Lease and/or Sublease, thereby deeming the Debtor and WERM in compliance with Bankruptcy Code § 365(b)(1)(A) and excusing the Debtor from any additional compliance with § 365(b)(1)(B) and (C);

4.      Authorizing the Debtor to enter into an amendment to the Sublease that amends and extends the Sublease with WERM.

5.      Alternatively, extending the time period within which the Debtor may assume or reject its unexpired, non-residential leases and executory contracts through March 18, 2020; and, to the extent applicable, the time for performance under Bankruptcy Code§ 365(d)(3); and,

6.      Granting any other and further relief as may be just and proper.

DATED:  October 10, 2019                    LEECH TISHMAN FUSCALDO & LAMPL, INC.


                                            By: /s/ Sandford L. Frey
                                            Sandford L. Frey
                                            (Proposed) Reorganization Attorneys for
                                            Hawkeye Entertainment, LLC, Debtor and Debtor-in-
                                            Possession

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

4

1

**LIST OF EXHIBITS TO MOTION**

2

| | |
|---|---|
| **Exhibit A** | **2009 Lease** |
| **Exhibit B** | **First Amendment** |
| **Exhibit C** | **Sublease** |
| **Exhibit D** | **August 5 Default Letter** |
| **Exhibit E** | **Debtor's August Response** |
| **Exhibit F** | **Correspondence re lack of objection to Church** |
| **Exhibit G** | **Correspondence re lack of objection to banner** |
| **Exhibit H** | **Three Day Notice** |
| **Exhibit I** | **New Vision Assumption Stipulation** |
| **Exhibit J** | **New Vision Assumption Order** |
| **Exhibit K** | **Global Settlement Agreement** |
| **Exhibit L** | **New Vision Settlement Order** |
| **Exhibit M** | **Redline of Subordination Agreement** |
| **Exhibit N** | **Redline of Estoppel Certificate** |
| **Exhibit O** | **Correspondence to Landlord Counsel** |
| **Exhibit P** | **Proposed Amendment to Sublease with WERM** |

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 South Los Robles Avenue, Suite 210
Pasadena, California 91101
626.796.4000

5

**TABLE OF CONTENTS**

I. PRLIMANARY STATEMENT AND RELIEF REQUESTED. ..................................................1

    A.    Landlord's Surreptitious and Erroneous Notice of Nonmonetary Default. ...........3

II. STATEMENT OF FACTS...................................................................................................7

    A.    The Debtor and WERM ........................................................................................7

    B.    Background ..............................................................................................................8

        1.    The Origin of the Prior Dispute with the Landlord..............................8

        2.    The Prior Chapter 11 Case, Settlement and Confirmed Plan....................11

        3.    Summary of the New Vision Settlement Agreement................................12

III. ASSUMPTION OF LEASE AND SUBLEASE.................................................................12

    A.    Assumption is Appropriate Because There are No Monetary or Nonmonetary Defaults under the Lease or Sublease. ...................................................................13

        1.    There are no Monetary Defaults Under the Lease .................................13

        2.    There are Also No Non-Monetary Defaults Under the Lease .................14

            (i)    The Debtor is Unaware of Any Fire Door Issues on the Premises .............................................................................15

            (ii)    There is No Alcohol Currently being Sold in the Ground Floor Lounge ...............................................................................16

            (iii)    The Debtor Timely and Diligently Removes Graffiti....................16

            (iv)    The Debtor and WERM are Using the Correct Area of the Premises leased to them ...........................................................17

            (v)    The Subtenant is Not Exceeding the Authorized Number of "All-Ages Events" and Has Not Failed to Properly Notify the Los Angeles Police Department.....................................................17

            (vi)    Neither the Debtor nor WERM have made any Unauthorized Alterations to the Building Façade .................................17

            (vii)    The Debtor is Not Required to Have Clear Glass Doors on the Purported VIP Rooms ......................................................19

            (viii)    The Agreement with the Church was Not in Violation of the CUB or Lease..............................................................20

            (ix)    The Debtor Did Not Refuse to Provide an Estoppel Certificate or Subordination Agreement to the Landlord's Lender ................22

IV. DISCUSSION.....................................................................................................................23

    A.    Bankruptcy Code Authorizes the Debtor to Assume the Lease and Sublease.......23

    B.    The Debtor Satisfies the Requirements under Section 365(b), including Cure and Adequate Assurance of Future Performance..................................................26

    C.    There is Adequate Assurance of Future Performance as the Debtor Is Not in Default Under the Lease ....................................................................................26

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

i

D.    The Debtor Should Be Deemed in Compliance with Bankruptcy Code § 365(B)(1)(A) and Excused from any Additional Compliance with § 365(b)(1)(B) AND (C) .................................................................................. 28

V. THE LANDLORD HAS BREACHED THE NEW VISION SETTLEMENT DOCUMENTS ........................................................................................................ 29

VI. THE DEBTOR SHOULD BE AUTHORIZED TO ENTER INTO AN AMENDED SUBLEASE WITH WERM WHICH AMENDS AND EXTENDS THE EXISTING SUBLEASE. .......................................................................................................... 32

VII. ALTERNATIVELY, THE DEBTOR MOVES TO EXTEND THE TIME TO ASSUME OR REJECT THE UNEXPIRED NON-RESIDENTIAL LEASES AND EXECUTORY CONTRACTS ................................................................................... 33

VIII. CONCLUSION ........................................................................................................... 35

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

ii

1

# TABLE OF AUTHORITIES

2    **Cases**

3    *Agarwal v. Pomona Valley Medical Group, Inc. (In re Pomona Valley Medical Group, Inc.),*
        476 F.3d 665 (9th Cir. 2007) .................................................................................................... 24

4

5    *B.C. & H. Corp. v. Acme Markets, Inc.,*
        19 Pa. D.&C.3d 419 (1980) ...................................................................................................... 21

6    *BC Brickyard Associates, Ltd. v. Ernest Home Ctr., Inc.,*
        (In re Ernest Home Ctr., Inc.), 221 B.R. 243,253 ................................................................... 34

7

8    *Durkin v. Benedor Corp.*
        (In re G.I. Industries, Inc.), 204 F.3d 1276, 1282 (9th Cir. 2000) .......................................... 25

9    *Cinicola v. Scharffenberger,*
        248 F.3d 110 (3d Cir. 2001 ...................................................................................................... 26

10

11   *In re Beare Co.,*
        177 B.R. 879 (Bakr. W.D. Tenn. 1994) .................................................................................... 24

12   *In re Embers 86th Street, Inc.,*
        184 B.R. 892 (Bankr. S.D.N.Y. 1995) ...................................................................................... 27

13

14   *In re Great Atlantic & Pacific Tea Co., Inc.,*
        472 F.3d 666 (S.D.N.Y. 2012) .................................................................................................. 27

15   *In re National Gypsum Co.,*
        208 F.3d 498 (5th Cir. 2000) .................................................................................................... 23

16

17   *In re Orion Pictures Corp.,*
        4 F. 3d 1095 (2nd Cir. 1993) .................................................................................................... 25

18   *In re Patriot Place, Ltd.,*
        486 B.R. 773 (Bankr. W.D. Tex. 2013) .................................................................................... 27

19

20   *In re Perfectlite Co.,*
        116 B.R. 84 (Bankr. N.D. Ohio 1990) ...................................................................................... 34

21   *In re S&M Food Services, Inc.,*
        117 B.R. 497 (Bailiff. E.D. Mo. 1990) .............................................................................. 34, 35

22

23   *In re Southwest Aircraft Services, Inc.,*
        831 F.2d 848 (9th Cir. 1987) .................................................................................................... 33

24   *In re Texas Health Enterprises Inc.,*
        72 Fed. Appx. 122 (5th Cir. 2003) ............................................................................................ 27

25

26   *In re Victoria Station, Inc.,*
        875 F.2d 1380 (9th Cir. 1989) ............................................................................................ 33, 34

27   *In re Wedtech Corporation,*
        72 B.R. 464 (Bankr. S.D.N.Y. 1987) .................................................................................. 35, 36

28

     *In re Wolflin Oil, L.L.C.,*
        318 B.R. 392 (Bankr. N.D. Tex. 2004) .................................................................................... 24

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

iii

*Morrisville Shopping Center v. Sun Ray Drug Co.,*
381 Pa. 576 (1955) ........................................................................................... 21

*Richmond Leasing Co. v. Capital Bank, N.A.,*
762 F.2d 1303 (5th Cir. 1985) ................................................................. 24, 26

*Theatre Holding Corp. v. Mauro,*
681 F.2d 102 (2d Cir. 1982) .......................................................................... 34

*Willamette Water Front Ltd. v. Victoria Station,*
(In re Victoria Station), 88 B.R. 231, 236 at n. 7 .......................................... 34

**Statutory Authorities**

11 U.S.C. § 363(b)(1) ......................................................................................... 32

11 U.S.C. § 365(a) .............................................................................................. 26

11 U.S.C. § 365(b)(1) ......................................................................................... 26

11 U.S.C. § 365(b)(1)(A)(B) and (C) ......................................................... 13, 31, 35

11 U.S.C. § 365(d)(3) .................................................................................... 27, 29

11 U.S.C. § 365(d)(4)(A)(B) .............................................................................. 33

Cal. Civ. Code § 1542 ........................................................................................ 30

**Rules and Regulations**

FRBP 9019 .......................................................................................................... 11

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

iv

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    PRLIMANARY STATEMENT AND RELIEF REQUESTED.**

Since confirmation of its plan of reorganization in its prior closed Chapter 11 case approximately four years ago (the background of which is discussed in more detail below), and since the Rent Commencement Date pursuant to the First Amendment[1] (also discussed in greater detail below), there is no dispute that the Debtor has been and is current with all of its monetary obligations under the Lease. Furthermore, the Debtor is <u>not</u> in default of any nonmonetary obligations (as will be explained below) despite the Landlord's unsupported and spurious contentions.   In fact, the purported nonmonetary defaults are an unalloyed fabrication by the Landlord in furtherance of another frivolous attempt to terminate the Lease and Sublease.

Additionally, as will be discussed in Section v. below, the Landlord's recent actions in declaring the Debtor and WERM in purported nonmonetary default of the Lease and Sublease, has breached the New Vision Settlement Documents (as defined below).   Most, if not all, of the conditions that are the subject of the Landlord's recent claim of nonmonetary default predate the settlement with the Landlord in the Prior Chapter 11 Case. Pursuant to the assumption of the Lease in the Prior Chapter 11 Case, such conditions were not required to be "cured" and were in essence deemed not to be matters of default, and any alleged right to declare them to be defaults was released and/or waived by the clear and unambiguous terms of the New Vision Settlement Documents and by virtue of this Court's Orders approving the settlement and authorizing assumption of the Lease.

So, in light of the foregoing, what is at the root of the current dispute?

Initially, the Court, creditors and parties in interest may be perplexed as to the reason why the Landlord is once again concocting an excuse to terminate the Lease and Sublease, which are not in default and are producing substantial income for the Landlord (and, in fact, the only income derived from the Building).   A brief explanation of the background and underlying economic realities concerning the Building owned by the Landlord, and Premises leased by the Debtor, may penetrate the diaphanous veil that conceals the Landlord's transparent motivation.

---

[1] Capitalized terms shall have the meaning ascribed to them in the Notice of Motion, unless defined otherwise in the Motion.

1

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

The Premises leased by the Debtor is located in the Pacific Stock Exchange Building on Spring Street in downtown Los Angeles and is a historical landmark.  The Premises leased by the Debtor occupy the first four flours of the Building.

The Debtor leased the Premises in 2009, well before the Landlord purchased the Building in a distressed foreclosure sale.  At the time that the Debtor entered into the 2009 Lease and prior to the Landlord's acquisition, the Premises had substantial deferred maintenance (including non-compliance with the City or Los Angeles High Rise Retrofit Ordinance for fire life safety systems), were in deplorable condition, and before the revitalization of downtown Los Angeles.  The Debtor and WERM spent millions of dollars for renovations and building compliance, which (as explained in greater detail below) included the cost of certain renovations to the Building in order to obtain a certificate of occupancy and the conditional use beverage ("CUB") for the Premises, and to make the Building Code compliant for its intended use.  As a result of the Debtor's substantial efforts and investment, the Debtor's related subtenant, WERM has been able to open, develop and operate an extremely successful entertainment venue from the Premises, which is now ranked among the top 20 entertainment venues in the world.

Except for the Premises leased by the Debtor and portions of the lobby on the first floor and basement, the remainder of the building office tower has no Certificate of Occupancy and is currently unusable.  As will be discussed below in Section II.B of this Motion, the prior owner of the Building permitted the Building to lapse into foreclosure after that entity defaulted on its loan to its lender.  The Landlord (through a prior affiliated entity) acquired the Building (subject to the Debtor's 2009 Lease and WERM's Sublease) by purchasing it for approximately $2.7 million, by purchasing the secured note of the lender, and thereafter completing the foreclosure sale of the Building.

After acquiring the Building, the Landlord refused to cure the numerous breaches of the Lease which it had inherited from its predecessor owner, and it further exacerbated those breaches by, among other things, refusing to make the necessary corrections to the Building which were the responsibility of the lessor under the 2009 Lease as well as perform necessary systems tests and maintenance.  This resulted in litigation initiated by the Debtor.  As this Court is already aware from

2

1   the Prior Chapter 11 Case, the Landlord attempted to rid itself of (i) the Lease and Sublease, (ii) the

2   Debtor's substantial claims for breach of the 2009 Lease, and (iii) the Debtor's Prior State Court

3   Actions (as defined below).   As the Landlord has also done now, before the Debtor had an

4   opportunity to adjudicate its claims, the Landlord surreptitiously served the Debtor with a Five-Day

5   Notice to Quit the Premises and declaring a forfeiture (which has a familiar ring to it), thereby

6   forcing the Debtor to seek bankruptcy protection by filing its Prior Chapter 11 Case.

7       After the filing of the Prior Chapter 11 Case, the parties eventually reached a settlement (see

8   further discussion below).   As part of the negotiated settlement, the Debtor, among other

9   concessions, reluctantly conceded to a substantial increase in the base rent demanded by the

10  Landlord, increasing it from the rate of $27,500 per month at the time of the 2009 Lease to $35,000

11  per month plus 3% annual adjustments.   The current base rent after applying the 3% adjustments

12  since the Rent Commencement Date is almost $40,000 each month ($39,392.81 to be precise).

13      It is important to note that the Debtor and WERM occupy the only usable space in the

14  Building.   Renovation of the Tower (as defined below) will be enormously difficult and extremely

15  expensive due to the condition of the Tower and historical restrictions placed on the Building.

16  Nevertheless, attempting to capitalize on the Debtor's significant improvements and the upswing in

17  the downtown market since 2009, the Landlord has marketed the Building for a sale price of over

18  $20 million.   It is axiomatic that the prospects of a sale of that magnitude are enhanced if the

19  Landlord can also reap the benefit of the Debtor's investment by ridding itself of the Debtor and

20  WERM, thereby becoming the beneficiary of the Debtor's substantial improvements to the Building

21  and Premises and the extremely valuable business operated by WERM.

22      To that end, the Landlord is motivated to continue its prior pattern of manufacturing alleged

23  defaults in a blatant and spurious attempt to terminate the Lease and Sublease so as to reap the

24  benefit of the substantial improvements made by the Debtor and WERM, WERM's operating

25  business, and the upswing in the downtown market since 2009, thereby enabling the Landlord to sell

26  the Building for the windfall that it desires.

27      **A.      Landlord's Surreptitious and Erroneous Notice of Nonmonetary Default.**

28  On August 5, 2019, without warning or prior notice to the Debtor or the subtenant, WERM,

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

3

1    the Landlord suddenly delivered a letter alleging various nonmonetary defaults, most of which

2    lacked specificity as to the exact nature of such defaults (see discussion below), with a 15-day cure

3    deadline.  A copy of the August 5, 2019 Letter is attached to this Motion as ***Exhibit D*** ("August 5

4    Default Letter").  *[See Declaration of Adi McAbian ("McAbian Dec") ¶18].*

5        The Debtor had no prior knowledge or notice of the Landlord's claims before receipt of the

6    August 5 Default Letter.  Moreover, the Debtor is unaware of any citation from any governmental

7    authority (which would typically be the entity citing and enforcing such alleged violations) of the

8    purported defaults asserted in the Landlord's August 5 Default Letter.  On the contrary, this letter

9    was the first such notification, whether written or oral, in which the Landlord claimed the existence

10    of nonmonetary defaults. In other words, the Landlord's fifteen-day notice came out of the clear

11    blue. *[McAbian Dec ¶19].*

12        In response to the Landlord's August 5 Default Letter, the Debtor made numerous attempts

13    to reach the Landlord's principal, Mr. Chang, to obtain more specificity as to the alleged defaults

14    and discuss the allegations.   All of those were unsuccessful.   Having been unable to obtain

15    specificity from the Landlord despite repeated attempts, on August 19 (within the 15-day period), the

16    Debtor served its written response to the Landlord's contentions, a copy of which response is

17    attached to this Motion as ***Exhibit E*** ("Debtor's August Response").  As part of the Debtor's August

18    Response, and despite the Debtor's categorical disagreement with the Landlord's claims and

19    contentions contained in the August 5 Default Letter, the Debtor notified the Landlord within the 15-

20    day cure period that it had complied with the Landlord's demands as to those items capable of being

21    performed within 15 days, and had commenced compliance with those items which required longer

22    than 15 days (see further discussion later in the Motion). *[McAbian Dec ¶20].*

23        Although the Debtor's August Response to the Landlord's fabricated contentions will be

24    discussed in greater detail below, by way of example, WERM suspended its event agreement with a

25    church to make use of the Premises for religious services on Sundays because the Landlord's August

26    5 Default Letter mischaracterized, without any bona fide legal basis or factual support, the

27    arrangement with the church a "sublease" without Landlord's consent; and, the Landlord further

28    contended, again without evidentiary basis, that the arrangement allegedly exceeded the 50 per year

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

4

1  limitation on all ages events imposed under the CUB for the Premises.  As discussed more fully

2  below, not only are both contentions legally and factually incorrect, the Debtor re-verified that the

3  City has no objection to the arrangement with the church.  Attached to this Motion as ***Exhibit F*** is a

4  correspondence from the Los Angeles Police Department, reverifying that it has no objection to

5  continued use by the church. *[See, McAbian Dec ¶36 and 37]*.

6      Regardless, faced with the August 5 Default Letter (coupled with the Landlord's refusal to

7  discuss the situation), the Debtor/WERM sadly and reluctantly notified the church, within the 15-

8  day period unilaterally imposed by the August 5 Default Letter, that it could no longer accommodate

9  church services.  This action forced upon it by the Landlord, has caused severe and unnecessary

10  hardship to the church and its congregation, particularly inasmuch as WERM subsidized a portion of

11  the costs incurred by the church. *[McAbian Dec ¶38]*.

12      Another example concerned the Debtor's banner, which had been hanging outside the

13  Building for nearly <u>ten years</u>.  The August 5 Default Letter suddenly claimed that the banner

14  constituted an alleged alteration to the Building façade in violation of historical restrictions. This

15  purported default had absolutely no basis.  The Landlord does not have control over the Building

16  façade due to a façade easement granted in favor of the Los Angeles Conservancy.  The banner is

17  not affixed to the façade (instead it is attached to eyehooks that have been in place since prior to the

18  Debtor's 2009 Lease). The banner had been in place for nearly ten years. Neither the Debtor nor

19  WERM are aware of any claim by the Los Angeles Conservancy or Office of Historic Resources that

20  the banner is a violation.  *[McAbian Dec ¶28 and 29]*.

21      Furthermore, in the face of the August 5 Default Letter, and pending updated written

22  confirmation from the Los Angeles Conservancy and the Office of Historic Resources that they had

23  no opposition, the Debtor notified the Landlord, within the 15 day notice period, that it had removed

24  the banner in response to the Landlord's sudden claim that the banner was improperly attached to the

25  Building façade (which it was not) and therefore constituted an alleged alteration to the Building

26  façade (which it is not). *[McAbian Dec ¶30]*.

27      Since the August 5 Default Letter, the façade and banner have been re-inspected; and, the

28  Debtor has received written confirmation from the Los Angeles Conservancy that the banner was not

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

5

in violation.  Attached to this Motion as **_Exhibit G_** is a correspondence dated September 6, 2019 from the Los Angeles Conservancy verifying that it has no objection to use of the banner. *[See, McAbian Dec ¶31]*. Although the banner has been removed from the Building, the Los Angeles Conservancy has confirmed that the Debtor's use of the banner was not a violation; and, therefore, the Landlord's notice of such default was inaccurate and wrongful (see further discussion later in the Motion below).

Despite its disagreement with each and every allegation contained in the August 5 Default Letter, the Debtor (under a reservation of its rights and pending further discussion) complied with the Landlord's demands as to those items capable of being performed within 15 days, and commenced compliance with those items which required longer than 15 days.  To that end, the Debtor promptly notified the Landlord in writing of the same. *[McAbian Dec ¶43]*.

Nevertheless, once again without warning or prior discussion, and prior to expiration of the 15 day notice period, the Landlord surreptitiously slipped under the door of the Debtor's business office a document entitled *3 Day Notice to Perform Conditions and Covenants or Quit*, a copy of which is attached to this Motion as **_Exhibit H_** ("Three Day Notice"), which purports to declare the Debtor and WERM in default and declare a forfeiture of the Lease and Sublease.  *[McAbian Dec ¶44]*.

Due to short notice period and the potentially devasting impact of the Three Day Notice on the right to possession of the Debtor and its subtenant pursuant to applicable law in the Ninth Circuit, the Debtor did not have adequate time to seek judicial intervention and/or reopen its former bankruptcy case and seek relief from this Court.  In order to preserve its right to possession under applicable Ninth Circuit law, protect its most valuable assets -- its Lease and Sublease -- and therefore protect the operating business, the rights of numerous creditors and interested parties, and indirectly the jobs of WERM's numerous employees, the Debtor has been forced to file this chapter 11. *[McAbian Dec ¶46]*.

By this Motion, the Debtor seeks to assume the Lease and Sublease.  As part of assumption, it is incumbent upon the Debtor to cure any defaults.  By this Motion, the Debtor presents evidence that neither it nor WERM are in default.  In response, the Landlord is required to adequately disclose

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

6

15

the basis for the asserted nonmonetary default(s) and present evidence in support. Assuming *arguendo* that there is a legitimate basis for the Landlord's asserted defaults (which the Debtor believes in good faith that there are none), the Debtor can and will promptly cure or complete the cure of such defaults to the extent any exist. In addition, the Debtor also anticipates filing a plan as soon as reasonably practical, which barring any unforeseen claims, will provide for a 100% distribution to creditors conditioned upon assumption of the Lease and Sublease.

As stated, once the evidence is before this Court, the Debtor is confident that it will become patently clear to the Court, creditors and parties in interest that no actual defaults exist. To the contrary, the evidence will show that the Landlord has served such notice in yet another attempt to wrongfully terminate the Lease and Sublease for an ulterior purpose.

## II.    STATEMENT OF FACTS

### A.    The Debtor and WERM

The Debtor commenced this bankruptcy case by filing a Voluntary Petition under Chapter 11 of the Bankruptcy Code on August 21, 2019 ("Case" or "Chapter 11 Case"). The Debtor's most valuable asset is the Lease for the Premises for the first four floors and a portion of the basement of the real property commonly known as the Pacific Stock Exchange Building located at 618 S. Spring Street, in Los Angeles, California ("Building"). By the terms of the Lease for the Premises, the Debtor is entitled to use the first four floors and the basement of the Building, which is in turn leased to a related company, WERM, that operates a thriving business. The Premises are located in the twelve-floor Building (excluding the basement) on Spring Street. [The Building, excluding the Premises used by the Debtor, is hereafter referred to as the "Tower"]. *[McAbian Dec ¶4]*.

The Debtor is a holding company for the Lease, which is sublet to a related entity. The Debtor's successful reorganization is dependent upon the assumption of the Lease and Sublease for the Premises at issue in this Motion. *[McAbian Dec ¶5]*.

The Debtor subleases the Premises to WERM, which operates a popular and highly successful entertainment venue, which has been operating, and continues to operate successfully, from the Premises. WERM books the venue for music events, private parties, corporate events, live entertainment, fashion shows and more. In connection with the business operations, the event venue

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

7

1    regularly employs approximately fifty to seventy regular employees and independent contractors, as

2    well as an additional approximately twenty security guards, six valet attendants and thirty marketing

3    team members (which varies depending on the events).  Literally thousands of people wait in line to

4    pass the rigorous security clearance in order to enter a venue that features some of the most sought-

5    after DJ's and Producers in the World as evidenced by the fact that the event venue is ranked in the

6    top 20 entertainment venues in the World. *[McAbian Dec ¶6]*.

7        In fact, the business aided significantly in the revitalization of Spring Street due to, among

8    other things, the safety of the area resulting from the tight security.  In turn, this has also resulted in

9    numerous restaurant openings and significantly increased occupancy rates for apartments located in

10   the surrounding area immediately adjacent to the Premises.

**B.    Background**

12       A brief discussion of the background and previous disputes with the Landlord will assist the

13   Court, creditors and parties in interest with a greater understanding of the immediate issues involved

14   with this Motion.

**1.    The Origin of the Prior Dispute with the Landlord**

16       On or about July 17, 2009, the Debtor initially entered into the 2009 Lease for the Premises

17   with an entity known as Pax America Development, LLC ("<u>Pax</u>").  In reliance upon its leasehold

18   interest, millions of dollars in improvements to the Building and Premises were made on behalf of

19   the Debtor.  But it did not end there.  The Debtor was also compelled to spend millions of additional

20   dollars and incur significant additional liability for repairs, and City of Los Angeles code

21   compliance.  It did so, even though it was the responsibility of the prior landlord, Pax, and its

22   successor under its commercial Lease, to undertake these efforts.  *[McAbian Dec ¶7]*.

23       Pursuant to signed covenant, the Tower cannot be occupied or used.  Despite that, the Tower

24   area must nevertheless be in compliance with certain health, safety and fire regulations in order for

25   the Debtor to operate the business from the Premises on the first four floors of the Building.  An

26   Order to that effect was issued by the City of Los Angeles under the High Rise Retrofit Ordinance in

27   1989; but, was not complied with until the Debtor completed the necessary work in 2010 *[McAbian*

28   *Dec ¶8]*.

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

8

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1    In other words, although customers of the business may not use the Tower, the City of Los

2    Angeles, Los Angeles Police Department and Los Angeles Fire Department, concerned about the

3    health, safety and welfare of the patrons of the business, nevertheless require that the Tower must

4    comply with fire safety regulations.  For example, operating sprinkler systems, fire alarms and fire

5    doors are required in portions of the Tower in case a fire should breakout in the upper floors while

6    patrons are attending the event venue on the first four floors operated by the Debtor. Safety features,

7    such as "Exit" signs, are also required for the safety of firemen, inspectors, workmen and others

8    entering the Tower.  *[McAbian Dec ¶9]*.

9    Under the 2009 Lease, it was the responsibility of the Pax and its successors to retrofit, repair

10    and maintain the Tower and the integrated systems for the benefit of the Debtor's continued use and

11    occupancy of the Premises as well as the health, safety and welfare of the customers of the operating

12    business. For example, Paragraph 5.8 of the 2009 Lease (as well as later amendments) provides in

13    applicable part:

14    High Rise Retrofit. . . The construction expenses, including all architectural,
engineering, inspection and permit fees for the Required Retrofit Work will be borne

15    by Landlord and paid to Tenant . . .

16

17    It was confirmed in a later amendment that it was the exclusive expense of Pax and its successors.

18    *[McAbian Dec ¶10]*.

19    In addition, among other breaches, the lessor also failed to pay or reimburse the Debtor the

20    contractual Tenant Improvement Allowance. The original lessor, Pax, and its successor, New Vision

21    Horizon, LLC ("NVH"), had failed to perform or pay for required work, and were in material default

22    of the Lease.  The Debtor was thus required to pay for repairs to the Building in order to bring it into

23    compliance, which was the responsibility of the lessor, and for which the lessor historically dragged

24    its feet in making the required repairs. The lessor's defaults required the Debtor to step in to perform

25    and pay for the necessary work to the portions of the Building which were the responsibility of the

26    lessor for the protection of the operating business; the health, safety and welfare of patrons; and, the

27    protection of the Debtor's substantial investment. In all, the Debtor had invested well-over

28    $3,500,000.00 into improvements to the Building of which over $1,500,000.00 was the
responsibility of the lessor. By way of example, the Debtor was compelled to purchase and install a

9

1  fire pump and sprinkler system required for the Building, which cost approximately $250,000.00.
2  *[McAbian Dec ¶11]*.

3      Although the Debtor attempted to resolve this situation amicably, Pax defaulted on numerous
4  settlement agreements.  In addition, Pax fell into default under its loan with Pax's lender.  Following
5  a number of serial bankruptcy filings by Pax and related entities which were determined to be in bad
6  faith, NVH, whose managing member is Michael Chang, purchased the note from Pax's lender for
7  approximately $2.7 million, and then foreclosed on Pax's interest in the Building.  At some point
8  after 2014, NVH apparently transferred its interest in the Lease to the Landlord, whose principal is
9  also Mr. Chang.  *[McAbian Dec ¶12]*.

10      The 2009 Lease and its addendums provided, among other things, for:  (a) prepaid rent
11  (which was delivered) and rent abatements and rent credits totaling fourteen (14) full calendar
12  months after the "Rent Commencement Date" (as then defined in the 2009 Lease); (b) payment by
13  Pax of $540,000 to the Debtor as a Tenant Improvement Allowance (Section 5.2 of the 2009 Lease
14  and Section 1.4 to Exhibit D of the 2009 Lease); and (c) payment by Pax of $1,100,000 to the Debtor
15  as reimbursement for the Required Retrofit Work performed by the Debtor. *[McAbian Dec ¶13]*.

16      Pax, and thereafter NVH, failed to pay the Debtor the Tenant Improvement Allowance as
17  required by the 2009 Lease, and failed to reimburse the Debtor for the Required Retrofit Work
18  performed by the Debtor, among other breaches of the 2009 Lease.  Despite the many breaches by
19  Pax and NVH, and after many delays and conditions resulting therefrom, the Debtor eventually
20  managed to obtain, at great expense to itself, a Certificate of Occupancy from the City of Los
21  Angeles for the operation of the venue and business. *[McAbian Dec ¶14]*.

22      As a result, the Debtor commenced several lawsuits to pursue its claims against Pax and
23  NVH ("Prior State Court Actions").  Before the Debtor's rights could be adjudicated in the Prior
24  State Court Actions, NVH, through Mr. Chang, served a Five-Day Notice in order to terminate the
25  2009 Lease (as then amended) and the Debtor's right to possession.  In response, the Debtor elected
26  to file for protection under Chapter 11 on September 30, 2013, which was assigned case number
27  1:13-bk-16307-MT ("Prior Chapter 11 Case"). *[McAbian Dec ¶15]*.  This Court presided over the
28  Prior Chapter 11 Case.

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

10

**2.    The Prior Chapter 11 Case, Settlement and Confirmed Plan**

After the petition date of the Prior Chapter 11 Case, the Debtor sought to assume the 2009 Lease and pursue its claims against the Landlord's predecessor, NVH.[2]  After numerous contested proceedings and substantial discovery, on July 29, 2014, the Landlord and the Debtor attended mediation with retired former Bankruptcy Judge, the Honorable Mitchel R. Goldberg ("Mediation"). Although NVH and the Debtor were not initially successful in settling their disputes at the Mediation, significant progress was made toward consensual resolution.  Due to the progress made at the Mediation, the parties continued negotiations subsequent to the Mediation, which resulted in a global resolution, whereby the Debtor's claims were allowed through offset and rent credit, and the 2009 Lease was assumed, subject to certain modifications to the 2009 Lease requested by NVH. *[McAbian Dec ¶16]*.

The settlement was memorialized in a series of documents, including, (i) the First Amendment [*Exhibit B*]; (ii) the *Stipulation for Assumption of Nonresidential Real Property Lease and Sublease for the Premises located at 618 South Spring Street, Los Angeles, California,* filed on August 28, 2014 *[Prior Case Docket No. 233]*, attached as ***Exhibit I*** ("New Vision Assumption Stipulation"); (iii) the *Order (1) Approving Stipulation for Assumption of Nonresidential Real Property Lease and Sublease for Premises Located at 618 South Spring Street, Los Angeles, California; and, (2) Granting Omnibus Motion of Hawkeye Entertainment, LLC, Debtor and Debtor-in-Possession for an Order Authorizing the Assumption of Non-Residential Real Property Lease and Sublease for Premises Located at 618 South Spring Street, Los Angeles,* entered by the Bankruptcy Court on September 4, 2014 *[Prior Case Docket No. 242]* attached *as* ***Exhibit J*** ("New Vision Assumption Order"); (iv)  *Settlement Agreement and Mutual Release of Claims*, dated August 19, 2014, attached as ***Exhibit K***, *[filed as part of Prior Case Docket No. 226]* ("Global Settlement Agreement"); and (v) the *Order Granting Motion of Hawkeye Entertainment, LLC, Debtor and Debtor in Possession, for an Order Approving Global Settlement between the Debtor and New Vision Horizon, LLC pursuant to FRBP 9019*, entered on September 12, 2014 *[Prior Case Docket No. 257]*, attached as ***Exhibit L*** ("New Vision *Settlement Order*" and together with the First

---

[2] As stated, the Landlord is the successor to NVH and Mr. Chang was a principal in both entities.

L E E C H   T I S H M A N   F U S C A L D O   &   L A M P L ,   I N C .
200 South Los Robles Avenue, Suite 210
Pasadena, California 91101
626.796.4000

11

1    Amendment, the New Vision Assumption Stipulation, the New Vision Assumption Order and the

2    Global Settlement Agreement, the "New Vision Settlement Documents").[3] *[McAbian Dec ¶16].*

3    ###    3.    Summary of the New Vision Settlement Agreement

4    The Debtor and NVH executed the New Vision Settlement Documents on August 20, 2014.

5    Pursuant to the New Vision Settlement Agreement, the Debtor and NVH entered into the New

6    Vision Assumption Stipulation.  Pursuant to the terms of the New Vision Settlement Agreement,

7    NVH adopted the 2009 Lease dated July 17, 2009, which was executed between the Debtor and Pax,

8    as modified by the First Amendment entered into as part of the Global Settlement Agreement.

9    Under the terms of the Global Settlement Agreement, the Debtor paid NVH the total sum of

10    $105,000 upon the effective date of the Global Settlement Agreement, which sum represented the

11    monthly rental payments in advance for the months of November 2014, December 2014 and January

12    2015.  Pursuant to the Global Settlement Agreement, among other things, NVH withdrew its

13    Opposition to the New Vision Assumption Motion and to entry of an Order assuming the 2009 Lease

14    as modified by the First Amendment; the Lease and Sublease were deemed current; the Debtor's

15    Prior State Court Actions were dismissed with prejudice with each side bearing their own costs and

16    attorneys' fees; and, NVH withdrew its POC filed in the Prior Chapter 11 Case.  Finally, the New

17    Vision Settlement Agreement provided for general mutual releases between the Debtor and NVH.

18    This Court approved the New Vision Settlement Documents by the New Vision Settlement Order,

19    entered in the Prior Chapter 11 Case on September 12, 2014 *[Prior Chapter 11 Case Docket No.*

20    *257].*

21    ## III.    ASSUMPTION OF LEASE AND SUBLEASE

22    The Debtor has determined, exercising its best business judgment, that solid, economic

23    reasons exist for the Debtor to assume the Lease and Sublease in order to preserve its valuable asset

24    and the income derived from leasing the Premises to the highly successful entertainment venue

25    operating profitably at this leased location, for the benefit of creditors, equity holders (who invested

26    millions of dollars), WERM, its subtenant, and indirectly the numerous employees of the

27

28    [3] The New Vision Settlement Documents memorialize the settlement, which is referred to as the "New Vision Settlement Agreement")

12

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1  entertainment venue. The Debtor believes that there can be no legitimate dispute that it satisfies the

2  articulated business judgment standard for assumption under applicable law in this Circuit. The

3  Debtor further contends that there is no meritorious question that assumption of the Lease and

4  Sublease is in the best interests of the Debtor's estate and creditors.

5      Furthermore, the Debtor can unequivocally demonstrate adequate assurance of future

6  performance based on cashflow derived from the Sublease, the financial resources of the Debtor's

7  equity holders, and those of WERM and its equity holders. Accordingly, the Debtor can meet the

8  statutory requisites for assumption under Bankruptcy Code § 365 and should be authorized to do so

9  at this time.

10     What is perhaps unique about the Motion is that the Debtor is unequivocally current with its

11  monetary obligations under the Lease; that it is in full compliance with the nonmonetary terms the

12  Lease and Sublease; and that it is not in default under either.  Therefore, the Debtor moves for the

13  assumption of the Lease and Sublease and an Order determining, as part of the assumption of such

14  Lease and Sublease, that the Debtor and WERM, as applicable, are not in breach of, and/or monetary

15  or nonmonetary default under, the Lease and/or Sublease, thereby deeming them in compliance with

16  Bankruptcy Code § 365(b)(1)(A), and excusing the Debtor from any additional compliance with §

17  365(b)(1)(B) and (C).

18     Alternatively, in the event the hearing on assumption is delayed beyond the initial 120-day

19  statutory period for assumption, the Debtor also moves this Court for an Order extending the time

20  period within which the Debtor must assume or reject non-residential unexpired leases and

21  executory contracts through and including March 18, 2020.  Currently, the Debtor has through and

22  including December 19, 2019 within which to assume or reject its unexpired non-residential leases

23  and executory contracts.

24  **A.**     **Assumption is Appropriate Because There are No Monetary or Nonmonetary**

25          **Defaults under the Lease or Sublease.**

26      **1.**     **There are no Monetary Defaults Under the Lease**

27     There is no bona fide dispute that the Debtor was current with all of its monetary obligations

28  under the Lease since the Rent Commencement Date (as defined in the First Amendment) through

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

13

1   the Petition Date, or that the Debtor continues to be current since the filing of the Petition in this

2   Case. *[McAbian Dec ¶17]*.

3   **2.    There are Also No Non-Monetary Defaults Under the Lease**

4   As mentioned earlier in this Motion, on August 5, 2019, without warning or prior notice to

5   the Debtor or the subtenant, WERM, the Landlord suddenly delivered the August 5 Default Letter, a

6   fifteen-day letter alleging various <u>nonmonetary</u> defaults, many of which lacked sufficient specificity

7   as to the exact nature of such defaults *[Exhibit D]*. The Debtor had no prior knowledge or notice of

8   the Landlord's claims before its receipt of the August 5 Default Letter.  Moreover, the Debtor is

9   unaware of any citation from any governmental authority in connection with the Premises of the type

10  asserted in the Landlord's August 5 Default Letter, and such letter was the first such notification,

11  whether written or oral, in which the Landlord claimed the existence of the nonmonetary defaults set

12  forth in the August 5 Default Letter.  In other words, the Landlord's fifteen-day notice came out of

13  the clear blue.  *[See McAbian Dec ¶18 and 19]*.

14  After receiving the Landlord's August 5 Default Letter, the Debtor made numerous attempts

15  to reach the Landlord's principal, Mr. Chang, to obtain more specificity as to the alleged defaults

16  and to discuss the allegations.  Those attempts were unsuccessful.  *[McAbian Dec ¶20]*.

17  Having been unable to obtain more specificity from the Landlord despite repeated attempts,

18  the Debtor served on August 19 (within the 15-day notice period) the Debtor's August Response,

19  that responded in writing to each of the Landlord's contentions *[Exhibit E]*.  As part of the Debtor's

20  August Response, and although the Debtor vigorously disputed the Landlord's claims and

21  contentions contained in the August 5 Default Letter, the Debtor nevertheless notified the Landlord,

22  within the 15-day cure period (under a reservation of its rights and pending further discussion), that

23  it had complied with the Landlord's demands as to those items capable of being performed within 15

24  days, and had commenced diligent compliance with those items which required longer than 15 days.

25  *[McAbian Dec ¶20]*.  Thus, despite its disagreement with each and every allegation contained in the

26  August 5 Default Letter, the Debtor (under a reservation of its rights and pending further discussion)

27  complied with the Landlord's demands as to those items capable of being performed within 15 days,

28  diligently commenced compliance with those items which required longer than 15 days, and

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

promptly notified the Landlord in writing of the same.  *[McAbian Dec ¶43].*

Despite its good faith efforts, the Debtor was shocked to discover that prior to the expiration of the 15 day period, the Landlord surreptitiously slipped under the door of the Debtor's business office (and left another copy at the club), the Three Day Notice, which purported to declare the Debtor in default and declare a forfeiture under the Lease.  The Landlord's actions were not only untimely, they were in bad faith.  *[McAbian Dec ¶44].*

For reasons which are irrelevant because of the filing of this Case, the Court should note that the August 5 Default Letter lacked specificity as to the nature of certain of the claimed defaults and did not comply with the notice required under Section 16.1 of the Lease.  As such, the August 5 Default Letter did not trigger the 15-day cure period specified in the Lease.  Notwithstanding the foregoing and Debtor's vehement disagreement with the Landlord's contention, the Debtor informed the Landlord that it would comply with the Landlord's demands pending further discussion, and it requested further clarification as to several of the Landlord's comments.  To date, no response has been forthcoming from the Landlord. *[McAbian Dec ¶20].*

Set forth below is the Debtor's response to the allegations of the Landlord concerning the alleged nonmonetary defaults.

### (i)     The Debtor is Unaware of Any Fire Door Issues on the Premises

The August 5 Default Letter contended that there are emergency fire doors that are allegedly not equipped with required safety equipment.  The Debtor has received no such notice from the Fire Department and is unaware of any such issues on the Premises. *[McAbian Dec ¶21].*

Prior to the Petition Date, the Debtor notified the Landlord that it was unaware of any emergency fire doors on the Premises that are allegedly not equipped with required "safety equipment."  Moreover, the Debtor notified the Landlord that it was willing to commence any corrections required, and the Debtor requested that the Landlord specify the location of the fire doors to which the Landlord was referring, and whether such doors are within the Premises leased by the Debtor or within the Building under the control of the Landlord.  The Debtor made several inquiries inquired as to the exact location in the Building where the "safety equipment" that the Landlord alleged is required to be installed and is allegedly not installed.  To date, the Landlord has never

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

responded to any of these inquiries. *[McAbian Dec ¶21].*

### (ii) There is No Alcohol Currently being Sold in the Ground Floor Lounge

With respect to alleged nonmonetary default that alcohol is allegedly being sold in the ground floor lounge (Item 1 of the August 5 Default Letter), the Debtor has confirmed that currently there is no alcohol being sold on the ground floor lounge. To that end, the Debtor requested several times that the Landlord advise the Debtor as to the dates of events held by WERM during which the Landlord alleges that there was alcohol service in the ground floor lounge area. To date, the Landlord has never responded. Regardless, the Debtor has advised WERM not to permit alcohol service in the ground floor lounge area. *[McAbian Dec ¶22].*

### (iii) The Debtor Timely and Diligently Removes Graffiti

With respect to the allegation regarding timely removal of graffiti (Item 2 of the August 5 Default Letter), Section 2.1 of the 2009 Lease defines the Premises as those floors and areas depicted on the Site Plan attached to the 2009 Lease. The Building (as defined in the Lease) includes the exterior walls, including those immediately adjacent to the Premises, and specifically excludes the exterior walls of the Building from the Premises. *[McAbian Dec ¶23].*

Condition No. 4 [each "Condition" herein referring to City of Los Angeles, Department of City Planning, Office of Zoning Administration conditions on Case No. ZA 1995-0830(CUB)(PA4) dated February 25, 2013] specifies, as a condition of occupancy of the "site" (e.g., the Premises) that "[A]ll graffiti on the site shall be removed or painted over to match the color of the surface to which it is applied within 24 hours of its occurrence". With respect to alleged default (2) and noting that WERM removes graffiti within the Premises and surrounding area, the <u>areas of the Building excluded from the definition of the Premises are the responsibility of Landlord related to common area maintenance</u>. Nevertheless, the Debtor timely and attentively removed graffiti from the Building area as well, even though that it is solely the obligation of the Landlord. *[McAbian Dec ¶24].*

Furthermore, at present, there is no graffiti. The Debtor further requested that the Landlord point out the area to which he was referring in the August 5 Default Letter. To date, the Landlord

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

16

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1  has not responded.  *[McAbian Dec ¶25]*.

2            **(iv)    The Debtor and WERM are Using the Correct Area of the**

3            **Premises leased to them**

4            With respect to alleged nonmonetary default (Item 3 of the August 5 Default Letter), which

5  correctly identifies the facility being conditioned upon use of 10,159 sf of public space and 1,736 sf

6  of office space (Condition No. 7), the Debtor is uncertain as to the basis for the Landlord's allegation

7  that the Debtor/WERM are making use of 14,006 square feet.  Accordingly, the Debtor requested

8  that the Landlord provide the basis for its calculation supporting its claim that the Debtor/WERM is

9  allegedly using 14,006 sf of public space and 12,849 sf of office space.  The Debtor requested that

10  the Landlord provide a mark-up of the floor plans of the Premises reflecting such alleged use. To

11  date, the Landlord has failed to respond to any of these requests by the Debtor.  *[McAbian Dec ¶26]*.

12            Regardless, the Debtor has advised WERM, and WERM has confirmed with the Debtor, that

13  there is no service permitted in the gallery area (which the Debtor surmises is the area in the

14  Building that the Landlord has included in its calculation above).

15  *[McAbian Dec ¶26]*.

16            **(v)    The Subtenant is Not Exceeding the Authorized Number of "All-**

17            **Ages Events" and Has Not Failed to Properly Notify the Los**

18            **Angeles Police Department**

19            With respect to alleged nonmonetary default relating to Condition No. 8 of the CUB (Item 4

20  of the August 5 Default Letter), WERM is not exceeding the authorized number of "all-ages events"

21  and WERM has not failed to provide requisite notice to the Los Angeles Police Department.

22  Nevertheless, the Debtor requested that the Landlord advise it of the dates and nature of all "all-ages

23  events" conducted or permitted by WERM during each of the last three (3) years, and identify each

24  instance in which WERM had not provided the Los Angeles Police Department notification of such

25  events. To date, the Landlord has failed to respond to any of the Debtor's requests in this regard.

26  *[McAbian Dec ¶27]*.

27            **(vi)    Neither the Debtor nor WERM have made any Unauthorized**

28            **Alterations to the Building Façade**

17

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

With respect to alleged nonmonetary default concerning the Building façade (Item 5 of the August 5 Default Letter), Condition No, 22 of the CUB, provides in pertinent part that "[n]o alteration shall be made to the building façade pursuant to ZAI 145 (I-1000)" which prohibits signage "placed on" the façade unless approved by the Cultural Heritage Commission or the Department of City Planning, Office of Historic Resources. *[McAbian Dec ¶28]*.

No alteration to an exterior wall or face of the Building or its design elements (e.g., the "façade") have been made by the Debtor or WERM. The issue raised by the Landlord for the first time in the August 5 Default Letter related to the Debtor's banner, which had been hanging outside the Building for nearly <u>ten years</u> without citation and without complaint by the Landlord. *[McAbian Dec ¶28]*.

Moreover, neither the Los Angeles Conservancy nor the Office of Historic Resources objected to the banner. Nonetheless, the August 5 Default Letter suddenly claimed for the very first time that the banner constituted an alleged alteration to the Building façade purportedly in violation of historical restrictions. *[McAbian Dec ¶29]*.

Faced with this threat of the August 5 Default Letter, and pending reverification from the Los Angeles Conservancy and the Office of Historic Resources, the Debtor notified the Landlord that it had removed the banner in response to the Landlord's sudden claim that the banner was improperly attached to the Building façade (which it was not) and therefore constituted an alleged alteration to the Building façade (which it is not). *[McAbian Dec ¶30]*.

After the August 5 Default Letter, the façade and banner have been re-inspected; and, the Debtor has received written confirmation from the Los Angeles Conservancy that the banner was not in violation. Attached to this Motion ***Exhibit G*** is a correspondence dated September 6, 2019 from the Los Angeles Conservancy ("<u>Conservancy Letter</u>") verifying that there is no objection to use of the banner, stating in pertinent part:

> On August 27, Adrian Scott Fine, Director of Advocacy, and I met with Adi McAbian during our annual conservation easement inspection. At that time we discussed the use of hanging banners on the building's Spring Street façade and the potential impacts on our easement agreement. **After inspecting the existing attachments, the Los Angeles Conservancy does not find issues with the use of signs in their current locations when utilizing the existing attachments**. *[emphasis added]*

18

1     [Conservancy Letter, Exhibit G] *[McAbian Dec ¶31]*.

2        Although the banner has been removed from the Building by the Debtor under protest and a

3    reservation of rights, the Los Angeles Conservancy has now again confirmed that the Debtor's use of

4    the banner was not a violation; and, therefore, the Landlord's notice of that purported default was

5    inaccurate and wrongful. *[McAbian Dec ¶32]*.

6        The Landlord does not have control over the Building façade due to a façade easement

7    granted in favor of the Los Angeles Conservancy; the banner is not affixed to the façade (instead it is

8    attached to eyehooks that have been in place since prior to the Debtor's 2009 Lease); the banner has

9    been in place for nearly ten years; and neither the Debtor nor WERM are aware of any claim by the

10   Office of Historic Resources that the banner is a violation. *[McAbian Dec ¶32]*.

11       Section 9.2(b) of the 2009 Lease prohibits the tenant from affixing a sign upon the exterior of

12   the Building unless it complies with governmental requirements and the façade easement as

13   applicable to the property.  Therefore, with respect to alleged nonmonetary default concerning the

14   banner (Item 5 of the August 5 Default Letter), and in light of the lack of opposition of the Los

15   Angeles Conservancy and Office of Historic Resources, the Debtor is not in monetary default under

16   the Lease.  Regardless, the Debtor nevertheless invited the Landlord to explain the basis for its

17   contention that a banner advertising the Premises or an event at the Premises is not compliant with

18   Section 9.2(b) of the 2009 Lease, as well as the basis for the Landlord's contention that the banner is

19   improperly "affixed to" or "placed on" the façade thereby constituting a default under the Lease.  In

20   typical fashion, the Landlord has failed to respond to any of the Debtor's requests in this regard.

21       *[See, McAbian Dec ¶32]*.

22       **(vii)    The Debtor is Not Required to Have Clear Glass Doors on the**

23       **Purported VIP Rooms**

24       Condition No. 45 of the CUB states that doors to VIP Rooms "shall be constructed of clear

25   glass."  From the outset, it should be made clear that WERM does not maintain "VIP Rooms," and

26   the area to which the Landlord may be referring is not utilized as VIP Rooms. *[McAbian Dec ¶33]*.

27       Without limiting the generality of the statement above, there is the Skyloft room located on

28   the Premises.  Recognizing that public safety is the primary concern of this condition, the Los

L E E C H   T I S H M A N   F U S C A L D O   &   L A M P L ,   I N C .
200 South Los Robles Avenue, Suite 210
Pasadena, California 91101
626.796.4000

19

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1    Angeles Historical Society, City's Department of City Planning, Department of Building & Safety,

2    Department of Public Health, and the Los Angeles Police Department have, for nearly ten years,

3    acknowledged the substitution of security cameras and the hiring of security guards at the Skyloft

4    room in lieu of such doors, as being compliant with the condition stated in the use permit.  To that

5    end, the Debtor and WERM have not been cited for any violation of the use conditions imposed on

6    Case No. ZA 1995-0830(CUB)(PA4) dated February 25, 2013 as provided for under the Municipal

7    Code and in the use conditions themselves (including Condition No. 45).  Given that there has been

8    City acknowledgment of the equivalent protection provided by the security cameras and security

9    guards, and that no citation has been issued, there is no merit to the Landlord's "failure to comply

10   with law" claim, or any contractual breach.  *[McAbian Dec ¶34]*.

11        Nevertheless, despite the erroneous nature of the Landlord's claim, the Debtor commenced

12   taking bids for doors with clear glass within the fifteen-day notice period provided under the August

13   5 Default Letter.  The doors have been ordered and delivery and installation is expected shortly.

14   *[McAbian Dec ¶35]*.

15             **(viii)    The Agreement with the Church was Not in Violation of the CUB**

16                        **or Lease**

17        The August 5 Default Letter erroneously contended that the use of the Premises by the

18   Fearless LA Church ("Church") was in violation of the CUB and further contended that it constitutes

19   an unapproved sublease; both contentions are wrong. The intended use under the Lease and the

20   entirety of WERM's business is to operate the Premises as an event venue whereby it books the

21   venue for events, music events, private parties, corporate events, live entertainment, fashion shows

22   and more. To that end, the CUB permits the facility to be booked for 50 yearly all ages events.  The

23   agreement between WERM and the Church is an event agreement, not a sublease or assignment.

24   *[McAbian Dec ¶36]*.

25        Nevertheless, WERM suspended its event agreement with the Church to make use of the

26   Premises for religious services on Sundays in response to the Landlord's August 5 Default Letter.

27   That letter mischaracterized the arrangement with the Church as a "sublease," without Landlord's

28   consent.  There is no bona fide legal basis or factual support for the Landlord's claim. The Landlord

20

1    further contended, without any evidentiary basis, that the arrangement allegedly exceeded the 50 per

2    year limitation on nonalcoholic events imposed under the CUB for the Premises.  Inasmuch as the

3    Church did not use the facility every week during the year, the 50 per year limitation on all ages

4    events was not violated.  Moreover, the Los Angeles Police Department had no objection to the use

5    by the Church for religious services. Not only are both contentions of the Landlord legally and

6    factually incorrect, the Debtor re-verified with the Los Angeles Police Department that the City has

7    no objection to the arrangement with the Church.   Attached to this Motion ***Exhibit  F*** is a

8    correspondence from the Los Angeles Police Department, verifying that the City has no objection to

9    continued use by the Church.  *[McAbian Dec ¶37].*

10    Regardless, faced with the August 5 Default Letter (coupled with the Landlord's refusal to

11    discuss the situation), and under protest and a reservation of rights, the Debtor/WERM sadly and

12    reluctantly notified the Church (within the 15 day period unilaterally imposed by the Landlord's

13    arbitrary August 5 Default Letter) that it could no longer accommodate Church services.

14    Regrettably, this has caused unnecessary hardship to the Church and its congregation, particularly

15    inasmuch as WERM subsidized a portion of the costs incurred by the Church. Because of the

16    Landlord's specious claim, the Church is not currently using the Premises for its religious services.

17    *[McAbian Dec ¶38].*

18    The relationship between WERM and the Church is not an assignment or a sublease, but

19    rather an event agreement.  An assignment requires a transfer by the tenant of its entire interest in the

20    lease without material alteration or addition to the terms of the lease, and without the tenant retaining

21    any reversionary interest in the lease. That is not applicable to the relationship with the Church in

22    this case. See, e.g., *B.C. & H. Corp. v. Acme Markets, Inc*. 19 Pa. D.&C.3d 419 (1980).  A sublease,

23    by contrast, is a transaction in which the tenant transfers all or part of the leased premises for an

24    extended portion of the unexpired term of the lease, or for the same term, but for a materially

25    different rent or upon materially different terms and conditions, thereby retaining some reversionary

26    interest in the premises. See, e.g., *Morrisville Shopping Center v. Sun Ray Drug Co*., 381 Pa. 576

27    (1955). That is equally not applicable to this case.

28    Here, the Church's arrangement was a week-to-week arrangement that permitted it to make

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

21

use of only a portion of the Premises for limited number of hours on Sunday to conduct religious services when the Premises were not otherwise in use by WERM for other events.  WERM retains the exclusive right to use of the Premises, including Sundays, and WERM was able to use the Premises to the exclusion of the Church on any Sunday in which it had another event.  This week-to-week arrangement has been in place for nearly six years.  *[McAbian Dec ¶39]*.

Regardless, the Debtor/WERM invited the Landlord to provide the legal and factual basis for its contention that use of the Premises by the Church was pursuant to an assignment or subletting.  No explanation or justification has thus far been forthcoming. *[McAbian Dec ¶40]*.

### (ix)    The Debtor Did Not Refuse to Provide an Estoppel Certificate or Subordination Agreement to the Landlord's Lender

It is accurate that the Debtor had been asked to provide an Estoppel Certificate and Subordination Agreement to the Landlord's lender.  However, the Landlord's contention that the Debtor refused, and is thereby in nonmonetary default, is entirely inaccurate.  The Landlord appears to be under the erroneous impression that the Debtor is required to execute any form of document that Landlord places before the Debtor.  This is simply not the case.  *[McAbian Dec ¶41]*.

Section 18.1 of the 2009 Lease provides in pertinent part that upon written request the Debtor will agree to subordinate its rights in such Lease to the Landlord's lender (which the Debtor agreed to do); and such lease further provides that "*provided, however, that as a condition to such subordination, the subordination instrument shall be **reasonably acceptable** to Tenant and shall include a non-disturbance agreement . . .*" *[emphasis added]*.  Furthermore, Section 18.3 of the 2009 Lease provides that the parties may request estoppel certificates from time to time. However, Section 18.3 also clearly provides, among other things, that such estoppel certificate will provide "*a statement that there are not, to such party's actual knowledge, uncured defaults on the part of the requesting party, **or specifying such defaults if any are claimed**, . . .*" *[emphasis added]*.

Consistent with its obligations under the Lease, the Debtor was and remains willing and able to provide a subordination agreement (that is *reasonably acceptable* to the Debtor, that includes a *non-disturbance*) and an estoppel certificate (*specifying* the *defaults* that exist).  *[McAbian Dec ¶41]*.

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

22

1   To that end, due to the condition of the Building, electrical wiring and other issues, the Debtor

2   requested reasonable changes to the documents and provided multiple drafts of subordination and

3   estoppel certificates which were reasonably acceptable to the Debtor and specified items required

4   under Section 18.3. The Landlord refused to accept the Debtor's reasonable changes despite multiple

5   attempts at modifying the language. *[See, Declaration of William Bresee ("Bresee Dec")]*.  In fact,

6   the Landlord twice abandoned its request before a document could be finally agreed upon.[4]  Despite

7   the Debtor's willingness to negotiate in good faith with the Landlord, the Landlord's conduct

8   suggested that it apparently decided not pursue negotiations.  *[See, Bresee Dec]*

9       Attached as ***Exhibits M*** and ***N***, respectively, are redlined copies of the last drafts of the

10  subordination agreement and estoppel certificate, with changes requested by the Debtor.  The Debtor

11  forwarded these drafts to the Landlord's counsel on June 3, 2019. *[See, Bresee Dec]*.  Thereafter, the

12  Landlord and his counsel having gone radio silent once again, the Debtor attempted to contact the

13  Landlord's counsel on several occasions without response, a copy of the Debtor's follow up email to

14  counsel is attached as ***Exhibit O***.  The Debtor received nothing and heard nothing in response until

15  receipt of the August 5 Default Letter. *[See, Declaration of Sandford L. Frey]*

16      In response to the August 5 Default Letter, the Debtor once again offered to provide the

17  Landlord with a subordination agreement and an estoppel certificate.  In the Debtor's August

18  Response, the Debtor once again delivered the drafts of the subordination agreement and estoppel

19  certificate in the form of *Exhibits M* and *N* and invited comment. The Landlord never responded to

20  the Debtor's tender.

21  *[McAbian Dec ¶42]*.

22  **IV.    DISCUSSION**

23      **A.    Bankruptcy Code Authorizes the Debtor to Assume the Lease and Sublease**

24      Bankruptcy Code §365 authorizes a debtor-in-possession to maximize the value of a debtor's

25  estate by assuming executory contracts or unexpired leases that benefit the estate.  *In re Nat'l*

26  *Gypsum Co.*, 208 F.3d 498, 505 (5th Cir. 2000).  The Debtor requests authorization to assume the

27  _____

28      [4] Although no concern of the Debtor, it does leave one wondering whether adequate disclosures were
made to the Landlord's lender as to the conditions of the Building.

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

23

Lease and Sublease pursuant to Bankruptcy Code §365(a) which provides, in pertinent part:

> (a)      Except as provided in sections 765 and 766 of this title and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

A chapter 11 debtor's decision to assume or reject an executory contract is governed by the "business judgment test." *Agarwal v. Pomona Valley Medical Group, Inc.* (*In re Pomona Valley Medical Group, Inc.*,) 476 F. 3d 665 (9th Cir. 2007) (analyzes business judgment test for contract rejection), see also *In re Beare Co.*, 177 B.R. 879, 882 (Bakr. W.D. Tenn. 1994) (analyzing contract assumption under reasonable business judgment test).  A court should approve a decision to assume an executory contract or unexpired lease pursuant to section 365 if based on a sound exercise of the debtor's business judgment.  See, *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); see also *In re Wolflin Oil, L.L.C.*, 318 B.R. 392, 396 (Bankr. N.D. Tex. 2004) (same).

Under the business judgment test, a debtor is presumed to be acting prudently, on an informed basis in good faith and in an honest belief that its actions benefit the bankruptcy estate. The business judgment test is met unless a court finds that the debtor's action is so manifestly unreasonable that it cannot be said to be based on sound business judgment, but only on bad faith, or whim or caprice. Id at 670.

Bankruptcy Code§ 365(a) permits debtors in possession to "assume or reject any executory contract or unexpired lease of the debtor," subject to court approval. While the Bankruptcy Court does not provide specific guidelines to apply in evaluating the decision to assume or reject an executory contract, the Ninth Circuit has held that such decisions should be reviewed under the business judgment rule standard. See, *Agarwal v. Pomona Valley Medical Group, Inc. (In re Pomona Valley Medical Group, Inc.*), 476 F.3d 665 (9th Cir. 2007); *Durkin v. Benedor Corp. (In re G.I. Industries, Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000). The business judgment rule standard is deferential to the decision of the debtor-in-possession, and in its review, "the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *Aganval*, 476 F.3d at 670.

24

1    Under the business judgment rule, the bankruptcy court puts itself in the shoes of the

2    trustee/DIP to determine whether assuming the contract or lease would be a good or bad business

3    decision. In reviewing the DIP's decision to assume, the court "sits as an overseer of the wisdom

4    with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession,

5    and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate."

6    *In re Orion Pictures Corp.*, 4 F. 3d 1095, 1099 (2nd Cir. 1993).

7    In this case, the Debtor has exercised its business judgment and has concluded that the

8    assumption of both the Lease and Sublease are necessary in order to preserve its most valuable asset

9    and income by permitting WERM to continue its business operations at the Premises. The

10   assumption of the Lease and Sublease is not only beneficial to the bankruptcy estate; it is also

11   beneficial to the creditors of the estate.  Preservation of the value of the Lease and the income

12   derived from continued operations of the entertainment venue at the Premises are entirely dependent

13   upon the Debtor's assumption of the Lease and Sublease.  *[McAbian Dec ¶47]*.  Therefore,

14   assumption of the Lease and Sublease represents a reasonable exercise of the Debtor's business

15   judgment and will benefit the Debtor's estate.

16   In order to obtain and book the type of talent that will draw the large crowds to the

17   entertainment venue, WERM must engage in negotiations and discussions with prospective talent

18   (DJ's and Producers) numerous months to over a year in advance of the actual scheduled appearance.

19   Once the talent is booked, WERM needs sufficient lead time to promote that scheduled appearance

20   through advertising, marketing and social media. Thus, it is essential that the Debtor is able to give

21   assurances to WERM and in turn both the talent and public that the Premises will be available at the

22   time of the performance. For these reasons, assumption of the Lease and Sublease are necessary at

23   this time so that the Debtor can provide those assurance. *[McAbian Dec ¶48]*.

24   Moreover, the entertainment venue at the Premises is being successfully operated by the

25   subtenant. The Debtor's Sublease with the subtenant is an integral part of the operations of the

26   Premises as an entertainment venue. Pursuant to its business judgment, the Debtor's assumption of

27   the Lease and Sublease are in the interests of the Debtor and the creditors of the estate. *[McAbian*

28   *Dec ¶49]*.

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

25

**B.    The Debtor Satisfies the Requirements under Section 365(b), including Cure and Adequate Assurance of Future Performance**

Bankruptcy Code §365(b) provides as follows:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debt the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:

    (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

    (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

    (C) provides adequate assurance of future performance under such contract or lease.

See 11 U.S.C. §§ 365(a), (b)(1).

Section 365(b)(1) of the Bankruptcy Code provides that if there has been a default under an executory contract or unexpired lease, other than a default as described in section 365(b)(2) of the Bankruptcy Code, a debtor may nevertheless assume such contract or lease if the debtor (i) cures, or provides adequate assurance that it will promptly cure, the default (with the exception of certain defaults arising from the failure to perform nonmonetary obligations under an unexpired lease of real property), (ii) compensates, or provides adequate assurance that it will promptly compensate, a non-debtor party to such contract or leases for any actual pecuniary loss to such party resulting from the default, and (iii) provides adequate assurance of future performance under such contract or lease. See 11 U.S.C. § 365(b)(1).  Here, the Debtor is not in default under the Lease or Sublease and there is adequate assurance of future performance.

**C.    There is Adequate Assurance of Future Performance as the Debtor Is Not in Default Under the Lease**

As explained in detail above, the Debtor has provided adequate assurance of future performance.  It is recognized that the phrase "adequate assurance" is not a term of art, and that Congress intended the phrase be given a practical, pragmatic construction. *Richmond Leasing Co. v. Capital Bank, N.A.*, 726 F.2d 1303, 1310 (5th Cir. 1985); *Cinicola v. Scharffenberger*, 248 F.3d 110

26

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1   (3d Cir. 2001}. Adequate assurance is generally considered something less than an absolute

2   guarantee. *In re Embers 86th Street, Inc.*, 184 B.R. 892, 902 (Bankr. S.D.N.Y. 1995). An evaluation

3   of what constitutes adequate assurance of future performance is a factual issue to be determined

4   according to the particular circumstances of each case and is fact-specific. *In re Patriot Place, Ltd.*,

5   486 B.R. 773, 801 (Bankr. W.D. Tex. 2013), citing, *In re Texas Health Enterprises Inc.*, 72 Fed.

6   Appx. 122, 125 (5th Cir. 2003) (what constitutes adequate assurance of future performance is

7   "extremely fact- specific."). In assessing whether there is adequate assurance of future performance

8   where there is an outstanding default, courts have focused on whether it appears that obligations

9   under the contract or lease will be met. *In re Embers 86th Street, Inc.* 184 B.R. 892,902 (Bankr.

10  S.D.N.Y. 1995).

11         In addition, courts also look at a number of factors, including DIP's payment history, extent

12  and history of defaults, presence of guarantee and/or security deposit, evidence of profitability, plan

13  with funds earmarked exclusively for landlord, general outlook in DIP's industry, and whether lease

14  is at or below prevailing market rate. *In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666, 675

15  (S.D.N.Y. 2012); see also, *In re Patriot Place, Ltd.*, 486 B.R. 773, 801 (Bankr. W.D. Tex. 2013).

16         Applying those factors to the instant case, it is clear that the Debtor has provided adequate

17  assurance. The Debtor submits that no prepetition obligations are owed with respect to the Lease and

18  Sublease. The Debtor contends that it is in full compliance with the terms of the Lease and that it is

19  not in default. There is no bona fide dispute that the Debtor was current with all of its monetary

20  obligations under the Lease since the Rent Commencement Date (as defined in the First

21  Amendment) through the Petition Date, or that the Debtor continues to be current since the filing of

22  the petition in this case.  As further discussed above, the Debtor has come forward with evidence

23  establishing that it is not in nonmonetary default.  Nevertheless, despite the Debtor's fervent

24  disagreement with each and every allegation of the Landlord contained in the August 5 Default

25  Letter, the Debtor (under a reservation of its rights and pending further discussion) complied with

26  the Landlord's demands as to those items capable of being performed within 15 days and

27  commenced compliance with those items which required longer than 15 days.  In addition, as

28  required by section 365(d)(3) of the Bankruptcy Code, the Debtor has timely performed all of its

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

27

1    post-petition obligations under the Lease and Sublease. *[McAbian Dec ¶43 and 47].*

2        Accordingly, the Debtor asserts that the cure amounts due with respect to the Lease and

3    Sublease are $0 and there are no nonmonetary defaults.  Moreover, the Debtor has demonstrated its

4    (i) ability to meet its obligations during the Chapter 11 Case as evidenced by the Debtor remaining

5    current on all post-petition obligations under the Lease and Sublease since the Petition Date, and (ii)

6    its willingness to accommodate under protest the Landlord's unilateral, vague and unsupportable

7    nonmonetary demands despite the Debtor's vehement disagreement.  Consequently, the Debtor

8    submits that no further showing of adequate assurance of future performance is necessary.

9        Nevertheless, sufficient evidence of the Debtor's ability to provide adequate assurance of

10    future performance under the terms of the Lease is provided by virtue of the (i) timely payments

11    under the Lease and Sublease; (ii) financial performance of the event venue operated by WERM;

12    (iii) financial ability of WERM to perform in the future, and, a fortiori the Debtor's ability to perform

13    in the future; and (iv) the financial strength of the Debtor's equity holders, the subtenant and its

14    equity holders.

15    **D.    The Debtor Should Be Deemed in Compliance with Bankruptcy Code §**

16    **365(B)(1)(A) and Excused from any Additional Compliance with § 365(b)(1)(B)**

17    **AND (C)**

18        For the reasons stated above, the Debtor and WERM, as applicable, are not in breach of,

19    and/or monetary or nonmonetary default under, the Lease and/or Sublease.  Therefore, they should

20    be deemed in compliance with Bankruptcy Code § 365(b)(1)(A) and the Debtor excused from any

21    additional compliance with § 365(b)(1)(B) and (C).

22        In addition, Bankruptcy Code§ 365(d)(3) provides as follows:

23    (3)    The trustee shall timely perform all the obligations of the debtor, except those
       specified in section 365(b)(2), arising from and after the order for relief under any
24    unexpired lease of nonresidential real property, until such lease is assumed or
       rejected, notwithstanding section 503(b)(l) of this title. The court may extend, for
25    cause, the time for performance of any such obligation that arises within 60 days after
       the date of the order for relief, but the time for performance shall not be extended
26    beyond such 60-day period. This subsection shall not be deemed to affect the trustee's
       obligations under the provisions of subsection (b) or (f) of this section. Acceptance of
27    any such performance does not constitute waiver or relinquishment of the lessor's
       rights under such lease or under this title.
28

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 South Los Robles Avenue, Suite 210
Pasadena, California 91101
626.796.4000

28

[11 U.S.C. § 365(d)(3)]

As stated, the Debtor has been fully performing under the Lease since the Petition Date with respect to its obligations under the Lease. In other words, there has been no post-petition default by the Debtor. *[McAbian Dec ¶47]*.

**V.    THE LANDLORD HAS BREACHED THE NEW VISION SETTLEMENT DOCUMENTS.**

Assuming *arguendo* that the purported nonmonetary defaults alleged by the Landlord in fact constitute nonmonetary defaults (which the Debtor's disputes for reasons stated above), the August 5 Default Letter, the Three Day Notice and the Landlord's recent actions in declaring the Debtor and WERM in purported nonmonetary default of the Lease and Sublease, has breached the New Vision Settlement Documents.  Specifically, the purported defaults regarding the (a) fire door issues *[Section III.A.2 (i) above]*, (b) usable area *[Section III.A.2 (iv) above]*, (c) the banner *[Section III.A.2 (vi) above]*, (d) the glass doors *[Section III.A.2 (vii) above]* and (e) the arrangement with the Church *[Section III.A.2 (viii) above]* (collectively referred to as the "Preexisting Nonmonetary Conditions") are all conditions that predate the settlement with the Landlord in the Prior Chapter 11 Case.  In other words, those Preexisting Nonmonetary Conditions were all in existence long before the Debtor and the Landlord entered into the New Vision Settlement Documents, and pursuant to assumption in the Prior Chapter 11 Case were not required to be "cured" and were in essence deemed not to be matters of default.  *[McAbian Dec ¶45]*.

Accordingly, the Landlord declaring a nonmonetary default based on the Preexisting Nonmonetary Conditions is a breach of the Global Settlement Agreement, the New Vision Assumption Stipulation, the New Vision Settlement Order and the New Vision Assumption Order.

Furthermore, the Landlord is estopped from asserting nonmonetary defaults based on the Preexisting Nonmonetary Conditions because each of them were in existence at the time that the Debtor and the Landlord entered into the New Vision Settlement Documents and prior to the Debtor's assumption of the Lease and Sublease in the Prior Chapter 11 Case.  Accordingly, any such defaults concerning the Preexisting Nonmonetary Conditions were waived and released by the

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

L E E C H   T I S H M A N   F U S C A L D O   &   L A M P L ,   I N C .
2 0 0   S o u t h   L o s   R o b l e s   A v e n u e ,   S u i t e   2 1 0
P a s a d e n a ,   C a l i f o r n i a   9 1 1 0 1
6 2 6 . 7 9 6 . 4 0 0 0

1  Landlord pursuant to the Global Settlement Agreement and the New Vision Assumption Stipulation.

2      The Global Settlement Agreement provides in pertinent part as follows:

3      Without admitting wrongdoing, fault, or liability to each other, and for the purpose of
4      avoiding further inconvenience, costs, and expenses, the Parties now desire and intend to
       fully and finally **settle and resolve all claims and disputes that exist, or that may exist**
5      between the Parties including, without limitation, all claims and disputes alleged, in, or
       which could be alleged in, or arise out of, or are related to the matters alleged in the First and
6      Second State Court Actions, and **all claims and disputes related to the Lease Assumption
7      Motion**.

8          *[emphasis added]*

9          [Global Settlement Agreement, Page 2 ¶ J]

10     In addition, the Global Settlement Agreement contains a comprehensive general release, as

11  follows:

12     As of the Effective Date, the Lease and Sublease shall be **deemed current and reinstated** as
       if no default exists or ever existed. [Page 5, Section 4] *[emphasis added]*  On the Effective
13     Date, except as otherwise provided in this Agreement. and except as to the Parties' rights and
       obligations under the Lease and the First Amendment, the Parties, on behalf of themselves
14     and each of their predecessors, successors, assigns, officers, directors, members, agents, and
       all other persons or entities acting on their behalf, hereby fully and forever release each other,
15     and each of their respective predecessors, successors, assigns, officers, directors, members,
16     agents, employees, insurers, representatives and attorneys, from **any and all claims**, actions
       or causes of action, damages, **demands**, costs, expenses, losses, and attorneys' fees, which
17     they have, **or could claim to have** against each other arising from **or related to**: (1) all
       claims alleged in the First or Second State Court Actions; (2) **all claims alleged in, or
18     related to the Lease Assumption Motion**, including claims related to the Rent
19     Commencement Date and any offsets to rent allegedly owed to Hawkeye by New Vision; (3)
       all claims related to the validity and enforceability of the Lease; (4) all claims related to the
20     validity and enforceability of the Sublease; (5) all claims related to any Rent owed from the
       period July 17, 2009 through October 31, 2014; and (6) all the Claims of New Vision arising
21     under or related to POC No. 2.  It is the parties' mutual intent that by this SETTLEMENT
22     AGREEMENT AND MUTUAL RELEASE OF CLAIMS the parties are **resolving all
       disputes between them**.  Notwithstanding the foregoing, nothing herein is intended to nor
23     shall release claims, if any, that any Party may have against Pax or its principals.

24      (b) It is the intention of the Parties that the releases provided in this Agreement, will be
       effective to **bar all claims, demands**, controversies, causes of action, liabilities, costs,
25     expenses, attorneys' fees, and damages of whatever character, nature and kind, known or
       unknown, suspected or unsuspected against one another. The Parties expressly waive any and
26     all rights and benefits conferred upon them by California Civil Code section 1542, which
       states:

27
28     *[emphasis added]*

30

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

[Global Settlement Agreement, Page 6, Section 10]

Furthermore, the New Vision Assumption Stipulation states as follows:

**IT IS HEREBY FURTHER STIPULATED AND AGREED** that upon entry of the order granting assumption of the Lease and Sublease, the Lease and Sublease **shall be deemed current and reinstated as if no default exists or ever existed**, and that **any and all** monetary and **non-monetary** defaults alleged by New Vision **are waived ab initio**.

*[emphasis added]*

[New Vision Assumption Stipulation, Page 5, lines 17-21]

The New Vision Assumption Order further provides, among other things, that:

**ORDERED** that upon entry of this order granting the assumption of the Lease and Sublease by the Debtor, the Lease and Sublease shall be **deemed current** and reinstated as if no default exists or ever existed, and that **any and all** monetary and **non-monetary defaults alleged by New Vision are deemed cured, satisfied and/or waived ab initio**; it is further,

**ORDERED** that the **Debtor is in full and complete compliance** each and every provision of Bankruptcy Code §365(b)(l) (A), (B) and (C); it is further,

*[emphasis added]*

[New Vision Assumption Order, Page 5, lines 5-10]

Based on the foregoing provisions and the release, the Preexisting Nonmonetary Conditions, which were in existence prior to the settlement, and which were not required to be "cured", were in essence deemed not to be matters of default, and any right to declare them to be defaults was released and waived by the clear and unambiguous terms of the New Vision Settlement Documents and pursuant to this Court's Orders approving the settlement and assumption of the Lease. Moreover, it is self-evident that assumption of the Lease pursuant to Bankruptcy Code § 365(a) and (b) mandates that the Lease could not have been in default as of the entry of the New Vision Assumption Order. Accordingly, the Preexisting Nonmonetary Conditions are deemed cured as of the date of assumption and any and all purported defaults in existence were either cured, deemed cured or waived by the Landlord. For the Landlord to thereafter assert defaults on the basis of conditions that existed as of the date of assumption is in without merit, without justification and patently frivolous, particularly inasmuch as the Landlord has been enjoying the benefits of the settlement (such as the increased base rent) for the past five years.

31

1

2  **VI.    THE DEBTOR SHOULD BE AUTHORIZED TO ENTER INTO AN AMENDED**

3  **SUBLEASE WITH WERM WHICH AMENDS AND EXTENDS THE EXISTING**

4  **SUBLEASE.**

5          By this Motion, as part of the assumption of the Sublease, the Debtor seeks to enter into an

6  amended sublease substantially in the form of attached **Exhibit P** ("Revised Sublease").  Apart from

7  the extension of the maturity date, the majority of the proposed amendments are technical and

8  nonmaterial in nature.

9          The term of the existing Sublease is through December 31, 2025, which is 120 months

10  commencing January 1, 2015.  However, in order to determine maturity date under the existing

11  Sublease, the parties need to determine the commencement date of the Sublease.  In order to

12  determine the commencement date, reference needs to be made to two other documents: (a) the First

13  Amendment to the Lease (specifically Section 8); and (b) the order of assumption from the prior case

14  which assumes (i) the Lease as modified by the First Amendment and (ii) the Sublease, all of which

15  were entered into pursuant to a Global Settlement Agreement approved by this Court in the Prior

16  Chapter 11 Case and then incorporated into the confirmed Chapter 11 plan.

17          Among other things, the Revised Sublease clarifies the maturity date.  Furthermore, the

18  Motion seeks authorization from the Court to extend the maturity date of the Sublease to coincide

19  with the maturity date under the Lease.

20          This Court has the authority to approve the Revised Sublease.  Bankruptcy Code § 363(b)(1)

21  provides that a trustee [or debtor-in-possession], "after notice and a hearing, may . . . lease, other

22  than in the ordinary course of business, property of the estate . . ."  Moreover, Section 14 of the First

23  Amendment provides as follows:

24          Assignment and Subletting.    Section 12.4 of the Lease is hereby deleted in its
          entirety.  Landlord acknowledges and agrees that Tenant has sublet the Premises to
25          WERM, and **Landlord hereby approves of and accepts WERM as a sublessee of**
          **the Premises**.  *(emphasis added)*
26

27  *[First Amendment, Section 14]*

28          Accordingly, this Court can and should authorize the Debtor to enter into the Revised Lease

with WERM.

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

## VII. ALTERNATIVELY, THE DEBTOR MOVES TO EXTEND THE TIME TO ASSUME OR REJECT THE UNEXPIRED NON-RESIDENTIAL LEASES AND EXECUTORY CONTRACTS

Should the Court require further evidentiary hearing and determine an extension necessary, the Debtor alternatively moves to extend the time to assume or reject the unexpired non-residential leases and executory contracts on the grounds that good cause exists. The current deadline for the Debtor to assume or reject is up to and including December 19, 2019. The Debtor seeks to extend that deadline through March 18, 2020 (which is within the 210 days mandated by statute).

Extensions of the deadline to assume or reject unexpired leases of non-residential real property are governed by Bankruptcy Code§ 365(d)(4)(A)-(B) (as modified by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005), which provides that:

> (A)    Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of — (i) the date that is 120 days after the order for relief; or (ii) the date of the entry of an order confirming a plan.

> (B)(i)    The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

> (ii)    If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

Thus, the Court may, for cause, order a 90-day extension of the period during which the Debtor may assume or reject nonresidential real property lease upon the filing of a motion for such relief.

Courts determine whether or not cause exists to extend the time within which a debtor may assume or reject its nonresidential real property leases by considering all of the particular facts and circumstances of the case. *In re Southwest Aircraft Services, Inc.*, 831 F.2d 848, 854 (9th Cir. 1987). Courts routinely grant extensions of the assumption or rejection period. In re Victoria Station, Inc., 875 F.2d 1380, 1384-86 (9th Cir. 1989) (aff'd extensions of section 365(d)(4) period.) Although the term "cause" as used in Section 365(d)(4) is not defined, "a great deal of discretion is left to the

1    Court to weigh all relevant factors related to the requested extension." *BC Brickyard Assocs., Ltd. v.*

2    *Ernest Home Ctr., Inc. (In re Ernest Home Ctr., Inc.)*, 221 B.R. 243,253 (9th Cir. B.A.P. 1998)

3    (Russell, J. concurring) (discussing the factors for cause considered by the Courts). Such factors

4    include prejudice to the parties and the complexity of the case. See, *Theatre Holding Corp. v.*

5    *Mauro*, 681 F.2d 102 (2d Cir. 1982); *In re Victoria Station, Inc.*, 88 B.R. 231,236 (9th Cir. B.A.P.

6    1988), aff'd, 875 F.2d 1380 (9th Cir. 1989); *In re Wedtech Corporation*, 72 B.R. 464, 471-473

7    (Bankr. S.D.N.Y. 1987).

8        In assessing whether or not cause exists to warrant an extension of the deadline of

9    Bankruptcy Code § 365(d)(4), the Ninth Circuit has directed courts to consider the following factors:

10       (1) whether the leases in question are primary assets of the debtor, (2) whether the lessors

11   continue to receive rental payments; (3) whether the case is exceptionally complex and/or involves a

12   large number of leases; and (4) whether properties remain vacant, thereby affecting neighboring

13   tenants. *Willamette Water Front Ltd. v. Victoria Station (In re Victoria Station)*, 88 B.R. 231, 236 at

14   n. 7. (9th Cir. 1989), aff'd, 875 F.2d 1380 (9th Cir. 1989); accord, *In re Perfectlite Co.*, 116 B.R. 84

15   (Bankr. N.D. Ohio 1990); *In re Wedtech Corp.*, 72 B.R. 464, 471-73.

16       In enacting Bankruptcy Code§ 365(d)(4), Congress did not alter the considerations relevant

17   to extensions of the time period for assumption or rejection of leases. Furthermore, no Ninth Circuit

18   decision contains a bright line rule for the extension of the 120-day period. However, a decision in

19   the Eastern District of Missouri contains comprehensive criteria for extending the time to assume or

20   reject commercial leases and is instructive in the instant case.

21       *In re S&M Food Services, Inc.*, 117 B.R. 497 (Bailiff. E.D. Mo. 1990), the debtor moved to

22   extend the time to assume six commercial leases over the objections of the various lessors. The

23   Court granted an extension to assume or reject. In so holding, the Court set forth the factors and

24   criteria to be considered, which as set forth below as these factors apply to the Debtor herein.

25   a)    The Lease and Sublease are the primary assets of the Debtor. In the instant case, the Lease

26   and Sublease are integral to the reorganization and ability to satisfy the claims of creditors. As

27   stated, the subtenant operates a highly successful entertainment venue, which is highly profitable.

28   b)    The Lease and the Sublease provide the location for very popular and highly successful

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

entertainment venue. The underlying business cannot operate without the Lease and Sublease.

c)      The Debtor filed its Case on August 21, 2019, less than 60 days ago. Because this case is still in its early stages, it would be not be unreasonable to grant an extension.

d)      The Debtor is the holding company for the Lease and sublets the leased Premises to the related subtenant under a Sublease, which operates a highly successful and profitable entertainment venue employing nearly a hundred people.

e)      The Debtor has already communicated its intention to assume the Lease and Sublease through the filing of this Motion.  Therefore, the Landlord will not suffer unnecessary harm or undue prejudice if it is necessary to extend the period to assume or reject to accommodate an evidentiary hearing if necessary, which necessity is under the control of the Landlord.  In other words, the extension is unnecessary if the Landlord does not oppose assumption.

Based upon factors set forth in *S&M Food Services*, the Debtor has met the applicable requirements for the Court to grant an extension of the 120-day period pursuant to Bankruptcy Code § 365(d)(4). Other than the inconvenience of delay, there will be no material prejudice to the Landlord, as a result of the requested extension. Therefore, the extension is appropriate and should be granted.

**VIII.   CONCLUSION**

For the reasons set forth herein, the Debtor respectfully requests that the Court grant the Motion to assume the Lease and Sublease pursuant to Bankruptcy Code § 365, authorizing the Debtor to assume the Lease, as modified by the First Amendment and any and all options and extensions thereunder and related thereto for the Premises; authorizing the Debtor to assume the Sublease and any extension thereto for the Premises; authorizing the Debtor to enter into an amended sublease with WERM which amends and extends the existing Sublease consistent with the term of the lease; and determining, as part of assumption of such Lease and Sublease, that the Debtor and WERM, as applicable, are not in breach of, and/or monetary or nonmonetary default under, the Lease and/or Sublease, thereby deeming them in compliance with Bankruptcy Code § 365(b)(1)(A) and excusing the Debtor from any additional compliance with § 365(b)(1)(B) and (C).

Alternatively, should it be necessary, the Debtor also respectfully requests that the Court find

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1  "good cause," for an order to extend the time to assume or reject the unexpired non-residential leases

2  and executory contracts from the current deadline of December 19, 2019 through and including

3  March 18, 2020.

4

5  DATED:  October 10, 2019                    LEECH TISHMAN FUSCALDO & LAMPL, INC.

6                                             By: /s/ Sandford L. Frey
                                               Sandford L. Frey
7                                              (Proposed) Reorganization Attorneys for
                                               Hawkeye Entertainment, LLC, Debtor and Debtor-in-
8                                              Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

**DECLARATION OF ADI MCABIAN**

I, Adi McAbian, declare as follows:

1.      I am the manager of the Debtor[1]. I manage the Debtor's day to day financial operations and am familiar with its business and operations. If called to testify, I could and would testify competently concerning the contents of this Declaration. My knowledge of the facts set forth herein is based on my personal knowledge of the Debtor's books and records as well as my observations of the Debtor's various assets.

2.      I make this declaration in support of the Debtor's Motion for an Order (1) Authorizing the Assumption of the Non-Residential Real Property Lease and Sublease; (2) Determining the Debtor and Sublessor Not to be in Breach or Default, Thereby Deeming Them in Compliance with Bankruptcy Code § 365(b)( 1 )(A) and Excusing the Debtor From Any Additional Compliance With § 365(b)( 1 )(B) and (C), and (3) Authorizing the Debtor to Enter Into a Revised Sublease that Amends and Extends the Sublease; or Alternatively, Extending the Time Period within Which the Debtor May Assume or   Reject Unexpired Non-Residential Leases and Executory Contracts ("Motion").

3.      The Debtor filed its voluntary petition for Chapter 11 under the United States Bankruptcy Code on August 21, 2019 ("Case" or "Chapter 11 Case").

4.      The Debtor is a California limited liability company. The Debtor's most valuable asset is the Lease for the Premises for the first four floors and a portion of the basement of the real property commonly known as the Pacific Stock Exchange Building located at 618 S. Spring Street, in Los Angeles, California ("Building").  By the terms of the Lease for the Premises, the Debtor is entitled to use the first four floors and part of the basement of the Building, which is in turn leased to a related company, WERM, that operates a thriving business. The Premises are located in the twelve-floor Building (excluding the basement) on Spring Street. [The Building, excluding the Premises used by the Debtor, is hereafter referred to as the "Tower"].

5.      The Debtor is a holding company for the Lease, which is sublet to a related entity.

---

[1] Capitalized terms shall have the meaning ascribed to them in the Notice and Motion, unless defined otherwise in this declaration.

1

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1  The Debtor's successful reorganization is dependent upon the assumption of the Lease and Sublease

2  for the Premises.

3       6.     The Debtor subleases the Premises to W.E.R.M. Investments, LLC ("WERM"),

4  which operates a popular and highly successful entertainment venue, which has been operating, and

5  continues to operate successfully, from the Premises. A true and correct copy of the Sublease is

6  attached to the Motion as ***Exhibit C*** and incorporated herein by this reference. A true and correct

7  copy of the First Amendment is attached to the Motion as ***Exhibit B*** and incorporated herein by this

8  reference. WERM books the venue for music events, private parties, corporate events, live

9  entertainment, fashion shows and more.  In connection with the business operations, the event venue

10  regularly employs approximately fifty to seventy regular employees and independent contractors, as

11  well as an additional approximately twenty security guards, six valet attendants and thirty marketing

12  team members (which varies depending on the events).  Literally thousands of people wait in line to

13  pass the rigorous security clearance in order to enter a venue that features some of the most sought-

14  after DJ's and Producers in the World as evidenced by the fact that the event venue is ranked in the

15  top 20 entertainment venues in the World.

16       7.     On or about July 17, 2009, the Debtor initially entered into the 2009 Lease for the

17  Premises with an entity known as Pax America Development, LLC ("Pax").  In reliance upon its

18  leasehold interest, millions of dollars in improvements to the Building and Premises were made on

19  behalf of the Debtor.  The Debtor was also compelled to spend millions of additional dollars and

20  incur significant additional liability for repairs, and City of Los Angeles code compliance.  It did so,

21  even though it was the responsibility of the prior landlord, Pax, and its successor under its

22  commercial Lease, to undertake these efforts.

23       8.     It is my understanding that the Tower cannot be occupied or used pursuant to signed

24  covenant. Despite that, it is my understanding that the Tower area must nevertheless be in

25  compliance with certain health, safety and fire regulations in order for the Debtor to operate the

26  business from the Premises on the first four floors of the Building.  An Order to that effect was

27  issued by the City of Los Angeles under the High Rise Retrofit Ordinance in 1989; but, was not

28  complied with until the Debtor completed the necessary work in 2010.

2

9.      In other words, it is my understanding that the Tower must comply with certain safety regulations despite that customers of the business may not use the Tower. For example, operating sprinkler systems, fire alarms and fire doors are required in portions of the Tower in case a fire should breakout in the upper floors while patrons are attending the event venue on the first four floors operated by the Debtor. Safety features, such as "Exit" signs, are also required for the safety of firemen, inspectors, workmen and others entering the Tower.

10.     A true and correct copy of the 2009 Lease is attached to the Motion as ***Exhibit A*** and incorporated herein by this reference.  Pursuant to Paragraph 5.8 of the 2009 Lease, it was the responsibility of the Pax and its successors to retrofit, repair and maintain the Tower and the integrated systems for the benefit of the Debtor's continued use and occupancy of the Premises as well as the health, safety and welfare of the customers of the operating business.  It was confirmed in a later amendment that it was the exclusive expense of Pax and its successors.

11.     In addition, among other breaches, the lessor also failed to pay or reimburse the Debtor the contractual Tenant Improvement Allowance. The original lessor, Pax, and its successor, New Vision Horizon, LLC ("NVH"), had failed to perform or pay for required work, and were in material default of the Lease.  The Debtor was thus required to pay for repairs to the Building in order to bring it into compliance, which was the responsibility of the lessor, and for which the lessor historically dragged its feet in making the required repairs. The lessor's defaults required the Debtor to step in to perform and pay for the necessary work to the portions of the Building which were the responsibility of the lessor for the protection of the operating business; the health, safety and welfare of patrons; and, the protection of the Debtor's substantial investment. In all, the Debtor had invested well-over $3,500,000.00 into improvements to the Building of which over $1,500,000.00 was the responsibility of the lessor. By way of example, the Debtor was compelled to purchase and install a fire pump and sprinkler system required for the Building, which cost approximately $250,000.00.

12.     Although the Debtor attempted to resolve this situation amicably, Pax defaulted on numerous settlement agreements.  In addition, Pax fell into default under its loan with Pax's lender. Following a number of serial bankruptcy filings by Pax and related entities which, to the best of my knowledge and belief, were determined to be in bad faith, NVH, whose managing member, to the

3

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1  best of my knowledge and belief, is Michael Chang, purchased the note from Pax's lender for

2  approximately $2.7 million, and then foreclosed on Pax's interest in the Building.  At some point

3  after 2014, NVH apparently transferred its interest in the Lease to the Landlord, whose principal is

4  also Mr. Chang.

5         13.     The 2009 Lease and its addendums provided, among other things, for:  (a) prepaid

6  rent (which was delivered) and rent abatements and rent credits totaling fourteen (14) full calendar

7  months after the "Rent Commencement Date" (as then defined in the 2009 Lease); (b) payment by

8  Pax of $540,000 to the Debtor as a Tenant Improvement Allowance (Section 5.2 of the 2009 Lease

9  and Section 1.4 to Exhibit D of the 2009 Lease); and (c) payment by Pax of $1,100,000 to the Debtor

10  as reimbursement for the Required Retrofit Work performed by the Debtor.

11         14.     Pax, and thereafter NVH, failed to pay the Debtor the Tenant Improvement

12  Allowance as required by the 2009 Lease, and failed to reimburse the Debtor for the Required

13  Retrofit Work performed by the Debtor, among other breaches of the 2009 Lease.  Despite the many

14  breaches by Pax and NVH, and after many delays and conditions resulting therefrom, the Debtor

15  eventually managed to obtain, at great expense to itself, a Certificate of Occupancy from the City of

16  Los Angeles for the operation of the venue and business.

17         15.     As a result, the Debtor commenced several lawsuits to pursue its claims against Pax

18  and NVH ("Prior State Court Actions").  Before the Debtor's rights could be adjudicated in the Prior

19  State Court Actions, NVH, through Mr. Chang, served a Five-Day Notice in order to terminate the

20  2009 Lease (as then amended) and the Debtor's right to possession.  In response, the Debtor elected

21  to file for protection under Chapter 11 on September 30, 2013, which was assigned case number

22  1:13-bk-16307-MT ("Prior Chapter 11 Case").

23         16.     After the petition date of the Prior Chapter 11 Case, the Debtor sought to assume the

24  2009 Lease and pursue its claims against the Landlord's predecessor, NVH.  After numerous

25  contested proceedings and substantial discovery, on July 29, 2014, the Landlord and the Debtor

26  attended mediation with retired former Bankruptcy Judge, the Honorable Mitchel R. Goldberg

27  ("Mediation").  Although NVH and the Debtor were not initially successful in settling their disputes

28  at the Mediation, significant progress was made toward consensual resolution.  Due to the progress

made at the Mediation, the parties continued negotiations subsequent to the Mediation, which resulted in a global resolution, whereby the Debtor's claims were allowed through offset and rent credit, and the 2009 Lease was assumed, subject to certain modifications to the 2009 Lease requested by NVH.  The settlement was memorialized in a series of documents, including, (i) the First Amendment [*Exhibit B*]; (ii) the New Vision Assumption Stipulation, a true and correct copy of which is attached to the Motion as ***Exhibit I*** and incorporated herein by this reference; (iii) the New Vision Assumption Order, a true and correct copy of which is attached to the Motion as ***Exhibit J*** and incorporated herein by this reference; (iv) the Global Settlement Agreement, a true and correct copy of which is attached to the Motion as ***Exhibit K*** and incorporated herein by this reference; and (v) the New Vision Settlement Order, a true and correct copy of which is attached to the Motion as ***Exhibit L*** and incorporated herein by this reference.

17.    The Debtor is current with all of its monetary obligations under the Lease since the Rent Commencement Date (as defined in the First Amendment) through the Petition Date, or that the Debtor continues to be current since the filing of the Petition in this Case.

18.    On August 5, 2019, the Landlord suddenly delivered a letter alleging various nonmonetary defaults, most of which lacked specificity as to the exact nature of such defaults, with a 15-day cure deadline.  A true and correct copy of the August 5, 2019 Letter is attached to the Motion as ***Exhibit D*** ("August 5 Default Letter") and incorporated herein by this reference.  This is the first notice that I am aware of from the Landlord relating to such alleged defaults.

19.    I had no prior knowledge or notice of the Landlord's claims before receipt of the August 5 Default Letter, and neither did any other member of the Debtor to the best of my knowledge and belief.  Moreover, I am unaware of any citation from any governmental authority (which would typically be the entity citing and enforcing such alleged violations) of the purported defaults asserted in the Landlord's August 5 Default Letter.  On the contrary, to the best of my knowledge and belief, this letter was the first such notification, whether written or oral, in which the Landlord claimed the existence of nonmonetary defaults.

20.    In response to the Landlord's August 5 Default Letter, William McAbian and I made numerous attempts to reach the Landlord's principal, Mr. Chang, to obtain more specificity as to the

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

5

1    alleged defaults and discuss the allegations.  All of those were unsuccessful.  Having been unable to

2    obtain specificity from the Landlord despite repeated attempts, on August 19 (within the 15-day

3    period), the Debtor served its written response to the Landlord's contentions, a true and correct copy

4    of which response is attached to the Motion as ***Exhibit E*** ("Debtor's August Response") and

5    incorporated herein by this reference.  As part of the Debtor's August Response, and despite the

6    Debtor's categorical disagreement with the Landlord's claims and contentions contained in the

7    August 5 Default Letter, within the 15-day cure period, we complied with the Landlord's demands

8    as to those items capable of being performed within 15 days and commenced compliance with those

9    items which required longer than 15 days.  We also notified the Landlord of the same.  The Debtor

10   requested further clarification as to several of the Landlord's comments.  To date, to the best of my

11   knowledge and belief, no response has been forthcoming from the Landlord.

12       21.    The August 5 Default Letter contended that there are emergency fire doors that are

13   allegedly not equipped with required safety equipment.  To the best of my knowledge and belief, the

14   Debtor has received no such notice from the Fire Department and is unaware of any such issues on

15   the Premises.  Prior to the Petition Date, we notified the Landlord that the Debtor was unaware of

16   any emergency fire doors on the Premises that are allegedly not equipped with required "safety

17   equipment."  Moreover, we notified the Landlord that the Debtor was willing to commence any

18   corrections required, and the Debtor requested that the Landlord specify the location of the fire doors

19   to which the Landlord was referring, and whether such doors are within the Premises leased by the

20   Debtor or within the Building under the control of the Landlord.  On behalf of the Debtor, we made

21   several inquiries inquiring as to the exact location in the Building where the "safety equipment" that

22   the Landlord alleged is required to be installed and is allegedly not installed.  To date, the Landlord

23   has never responded to any of these inquiries to the best of my knowledge and belief.

24       22.    With respect to alleged nonmonetary default that alcohol is allegedly being sold in the

25   ground floor lounge (Item 1 of the August 5 Default Letter), I have confirmed that currently there is

26   no alcohol being sold on the ground floor lounge.  To that end, William McAbian and I requested

27   several times that the Landlord advise the Debtor as to the dates of events held by WERM during

28   which the Landlord alleges that there was alcohol service in the ground floor lounge area.  To date,

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

6

1   to the best of my knowledge and belief, the Landlord has never responded.  Regardless, I advised the

2   staff of WERM not to permit alcohol service in the ground floor lounge area.

3         23.    With respect to the allegation regarding timely removal of graffiti (Item 2 of the

4   August 5 Default Letter), I have reviewed Section 2.1 of the 2009 Lease which defines the Premises

5   as those floors and areas depicted on the Site Plan attached to the 2009 Lease.  The Building (as

6   defined in the Lease) includes the exterior walls, including those immediately adjacent to the

7   Premises, and specifically excludes the exterior walls of the Building from the Premises.

8         24.    I am also familiar with Condition No. 4 [each "Condition" herein referring to City of

9   Los Angeles, Department of City Planning, Office of Zoning Administration conditions on Case No.

10   ZA 1995-0830(CUB)(PA4) dated February 25, 2013], which specifies, as a condition of occupancy

11   of the "site" (e.g., the Premises) that "[A]ll graffiti on the site shall be removed or painted over to

12   match the color of the surface to which it is applied within 24 hours of its occurrence".  With respect

13   to alleged default (2) and noting that WERM removes graffiti within the Premises and surrounding

14   area, the areas of the Building excluded from the definition of the Premises are the responsibility of

15   Landlord related to common area maintenance.  Nevertheless, I have seen to it that the Debtor timely

16   and attentively removed graffiti from the Building area as well, even though that it is solely the

17   obligation of the Landlord.

18         25.    Furthermore, I have personally inspected the Premises and there is no graffiti as of

19   the date of this declaration.  I further requested in writing that the Landlord point out the area to

20   which he was referring in the August 5 Default Letter.  To date, the Landlord has not responded to

21   the best of my knowledge and belief.

22         26.    With respect to alleged nonmonetary default (Item 3 of the August 5 Default Letter), I

23   am uncertain as to the basis for the Landlord's allegation that the Debtor/WERM are making use of

24   14,006 square feet.  Accordingly, I caused the Debtor to request in writing that the Landlord provide

25   the basis for its calculation supporting its claim that the Debtor/WERM is allegedly using 14,006 sf

26   of public space and 12,849 sf of office space.  I caused the Debtor to request that the Landlord

27   provide a mark-up of the floor plans of the Premises reflecting such alleged use. To date, to the best

28   of my knowledge and belief, the Landlord has failed to respond to any of these requests by the

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

7

1    Debtor.  Regardless, I have advised WERM and its staff, and WERM has confirmed to me, that there

2    is no service permitted in the gallery area (which I surmise is the area in the Building that the

3    Landlord has included in its calculation above).

4         27.    With respect to alleged nonmonetary default relating to Condition No. 8 of the CUB

5    (Item 4 of the August 5 Default Letter), I have personal knowledge of the fact that WERM is not

6    exceeding the authorized number of "all-ages events" and that WERM has not failed to provide

7    requisite notice to the Los Angeles Police Department.  Nevertheless, I caused the Debtor to request

8    that the Landlord advise it of the dates and nature of all "all-ages events" conducted or permitted by

9    WERM during each of the last three (3) years and identify each instance in which WERM had not

10   provided the Los Angeles Police Department notification of such events. To date, to the best of my

11   knowledge and belief, the Landlord has failed to respond to any of the Debtor's requests in this

12   regard.

13        28.    With respect to alleged nonmonetary default concerning the Building façade (Item 5

14   of the August 5 Default Letter), I have reviewed Condition No, 22 of the CUB, which provides in

15   pertinent part that "[n]o alteration shall be made to the building façade pursuant to ZAI 145 (I-

16   1000)" which prohibits signage "placed on" the façade unless approved by the Cultural Heritage

17   Commission or the Department of City Planning, Office of Historic Resources.  No alteration to an

18   exterior wall or face of the Building or its design elements (e.g., the "façade") have been made by

19   the Debtor or WERM.  The issue raised by the Landlord for the first time in the August 5 Default

20   Letter related to the Debtor's banner, which had been hanging outside the Building for nearly ten

21   years without citation and without complaint by the Landlord.

22        29.    Moreover, I am not aware of any objection by either the Los Angeles Conservancy or

23   the Office of Historic Resources to use of the banner.  Nonetheless, the August 5 Default Letter

24   suddenly claimed that the banner constituted an alleged alteration to the Building façade purportedly

25   in violation of historical restrictions.

26        30.    Faced with this threat of the August 5 Default Letter, and pending reverification from

27   the Los Angeles Conservancy and the Office of Historic Resources, I caused the Debtor to remove

28   the banner in response to the Landlord's sudden claim that the banner was improperly attached to the

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

8

Building façade (which it was not) and therefore constituted an alleged alteration to the Building façade (which it is not). I also caused the Debtor to notify the Landlord of its removal.

31.    After the August 5 Default Letter, the façade and banner have been re-inspected; and, the Debtor has received written confirmation from the Los Angeles Conservancy that the banner was not in violation. I was present during the inspection on August 27, 2019. I do not believe there is any objection to the banner. I base that belief on my discussions with the Los Angeles Conservancy, including, ***Exhibit G***, attached to the Motion and incorporated herein by this reference, which is a true and correct copy of a correspondence dated September 6, 2019 from the Los Angeles Conservancy ("Conservancy Letter") verifying that there is no objection to use of the banner, stating in pertinent part:

> On August 27, Adrian Scott Fine, Director of Advocacy, and I met with Adi McAbian during our annual conservation easement inspection. At that time we discussed the use of hanging banners on the building's Spring Street façade and the potential impacts on our easement agreement. **After inspecting the existing attachments, the Los Angeles Conservancy does not find issues with the use of signs in their current locations when utilizing the existing attachments**.
> *[emphasis added]*
>
> [Conservancy Letter, Exhibit G]

32.    Although the banner has been removed from the Building by the Debtor under protest and a reservation of rights, the Los Angeles Conservancy has now again confirmed that the Debtor's use of the banner was not a violation. Therefore, I believe the Landlord's notice of that purported default to be inaccurate and wrongful. There is a façade easement granted in favor of the Los Angeles Conservancy. The banner is not affixed to the façade (instead it is attached to eyehooks that have been in place since prior to the Debtor's 2009 Lease). The banner has been in place for nearly ten years and neither I, nor to the best of my knowledge any representative of the Debtor or WERM are aware of any claim by the Office of Historic Resources that the banner is a violation. Nevertheless, to show good faith, I caused the Debtor to invite the Landlord to explain the basis for its contention that a banner advertising the Premises or an event at the Premises is not compliant with Section 9.2(b) of the 2009 Lease, as well as the basis for the Landlord's contention that the banner is improperly "affixed to" or "placed on" the façade thereby constituting a default under the

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

9

1  Lease.  To the best of my knowledge and belief, the Landlord has failed to respond to any of the

2  Debtor's requests in this regard.

3       33.       I have reviewed Condition No. 45 of the CUB, which states that doors to VIP Rooms

4  "shall be constructed of clear glass."  From the outset, it should be made clear that I am not aware of

5  any VIP Rooms maintained by WERM.

6       34.       There is the Skyloft room located on the Premises, which is the area to which I

7  assume the Landlord is referring.  Recognizing that public safety is the primary concern of this

8  condition, the Los Angeles Historical Society, City's Department of City Planning, Department of

9  Building & Safety, Department of Public Health, and the Los Angeles Police Department have, for

10  nearly ten years, acknowledged the substitution of security cameras and the hiring of security guards

11  at the Skyloft room in lieu of such doors, as being compliant with the condition stated in the use

12  permit.  To that end, to the best of my knowledge and belief, the Debtor and WERM have not been

13  cited for any violation of the use conditions imposed on Case No. ZA 1995-0830(CUB)(PA4) dated

14  February 25, 2013 as provided for under the Municipal Code and in the use conditions themselves

15  (including Condition No. 45).  Given that there has been City acknowledgment of the equivalent

16  protection provided by the security cameras and security guards, and that no citation has been issued,

17  I do not believe that there is any merit to the Landlord's "failure to comply with law" claim, or any

18  contractual breach.

19       35.       Nevertheless, I caused the Debtor to commence taking bids for doors with clear glass

20  within the fifteen-day notice period provided under the August 5 Default Letter.  The doors have

21  been ordered based on my approval, and delivery and installation is expected shortly.

22       36.       The August 5 Default Letter erroneously contended that the use of the Premises by

23  the Fearless LA Church ("Church") was in violation of the CUB and further contended that it

24  constitutes an unapproved sublease; both contentions are wrong. The intended use under the Lease

25  and the entirety of WERM's business is to operate the Premises as an event venue whereby it books

26  the venue for events, music events, private parties, corporate events, live entertainment, fashion

27  shows and more. To that end, the CUB permits the facility to be booked for 50 yearly all ages

28  events.  I have personal knowledge of the agreement between WERM and the Church.  I intended

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

10

the agreement between WERM and the Church to be an event agreement, not a sublease or assignment.

37.    Nevertheless, WERM suspended its event agreement with the Church to make use of the Premises for religious services on Sundays in response to the Landlord's August 5 Default Letter.  Inasmuch as the Church did not use the facility every week during the year, the 50 per year limitation on all ages events was not violated.  Moreover, I am advised that the Los Angeles Police Department has no objection to the use by the Church for religious services. I re-verified with the Los Angeles Police Department that the City has no objection to the arrangement with the Church. Attached to the Motion as ***Exhibit F*** and incorporated herein by this reference is a true and correct copy of a correspondence from the Los Angeles Police Department, verifying that the City has no objection to continued use by the Church.

38.    Regardless, faced with the August 5 Default Letter (coupled with the Landlord's refusal to discuss the situation), and under protest and a reservation of rights, I caused the Debtor/WERM to notify the Church (within the 15 day period imposed by the August 5 Default Letter) that we could no longer accommodate Church services.  The Church is not currently using the Premises for its religious services.

39.    The relationship between WERM and the Church is not an assignment or a sublease, but rather an event agreement.  Here, the Church's arrangement was a week-to-week arrangement that permitted it to make use of only a portion of the Premises for limited number of hours on Sunday to conduct religious services when the Premises were not otherwise in use by WERM for other events.  WERM retains the exclusive right to use of the Premises, including Sundays, and WERM was able to use the Premises to the exclusion of the Church on any Sunday in which it had another event. This week-to-week arrangement has been in place for nearly six years.  WERM often subsidized a portion of the costs incurred by the Church.

40.    Regardless, the Debtor/WERM invited the Landlord to provide the legal and factual basis for its contention that use of the Premises by the Church was pursuant to an assignment or subletting.  No explanation or justification has thus far been forthcoming.

41.    The Debtor had been asked to provide an Estoppel Certificate and Subordination

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

11

1  Agreement to the Landlord's lender.  However, the Landlord's contention that the Debtor refused, is

2  entirely inaccurate.  Consistent with its obligations under the Lease, the Debtor was and remains

3  willing and able to provide a subordination agreement (that is *reasonably acceptable* to the Debtor,

4  that includes a *non-disturbance*) and an estoppel certificate (*specifying* the *defaults* that exist).  To

5  that end, due to the condition of the Building, electrical wiring and other issues, the Debtor requested

6  reasonable changes to the documents and provided multiple drafts of subordination and estoppel

7  certificates which were reasonably acceptable to the Debtor and specified items required under

8  Section 18.3.

9      42.    In response to the August 5 Default Letter, the Debtor once again offered to provide

10  the Landlord with a subordination agreement and an estoppel certificate.  In the Debtor's August

11  Response, the Debtor once again delivered the drafts of the subordination agreement and estoppel

12  certificate in the form of ***Exhibits M*** and ***N***, true and correct copies of which are attached to the

13  Motion, and invited comment. The Landlord never responded to the Debtor's tender, to the best of

14  my knowledge and belief.

15      43.    Despite its disagreement with each and every allegation contained in the August 5

16  Default Letter, the Debtor (under a reservation of its rights and pending further discussion) complied

17  with the Landlord's demands as to those items capable of being performed within 15 days, and

18  commenced compliance with those items which required longer than 15 days.  To that end, the

19  Debtor promptly notified the Landlord in writing of the same.

20      44.    Nevertheless, once again without warning or prior discussion, and <u>prior to expiration</u>

21  <u>of the 15 day notice period</u>, the Landlord surreptitiously slipped under the door of the Debtor's

22  business office a document entitled *3 Day Notice to Perform Conditions and Covenants or Quit*, a

23  true and correct copy of which is attached to the Motion as ***Exhibit H*** ("<u>Three Day Notice</u>"), which

24  purports to declare the Debtor and WERM in default and declare a forfeiture of the Lease and

25  Sublease.

26      45.    The purported defaults regarding the (a) fire door issues, (b) usable area, (c) the

27  banner, (d) the glass doors and (e) the arrangement with the Church (collectively referred to as the

28  "<u>Preexisting Nonmonetary Conditions</u>") are all conditions that predate the settlement with the

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

12

Landlord in the Prior Chapter 11 Case.  In other words, those Preexisting Nonmonetary Conditions were all in existence long before the Debtor and the Landlord entered into the New Vision Settlement Documents, and pursuant to assumption in the Prior Chapter 11 Case were not required to be "cured" and were in essence deemed not to be matters of default.

46.    Due to short notice period and the potentially devasting impact of the Three Day Notice on the right to possession of the Debtor and its subtenant pursuant to applicable law in the Ninth Circuit, the Debtor did not have adequate time to seek judicial intervention and/or reopen its former bankruptcy case and seek relief from this Court.  In order to preserve its right to possession under applicable Ninth Circuit law, protect its most valuable assets -- its Lease and Sublease -- and therefore protect the operating business, the rights of numerous creditors and interested parties, and indirectly the jobs of WERM's numerous employees, the Debtor has been forced to file this chapter 11.

47.    In this case, the Debtor has exercised its business judgment and has concluded that the assumption of both the Lease and Sublease are necessary in order to preserve its most valuable asset and income by permitting WERM to continue its business operations at the Premises. The assumption of the Lease and Sublease is not only beneficial to the bankruptcy estate; it is also beneficial to the creditors of the estate.  Preservation of the value of the Lease and the income derived from continued operations of the entertainment venue at the Premises are entirely dependent upon the Debtor's assumption of the Lease and Sublease.  The Debtor has timely performed all of its post-petition obligations under the Lease and Sublease.

48.    In order to obtain and book the type of talent that will draw the large crowds to the entertainment venue, WERM must engage in negotiations and discussions with prospective talent (DJ's and Producers) numerous months to over a year in advance of the actual scheduled appearance. Once the talent is booked, WERM needs sufficient lead time to promote that scheduled appearance through advertising, marketing and social media. Thus, it is essential that the Debtor is able to give assurances to WERM and in turn both the talent and public that the Premises will be available at the time of the performance. For these reasons, assumption of the Lease and Sublease are necessary at this time so that the Debtor can provide those assurance.

13

1       49.     Moreover, the entertainment venue at the Premises is being successfully operated by

2   the subtenant. The Debtor's Sublease with the subtenant is an integral part of the operations of the

3   Premises as an entertainment venue. Pursuant to its business judgment, the Debtor's assumption of

4   the Lease and Sublease are in the interests of the Debtor and the creditors of the estate.

5          I declare under penalty of perjury under the laws of the United States of America that the

6   foregoing is true and correct, and that this declaration was executed on October 10, 2019 at Los

7   Angeles, California.

8                                    _____
                                      Adi McAbian
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

14

### DECLARATION OF WILLIAM F. BRESEE

I, William F. Bresee, declare as follows:

1.      I submit this Declaration in support of the Debtor's[1] Motion.

2.      I am an individual over the age of eighteen, and I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

3.      I am a partner in the law firm of Leech Tishman Fuscaldo & Lampl, Inc., which maintains an office at 200 South Los Robles, Suite 210, Pasadena, California 91101, among other locations in California and nationally.  I am an attorney licensed to practice law in the State of California.  My main practice areas are general business, corporate, construction and real estate.  In that regard, I have often been involved in the review of estoppel and subordination agreements, particularly in connection with my construction practice.

4.      After the Debtor was asked by the Landlord to provide an estoppel certificate and subordination agreement for the Landlord's lender, I was asked to review the documents and provide comments.  At all times, it was our goal to provide an estoppel certificate and subordination agreement for the Landlord that was reasonably acceptable to the parties, but that was not misleading as to the condition of the Building in general and its electrical system in particular.  Initially, I negotiated the documents directly with a representative of the Landlord.  I made changes to the documents that I believed reasonable under the circumstances and consistent with Section 18.3 of the 2009 Lease.  However, I also tried to make changes that were sensitive to the Landlord's relationship with its lender.  Thus, I attempted to make changes that were reasonably designed to avoid having the documents appear misleading as to the condition of the Building, while at the same time being sensitive to the Landlord's relationship with its lender. Eventually, the lender's counsel contacted me directly and we circulated multiple drafts of a subordination and estoppel certificate.  After numerous redline drafts were circulated and negotiations ensued, I suddenly stopped hearing from the lender's counsel.

5.      After several months, on or about May 2, 2019, my partner Sandford Frey received an

---

[1] Capitalized terms shall have the meaning ascribed to them in the Motion, unless otherwise defined herein.

1

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000

1    email correspondence from Robert Odson, informing us that his firm had been retained to represent

2    the Landlord in connection with the subordination and estoppel certificate.  At that time, Mr. Frey

3    once again involved me in those negotiations.  At first, Mr. Odson appeared quite anxious to finalize

4    the proposed documents.  I was again provided with a form subordination and estoppel certificate by

5    Mr. Odson, and once again my office forwarded redlined drafts of my requested changes.  Although

6    Mr. Odson and I disagreed as to the reasonableness of some of the requested changes, Mr. Frey and I

7    once again confirmed our intention and willingness to negotiate final agreements in good faith with

8    the Landlord's counsel which did not misrepresent the condition of the Building and its service

9    equipment and did not interfere with the relationship between the Landlord and its lender.  Before

10    the documents were finalized, we suddenly stopped hearing from Mr. Odson.  At my request, Mr.

11    Frey attempted to contact Mr. Odson and we were surprised at receiving no response.  The Landlord

12    having twice abandoned its request before the documents could be finally agreed upon, we

13    concluded that the Landlord's conduct suggested that it apparently no longer required the

14    documents.

15         6.      Attached to the Motion as **_Exhibits M_** and **_N_**, respectively, are true and correct copies

16    of the last drafts of my redlined changes to the proposed subordination agreement and estoppel

17    certificate.  We forwarded these drafts to the Landlord's counsel on June 3, 2019.  As stated, I

18    though the requested changes to be reasonable under the circumstances, as our instructions were to

19    negotiate with the Landlord in good faith and to that end we were and remain willing to consider any

20    reasonable changes in responses.

21         7.      To date, I have not received a response to the Debtor's requested changes to the

22    proposed subordination agreement and estoppel certificate.  Indeed, we heard nothing from anyone

23    concerning the issue until we received a copy of the August 5 Default Letter from our client.

24         I declare under penalty of perjury under the laws of the United States of America that the

25    foregoing is true and correct, and that this declaration was executed on October 9, 2019 at Pasadena,

26    California.

27

28              William F. Bresee

**DECLARATION OF SANDFORD L. FREY**

I, Sandford L. Frey, declare as follows:

1.    I submit this Declaration in support of the Debtor's[1] Motion.

2.    I am an individual over the age of eighteen, and I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

3.    I am a partner in the law firm of Leech Tishman, which maintains an office at 200 South Los Robles, Suite 210, Pasadena, California 91101, among other locations in California and nationally.  I am an attorney licensed to practice law in the State of California and in the United States Bankruptcy Courts for the Central District of California.

4.    On June 3, 2019, I submitted the Debtor's proposed comments to the Landlord's subordination agreement and estoppel certificate to counsel for the Landlord.  Having received no response from Landlord's counsel, on June 18, 2018, I again wrote to Landlord's counsel following up on the status of the Debtor's comments to the subordination agreement and estoppel certificate. True and correct copies of my June 3, 2019 and June 18, 2019 emails are attached collectively to the Motion as ***Exhibit O*** and incorporated herein by this reference.

5.    I heard nothing in response to the Debtor's comments until the Debtor received the August 5 Default Letter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on October 10, 2019 at Los Angeles, California.

/s/ Sandford L. Frey
Sandford L. Frey

---

[1] Capitalized terms shall have the meaning ascribed to them in the Motion, unless otherwise defined herein.

1

LEECH TISHMAN FUSCALDO & LAMPL, INC.
200 SOUTH LOS ROBLES AVENUE, SUITE 210
PASADENA, CALIFORNIA 91101
626.796.4000