# Exhibit A

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 2 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 62 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 42 of 85





## LEASE AGREEMENT

This Lease Agreement ("Lease") is entered into as of the date set forth in Section 1.1 by and between Landlord and Tenant.

### ARTICLE 1- BASIC LEASE PROVISIONS

1.1    Effective Date: *July 17th 2009*

1.2    Landlord: PAX AMERICA DEVELOPMENT, LLC, a California limited liability company.

1.3    Tenant:    HAWKEYE ENTERTAINMENT, LLC, a California Limited Liability Company.

1.4    Tenant's Trade Name: _____ (Article 9)

1.5    Premises: 618 S. Spring Street, 1st, 2nd, 3rd and 4th floors (existing nightclub space), Los Angeles, California 90004. (Article 2)

1.6    Floor Area of Premises: Approximately Twenty-Three Thousand (23,000) square feet which has been agreed upon as the usable square footage by the parties based upon architectural drawings, and shall be deemed conclusive for the purposes of this lease agreement and any subsequent assignments, extensions, options, or modifications. (Article 2)

1.7    Total Building Area: Approximately Seventy Thousand (70,000) square feet. (Article 2)

1.8    Tenant's Share of Common Area Costs: Thirty Percent (30%). (Article 11)

1.9    Tenant's Share of Property Taxes: Thirty Percent (30%) of the entire property taxes assessed on the Building payable every six (6) months. (Article 7)

1.10    Initial Term: Ten (10) Lease Years commencing on the Rent Commencement Date (as defined below). "Lease Year" as used herein means each of the consecutive twelve (12) calendar month periods during the Term beginning on the first day of the calendar month in which the Rent Commencement Date occurs, except that, if the Rent Commencement Date occurs on a day other than the first day of the month, the first Lease Year shall be deemed to be the first twelve (12) full calendar months after the Rent Commencement Date and the number of days occurring between the Rent Commencement Date and the first full calendar month thereafter. (Section 3.1)

1.11    Intentionally Deleted.

1.12    Rent Abatement: Minimum Rent shall be abated for the nine (9) full calendar months after the Rent Commencement Date.

1.13    Rent Commencement Date: The earlier of (i) Tenant's grand opening in the Premises, or (ii) the date on which all of the following has occurred: (a) Tenant has obtained the CUP (as defined in Section 5.3) and ABC License (as defined in Section 5.3) and sign off by LADBS, (b) Tenant has completed Tenant's Work, and (c) there exists no outstanding order against Landlord or the Building from



LA:17690509.3

7/17/09 03:37 PM

HAWKEYE 02179

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 3 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 63 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 43 of 85

any governmental or administrative agency preventing or materially interfering with Tenant's ability to conduct the Permitted Use in the Premises. (Article 3)

1.14   Minimum Rent: Minimum Rent shall be payable monthly in the amount of $27,500.00. Minimum Rent shall increase as of the commencement of each Lease Year ("Adjustment Date") determined by multiplying $27,500 by a fraction, the numerator of which is the CPI (as defined in Section 22.11(c)) published three (3) months before the Adjustment Date and the denominator of which is the CPI published three (3) months before the Rent Commencement Date; provided, however, that in no event shall the Minimum Rent for any Lease Year exceed the Minimum Rent for the prior Lease Year by more than three percent (3%). (Article 6)

1.15   Percentage Rent: None.

1.16   Radius Restriction Area: None.

1.17   Use of Premises: The Premises shall be used solely for the operation of a nightclub, restaurant, entertainment venue and related lawful businesses along with the storage use (collectively, the "Permitted Use"). The Premises may not be used for any other purpose without the Landlord's prior written consent. (Article 9)

1.18   Insurance Limits: Not less than Two Million Dollars ($2,000,000.00) in single limit coverage per occurrence with an annual aggregate of not less than Four Million Dollars ($4,000,000.00) for bodily injury, personal injury, death and property damage liability with liquor liability and assault and battery coverage endorsements. (Article 13)

1.19   Security Deposit: Twenty-Seven Thousand Five Hundred Dollars ($27,500.00). (Section 22.2)

1.20   Guarantor(s): _William McAhin_ an individual.

1.21   Broker(s): None.

1.22   Notices (Article 21):

To Landlord:                                    To Tenant:

PAX AMERICA DEVELOPMENT, LLC        HAWKEYE ENTERTAINMENT, LLC
2333 Beverly Blvd.                              1242 Ventura Blvd. #212
Los Angeles, California 90057                Sherman Oaks, California 91423

Attn: Kevin K Choe                             Attn: _William McAhin_.

1.23   Options: Two (2) terms of Five (5) Lease Years each. (Section 3.2)

1.24   Prepaid Rent: Twenty-Seven Thousand Five Hundred Dollars ($27,500.00) applicable to Minimum Rent due for the first calendar month commencing after expiration of the Rent Abatement Period (as defined in Section 6.2).

1.25   Tenant Improvement Allowance: Five Hundred Forty Thousand Dollars ($540,000.00). (Article 5)

LA:17690509.5

7/17/09 03:39 PM

HAWKEYE 02180

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 4 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 64 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 44 of 85



If there is any conflict between any provisions contained in this Article 1 and the balance of this Lease, the provisions of this Article 1 shall control.

ARTICLE 2- PREMISES

2.1    Premises. Landlord leases to Tenant and Tenant leases from Landlord, for the "Term" (as defined in Article 3) and upon the covenants and conditions set forth in this Lease, the premises described in Section 1.5 ("Premises") and depicted on the Site Plan as the 1st through 4th floors of the Building, which Site Plan is attached hereto as Exhibit A and incorporated herein by reference. "Building" as used herein means the structure constructed in which the Premises is located pursuant to the terms hereof. Notwithstanding anything contained in this Lease to the contrary, the Premises shall be deemed to include the airspace within and the interior surfaces of the fixed ceiling, slab and exterior walls. The Premises does not include the roof, floor slab or foundations, or the structural or exterior walls which are immediately adjacent to the Premises. Tenant shall have the non-exclusive right to use the Common Area of the 1st Floor of the Building as provided in this Lease. Tenant shall also have the non-exclusive right to place equipment on the roof of the Building.

2.2    Reservation. Landlord reserves the right to use the exterior walls, roof and plenum in, above and below the Premises for the repair, maintenance, use and replacement of pipes, ducts, utility lines and systems, structural elements serving the Building and for such other purposes related to the maintenance of the Building as Landlord reasonably deems necessary. In exercising its rights reserved herein, Landlord shall not unreasonably interfere with the operation of Tenant's business on the Premises and shall, to the extent possible, limit the exercise of the foregoing right to such times as the business in the Premises is not open to the public.

2.3    Floor Area. The term "Floor Area," as used in this Lease, shall mean all areas designated by Landlord for the exclusive use of a tenant measured from the exterior surface of exterior walls (and extensions, in the case of openings) and from the center of interior demising walls, and shall include, but not be limited to, restrooms, mezzanines, warehouse or storage areas, clerical or office areas and employee areas. The Premises shall be deemed to contain the number of square feet of Floor Area specified in Section 1.6 of this Lease. Notwithstanding anything herein to the contrary, Landlord shall have the right at any time to re-measure the Premises and verify the actual Floor Area thereof. Even in the event the Floor Area of the Premises is determined by Landlord to be more or less than the Floor Area as specified in Section 1.6 of this Lease, the Minimum Rent and Additional Rent (as hereinafter defined) including, but not limited to, Tenant's Share of Common Area Costs and Tenant's Share of Taxes as provided under Section 1.8, Section 1.9 and Article 7 of this Lease, shall not be adjusted accordingly.

2.4    Building Area. The term "Building Area," as used in this Lease shall mean all areas of the Building where the demised Premises are located including, but not limited to, the demised Premises, other rentable areas in the Building and areas within the Building designated as Common Areas for use by any and all tenants in the Building measured from the exterior surface of exterior walls (and extensions, in the case of openings) and from the center of interior demising walls, and shall include, but not be limited to, restrooms, mezzanines, warehouse or storage areas, clerical or office areas and employee areas. The Building shall be deemed to contain the number of square feet of Total Building Area specified in Section 1.7 of this Lease. Notwithstanding anything herein to the contrary, Landlord shall have the right at any time to re-measure the Total Building Area and verify the actual floor area thereof. Even in the event the Total Building Area is determined by Landlord to be more or less than the Total Building Area as specified in Section 1.7 of this Lease, the Minimum Rent and Additional Rent, including, but not limited to, Tenant's Share of Common Area Costs and Tenant's Share of Taxes as provided under Section 1.8,



LA:176909599.5

7/17/00 01:36 PM

HAWKEYE 02181

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 5 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 65 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 45 of 85



Section 1.9 and Article 7 of this Lease, shall not be adjusted accordingly. Execution of this Lease by Tenant shall deem the Tenant's unequivocal acceptance of the Total Building Area as specified in this Lease.

2.5    Parking. Tenant acknowledges and agrees that this Lease does not include grant of parking spaces for Tenant of Tenant's patrons within the Building. Tenant shall be solely responsible to procure required parking spaces for the operation of Tenant's business during the term of this Lease.

2.6    Common Area Usage. Tenant shall have the non-exclusive right without additional payment to Landlord, and in common with all other tenants in the Building, to use the Common Area located on the exterior of the Building and the Common Area located on the first floor of the Building ("First Floor Common Area") identified by hatched mark in Exhibit A attached hereto and incorporated herein by reference. In addition, without additional payment to Landlord, the portion of the First Floor Common Area immediately left from the main entrance to the Building identified as the "Waiting Area" in Exhibit A is hereby designated as an area to be exclusively used by Tenant and its invitees, only during the Term, as Tenant's patrons' waiting area. None of the foregoing designated Common Areas shall be used by Tenant for any activity which generates any revenue in the said Common Area without the Landlord's prior written consent.

ARTICLE 3- TERM

3.1    Term. This Lease shall be effective from and after the Effective Date specified in Section 1.1. It is expressly acknowledged and agreed by the parties that this Lease and the terms and provisions hereof are binding in all respects when executed and delivered by the parties, notwithstanding that the Term does not commence and certain obligations, including the obligation to pay Minimum Rent, do not accrue until a later time as expressly provided elsewhere in this Lease. The initial term of this Lease ("Initial Term") shall commence on the Rent Commencement Date (as specified in Section 1.13). The Initial Term shall continue, unless sooner terminated in accordance with the provisions of this Lease, for the number of Lease Years specified in Section 1.10 from the Rent Commencement Date. Within ten (10) days after either party's request, the parties shall execute a certificate substantially in the form of Exhibit C attached hereto evidencing the Rent Commencement Date of this Lease. Notwithstanding anything in this Lease to the contrary, in the event Tenant elects, in its sole discretion, to open for business in the Premises prior to the satisfaction of all of the requirements of clause (ii) of Section 1.13, then the cost incurred by Tenant to comply with any special conditions imposed by any governmental agency due to any uncompleted highrise retrofit work set forth in Section 5.8 below, shall be Landlord's responsibility and Landlord shall reimburse Tenant for such cost within thirty (30) days after receipt of demand therefor and, in the event that Landlord fails to timely reimburse Tenant for such cost, Tenant shall be permitted to deduct such amount from Minimum Rent and Additional Rent next coming due under this Lease.

3.2    Options. Landlord grants to Tenant the options ("Option(s)") of extending the Initial Term for two (2) periods of five (5) Lease Years each (each such period is herein referred to as the "Extension Period" and collectively as the "Extension Periods") pursuant to the terms set forth herein. With respect to each Extension Period, Tenant may exercise the Option by giving Landlord written notice ("Option Notice") of Tenant's irrevocable exercise of the Option at least six (6) months in advance of the prospective Extension Period. If Tenant fails to timely provide any Option Notice to Landlord, such failure shall not in and of itself cause Tenant to forfeit its right to exercise the Option respecting the applicable Extension Period and, in such event, Tenant shall have thirty (30) days after receipt of written notice from Landlord of Tenant's failure to timely exercise the Option to deliver the Option Notice. If Tenant does not deliver the Option Notice to Landlord within said 30-day period, then Tenant's rights to the applicable Extension Period, as well as any subsequent Extension Period, shall terminate. Any Option shall immediately and automatically terminate and shall be of no further force or effect in the event that



LA:176905995

7/17/09 01:35 PM

HAWKEYE 02182

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 6 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 66 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 46 of 85

this Lease is terminated in accordance with the terms and provisions of this Lease. As used in this Lease, "Term" means the Initial Term plus any Extension Period(s) the Option(s) for which is (are) exercised by Tenant pursuant to this Section 3.2.

ARTICLE 4- POSSESSION

4.1    Turnover Date. The term "Turnover Date", as used in this Lease, shall mean the Effective Date. The Premises shall be available for Tenant's contractor to commence construction of "Tenant's Work" (as specified in Exhibit D) on the Turnover Date.

4.2    Delivery of Possession. Landlord shall deliver and Tenant shall accept possession of the Premises from Landlord upon the Turnover Date; provided, however, Tenant shall have no right to enter into possession of the Premises until Tenant has delivered copies of policies of insurance or certificates thereof (as required under Article 13). In addition Tenant shall not commence any of Tenant's Work until the following requirements have been satisfied:  (a) "Final Approved Plans" (as defined in Exhibit D) have been approved by Landlord pursuant to Exhibit D; (b) Tenant has delivered to Landlord a copy of Tenant's building permit, if issued by such date, and (c) Tenant has caused to be transferred to its name (and delivered written confirmation thereof to Landlord to the extent reasonably obtainable by Tenant from each applicable utility company) the utilities needed for Tenant to operate from the Premises from Landlord to Tenant. Tenant shall pay the Security Deposit (as specified in Section 1.19) and Prepaid Rent (as specified in Section 1.24) to Landlord on the date Tenant signs this Lease. Tenant agrees to accept possession of the Premises on the Turnover Date in its present "AS IS," "WHERE-IS" and "WITH ALL FAULTS" condition provided that the roof shall be in water-tight condition, and shall, subject to the terms and conditions of this Lease, hold Landlord harmless from any liability or claims relating to the condition of the Premises.

4.3    Landlord's Tender of Possession AS-IS. Tenant acknowledges that Tenant has had sufficient opportunity to inspect the Premises prior to execution this Lease. Tenant agrees, subject to Landlord's obligations under Sections 5.7, 9.5 and 10.1 and Exhibit D, to accept possession of the Premises on the Effective Date in its present condition "AS IS," "WHERE-IS" and "WITH-ALL-FAULTS."

4.4    Landlord Disclosures.  Tenant expressly acknowledges that Tenant has been made fully aware of the necessity for the Building in which the Premises are located to comply with the L.A. City High Rise Retrofit requirements respecting fire safety standards. Landlord has apprised Tenant of the current requirements as set forth by LADBS in its notice of violation dated December 10, 2006 stating that the Building is not up to current High Rise Retrofit standards. As a portion of this notice, Landlord has disclosed to Tenant the necessity for Fire Department approval of the compliance work. Landlord represents and warrants that no other notices of additional noncompliance or violations exist to Landlord's knowledge as of the Effective Date.

ARTICLE 5- TENANT'S CONSTRUCTION– TENANT CONSTRUCTION ALLOWANCE

5.1    Tenant's Construction. Tenant shall commence construction of Tenant's Work, if any, upon Landlord's delivery of possession of the Premises to Tenant, subject to the requirements of Section 4.2, and shall diligently prosecute same to completion. Tenant shall deliver to Landlord a copy of the certificate of occupancy for the Premises issued by the appropriate governmental agency upon completion of Tenant's Work.

LA:176905595.5

7/17/09 01:36 PM

HAWKEYE 02183

Case 1:19-bk-12102-MT   Doc 21-1   Filed 10/10/19   Entered 10/10/19 15:51:17   Desc
Exhibit Exhibits A - P   Page 7 of 132

Case 1:13-bk-16307-MT   Doc 343-3   Filed 01/05/16   Entered 01/05/16 18:45:32   Desc
Exhibit 4 to Part 2   Page 67 of 121

Case 1:13-bk-16307-MT   Doc 226-1   Filed 08/27/14   Entered 08/27/14 17:15:04   Desc
Exhibit A   Page 47 of 85

5.2    Tenant Improvement Allowance. Landlord shall, concurrently with the execution of this Lease, pay to Tenant the sum of FIVE HUNDRED FORTY THOUSAND DOLLARS ($540,000.00) as a Tenant Improvement Allowance. Tenant shall be permitted to use and apply the Tenant Improvement Allowance in any manner it elects.

5.3    Tenant Improvement Work. Tenant shall be solely responsible for performing or causing to be performed any and all tenant improvement work required by Tenant to be performed in the Premises in order to operate the Permitted Use, including, but not limited to, the procurement of a Conditional Use Permit ("CUP") from the appropriate governmental agencies for the use of the Premises as a nightclub and/or restaurant, and the procurement of the required ABC license ("ABC License") from the appropriate governmental agencies. Any proposed tenant improvement work must be pre-approved by Landlord in writing pursuant to Exhibit D, but approval of the same by Landlord shall not be unreasonably withheld.

5.4    Rights to CUP. The entire rights under the CUP shall belong to Landlord following the expiration of the Term or earlier termination of this Lease.

5.5    Tenant Improvement Work in the First Floor Common Area. Tenant shall be required, as a part of Tenant's Work, to remodel the First Floor Common Area including the main corridor and the bathrooms located on the first floor of the Building. Tenant shall complete the remodeling of the First Floor Common Area subject to the Landlord's prior approval of the plans therefore in accordance with Exhibit D. The workmanship and the materials utilized in the remodel of the first floor Common Area by Tenant shall be first-class and Tenant shall perform or cause such remodel to be performed at Tenant's sole expense (except to the extent that Tenant elects to pay for all or any portion of same through the Tenant Improvement Allowance).

5.6    Repair and Operation of Elevators. Tenant expressly acknowledges that the elevators in the Building are inoperative as of the Effective Date. As a part of consideration for Landlord to enter into this Lease and as a part of Tenant's work, Tenant agrees to repair and remodel one of elevators in the Building at Tenant's sole cost (except to the extent that Tenant elects to pay for all or any portion of same through the Tenant Improvement Allowance) and Tenant shall maintain such elevator during the term of this Lease to the extent such elevator is necessary for the procurement of the CUP and to comply with the laws applicable to the operation of Tenant's business in the Premises. Such repair and maintenance shall be completed by Tenant through a contractor approved by Landlord and the quality of such remodeling work on the elevator so repaired and put back in operation by Tenant shall require the Landlord's prior written consent. In the event that future tenants occupy any portion of the Building, then such elevator maintenance obligation shall be assumed by Landlord as a part of Common Area Costs. Notwithstanding anything in this Lease to the contrary, so long as Tenant is responsible for the maintenance of one of the elevators as provided herein, Common Area Costs shall not include any cost incurred by Landlord in connection with maintenance of the elevators in the Building.

5.7    Installation and Maintenance of HVAC. Tenant shall be solely responsible for maintaining, replacing or upgrading the HVAC system for the Premises during the Term of this Lease as provided under Tenant's Maintenance Obligations as set forth in Section 10.3 of this Lease.

5.8    High Rise Retrofit. As a part of Tenant's Work, Tenant will complete the required construction to effect completion of the Los Angeles City High Rise Retrofit requirements for the Building as per the requirements set forth in the December 10, 2006 LADBS notice of noncompliance ("Required Retrofit Work"). The construction expenses, including all architectural, engineering,

LA:176905595.5

7/17/09 01:36 PM

HAWKEYE 02184

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 8 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 68 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 48 of 85



inspection and permit fees for the Required Retrofit Work will be borne by Landlord and paid to Tenant according to Exhibit D.

ARTICLE 6- RENTAL

6.1    Minimum Rent. Tenant shall pay the sum specified in Section 1.14 ("Minimum Rent") in advance, on or before the first (1st) day of each month, without prior demand and without offset or deduction (except as expressly and specifically provided in this Lease), commencing on the Rent Commencement Date. Should the Rent Commencement Date be a day other than the first (1st) day of a calendar month, then the Minimum Rent for the first partial month shall be prorated based on the actual number of days in such calendar month.

6.2    Rent Abatement. Notwithstanding anything in this Lease to the contrary, Minimum Rent shall be abated (i.e., Tenant shall have no obligation to pay Minimum Rent) for the nine (9) full calendar months after the Rent Commencement Date plus, if the Rent Commencement Date occurs on a day other than the first day of the month, the period between the Rent Commencement Date and the first full calendar month thereafter (collectively, "Rent Abatement Period"). In no event shall the Term of this Lease be extended by the Rent Abatement Period. The abatement of Minimum Rent during the Rent Abatement Period shall not effect Tenant's obligation to pay Additional Rent during the Rent Abatement Period.

6.3    Percentage Rent; Gross Sales Reports. Tenant shall not be required to pay Percentage Rent or to provide reports respecting sales from the Premises.



6.4    Additional Rent. Tenant shall pay, as "Additional Rent", all sums required to be paid by Tenant to Landlord pursuant to this Lease in addition to Minimum Rent. Landlord shall have the same rights and remedies for the nonpayment of Additional Rent as it has with respect to the nonpayment of Minimum Rent. It is the intention of Landlord and Tenant that the Minimum Rent and Additional Rent to be paid hereunder shall be paid to Landlord without deduction of any amount or any nature whatsoever, except as otherwise expressly and specifically provided in this Lease.

6.5    Place of Payment. Tenant shall pay Minimum Rent and Additional Rent to Landlord at the address specified in Section 1.22, or to such other address and/or person as Landlord may from time to time designate in writing to Tenant.

6.6    Late Payments. If Tenant fails, within five (5) business days after Tenant's receipt of written notice from Landlord that same is past due and unpaid, to pay any Minimum Rent or Additional Rent, the unpaid amounts shall bear interest at the Interest Rate, as defined in Section 22.11(m), from the date the unpaid amount was initially due, to and including the date of payment. In addition, if any Minimum Rent or Additional Rent is not received by Landlord from Tenant within five (5) business days after Tenant's receipt of written notice that such payment is past due and unpaid, Landlord may impose a late charge equal to four percent (4%) of the delinquent amount. Landlord and Tenant agree that this late charge represents a reasonable estimate of the costs and expenses Landlord will incur and is fair compensation to Landlord for its loss suffered by reason of late payment by Tenant. Acceptance of a late charge or interest shall not constitute a waiver of Tenant's default with respect to the overdue amount nor prevent Landlord from exercising any of the other rights and remedies available to Landlord under this Lease, at law or in equity. If Tenant fails in three (3) consecutive months in any calendar year to make rental payments when due date, or if checks are returned due to insufficient funds three (3) consecutive times during the Lease Term. Landlord, in order to reduce its administrative costs may require, by giving written notice to Tenant (and in addition to the late charge stated herein, as well as any other rights and



LA:176900599.5

7/17/09 01:36 PM

HAWKEYE 02185

70

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 9 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 62 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 42 of 85



## LEASE AGREEMENT

This Lease Agreement ("Lease") is entered into as of the date set forth in Section 1.1 by and between Landlord and Tenant.

### ARTICLE 1- BASIC LEASE PROVISIONS

1.1     Effective Date: _July 17th 2009_

1.2     Landlord: PAX AMERICA DEVELOPMENT, LLC, a California limited liability company.

1.3     Tenant:     HAWKEYE ENTERTAINMENT, LLC, a California Limited Liability Company.

1.4     Tenant's Trade Name: _____ (Article 9)

1.5     Premises: 618 S. Spring Street, 1st, 2nd, 3rd and 4th floors (existing nightclub space), Los Angeles, California 90004. (Article 2)

1.6     Floor Area of Premises: Approximately Twenty-Three Thousand (23,000) square feet which has been agreed upon as the usable square footage by the parties based upon architectural drawings, and shall be deemed conclusive for the purposes of this lease agreement and any subsequent assignments, extensions, options, or modifications. (Article 2)

1.7     Total Building Area: Approximately Seventy Thousand (70,000) square feet. (Article 2)

1.8     Tenant's Share of Common Area Costs: Thirty Percent (30%). (Article 11)

1.9     Tenant's Share of Property Taxes: Thirty Percent (30%) of the entire property taxes assessed on the Building payable every six (6) months. (Article 7)

1.10    Initial Term: Ten (10) Lease Years commencing on the Rent Commencement Date (as defined below). "Lease Year" as used herein means each of the consecutive twelve (12) calendar month periods during the Term beginning on the first day of the calendar month in which the Rent Commencement Date occurs, except that, if the Rent Commencement Date occurs on a day other than the first day of the month, the first Lease Year shall be deemed to be the first twelve (12) full calendar months after the Rent Commencement Date and the number of days occurring between the Rent Commencement Date and the first full calendar month thereafter. (Section 3.1)

1.11    Intentionally Deleted.

1.12    Rent Abatement: Minimum Rent shall be abated for the nine (9) full calendar months after the Rent Commencement Date.

1.13    Rent Commencement Date: The earlier of (i) Tenant's grand opening in the Premises, or (ii) the date on which all of the following has occurred: (a) Tenant has obtained the CUP (as defined in Section 5.3) and ABC License (as defined in Section 5.3) and sign off by LADBS, (b) Tenant has completed Tenant's Work, and (c) there exists no outstanding order against Landlord or the Building from

LA:176905893

7/17/09 03:37 PM

HAWKEYE 02179

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 10 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 63 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 43 of 85

any governmental or administrative agency preventing or materially interfering with Tenant's ability to conduct the Permitted Use in the Premises. (Article 3)

1.14    Minimum Rent: Minimum Rent shall be payable monthly in the amount of $27,500.00. Minimum Rent shall increase as of the commencement of each Lease Year ("Adjustment Date") determined by multiplying $27,500 by a fraction, the numerator of which is the CPI (as defined in Section 22.11(c)) published three (3) months before the Adjustment Date and the denominator of which is the CPI published three (3) months before the Rent Commencement Date; provided, however, that in no event shall the Minimum Rent for any Lease Year exceed the Minimum Rent for the prior Lease Year by more than three percent (3%). (Article 6)

1.15    Percentage Rent: None.

1.16    Radius Restriction Area: None.

1.17    Use of Premises: The Premises shall be used solely for the operation of a nightclub, restaurant, entertainment venue and related lawful businesses along with the storage use (collectively, the "Permitted Use"). The Premises may not be used for any other purpose without the Landlord's prior written consent. (Article 9)

1.18    Insurance Limits: Not less than Two Million Dollars ($2,000,000.00) in single limit coverage per occurrence with an annual aggregate of not less than Four Million Dollars ($4,000,000.00) for bodily injury, personal injury, death and property damage liability with liquor liability and assault and battery coverage endorsements. (Article 13)

1.19    Security Deposit: Twenty-Seven Thousand Five Hundred Dollars ($27,500.00). (Section 22.2)

1.20    Guarantor(s): _William McMira_ an individual.

1.21    Broker(s): None.

1.22    Notices (Article 21):

To Landlord:

PAX AMERICA DEVELOPMENT, LLC
2333 Beverly Blvd.
Los Angeles, California 90057

Attn: Kevin K Choe

To Tenant:

HAWKEYE ENTERTAINMENT, LLC
1242 Ventura Blvd. #212
Sherman Oaks, California 91423

Attn: _William McMira_.

1.23    Options: Two (2) terms of Five (5) Lease Years each. (Section 3.2)

1.24    Prepaid Rent: Twenty-Seven Thousand Five Hundred Dollars ($27,500.00) applicable to Minimum Rent due for the first calendar month commencing after expiration of the Rent Abatement Period (as defined in Section 6.2).

1.25    Tenant Improvement Allowance: Five Hundred Forty Thousand Dollars ($540,000.00). (Article 5)

LA:17690509.5

7/17/09 03:39 PM

HAWKEYE 02180

72

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 11 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 64 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 44 of 85



If there is any conflict between any provisions contained in this Article 1 and the balance of this Lease, the provisions of this Article 1 shall control.

## ARTICLE 2- PREMISES

2.1     Premises. Landlord leases to Tenant and Tenant leases from Landlord, for the "Term" (as defined in Article 3) and upon the covenants and conditions set forth in this Lease, the premises described in Section 1.5 ("Premises") and depicted on the Site Plan as the 1st through 4th floors of the Building, which Site Plan is attached hereto as Exhibit A and incorporated herein by reference. "Building" as used herein means the structure constructed in which the Premises is located pursuant to the terms hereof. Notwithstanding anything contained in this Lease to the contrary, the Premises shall be deemed to include the airspace within and the interior surfaces of the fixed ceiling, slab and exterior walls. The Premises does not include the roof, floor slab or foundations, or the structural or exterior walls which are immediately adjacent to the Premises. Tenant shall have the non-exclusive right to use the Common Area of the 1st Floor of the Building as provided in this Lease. Tenant shall also have the non-exclusive right to place equipment on the roof of the Building.



2.2     Reservation. Landlord reserves the right to use the exterior walls, roof and plenum in, above and below the Premises for the repair, maintenance, use and replacement of pipes, ducts, utility lines and systems, structural elements serving the Building and for such other purposes related to the maintenance of the Building as Landlord reasonably deems necessary. In exercising its rights reserved herein, Landlord shall not unreasonably interfere with the operation of Tenant's business on the Premises and shall, to the extent possible, limit the exercise of the foregoing right to such times as the business in the Premises is not open to the public.

2.3     Floor Area. The term "Floor Area," as used in this Lease, shall mean all areas designated by Landlord for the exclusive use of a tenant measured from the exterior surface of exterior walls (and extensions, in the case of openings) and from the center of interior demising walls, and shall include, but not be limited to, restrooms, mezzanines, warehouse or storage areas, clerical or office areas and employee areas. The Premises shall be deemed to contain the number of square feet of Floor Area specified in Section 1.6 of this Lease. Notwithstanding anything herein to the contrary, Landlord shall have the right at any time to re-measure the Premises and verify the actual Floor Area thereof. Even in the event the Floor Area of the Premises is determined by Landlord to be more or less than the Floor Area as specified in Section 1.6 of this Lease, the Minimum Rent and Additional Rent (as hereinafter defined) including, but not limited to, Tenant's Share of Common Area Costs and Tenant's Share of Taxes as provided under Section 1.8, Section 1.9 and Article 7 of this Lease, shall not be adjusted accordingly.

2.4     Building Area. The term "Building Area," as used in this Lease shall mean all areas of the Building where the demised Premises are located including, but not limited to, the demised Premises, other rentable areas in the Building and areas within the Building designated as Common Areas for use by any and all tenants in the Building measured from the exterior surface of exterior walls (and extensions, in the case of openings) and from the center of interior demising walls, and shall include, but not be limited to, restrooms, mezzanines, warehouse or storage areas, clerical or office areas and employee areas. The Building shall be deemed to contain the number of square feet of Total Building Area specified in Section 1.7 of this Lease. Notwithstanding anything herein to the contrary, Landlord shall have the right at any time to re-measure the Total Building Area and verify the actual floor area thereof. Even in the event the Total Building Area is determined by Landlord to be more or less than the Total Building Area as specified in Section 1.7 of this Lease, the Minimum Rent and Additional Rent, including, but not limited to, Tenant's Share of Common Area Costs and Tenant's Share of Taxes as provided under Section 1.8,

LA:17690599.5

7/17/09 01:36 PM

HAWKEYE 02181

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 12 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 65 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 45 of 85



Section 1.9 and Article 7 of this Lease, shall not be adjusted accordingly. Execution of this Lease by Tenant shall deem the Tenant's unequivocal acceptance of the Total Building Area as specified in this Lease.

2.5    Parking. Tenant acknowledges and agrees that this Lease does not include grant of parking spaces for Tenant of Tenant's patrons within the Building. Tenant shall be solely responsible to procure required parking spaces for the operation of Tenant's business during the term of this Lease.

2.6    Common Area Usage. Tenant shall have the non-exclusive right without additional payment to Landlord, and in common with all other tenants in the Building, to use the Common Area located on the exterior of the Building and the Common Area located on the first floor of the Building ("First Floor Common Area") identified by hatched mark in Exhibit A attached hereto and incorporated herein by reference. In addition, without additional payment to Landlord, the portion of the First Floor Common Area immediately left from the main entrance to the Building identified as the "Waiting Area" in Exhibit A is hereby designated as an area to be exclusively used by Tenant and its invitees, only during the Term, as Tenant's patrons' waiting area. None of the foregoing designated Common Areas shall be used by Tenant for any activity which generates any revenue in the said Common Area without the Landlord's prior written consent.

ARTICLE 3- TERM

3.1    Term. This Lease shall be effective from and after the Effective Date specified in Section 1.1. It is expressly acknowledged and agreed by the parties that this Lease and the terms and provisions hereof are binding in all respects when executed and delivered by the parties, notwithstanding that the Term does not commence and certain obligations, including the obligation to pay Minimum Rent, do not accrue until a later time as expressly provided elsewhere in this Lease. The initial term of this Lease ("Initial Term") shall commence on the Rent Commencement Date (as specified in Section 1.13). The Initial Term shall continue, unless sooner terminated in accordance with the provisions of this Lease, for the number of Lease Years specified in Section 1.10 from the Rent Commencement Date. Within ten (10) days after either party's request, the parties shall execute a certificate substantially in the form of Exhibit C attached hereto evidencing the Rent Commencement Date of this Lease. Notwithstanding anything in this Lease to the contrary, in the event Tenant elects, in its sole discretion, to open for business in the Premises prior to the satisfaction of all of the requirements of clause (ii) of Section 1.13, then the cost incurred by Tenant to comply with any special conditions imposed by any governmental agency due to any uncompleted highrise retrofit work set forth in Section 5.8 below, shall be Landlord's responsibility and Landlord shall reimburse Tenant for such cost within thirty (30) days after receipt of demand therefor and, in the event that Landlord fails to timely reimburse Tenant for such cost, Tenant shall be permitted to deduct such amount from Minimum Rent and Additional Rent next coming due under this Lease.

3.2    Options. Landlord grants to Tenant the options ("Option(s)") of extending the Initial Term for two (2) periods of five (5) Lease Years each (each such period is herein referred to as the "Extension Period" and collectively as the "Extension Periods") pursuant to the terms set forth herein. With respect to each Extension Period, Tenant may exercise the Option by giving Landlord written notice ("Option Notice") of Tenant's irrevocable exercise of the Option at least six (6) months in advance of the prospective Extension Period. If Tenant fails to timely provide any Option Notice to Landlord, such failure shall not in and of itself cause Tenant to forfeit its right to exercise the Option respecting the applicable Extension Period and, in such event, Tenant shall have thirty (30) days after receipt of written notice from Landlord of Tenant's failure to timely exercise the Option to deliver the Option Notice. If Tenant does not deliver the Option Notice to Landlord within said 30-day period, then Tenant's rights to the applicable Extension Period, as well as any subsequent Extension Period, shall terminate. Any Option shall immediately and automatically terminate and shall be of no further force or effect in the event that



LA:176905993

7/17/09 01:36 PM

HAWKEYE 02182

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 13 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 66 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 46 of 85



this Lease is terminated in accordance with the terms and provisions of this Lease. As used in this Lease, "Term" means the Initial Term plus any Extension Period(s) the Option(s) for which is (are) exercised by Tenant pursuant to this Section 3.2.

ARTICLE 4- POSSESSION

4.1    Turnover Date. The term "Turnover Date", as used in this Lease, shall mean the Effective Date. The Premises shall be available for Tenant's contractor to commence construction of "Tenant's Work" (as specified in Exhibit D) on the Turnover Date.

4.2    Delivery of Possession. Landlord shall deliver and Tenant shall accept possession of the Premises from Landlord upon the Turnover Date; provided, however, Tenant shall have no right to enter into possession of the Premises until Tenant has delivered copies of policies of insurance or certificates thereof (as required under Article 13). In addition Tenant shall not commence any of Tenant's Work until the following requirements have been satisfied: (a) "Final Approved Plans" (as defined in Exhibit D) have been approved by Landlord pursuant to Exhibit D; (b) Tenant has delivered to Landlord a copy of Tenant's building permit, if issued by such date, and (c) Tenant has caused to be transferred to its name (and delivered written confirmation thereof to Landlord to the extent reasonably obtainable by Tenant from each applicable utility company) the utilities needed for Tenant to operate from the Premises from Landlord to Tenant. Tenant shall pay the Security Deposit (as specified in Section 1.19) and Prepaid Rent (as specified in Section 1.24) to Landlord on the date Tenant signs this Lease. Tenant agrees to accept possession of the Premises on the Turnover Date in its present "AS IS," "WHERE-IS" and "WITH ALL FAULTS" condition provided that the roof shall be in water-tight condition, and shall, subject to the terms and conditions of this Lease, hold Landlord harmless from any liability or claims relating to the condition of the Premises.



4.3    Landlord's Tender of Possession AS-IS. Tenant acknowledges that Tenant has had sufficient opportunity to inspect the Premises prior to execution this Lease. Tenant agrees, subject to Landlord's obligations under Sections 5.7, 9.5 and 10.1 and Exhibit D, to accept possession of the Premises on the Effective Date in its present condition "AS IS," "WHERE-IS" and "WITH-ALL-FAULTS."

4.4    Landlord Disclosures. Tenant expressly acknowledges that Tenant has been made fully aware of the necessity for the Building in which the Premises are located to comply with the L.A. City High Rise Retrofit requirements respecting fire safety standards. Landlord has apprised Tenant of the current requirements as set forth by LADBS in its notice of violation dated December 10, 2006 stating that the Building is not up to current High Rise Retrofit standards. As a portion of this notice, Landlord has disclosed to Tenant the necessity for Fire Department approval of the compliance work. Landlord represents and warrants that no other notices of additional noncompliance or violations exist to Landlord's knowledge as of the Effective Date.

ARTICLE 5- TENANT'S CONSTRUCTION~ TENANT CONSTRUCTION ALLOWANCE

5.1    Tenant's Construction. Tenant shall commence construction of Tenant's Work, if any, upon Landlord's delivery of possession of the Premises to Tenant, subject to the requirements of Section 4.2, and shall diligently prosecute same to completion. Tenant shall deliver to Landlord a copy of the certificate of occupancy for the Premises issued by the appropriate governmental agency upon completion of Tenant's Work.



LA:176905/95.5

7/17/09 01:35 PM

HAWKEYE 02183

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 14 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 67 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 47 of 85



5.2    Tenant Improvement Allowance. Landlord shall, concurrently with the execution of this Lease, pay to Tenant the sum of FIVE HUNDRED FORTY THOUSAND DOLLARS ($540,000.00) as a Tenant Improvement Allowance. Tenant shall be permitted to use and apply the Tenant Improvement Allowance in any manner it elects.

5.3    Tenant Improvement Work. Tenant shall be solely responsible for performing or causing to be performed any and all tenant improvement work required by Tenant to be performed in the Premises in order to operate the Permitted Use, including, but not limited to, the procurement of a Conditional Use Permit ("CUP") from the appropriate governmental agencies for the use of the Premises as a nightclub and/or restaurant, and the procurement of the required ABC license ("ABC License") from the appropriate governmental agencies. Any proposed tenant improvement work must be pre-approved by Landlord in writing pursuant to Exhibit D, but approval of the same by Landlord shall not be unreasonably withheld.

5.4    Rights to CUP. The entire rights under the CUP shall belong to Landlord following the expiration of the Term or earlier termination of this Lease.

5.5    Tenant Improvement Work in the First Floor Common Area. Tenant shall be required, as a part of Tenant's Work, to remodel the First Floor Common Area including the main corridor and the bathrooms located on the first floor of the Building. Tenant shall complete the remodeling of the First Floor Common Area subject to the Landlord's prior approval of the plans therefore in accordance with Exhibit D. The workmanship and the materials utilized in the remodel of the first floor Common Area by Tenant shall be first-class and Tenant shall perform or cause such remodel to be performed at Tenant's sole expense (except to the extent that Tenant elects to pay for all or any portion of same through the Tenant Improvement Allowance).

5.6    Repair and Operation of Elevators. Tenant expressly acknowledges that the elevators in the Building are inoperative as of the Effective Date. As a part of consideration for Landlord to enter into this Lease and as a part of Tenant's work, Tenant agrees to repair and remodel one of elevators in the Building at Tenant's sole cost (except to the extent that Tenant elects to pay for all or any portion of same through the Tenant Improvement Allowance) and Tenant shall maintain such elevator during the term of this Lease to the extent such elevator is necessary for the procurement of the CUP and to comply with the laws applicable to the operation of Tenant's business in the Premises. Such repair and maintenance shall be completed by Tenant through a contractor approved by Landlord and the quality of any remodeling work on the elevator so repaired and put back in operation by Tenant shall require the Landlord's prior written consent. In the event that future tenants occupy any portion of the Building, then such elevator maintenance obligation shall be assumed by Landlord as a part of Common Area Costs. Notwithstanding anything in this Lease to the contrary, so long as Tenant is responsible for the maintenance of one of the elevators as provided herein, Common Area Costs shall not include any cost incurred by Landlord in connection with maintenance of the elevators in the Building.

5.7    Installation and Maintenance of HVAC. Tenant shall be solely responsible for maintaining, replacing or upgrading the HVAC system for the Premises during the Term of this Lease as provided under Tenant's Maintenance Obligations as set forth in Section 10.3 of this Lease.

5.8    High Rise Retrofit. As a part of Tenant's Work, Tenant will complete the required construction to effect completion of the Los Angeles City High Rise Retrofit requirements for the Building as per the requirements set forth in the December 10, 2006 LADBS notice of noncompliance ("Required Retrofit Work"). The construction expenses, including all architectural, engineering,



LA:176905599.5

7/17/09 01:36 PM

HAWKEYE 02184

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 15 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 68 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 48 of 85



inspection and permit fees for the Required Retrofit Work will be borne by Landlord and paid to Tenant according to Exhibit D.

ARTICLE 6- RENTAL

6.1    Minimum Rent. Tenant shall pay the sum specified in Section 1.14 ("Minimum Rent") in advance, on or before the first (1st) day of each month, without prior demand and without offset or deduction (except as expressly and specifically provided in this Lease), commencing on the Rent Commencement Date. Should the Rent Commencement Date be a day other than the first (1st) day of a calendar month, then the Minimum Rent for the first partial month shall be prorated based on the actual number of days in such calendar month.

6.2    Rent Abatement. Notwithstanding anything in this Lease to the contrary, Minimum Rent shall be abated (i.e., Tenant shall have no obligation to pay Minimum Rent) for the nine (9) full calendar months after the Rent Commencement Date plus, if the Rent Commencement Date occurs on a day other than the first day of the month, the period between the Rent Commencement Date and the first full calendar month thereafter (collectively, "Rent Abatement Period"). In no event shall the Term of this Lease be extended by the Rent Abatement Period. The abatement of Minimum Rent during the Rent Abatement Period shall not effect Tenant's obligation to pay Additional Rent during the Rent Abatement Period.

6.3    Percentage Rent; Gross Sales Reports. Tenant shall not be required to pay Percentage Rent or to provide reports respecting sales from the Premises.

6.4    Additional Rent. Tenant shall pay, as "Additional Rent", all sums required to be paid by Tenant to Landlord pursuant to this Lease in addition to Minimum Rent. Landlord shall have the same rights and remedies for the nonpayment of Additional Rent as it has with respect to the nonpayment of Minimum Rent. It is the intention of Landlord and Tenant that the Minimum Rent and Additional Rent to be paid hereunder shall be paid to Landlord without deduction of any amount or any nature whatsoever, except as otherwise expressly and specifically provided in this Lease.



6.5    Place of Payment. Tenant shall pay Minimum Rent and Additional Rent to Landlord at the address specified in Section 1.22, or to such other address and/or person as Landlord may from time to time designate in writing to Tenant.

6.6    Late Payments. If Tenant fails, within five (5) business days after Tenant's receipt of written notice from Landlord that same is past due and unpaid, to pay any Minimum Rent or Additional Rent, the unpaid amounts shall bear interest at the Interest Rate, as defined in Section 22.11(m), from the date the unpaid amount was initially due, to and including the date of payment. In addition, if any Minimum Rent or Additional Rent is not received by Landlord from Tenant within five (5) business days after Tenant's receipt of written notice that such payment is past due and unpaid, Landlord may impose a late charge equal to four percent (4%) of the delinquent amount. Landlord and Tenant agree that this late charge represents a reasonable estimate of the costs and expenses Landlord will incur and is fair compensation to Landlord for its loss suffered by reason of late payment by Tenant. Acceptance of a late charge or interest shall not constitute a waiver of Tenant's default with respect to the overdue amount nor prevent Landlord from exercising any of the other rights and remedies available to Landlord under this Lease, at law or in equity. If Tenant fails in three (3) consecutive months in any calendar year to make rental payments when due date, or if checks are returned due to insufficient funds three (3) consecutive times during the Lease Term, Landlord, in order to reduce its administrative costs may require, by giving written notice to Tenant (and in addition to the late charge stated herein, as well as any other rights and



LA:1769050595

7/17/09 01:36 PM

HAWKEYE 02185

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 16 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 69 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 49 of 85



remedies accruing under this Lease, or any other term, provision or covenant of this Lease at law or in equity) that Minimum Rent is to be paid quarterly in advance instead of monthly and that all future rental payments are to be made on or before the due date by cash, cashier's check or money order, and that the delivery of Tenant's personal or corporate check will no longer constitute a payment of Rent as provided in this Lease

### ARTICLE 7- TAXES

7.1    Real Property Taxes.

(a)    As used in this Lease, the term "Taxes" shall include any form of tax or assessment, license fee, license tax, use tax, possessory interest tax, tax or excise on rental, or any other levy, charge, expense or imposition imposed by any Federal, state, county or city authority having jurisdiction, or any political subdivision thereof, or any school, agricultural, lighting, drainage or other improvement or special assessment district, special improvement district or local improvement district on the interest of Landlord in the Building and the underlying realty. Tenant shall pay to Landlord, as Additional Rent, Tenant's Share of Taxes, in addition to and together with any and all rental otherwise payable hereunder. Notwithstanding anything in this Lease to the contrary, Tenant shall have no obligation to reimburse Landlord for and Taxes shall not include (i) any penalties or late fees resulting from Landlord's failure to pay Taxes prior to delinquency, (ii) the increased amount of any Taxes if such are not paid by the date required to take advantage of any discount offered by the taxing authority, (iii) any fees, assessments or other charges (such as sewer, storm drain or street work charges, parkland or road dedication fees, frontage or other development fees) levied by governmental agencies as a condition of or in connection with the initial development or redevelopment of the Building, (iv) any costs for on site or off site infrastructure or capital improvements in connection with the initial development, redevelopment or acquisition of the Building, (v) any income, business, personal property, franchise, inheritance, gift, succession or transfer taxes imposed on Landlord by any governmental authority, or (vi) any increase in Taxes resulting from a change of ownership in the Building or underlying realty.

(b)    Landlord shall pay all Taxes levied against the Building and underlying realty prior to delinquency. From and after the Rent Commencement Date, Tenant shall pay to Landlord, as Additional Rent, Tenant's Share of Taxes assessed against the Building and underlying realty for each full or partial fiscal tax year during the Term pursuant to Section 7.1(c) below. Landlord shall deliver to Tenant a copy of each tax bill covering the Building and underlying realty on Landlord's receipt of the same, together with Landlord's calculation of Tenant's Share of Taxes. Tenant shall pay Landlord Tenant's Share of Taxes respecting said tax bill within thirty (30) days after Tenant's receipt of said tax bill, or thirty (30) days prior to delinquency, whichever is later. If the taxing authority permits payment to be made in installments without an increase or penalty, Tenant's obligation to reimburse Landlord for Taxes under this Section 7.1 shall be limited to Tenant's Share of such installment payments. Tenant's payment shall be proportionately reduced for periods of the Term of less than a full fiscal tax year.

(c)    For the purposes of this Lease, "Tenant's Share of Taxes" shall be deemed to be Thirty Three Percent (33%) of the Taxes on the Building and underlying realty.

7.2    Other Property Taxes. Tenant shall pay, prior to delinquency, all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation, trade fixtures, merchandise and other personal property in, on or upon the Premises.



LA:176905695

7/17/09 01:36 PM

HAWKEYE 02186

78

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 17 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 70 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 50 of 85



7.3    Contesting Taxes. If Landlord elects to contest (either formally or informally through negotiations) any Taxes levied or assessed against the Building during the Term, Tenant shall not be required to pay any portion of the costs or expenses incurred by Landlord in connection with such contest. However, if Landlord is successful in such contest (whether by settlement or otherwise), Landlord may deduct from the portion of any refund received which is payable to Tenant, Tenant's proportionate share of the costs and expenses incurred by Landlord in connection with such contest, determined pursuant to the formula set forth in Section 7.1(c) for the allocation of Taxes. Landlord shall pay to Tenant that portion of the total refund remaining, if any, which is attributable to Tenant's Share of Taxes prorated in the same manner as set forth in Section 7.1(c). Tenant may, at its own expense, initiate proceedings to contest any Taxes assessed against the Building or underlying realty on Landlord's behalf. If Tenant is successful in such contest, any refund shall first be used to reimburse Tenant for its reasonable expenses incurred in connection with the tax contest. The balance, if any, shall be apportioned between Landlord and the tenants (including Tenant) of the Building based on their respective payments of the tax bill or charge that was the subject of the tax contest.

7.4    Delinquent Taxes. If Landlord shall fail to pay any Taxes levied against the Building or underlying realty prior to delinquency, Tenant shall be permitted to pay same on Landlord's behalf and to deduct the amount paid from Minimum Rent and Additional Rent next due hereunder, including interest thereon at the Interest Rate from the date paid by Tenant until the date Tenant has recouped such payment.

### ARTICLE 8- UTILITIES



Tenant agrees to pay directly to the appropriate utility company all charges for utility services supplied to Tenant for which there is a separate meter and/or sub-meter to the Premises. Tenant agrees to pay to Landlord its share of all charges for utility services supplied to the Premises and the Common Area used exclusively by Tenant for which there is no separate meter or sub-meter upon billing by Landlord of Tenant's share, as reasonably determined by Landlord based upon estimated usage (but in no event shall Tenant's share exceed thirty percent (30%) of the amount of any bill). Landlord shall not be liable for any interruption whatsoever in utility services not furnished by Landlord, nor shall Landlord be liable for interruptions in utility services furnished by Landlord which are due to fire, accident, strike, acts of God or other causes beyond the control of Landlord or in order to make alterations, repairs or improvements. Notwithstanding the foregoing, in the event of an interruption in utility service to the Premises or the Common Area which is caused by the negligence or willful misconduct of Landlord or its Representatives, which interruption materially interferes with Tenant's ability to operate its business in the Premises then, in addition to Tenant's other rights and remedies under this Lease, Minimum Rent and Additional Rent shall abate from the commencement of such interruption until such interruption is corrected.

### ARTICLE 9- TENANT'S CONDUCT OF BUSINESS

9.1    Permitted Use. Tenant shall use the Premises solely for the Permitted Use specified in Section 1.17 and for no other use or purpose without first obtaining the Landlord's prior written consent.

9.2    Tenant's Signs.



(a)    Tenant shall be permitted to install interior signage in the First Floor Common Area. Any such signage shall be professionally prepared and maintained in a neat manner, and shall comply with all applicable laws, ordinances and regulations.

LA:176909999.5

7/17/09 01:36 PM

HAWKEYE 02187

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 18 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 71 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 51 of 85



(b)    Tenant shall not affix upon the exterior (or interior windows or doors) of the Premises or anywhere adjacent to the Premises or the Building any sign, advertising placard, name, insignia, trademark, descriptive material or other like item (collectively, the "Exterior Signs"), unless the Exterior Signs (i) comply with all governmental requirements, and (ii) have been approved by the beneficiary of that certain _____, dated _____ and recorded in the Official Records of Los Angeles County as Instrument No. _____ on _____ ("Façade Easement"). All of the Exterior Signs shall be erected by Tenant at its sole cost and expense. Tenant shall maintain all of its Exterior Signs in good condition and repair during the Term. Notwithstanding anything herein to the contrary, Tenant shall be entitled, at Tenant's sole cost and expense, to place a sign panel on a monument sign or pylon sign, if any, erected at the Building, in the top position. Nothing herein shall be construed as a representation that Landlord will install a monument or pylon sign or an obligation of Landlord to install such a sign.

9.3    Building Name. The name of the Building where the Premises is located is "Pacific Stock Exchange Building" Tenant may use the name of the Building in its advertising as the address reference for the Premises. Tenant shall not use the name of the Building for any other purpose. Landlord reserves the right, in its sole discretion, to change the name and logo of the Building at any time. Tenant expressly acknowledges that Landlord has not made any representation with respect to the Landlord's rights to use the name "Pacific Stock Exchange" in connection with the name of the Building. Tenant shall conduct its own investigation prior to the usage of the Building name "Pacific Stock Exchange Building" in connection with the Tenant's advertisements containing such name.



9.4    Historical Status of Building. Tenant acknowledges the historical status of the Building and the fact that such status imposes certain special restrictions and limitations with respect to improvements and alterations to the Premises and signage on the exterior of the Building. Tenant agrees to comply with any revisions requested by Landlord to the plans for Tenant's Work or any subsequent alterations which are reasonably required by Landlord for the purpose of maintaining the Building's historical status and the eligibility of the Building for rehabilitation tax credits. Tenant acknowledges that Landlord has granted the Façade Easement under which a nonprofit organization has been granted certain control rights with respect to the facade of the Building and Tenant hereby agrees that this Lease, and any encumbrances hereafter existing on this Lease, are and shall be subordinated to such Façade Easement or any other similar easement which Landlord may grant and that the provisions of this Lease shall be subject to all restrictions and requirements reasonably imposed on Landlord in connection with such easement(s); provided, however, that in no event shall Landlord agree to amend the Façade Easement or enter into or amend any other similar easement in a manner which will interfere with Tenant's rights under this Lease or the operation of Tenant's business in the Premises or impose any additional financial obligations on Tenant.

9.5    Compliance with Laws. Tenant shall promptly comply with any and all present and future governmental laws, ordinances, rules, regulations and orders applicable to the Premises and Tenant's use and occupancy thereof for the Permitted Use, including but not limited to the Americans with Disabilities Act of 1990, 42 USC section 12101 et. seq. (the "ADA") and all analogous state and local laws, and all rules and regulations promulgated to further the purpose thereof (collectively, "Laws"). Tenant's obligations hereunder shall include the making of alterations, additions and improvements to the Premises required by any Law for the conduct or continuance of the Permitted Use in the Premises. Tenant's obligation to comply with Laws shall include, without limitation, the responsibility of Tenant to make alterations to the Premises regardless of, among other factors, the relationship of the cost of curative action to the rent payable under this Lease, the length of the then remaining Term hereof, the relative benefit of the repairs to Landlord or Tenant, the degree to which the curative action may interfere with

LA:176905599.9

7/17/06 01:36 PM

HAWKEYE 02188

80

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 19 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 72 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 52 of 85



Tenant's use or enjoyment of the Premises, or the likelihood that the parties contemplated the particular Law involved. Tenant shall have the right to contest or review, by procedures permitted by applicable law, at its own expense, any such Law and may delay compliance therewith if permitted by such Law, provided that Landlord or any other tenant, occupant or owner of the Building is not subject to civil liability or criminal prosecution as a result thereof and Landlord's title to or interest in, or such tenant's, occupant's or owner's business in or title to, the Building, or any portion thereof, is not subjected to forfeiture, involuntary sale, loss or closure as a result thereof. Tenant shall indemnify, defend, protect and hold Landlord and such other tenants, occupants and owners harmless from and against any and all liability, loss, cost, damage or expense (including attorneys' fees) resulting from or in connection with any contest hereunder. Any contest shall be conducted with all due diligence. Tenant shall diligently comply with any final, non-appealable decision in any such contest. In addition, Tenant expressly acknowledges that Landlord has not made any representation regarding the compliance and/or noncompliance of any or all portions of the Building and/or the demised Premises to the Laws; and Tenant has made an independent investigation of the same and is satisfied with the current condition of the Building and the Premises prior to executing this Lease. Notwithstanding the foregoing and anything else in this Lease to the contrary, Tenant's obligation to comply with Laws is hereby expressly limited to requiring Tenant to perform any non-structural alterations, additions and improvements to the Premises required by any Law for the conduct or continuance of the Permitted Use in the Premises or as a result of Tenant's Work but shall not require Tenant to perform (i) any structural alterations, additions or improvements, (ii) any alterations additions or improvements to any portion of the Building other than the Premises including, without limitation any Common Area (whether or not Tenant is entitled to the exclusive right to use such portion of the Common Area), or (iii) any alterations additions or improvements which are generally required and not specifically required for restaurant use (i.e., general alterations, additions or improvements required for office or general retail use would be Landlord's responsibility). Landlord shall, at its sole cost and expense, promptly comply with any and all present and future Laws including, without limitation, any retrofit requirements (except to the extent to be performed by Tenant as a part of Tenant's Work) applicable to the Building including, without limitation, the Premises (but only to the extent that Tenant is not responsible for such compliance with respect to the Premises as provided hereinabove).

## ARTICLE 10- MAINTENANCE, REPAIRS AND ALTERATIONS



10.1    Landlord's Maintenance Obligations. Landlord shall maintain in good condition and repair, at its sole cost, the structural components and foundations, roofs (including roof membranes) and exterior surfaces of the exterior walls (specifically including window frames) of the Building which, for purposes hereof, includes all structures comprising the Building if and to the extent the Building is comprised of multiple structures. Landlord shall also maintain, in a first-class condition at its sole cost but subject to reimbursement from Common Area Costs to the extent provided by Section 11.4, the Common Area in the Building (except the First Floor Common Area during the period that Tenant is to maintain same pursuant to Section 10.4), all elevators in the Building (except the elevator to be maintained by Tenant during the period that Tenant is to maintain same pursuant to Section 5.6). Landlord acknowledges that the use of the Premises for the Permitted Use shall require the Premises to comply with health department requirements, which requirements include that the Premises be free of vermin and Landlord shall, at its sole cost, maintain or cause to be maintained all portions of the Building (other than the Premises) and the Common Area such that the same shall be free of vermin. Further, Landlord shall maintain, at its sole cost, any and all base building utility systems including electrical, plumbing and mechanical systems to the point of connection to those lines which exclusively serve the Premises and other premises within the Building (e.g., any main electrical panel, main sewer line, main gas line, etc.). Landlord's maintenance obligation hereunder shall not extend to (i) doors and door frames



LA:179905599.5

7/17/09 01:36 PM

HAWKEYE 02189

81

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 20 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 73 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 53 of 85



servicing the Premises and any other premises in the Building then leased or occupied, but only to the extent the tenant or occupant thereof assumes responsibility for such maintenance, (ii) windows servicing the Premises and any other premises in the Building then leased or occupied, but only to the extent the tenant or occupant thereof assumes responsibility for such maintenance, and (iii) storefronts and any storefront awnings of the Premises or any other premises in the Building then leased or occupied, but only to the extent the tenant or occupant thereof assumes responsibility for such maintenance. Notwithstanding the foregoing, if and to the extent any repairs or replacements are necessitated by the negligence or willful acts of Tenant or its Representatives or by reason of Tenant's failure to observe or perform any conditions or agreements contained in this Lease, the cost of same shall be the sole responsibility of Tenant. Notwithstanding anything to the contrary contained in this Lease, Landlord shall not be liable for failure to make repairs required to be made by Landlord under the provisions of this Lease unless Tenant has previously notified Landlord in writing of the need for such repairs and Landlord has failed to commence and complete the repairs within a reasonable period of time following receipt of Tenant's written notification.

10.2    Landlord's Right of Entry. Landlord, its agents, contractors, servants and employees may enter the Premises following at least Twenty-Four (24) hour prior written notice to Tenant, and Landlord's good faith efforts to coordinate such entry with Tenant's on-site management so as to minimize interference with Tenant's business operations (except in a case of emergency): (a) to examine the Premises; (b) to perform any obligation or exercise any right or remedy of Landlord under this Lease; (c) to perform work necessary to comply with laws, ordinances, rules or regulations of any public authority or of any insurance underwriter; and (d) to perform work that Landlord deems necessary to prevent waste or deterioration in connection with the Premises; provided, however, that if any such entry by Landlord is the result of the failure by Tenant to perform any work required to be performed by Tenant under this Lease, Landlord shall have no right to perform such work on Tenant's behalf unless Tenant fails to commence such work within ten (10) business days after written notice from Landlord of the need for such work (or if more than ten (10) business days shall be required to commence such work because of the nature of the work, if Tenant shall fail to diligently proceed to commence to perform such work within a reasonable period after receipt of written notice). If Landlord makes any repairs which Tenant is obligated to make pursuant to the terms of this Lease, Tenant shall pay the cost of such repairs to Landlord, as Additional Rent, within thirty (30) days after receipt of a bill from Landlord for same. Notwithstanding the foregoing, in the event that Tenant by written notice to Landlord disputes the need for any repair performed or to be performed by Landlord, Tenant's responsibility for any repair performed or to be performed by Landlord and/or the cost of any repair performed by Landlord, then Tenant shall have no responsibility to pay any cost of such repair to Landlord unless and until such obligation and amount is determined pursuant to the procedures(s) set forth in Section 22.10.

10.3    Tenant's Maintenance Obligations. Except for the portions and components of the Premises to be maintained by Landlord as set forth in Section 10.1 and the Base Building Systems to be maintained by Landlord as set forth in Section 10.1, Tenant, at its expense, shall keep the Premises and all utility facilities and systems exclusively serving the Premises (the "Tenant Utility Facilities"), including, but not limited to, all plumbing and electrical conduits, wiring, fixtures, pipes, floor covering, vents, HVAC System (as defined herein below), lighting, storefronts, plate glass and glazing, interior ceilings and the fire protection and suppression system components within the Premises, in good condition and repair and shall make repairs and/or replacements necessary to keep the Premises and Tenant Utility Facilities in such condition; provided, however, that the process to perform any maintenance, repairs or replacements by Tenant to portions of the Tenant Utility Facilities located outside of the Premises shall be subject to the prior written consent of Landlord. All replacements shall be of a quality equal to or exceeding that of the original. At the written request of Landlord, Tenant shall contract with a qualified, licensed HVAC service company approved by Landlord for the regular (but not less frequently than



LA:176905991.5

7/17/09 01:36 PM

HAWKEYE 02190

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 21 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 74 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 54 of 85



quarterly) maintenance, repair and/or replacement (when necessary) of the heating, ventilating and air conditioning equipment serving the Premises (the "HVAC System") and shall provide Landlord with a copy of any service contract within ten (10) days following its execution. In addition, Tenant shall be solely responsible to contract with and pay for the trash disposal services as required by Tenant. Any such trash bins shall only be located adjacent to the Building and as convenient as possible to the Premises in an area mutually approved by Landlord and Tenant. Notwithstanding the foregoing, if and to the extent any repairs or replacements are necessitated by the negligence or willful acts of Landlord or its Representatives or by reason of Landlord's failure to observe or perform any conditions or agreements contained in this Lease, the cost of same shall be the sole responsibility of Landlord.

10.4    Tenant's Maintenance Obligations of the First Floor Common Area. Tenant shall also maintain the First Floor Common Area used by Tenant pursuant to Section 2.6 at the Tenant's sole cost during the term of this Lease so long as the Tenant is the only Tenant in the Building utilizing the First Floor Common Area. However, at such time as Landlord enters into a lease or other occupancy agreement for space in the Building during the Term of this Lease, then the maintenance obligation of the First Floor Common Area including all expenses and payments shall be Landlord's responsibility except for the maintenance of the First Floor Common Area restrooms which shall be maintained by Tenant and shall only be available for the exclusive use by Tenant, its Representatives and invitees during the Term of this Lease. The term "maintain" as used herein shall include the obligation to manage, repair, clean and, with respect to the restrooms, supply disposable toiletries. Landlord shall in any event provide all liability insurance for the Common Area including, without limitation, the First Floor Common Area and First Floor Common Area restrooms. Notwithstanding anything in this Lease to the contrary, so long as Tenant is responsible for the maintenance of the First Floor Common Area, Common Area Costs shall not include any cost incurred by Landlord in connection with maintenance of the First Floor Common Area.

10.5    Alterations.

(a)    Tenant shall not make or cause to be made to the Premises or the Tenant Utility Facilities any addition, renovation, alteration, reconstruction or change (collectively, "Alterations") (i) costing in excess of One Hundred Thousand Dollars ($100,000.00), (ii) involving structural changes or additions, (iii) affecting the exterior storefront, fire sprinkler systems, exterior walls, floor slab, or roof of the Premises, or (iv) requiring or resulting in any penetration of the roof, demising walls or floor slab of the Premises, without first obtaining the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    All Alterations shall be made under the supervision of a competent licensed architect (if the work involves the construction of improvements to the Premises as compared to aesthetic changes such as repainting, installing replacement lighting, floor covering, etc.) or competent licensed structural engineer (if any structural work is to be performed) satisfactory to Landlord and shall be made in accordance with plans and specifications with respect thereto, approved in writing by Landlord before the commencement of work.

(c)    Tenant shall provide Landlord with not less than ten (10) days prior written notice of the commencement of any Alterations in the Premises and Landlord shall have the right to enter upon the Premises to post customary notices of non-responsibility with respect thereto. Tenant, at its cost, shall obtain all required governmental permits and approvals for all Alterations and all such Alterations shall be performed strictly in accordance with all applicable laws, ordinances, rules or regulations of any public authority, in a good and workmanlike manner and diligently prosecuted to completion to the end that the Premises shall at all times be a complete unit except during the period of work. Construction work in connection with any Alterations shall be performed in such manner as not to obstruct the access to or



LA:176905599.5

7/17/09 01:36 PM

HAWKEYE 02191

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 22 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 75 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 55 of 85



otherwise unreasonably interfere with the operation of business by any other occupant of the Building. All improvements to the Premises by Tenant including, but not limited to, recessed light fixtures, floor coverings and partitions and other similar tenant improvement items, but excluding trade fixtures including, but not limited to signs, sound systems, lighting systems (other than recessed lighting), furniture and equipment shall be deemed to be the property of Landlord upon installation thereof. Within thirty (30) days after the completion of any Alterations, Tenant shall deliver to Landlord a set of "as built" plans depicting the Alterations as actually constructed or installed (or a copy of the plans previously approved by Landlord marked to show any changes thereon). If Tenant shall make any permitted Alterations, Tenant shall, upon Landlord's written request, obtain "Builder's All Risk" insurance coverage in an amount reasonably required to cover the construction of such Alterations.

ARTICLE 11- COMMON AREA

11.1    Definition of Common Area. The term "Common Area", as used in this Lease, shall mean all areas within the exterior boundaries of the Building (or areas immediately adjacent to the Building and located on the underlying realty), now or later made available for the general use of Landlord, Tenant and other persons entitled to occupy any floor area in the Building.

11.2    Use of Common Area. The use and occupancy by Tenant of the Premises shall include the unobstructed right to the non-exclusive use by Tenant, its Representatives and invitees of the Common Area (except those portions of the Common Area on which have been constructed or placed permanent or temporary kiosks, displays, carts and stands and except areas used in the maintenance or operation of the Building) in common with Landlord and the other tenants of the Building and their customers and invitees with certain limitations as set forth in Section 2.6 of this Lease.



11.3    Control of and Changes to Common Area. Landlord shall have the sole and exclusive control of the Common Area, and the right to make changes to the Common Area. Landlord's rights shall include, but not be limited to, the right to (a) restrain the use of the Common Area by unauthorized persons; (b) utilize from time to time any portion of the Common Area for promotional, entertainment and related matters; (c) place permanent or temporary kiosks, displays, carts and stands in the Common Area and to lease same to tenants; provided, however, no such items will be placed in a manner which will materially interfere with Tenant's ability to operate its business from the Premises, impair ingress, egress or other access to or from the Premises, or impair the visibility of the Premises; (d) temporarily close any portion of the Common Area for repairs, improvements or Alterations, to discourage non-customer use, to prevent dedication or an easement by prescription or for any other reason deemed sufficient in Landlord's reasonable judgment; and (e) renovate, upgrade or change the shape and size of the Common Area or add, eliminate or change the location of improvements to the Common Area. Notwithstanding anything herein to the contrary, in no event shall Landlord without Tenant's prior written consent change the shape or size of or otherwise modify the Common Area located on the first through fourth floors of the Building.

11.4    Common Area Costs. The term "Common Area Costs", as used in this Lease, shall mean and be limited to all reasonable costs and expenses incurred by Landlord in (a) cleaning the façade of the Building from time to time, (b) maintaining the insurance required to be maintained by Landlord pursuant to Section 13.7, (c) subject to Section 10.4, maintaining the First Floor Common Area, and (d) subject to Section 5.6, maintaining and repairing the elevators. Common Area Costs shall expressly exclude any expenditures that are in the nature of capital improvements or replacements and not properly chargeable as an expense against income under the Internal Revenue Code or in accordance with generally accepted accounting principles.



LA:176905995

7/17/09 01:36 PM

HAWKEYE 02192

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 23 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 76 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 56 of 85



11.5    Payment of Common Area Costs. Following the end of the calendar year in which the Rent Commencement Date occurs and following the end of each calendar year thereafter, Landlord shall furnish Tenant a statement ("Annual Statement") covering the calendar year just expired, showing the total of the Common Area Costs and Tenant's Share of Common Area Costs for such calendar year. Within thirty (30) days after receipt of the Annual Statement, Tenant shall pay to Landlord Tenant's Share of Common Area Costs for such calendar year. If Landlord fails to furnish any Annual Statement to Tenant within six (6) months following the end of any calendar year, such failure shall constitute a waiver by Landlord of its right to collect any Common Area Costs from Tenant for said calendar year. If Landlord fails to include any Common Area Cost in an Annual Statement and fails to correct said Annual Statement within six (6) months following the end of any calendar year, such failure shall constitute a waiver by Landlord to collect Tenant's Share of such Common Area Cost.

11.6    Information and Audit Rights. On Tenant's request, Landlord shall provide to Tenant copies of contracts, invoices, paid receipts or other sufficient evidence to support the Annual Statement (regardless of whether Tenant undertakes a complete audit under this Section). In addition, Tenant, or its agents, may conduct, at Tenant's expense, an audit of Common Area Costs for any calendar year within twelve (12) months of Tenant's receipt of the Annual Statement and any supporting documentation requested by Tenant pursuant to this Section. Notwithstanding the foregoing, if Tenant's audit for any calendar year reveals that (a) a type or category of Common Area Costs not authorized by Section 11.4 has been included in Common Area Costs, or (b) Common Area Costs have been overstated for the audit year by more than five percent (5%), Tenant may also audit Common Area Costs for the calendar year preceding the audit year. Tenant shall conduct its audit at Landlord's office in the continental United States during reasonable business hours on at least ten (10) days advance written notice. Any such audit may include without limitation inspection of the work undertaken and all original contracts, work orders, invoices and other records for said expenses. Landlord shall reasonably cooperate with Tenant in any such audit. If Tenant's audit reveals that Common Area Costs for the audit year are overstated, then Landlord shall reimburse Tenant the amount of such overpayment within thirty (30) days of receipt of documentation evidencing such overstatement and, if such audit reveals that Common Area Costs for the audit year are overstated by more than five percent (5%) for such year, Landlord shall also reimburse Tenant for the reasonable expenses of such audit within thirty (30) days of receipt of receipts or other documentation detailing the costs for said audit. In the event Landlord fails to timely make any such reimbursement required under this Section 11.6, Tenant shall be entitled to offset the amount due from Minimum Rent and Additional Rent next coming due.

ARTICLE 12- ASSIGNMENT AND SUBLETTING

12.1    Landlord's Consent Required. Landlord and Tenant agree that the Building consists of an interdependent group of retail enterprises and that the realization of the benefits of this Lease, both to Landlord and Tenant, is dependent upon Tenant's creating and maintaining a successful and profitable retail operation in the Premises and that the "tenant mix" of the Building is vital to the realization of the benefits of this Lease, both to Landlord and Tenant. Tenant acknowledges and agrees that any assignment or subletting of all or any portion of the Premises shall required prior written consent of Landlord which consent shall not be unreasonably withheld, conditioned or delayed subject to the terms, covenants and conditions contained in this Lease.



12.2    Procedures. Should Tenant desire to enter into an assignment or sublease, other than any assignment or sublease which is expressly stated in this Article 12 not to require the prior written consent of Landlord, Tenant shall request, in writing, Landlord's consent to the proposed assignment or sublease at least thirty (30) days before the intended effective date of the proposed assignment or sublease, which request shall include the following (and shall be accompanied by a payment of Two Thousand Dollars

LA:176905995.5

7/17/09 01:36 PM

HAWKEYE 02193

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 24 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 77 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 57 of 85



($2,000) to reimburse Landlord for costs incurred in connection with reviewing such proposed assignment or sublease): (a) if the assignment or sublease contemplates a change in the use of the Premises, the new proposed use of the proposed transferee; (b) a description of the identity, net worth and previous business experience of the proposed transferee; and (c) any further information relevant to the proposed assignment or sublease which Landlord may reasonably request. Within ten (10) days after receipt of Tenant's request for consent to the proposed assignment or sublease together with all of the above-required information, Landlord shall respond and shall have the right either to: (i) consent to the proposed assignment or sublease; or (ii) refuse to consent to the proposed assignment or sublease. Landlord's consent to a proposed assignment or sublease shall only be effective if and when Landlord has notified Tenant in writing that Landlord consents to such proposed assignment or sublease or Landlord fails to timely respond to a request for consent to any assignment or sublease in which event Landlord shall be deemed to have given its consent thereto. Upon Landlord's consent or deemed consent to a proposed assignment, Landlord, Tenant and the proposed transferee shall enter into and fully execute a written assignment and assumption agreement in a form reasonable acceptable to Landlord, Tenant and the proposed assignee. If Landlord refuses to consent to any proposed assignment or sublease, Landlord shall state in its response the detailed reason(s) for such refusal in reasonable detail.

12.3    Standard for Consent.

(a)    Tenant agrees that Landlord may refuse its consent to the proposed assignment or sublease on the following grounds: (i) the proposed transferee proposes to change the use of the Premises from the Permitted Use and Landlord reasonably withholds its consent thereto, (ii) the proposed transferee's financial condition, net worth or liquidity is inadequate to support all of the financial and other obligations of Tenant under this Lease or, with respect to any sublease, the obligation being incurred in connection therewith (in either event taking into account the financial condition, net worth and liquidity of any other remaining obligors under the Lease); (iii) the business reputation or character of the proposed transferee is not reasonably acceptable to Landlord; or (iv) the proposed transferee is not likely to conduct in the Premises a business of a quality substantially equal to that conducted by Tenant.

(b)    Any purported assignment without Landlord's prior written consent shall be void and of no force or effect and shall not confer any estate or benefit on anyone. Consent to one (1) assignment by Landlord shall not be deemed to be consent to any subsequent assignment to any other party.

12.4    Permitted Assignment/ Sublease. Notwithstanding anything in this Lease to the contrary, Tenant shall have the right without Landlord's consent, to enter into an assignment or sublease to any Affiliate or to any Person succeeding to substantially all of the assets of Tenant as a result of a consolidation or merger, or to a Person acquiring all or substantially all of the stock, other ownership interest or assets of Tenant ("Permitted Assignment"), provided that the Permitted Use will be conducted in the Premises and provided further that within fifteen (15) days after the effective date of any such transfer the assignee or sublessee executes and delivers to Landlord an instrument reasonably acceptable to Landlord containing an express assumption of all of Tenant's obligations under this Lease (or, in the case of a sublease, a copy of the sublease which shall provide that it is subject to the Lease, which copy may be redacted to delete economic terms).

12.5    No Release; Form. No assignment or Permitted Assignment, whether with or without Landlord's consent, shall relieve Tenant and Guarantor hereunder from its covenants and obligations under this Lease. Tenant and Guarantor shall be relieved from its covenants and obligations under this Lease only through a written agreement between Landlord, Tenant and Guarantor, not to be unreasonably withheld. It is the expressed intent of the parties that any such release will be given by Landlord if the



LA:17890598.5

7/17/09 01:36 PM

HAWKEYE 02194

Case 1:19-bk-12102-MT   Doc 21-1   Filed 10/10/19   Entered 10/10/19 15:51:17   Desc
Exhibit Exhibits A - P   Page 25 of 132

Case 1:13-bk-16307-MT   Doc 343-3   Filed 01/05/16   Entered 01/05/16 18:45:32   Desc
Exhibit 4 to Part 2   Page 78 of 121

Case 1:13-bk-16307-MT   Doc 226-1   Filed 08/27/14   Entered 08/27/14 17:15:04   Desc
Exhibit A   Page 58 of 85



assignee under a Permitted Assignment and a substitute Guarantor are provided that are the reasonable financial equivalent to the Tenant and Guarantor provided within this Lease.

## ARTICLE 13- INSURANCE

13.1   Tenant's Insurance. Tenant, at its sole cost and expense, commencing on the Turnover Date and continuing during the Term, shall procure, pay for and keep in full force and effect the following types of insurance, in at least the amounts and in the forms specified below:

(a)   Commercial general liability insurance with coverage limits of not less than the combined single limit for bodily injury, personal injury, death and property damage liability per occurrence specified in Section 1.18, insuring against any and all liability of the insured arising out of the maintenance, use or occupancy of the Premises, subject to increases in amount every five (5) Lease Years to amounts then customary in the industry for similar uses to the Permitted Use. All such liability insurance shall specifically insure the performance by Tenant of the indemnity agreement as to liability for injury to or death of persons and injury or damage to property set forth in Section 13.4. Further, all such liability insurance shall include, but not be limited to, personal injury, products and completed operations, blanket contractual, cross-liability and severability of interest clauses, broad form property damage, independent contractors and, if alcoholic beverages are served, sold, consumed or obtained in the Premises, the following policy coverage endorsements:



(1)   Liquor liability coverage endorsement;

(2)   Assault and battery coverage endorsement;

(b)   Standard form workers' compensation and employer's liability insurance covering all of Tenant's employees for injury or illness suffered in the course of or arising out of their employment, providing statutory workers' compensation benefits and employer's liability limits of liability of not less than One Million Dollars ($1,000,000.00);

(c)   If applicable, plate glass insurance covering the full replacement value of plate glass, frames and lettering thereon within and part of the Premises, which insurance shall include a safety glazing material endorsement; provided, however, that Tenant shall have the right to self-insure for plate glass with Landlord's express prior written consent;

(d)   If Tenant utilizes a security guard at the Premises, Tenant (or the security guard company) shall maintain security guard liability insurance with coverage and amounts customary for licensed security companies in the Los Angeles area; and

(e)   Insurance covering all of Tenant's Work, Tenant's leasehold improvements, Alterations permitted under Article 10, trade fixtures, merchandise and personal property (including stock and equipment) from time to time in, on or about the Premises in an amount not less than their full replacement value from time to time, including replacement cost endorsement, providing protection against any peril covered under an "All Risk" standard insurance policy. Any policy proceeds shall be used for the repair or replacement of the property damaged or destroyed except that, if this Lease is terminated in connection with any damage, then Tenant shall be entitled to the proceeds of such policy; and



LA:176905895

7/17/09 01:36 PM

HAWKEYE 02195

87

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 26 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 79 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 59 of 85



13.2    Policy Form.    All policies of insurance required of Tenant and Landlord herein shall be issued by insurance companies with a general policy holder's rating of not less than "A" and a financial rating of not less than Class "VII", as rated in the most current available "Best's Key Rating Guide", and which are qualified to do business in the Building State. All of Tenant's policies, except for the Workers' Compensation coverage, shall name and shall be for the mutual and joint benefit and protection of Landlord, Tenant and Landlord's property manager, mortgagee(s) or beneficiary(ies) as additional insureds provided Landlord shall have furnished to Tenant the names and addresses of such property manager, mortgagee(s) and beneficiary(ies). Executed copies of the policies of insurance or certificates evidencing such insurance shall be delivered to Landlord prior to Tenant, its agents or employees entering the Premises pursuant to this Lease for any purpose. Thereafter, executed copies of renewal policies or certificates shall be delivered to Landlord within ten (10) days prior to the expiration of the term of each policy. All policies of insurance delivered to Landlord must contain a provision that the company writing the policy will give to Landlord at least ten (10) days' prior written notice of any cancellation or lapse of insurance. All policies required of Tenant herein shall be endorsed to read that such policies are primary policies and any insurance carried by Landlord or Landlord's property manager shall be noncontributing with such policies. No policy required to be maintained by Tenant shall have a deductible greater than Fifteen Thousand Dollars ($15,000.00) unless approved in writing by Landlord.

13.3    Blanket Policies.    Notwithstanding anything to the contrary contained in this Article 13, Tenant's obligation to carry insurance may be satisfied by coverage under a so-called blanket policy or policies of insurance; provided, however, that the coverage afforded Landlord will not be reduced or diminished and the requirements set forth in this Lease are otherwise satisfied in such blanket policy or policies.



13.4    Indemnity.    To the fullest extent permitted by law and subject to Section 13.5, Tenant covenants with Landlord that, except to the extent caused by the negligence or misconduct of Landlord or its Representatives, neither Landlord nor its Representatives shall be liable for any damage or liability of any kind or for any injury to or death of persons or damage to property of Tenant or any other person occurring from and after the Effective Date from any cause whatsoever related to the use, occupancy or enjoyment of the Premises by Tenant or its Representatives and Tenant shall pay for, defend (with an attorney approved by Landlord), indemnify, and save Landlord harmless against and from any real or alleged damage or injury and from all claims, judgments, liabilities, costs and expenses, including attorney's fees and costs, arising out of or connected therewith, or any repairs, Alterations or improvements (including original improvements and fixtures specified as Tenant's Work) which Tenant may make or cause to be made upon the Premises or any breach of this Lease by Tenant; provided, however, Tenant shall not be liable for such damage or injury to the extent and in the proportion that the same is ultimately determined to be attributable to the negligence or misconduct of Landlord or its Representatives, and Landlord shall pay for, defend (with an attorney approved by Tenant), indemnify, and save Tenant and its Representatives harmless against and from any and all claims, judgments, liabilities, costs and expenses, including attorneys fees and costs, resulting from any such damage or injury.

To the fullest extent permitted by law and subject to Section 13.5, Landlord covenants with Tenant that, except to the extent caused by the negligence or misconduct of Tenant or its Representatives, neither Tenant nor its Representatives shall be liable for any damage or liability of any kind or for any injury to or death of persons or damage to property of Landlord or any other person occurring from and after the Effective Date from any cause whatsoever related to occurrences in the Building (other than the Premises) or Common Area and Landlord shall pay for, defend (with an attorney approved by Tenant), indemnify, and save Tenant and its Representatives harmless against and from any real or alleged damage

LA:1769059v.5

7/17/09 01:36 PM

HAWKEYE 02196

Case 1:19-bk-12102-MT   Doc 21-1   Filed 10/10/19   Entered 10/10/19 15:51:17   Desc
Exhibit Exhibits A - P   Page 27 of 132

Case 1:13-bk-16307-MT   Doc 343-3   Filed 01/05/16   Entered 01/05/16 18:45:32   Desc
Exhibit 4 to Part 2   Page 80 of 121

Case 1:13-bk-16307-MT   Doc 226-1   Filed 08/27/14   Entered 08/27/14 17:15:04   Desc
Exhibit A   Page 60 of 85



or injury and from all claims, judgments, liabilities, costs and expenses, including attorney's fees and costs, arising out of or connected therewith, or any repairs, alterations or improvements which Landlord may make or cause to be made to the Building or Common Area or any breach of this Lease by Landlord; provided, however, Landlord shall not be liable for such damage or injury to the extent and in the proportion that the same is ultimately determined to be attributable to the negligence or misconduct of Tenant or its Representatives, and Tenant shall pay for, defend (with an attorney approved by Landlord), indemnify, and save Landlord and its Representatives harmless against and from any and all claims, judgments, liabilities, costs and expenses, including attorneys fees and costs, resulting from any such damage or injury.

The obligations to indemnify set forth in this Section 13.4 shall include all attorneys' fees, litigation costs, investigation costs and court costs and all other costs, expenses and liabilities incurred by the indemnified party from the first notice that any claim or demand is to be made or may be made. All indemnity obligations under this Section 13.4 shall survive the expiration or earlier termination of this Lease.

13.5   Waiver of Subrogation. Landlord and Tenant each waive any rights each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective property, the Premises or its contents, or to other portions of the Building arising from any liability, loss, damage or injury caused by fire or other casualty for which property insurance is carried or required to be carried pursuant to this Lease. The insurance policies obtained by Landlord and Tenant pursuant to this Lease shall contain endorsements waiving any right of subrogation which the insurer may otherwise have against the non-insuring party. If Landlord has contracted with a third party for the management of the Building, the waiver of subrogation by Tenant herein shall also run in favor of such third party.



13.6   Failure by Tenant to Maintain Insurance. If Tenant refuses or neglects to secure and maintain insurance policies complying with the provisions of this Article 13, or to provide copies of policies or certificates or copies of renewal policies or certificates within the time provided in Section 13.2 (either or both such events is referred to as an "Insurance Failure"), Landlord may, after providing at least ten (10) days written notice to Tenant of its intention to do so and so long as an Insurance Failure continues, secure the appropriate insurance policies and Tenant shall pay, upon thirty (30) days following demand, the cost of same to Landlord, as Additional Rent.

13.7   Landlord's Insurance. Landlord shall maintain in force an insurance policy as required by the terms of Landlord's mortgage loan for the Building. In the absence of a mortgage loan and specified insurance requirements thereunder, Landlord shall maintain in force an insurance policy for the Building covering all perils generally included within the classification "Special Form–Risks of Direct Physical Loss" (excluding earthquake and flood) for the Building including the Premises. Said insurance policy shall insure one hundred percent (100%) of the full replacement cost of the Building, including the improvements, fixtures and equipment in the Building, but excluding (a) the trade fixtures, inventory and other personal property of tenants and (b) the value of excavations, underground utilities, foundations and footings. At Landlord's option, said insurance policy or policies may also include a rental loss endorsement covering loss of rents under its leases in the Building for a period not to exceed twelve (12) months. Landlord shall maintain in force a commercial general liability insurance policy insuring against bodily injury, death and property damage occurring in or about the Common Area of the Building. Said insurance policy or policies shall (a) name Tenant as additional insured, (b) have a per occurrence limit of at least $2,000,000 and a general aggregate limit of at least $5,000,000, (c) be primary and noncontributing with any insurance maintained by Tenant, and (d) include a blanket contractual liability



LA:17980539.5

7/17/09 01:36 PM

HAWKEYE 02197

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 28 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 81 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 61 of 85



endorsement specifically insuring the performance by Landlord of the indemnity agreement as to liability for injury to or death of persons and injury or damage to property set forth in Section 13.4.

ARTICLE 14- DAMAGE

14.1    Insured Casualty. In the case of damage by fire or other perils covered by the insurance specified in Section 13.7, the following provisions shall apply:

(a)    Within a period of sixty (60) days after all applicable permits have been obtained (which permits Landlord shall promptly apply for and diligently seek), Landlord shall commence such repair, reconstruction and restoration of the Building and the Premises to the condition which existed prior to such damage, and shall diligently prosecute the same to completion; provided, however, that Tenant, at its cost, shall repair and restore all items of Tenant's Work and replace its stock in trade, trade fixtures, furniture, furnishings and equipment. Tenant shall commence this work promptly upon delivery of possession of the Premises to Tenant with Landlord's restoration work complete and shall diligently prosecute same to completion.

(b)    Notwithstanding the foregoing, if the destruction occurs during the last two (2) years of the Term, or at any time if it is reasonably estimated that repair or restoration after a casualty which Landlord is obligated under the Lease to undertake will take more than two hundred seventy (270) days after the date of destruction for such work to complete, Landlord and Tenant shall each have the right to terminate this Lease by written notice delivered to the other delivered within sixty (60) days after the date of destruction.



14.2    Uninsured Casualty. If the Premises or the Building are damaged as a result of any casualty not covered by the insurance specified in Section 13.7 and not required to be covered by such insurance, within a period of sixty (60) days after all applicable permits have been obtained (which permits Landlord shall promptly apply for and diligently seek), Landlord shall commence such repair, reconstruction and restoration of the Building and the Premises to the condition which existed prior to such damage, and shall diligently prosecute the same to completion, or Landlord may elect by delivery of written notice to Ten ant within sixty (60) days after the date of destruction not to so repair, reconstruct or restore the damaged property, in which event this Lease shall cease and terminate upon delivery of such notice. In the event Landlord elects to restore the Premises, Tenant shall have the same repair, restoration and replacement obligations it has pursuant to Section 14.1(a).

14.3    Distribution of Proceeds. In the event of the termination of this Lease pursuant to this Article 14, each party shall be entitled to the proceeds from the property insurance it maintains.

14.4    Abatement. From and after any such casualty and during any period of repair, reconstruction and restoration by Landlord and Tenant, as provided in this Article 14, the Minimum Rent and Additional Rent payable hereunder shall be abated proportionately with the degree to which Tenant's use of the Premises is impaired; provided, that Minimum Rent and Additional Rent payable hereunder shall be fully abated until Tenant reopens for business if it is not reasonably practicable for Tenant to continue operation of its business from the standpoint of prudent business management after any such casualty and during any period of repair, reconstruction and restoration by Landlord and Tenant. Tenant shall continue the operation of its business in the Premises during any such period to the extent reasonably practicable from the standpoint of prudent business management and, except to the extent such damage or destruction is caused by the negligence or misconduct of Landlord or its Representatives, Tenant shall not be entitled to any compensation or damages from Landlord for loss of use of the whole



LA\17690599.5

7/17/09 01:36 PM

HAWKEYE 02198

90

Case 1:19-bk-12102-MT   Doc 21-1   Filed 10/10/19   Entered 10/10/19 15:51:17   Desc
Exhibit Exhibits A - P   Page 29 of 132

Case 1:13-bk-16307-MT   Doc 343-3   Filed 01/05/16   Entered 01/05/16 18:45:32   Desc
Exhibit 4 to Part 2   Page 82 of 121

Case 1:13-bk-16307-MT   Doc 226-1   Filed 08/27/14   Entered 08/27/14 17:15:04   Desc
Exhibit A   Page 62 of 85



or any part of the Premises or the Building of which the Premises are a part, Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

14.5    Waiver of Termination. Tenant waives any statutory rights of termination which may arise by reason of any partial or total destruction of the Premises.

ARTICLE 15- EMINENT DOMAIN

15.1    Taking. The term "Taking", as used in this Article 15, shall mean an appropriation or taking under the power of eminent domain by any public or quasi-public authority or a voluntary sale or conveyance in lieu of condemnation but under threat of condemnation.

15.2    Total Taking. In the event of a Taking of the entire Premises, this Lease shall terminate and expire as of the date possession is delivered to the condemning authority and Landlord and Tenant shall each be released from any liability accruing pursuant to this Lease after the date of such termination, but Minimum Rent and Additional Rent for the last month of Tenant's occupancy shall be prorated and Landlord shall refund to Tenant any Minimum Rent and Additional Rent paid in advance.

15.3    Partial Taking. If (a) there is a Taking of a material portion of the Premises and, regardless of the amount taken, the remainder of the Premises is not, in Tenant's sole but reasonable business judgment, suitable for the continued operation of Tenant's business, Tenant may terminate this Lease; or (b) there is a Taking of a material portion of the Common Area which renders the use of the Premises infeasible, either Landlord or Tenant may terminate this Lease, upon giving notice in writing of such election to the other party within thirty (30) days after receipt by Tenant from Landlord of written notice that a portion of the Premises and/or Common Area has been so appropriated or taken. In each case, the termination of this Lease shall be effective as of the earlier of the date Tenant is required to vacate the Premises, or the portion of the Premises and/or the Common Area is taken.



15.4    Award. In the event of a Total Taking or a Partial Taking, Landlord is entitled to all damages and compensation awarded or paid in connection with any such Total Taking or Partial Taking for its ownership interest in the Premises. Tenant is entitled to all damages and compensation awarded or paid in connection with any such Total Taking or Partial Taking for its leasehold interest in the Premises, its loss of business goodwill, relocation expenses, and the value of Tenant's trade fixtures, furniture and equipment and any leasehold improvements made at Tenant's expense. Landlord and Tenant are also each entitled to any compensation awarded for its attorneys' fees and/or litigation expenses.

15.3    Continuation of Lease. In the event of a Taking, if Landlord and Tenant elect not to terminate this Lease as provided above (or have no right to so terminate), Landlord agrees, at Landlord's cost and expense (to the extent of the condemnation proceeds) as soon as reasonably possible after the Taking, to restore the Premises and/or the Common Area necessary for Tenant to operate its business from the Premises in a like manner and character as existed prior to the Taking and, thereafter, Minimum Rent and Additional Rent payable by Tenant hereunder shall be reduced on an equitable basis, taking into account the relative value of the portion taken as compared to the portion remaining, and Landlord shall be entitled to receive the total award or compensation in such proceedings.    Notwithstanding the foregoing, if such restoration is not completed within one hundred fifty (150) days of such Taking or, notwithstanding such restoration, Landlord is unable to operate its business from the Premises in a like manner and character as existed prior to the Taking, then Tenant shall be permitted to terminated this Lease by written notice delivered to Landlord.

LA:176300599.5

7/17/09 01:36 PM

HAWKEYE 02199

91

Case 1:19-bk-12102-MT   Doc 21-1   Filed 10/10/19   Entered 10/10/19 15:51:17   Desc
Exhibit Exhibits A - P   Page 30 of 132

Case 1:13-bk-16307-MT   Doc 343-3   Filed 01/05/16   Entered 01/05/16 18:45:32   Desc
Exhibit 4 to Part 2   Page 83 of 121

Case 1:13-bk-16307-MT   Doc 226-1   Filed 08/27/14   Entered 08/27/14 17:15:04   Desc
Exhibit A   Page 63 of 85



ARTICLE 16- DEFAULTS BY TENANT

16.1    Events of Default. Should Tenant at any time be in default with respect to any payment of Minimum Rent or Additional Rent or any other charge payable by Tenant pursuant to this Lease for a period of five (5) business days after written notice from Landlord to Tenant, or should Tenant be in default in the prompt and full performance of any other of its promises, covenants or agreements herein contained for more than thirty (30) days (provided, however, if the default cannot be rectified or cured within such thirty (30) day period, the default shall be deemed to be rectified or cured if Tenant, within such thirty (30) day period, shall have commenced to rectify or cure the default and shall thereafter diligently and continuously prosecute same to completion) after written notice thereof from Landlord to Tenant specifying the particulars of the default, then Landlord may treat the occurrence of any one (1) or more of the foregoing events as a breach of this Lease and, in addition to any or all other rights or remedies of Landlord by law provided, Landlord shall have the right, at Landlord's option, to terminate this Lease and all of the rights of Tenant in or to the Premises. Notwithstanding anything which may be or appear to be to the contrary in this Lease, it is expressly understood and agreed that Tenant's liability under this Lease resulting from any default by Tenant or other claim arising under this Lease shall be limited to actual damages and not special, consequential or punitive damages or loss of profits.

16.2    Termination of Lease. Should Landlord elect to terminate this Lease pursuant to the provisions of Sections 16.1(a) above, Landlord may recover from Tenant, as damages, the following: (a) the worth at the time of award of any unpaid rental which had been earned at the time of the termination, plus (b) the worth at the time of award of the amount by which the unpaid rental which would have been earned after termination until the time of award exceeds the amount of rental loss Tenant proves could have been reasonably avoided, plus (c) the worth at the time of award of the amount by which the unpaid rental for the balance of the Term after the time of award exceeds the amount of rental loss that Tenant proves could be reasonably avoided, plus (d) any other amounts necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom plus, at Landlord's election, any other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by the laws of the Building State.

As used in subparagraphs (a) and (b) above, the "worth at the time of award" is computed by allowing interest at the Interest Rate. As used in subparagraph (c) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

16.3    Definitions of Rental. For purposes of this Article 16 only, the term "rental" shall be deemed to be Minimum Rent, Additional Rent and all other sums required to be paid by Tenant pursuant to the terms of this Lease. All sums, other than Minimum Rent, shall, for the purpose of calculating any amount due under the provisions of Section 16.2(c) above, be computed on the basis of the average monthly amount accruing during the immediately preceding sixty (60) month period, except that if it becomes necessary to compute these sums before the sixty (60) month period has occurred, then these sums shall be computed on the basis of the average monthly amount accruing during the shorter period.

ARTICLE17 - DEFAULTS BY LANDLORD

17.1    Landlord's Liability. If Landlord fails to perform any of the covenants, provisions or conditions contained in this Lease on its part to be performed within thirty (30) days after written notice

LA-178505599.5

7/17/09 01:36 PM

HAWKEYE 02200

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 31 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 84 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 64 of 85



of default (or if more than thirty (30) days shall be required because of the nature of the default, if Landlord shall fail to diligently proceed to commence to cure the default after written notice), or if Landlord shall have breached any representation or warranty in this Lease, then Tenant shall be entitled to all rights and remedies available at law or in equity (including specific performance or other injunctive relief); provided, that Tenant in any action for damages against Landlord shall be only for actual damages (and not special, consequential or punitive damages or loss of profits) sustained by Tenant as a result of Landlord's breach or default and Tenant shall not be entitled to unilaterally terminate this Lease as a result thereof; provided, however, that nothing herein shall limit Tenant's right to bring an action to terminate this Lease as a result thereof. Notwithstanding anything contained in this Lease to the contrary, it is expressly understood and agreed that any judgment against Landlord resulting from any default or other claim under this Lease (excluding any claim involving misappropriation or fraud) shall be satisfied only out of (i) the rents, issues, profits and other income actually received from the operation of the Building, (ii) insurance proceeds, (iii) condemnation proceeds, and (iv) Landlord's equity in the Building and underlying realty, and no other property of Landlord or its Representatives, wherever situated, shall be subject to levy on any judgment obtained against Landlord. In the event Tenant obtains a money judgment against Landlord (whether in a mediation, arbitration, reference or court proceeding) which is not paid by Landlord within the time provided by said judgment or, if no time is provided, within the time provided by applicable law, Tenant shall be permitted to offset from Minimum Rent and Additional Rent next becoming due under this Lease, the amount of such judgment.

17.2    Cure by Assignee. If any part of the Premises is at any time subject to a first mortgage or a first deed of trust, and this Lease or the rentals due from Tenant hereunder are assigned by Landlord to a mortgagee, trustee or beneficiary ("Assignee" for purposes of this Article 17 only) and Tenant is given written notice of the assignment including the post office address of Assignee, then Tenant shall also give written notice of any default by Landlord to Assignee, specifying the default in reasonable detail and affording Assignee the same cure period afforded Landlord as provided in Section 17.1 to make performance for and on behalf of Landlord. If and when Assignee has made performance on behalf of Landlord, the default shall be deemed cured.

17.3    Tenant may make all payments and do all necessary work to cure any default by Landlord which is not cured after notice and within the applicable cure period. Landlord shall reimburse Tenant for all reasonable sums expended by Tenant to cure such default within thirty (30) days of Landlord's receipt of invoices, paid receipts or other sufficient evidence of said reasonable sums, together with interest at the Interest Rate from the date of Tenant's expenditure until paid in full. If the parties disagree on (a) whether or not Tenant has the right to cure Landlord's default under this Section 17.3 or (b) the amount of any sums due Tenant under this Section 17.3, then either party may submit the dispute to resolution in accordance with Section 22.10. Notwithstanding anything herein to the contrary, in the case of a bona fide emergency (e.g., danger to person or property including, without limitation, a roof leak or dangerous condition), provided Tenant first makes a reasonable, good faith effort to notify Landlord or the manager of the Building, Tenant shall be entitled to make such repairs as are necessary to remove the emergency for Landlord's account and Landlord will reimburse Tenant for the cost paid by Tenant in doing so within thirty (30) days after Tenant's delivery to Landlord of an invoice, together with reasonable back up documentation, for same.



17.4    If Landlord fails to pay Tenant the amounts due Tenant under Section 17.3 within the 30 day period referred to in Section 17.3, Tenant may notify Landlord in writing of its intent to deduct such amounts from rent ("Notice of Rental Offset"). If Landlord fails to pay Tenant such amounts within fifteen (15) days of the Notice of Rental Offset, Tenant may deduct such amounts from any and all Minimum Rent and Additional Rent payments due under this Lease. Nothing in this Lease shall preclude Tenant from collecting any amount paid by it under Section 17.3 without waiting for rental offsets to

LA:176900599.5

7/17/09 01:36 PM

HAWKEYE 02201

93

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 32 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 85 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 65 of 85



accrue. Notwithstanding anything in this Section 17.3 to the contrary, if either party has initiated a proceeding in accordance with Section 22.10 to resolve a dispute respecting any exercise by Tenant of its rights under Section 17.3 or this Section 17.4, then Tenant shall not have the right to deduct such amounts from Minimum Rent or Additional Rent unless and until the proceeding determines that Tenant has the right to do so.

ARTICLE 18- SUBORDINATION, ATTORNMENT AND TENANT'S CERTIFICATE

18.1    Subordination. Upon written request of Landlord, Landlord's mortgagee, the beneficiary of a deed of trust of Landlord or a lessor of Landlord, Tenant will subordinate its rights pursuant to this Lease in writing to the lien of any future mortgage, deed of trust or the interest of any future lease in which Landlord is the lessee (or, at Landlord's option, cause the lien of said mortgage, deed of trust or the interest of any lease in which Landlord is the lessee to be subordinated to this Lease) and to all advances hereafter to be made upon the security thereof; provided, however, that as a condition to such subordination, the subordination instrument shall be reasonably acceptable to Tenant and shall include a non-disturbance agreement confirming that Tenant's rights under the Lease and right to possession of the Premises will be recognized and not disturbed upon a foreclosure, sale or other transfer under any mortgage or deed of trust, or termination of any lease in which Landlord is the lessee. If the Premises are subject to one or more mortgages or deeds of trust as of the Effective Date or to a lease in which Landlord is the lessor, Landlord shall deliver to Tenant, concurrent with the execution of this Lease, a non-disturbance agreement ("NDA") executed by each such mortgagee, holder of a deed of trust and lessor in a form reasonably acceptable to Tenant and confirming that Tenant's rights under the Lease and right to possession of the Premises will be recognized and not disturbed upon a foreclosure, sale or other transfer under any such mortgage or deed of trust, or termination of any lease in which Landlord is the lessee.

18.2    Attornment. In the event any proceedings are brought for foreclosure, or in the event of the exercise of the power of sale or in the event of any transfer under any mortgage or deed of trust made by Landlord encumbering the Premises, or should a lease in which Landlord is the lessee be terminated, Tenant shall attorn to the purchaser or lessor under such lease upon any foreclosure, sale, transfer or lease termination and recognize the purchaser or lessor as Landlord under this Lease.

18.3    Estoppel Certificates. From time to time (but not more than twice in any calendar year), each party shall execute and deliver to the other (or to any third party specified by the requesting party), a written statement certifying the following information: (i) this Lease is in full force and effect and has not been amended, except for any amendments specifically stated, (ii) the expiration date of the Term of this Lease, subject to Tenant's right to extend the Term under Section 3.2, (iii) a statement that there are not, to such party's actual knowledge, uncured defaults on the part of the requesting party, or specifying such defaults if any are claimed, (iv) a statement that, to such party's actual knowledge, such party has no claims or offsets against the requesting party, or specifying such claims or offsets if any are claimed, and (v) the then current monthly Minimum Rent payable under this Lease and the date through which such monthly Minimum Rent has been paid. Each party shall deliver such estoppel statement within thirty (30) days of a written request from the other party.  Any such estoppel statement may be relied on by any prospective purchaser, lender, assignee or subtenant of the Premises.

ARTICLE 19- QUIET ENJOYMENT

So long as Tenant is not in default beyond the applicable cure period (after receipt of notice of such default) of its obligation for payment of Minimum Rent and Additional Rent or its observation and performance of all of the other covenants, terms and conditions of this Lease to be observed and performed by Tenant, Landlord covenants that Tenant shall peaceably and quietly hold and enjoy the



LA:17690599.5

7/17/09 01:36 PM

HAWKEYE 02202

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 33 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 86 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 66 of 85



Premises from and after delivery thereof to Tenant; subject, however, to all matters of record to which this Lease is subject; provided that none of such matters of record shall diminish the rights or increase the obligations of Tenant under this Lease, or interfere with or prevent the use of the Premises for the use specified in Section 1.17.

ARTICLE 20- TITLE OF LANDLORD

Landlord represents, warrants and covenants that, as of the date of this Lease, (i) Landlord is the owner in fee title to the Building and underlying realty, and (ii) there are no liens upon its estate other than (a) covenants, conditions, restrictions, easements, ground leases, mortgages or deeds of trust currently of record (collectively, "Agreements"); (b) the effect of any zoning laws of the city, county and state where the Building is situated, and (c) general and special taxes not delinquent. Tenant agrees that as to its leasehold estate, Tenant will conform to and will not violate the terms of the Agreements, and Tenant will conform to and will not violate the terms of any amendments or modifications to the Agreements made from time to time provided that no such amendment or modification interferes with or prevents Tenant from using the Premises for the use set forth in Section 1.17, and does not diminish the rights or increase the obligations of Tenant under this Lease. Landlord covenants not to enter into or permit any amendment or modification of the Agreements which interferes with or prevents Tenant from using the Premises for the use set forth in Section 1.17, or diminishes the rights or increases the obligations of Tenant under this Lease.

ARTICLE 21- [INTENTIONALLY LEFT BLANK]

ARTICLE 22- MISCELLANEOUS



22.1    Notices. Every notice, demand or request required hereunder or by law to be given by either party to the other shall be in writing. Every provision of this Lease which provides that either party shall notify the other of any particular matter shall be governed by this Section. Notices shall be given by personal service or by United States certified or registered mail, postage prepaid, return receipt requested, or nationally recognized overnight private courier (e.g., Federal Express, UPS), addressed to the party to be served at the address indicated in Section 1.22 or such other address as the party to be served may from time to time designate in a notice to the other party. Notice personally served shall be effective when delivered to the party upon whom such notice is served. If served by registered or certified mail, notice shall be conclusively deemed served on the date shown on the return receipt, but if delivery is refused or the notice is unclaimed, notice shall conclusively be deemed given forty eight (48) hours after mailing. If served by nationally recognized private courier, notice to the addressee shall be conclusively deemed given as confirmed by the nationally recognized private courier service making delivery but if delivery is refused or the notice is unclaimed, notice shall conclusively be deemed given twenty-four (24) hours after deposit with the nationally recognized private courier. Copies of any notice shall be sent to the addresses, if any, designated for service of copies of notices in Section 1.22 but the inadvertent failure to serve a copy of a notice, either to the address so designated or in the manner provided in this Section, shall not render service of notice invalid if the original notice is served in accordance with this Section.

22.2    Security Deposit. The Security Deposit shall be held by Landlord as security for the faithful performance by Tenant of all of the terms, covenants and conditions of this Lease to be kept and performed by Tenant during the Lease Term. If Tenant defaults with respect to any provision of this Lease, including but not limited to the provisions relating to the payment of rent, and provided that notice of such default has been delivered and the applicable cure period has lapsed, Landlord may (but shall not be required to) use, apply or retain all or any part of the Security Deposit for the payment of any rent or any other sum in default or for the payment of any amount which Landlord may spend or become



LA:1769059.5

7/17/09 01:36 PM

HAWKEYE 02203

95

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 34 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 87 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 67 of 85



obligated to spend by reason of Tenant's default. If any portion of the Security Deposit is so used or applied, Tenant shall, within five (5) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount. Landlord shall not be required to keep the Security Deposit separate from its general funds, and Tenant shall not be entitled to interest on the Security Deposit. The Security Deposit, or any balance thereof remaining after application by Landlord as permitted hereinabove, shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within thirty (30) days following the expiration of the Lease Term or upon termination of the Lease.

22.3    Hazards Materials.

(a)    Tenant shall, at its sole cost and expense, comply with all federal, state and local laws and regulations relating to the storage, use, handling and disposal of hazardous, toxic or radioactive matter posing a risk of injury to health, safety or property (collectively, "Hazardous Materials") and applicable to Tenant's use of the Premises. Tenant represents and warrants that, except for materials falling within the definition of "Hazardous Materials" which are normally used and properly disposed of in the ordinary course of Tenant's business, or which are sold by Tenant in the ordinary course of Tenant's business, neither Tenant, nor its Representatives will store, dispose of, produce, use, transport or manufacture any Hazardous Materials in the Premises or any portion of the Building. Tenant shall notify Landlord and shall provide to Landlord a copy or copies of any environmental entitlements or inquiries related to the Premises if and when received by Tenant.



(b)    The clean-up and disposal of any Hazardous Materials released or deposited into or about the Premises and/or the Building by Tenant or its agents, contractors or employees ("Tenant Caused Release") shall be performed by Tenant at Tenant's sole cost and expense and shall be performed in accordance with all applicable laws, rules, regulations and ordinances, pursuant to a site assessment and removal/remediation plan prepared by a licensed and qualified geotechnical engineer and submitted to and approved in writing by Landlord prior to the commencement of any work. The foregoing notwithstanding, Landlord in Landlord's sole and absolute discretion may elect, by written notice to Tenant, to perform the testing, clean-up and disposal of such Hazardous Materials present due to a Tenant Caused Release and, in such event, Tenant shall pay to Landlord, within thirty (30) days of Tenant's receipt of written request therefor delivered together with copies of paid invoices, the actual third-party cost of same upon receipt from Landlord of Landlord's written invoice therefor. Notwithstanding the foregoing, in the event that Tenant by written notice to Landlord disputes the need for any testing, clean-up or disposal performed or to be performed by Landlord, Tenant's responsibility therefor and/or the cost thereof, then Tenant shall have no responsibility to pay any such cost to Landlord unless and until such obligation and amount is determined pursuant to the procedures(s) set forth in Section 22.10. Tenant agrees to indemnify, defend and hold Landlord and its Representatives harmless from any claims, judgments, damages, fines, penalties, costs (including attorney, consultant and expert fees), liabilities (including sums paid in settlement of claims) or loss which arise during or after the Term of this Lease, in connection with a Tenant Caused Release during the Term of this Lease (and the foregoing indemnity shall expressly survive the expiration of the Term or earlier termination of this Lease). Without limiting the generality of the foregoing, this indemnification does specifically cover costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of a Tenant Caused Release.

(c)    In the event that any Hazardous Materials are determined to be located in the Premises or in, on and/or under the Building, the presence of such Hazardous Materials are not the result of a Tenant Caused Release and such Hazardous Materials are required to be remediated pursuant to applicable laws

LA:176903699.5

7/17/09 01:36 PM

HAWKEYE 02204

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 35 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 88 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 68 of 85



or the same have a material and adverse affect upon Tenant's use of or operation of its business from the Premises, Landlord shall perform or cause to be performed the necessary testing, remediation and clean-up of such Hazardous Materials in accordance with all applicable laws, rules, regulations and ordinances and at no expense to Tenant. Notwithstanding the foregoing, if the cost of the clean-up of such Hazardous Materials is reasonably estimated to exceed twenty percent (20%) of the then full replacement cost of the Premises and provided such Hazardous Materials are not present due to a Landlord Caused Release (as defined below), then Landlord shall be entitled to terminate this Lease by written notice delivered to Tenant within thirty (30) days after the date of the completion of an assessment of the discharge. Further, if it is reasonably estimated that the clean-up of such Hazardous Materials will cause the Premises to be uninhabitable or require Tenant to close its business therein for more than one hundred twenty (120) days, then Tenant shall be entitled to terminate this Lease by written notice delivered to Landlord within thirty (30) days after the date of the completion of an assessment of the discharge. Landlord shall promptly deliver to Tenant copies of all assessments of the discharge ordered or received by Landlord. Landlord agrees to indemnify, defend and hold Tenant and its Representatives harmless from any claims, judgments, damages, fines, penalties, costs (including attorney, consultant and expert fees), liabilities (including sums paid in settlement of claims) or loss which arise during or after the Term of this Lease, in connection with a Landlord Caused Release whether prior to or during the Term of this Lease (and the foregoing indemnity shall expressly survive the expiration of the Term or earlier termination of this Lease). Without limiting the generality of the foregoing, this indemnification does specifically cover costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of a Landlord Caused Release. As used herein, a "Landlord Caused Release" means a release or deposit into or about the Premises and/or the Building of Hazardous Materials by Landlord or its agents, contractors or employees.



(d)    From and after the determination that Hazardous Materials are located in the Premises or in, on and/or under the Building, and provided that the presence of such Hazardous Materials are not the result of a Tenant Caused Release and such Hazardous Materials are required to be remediated pursuant to applicable laws or the same have a material and adverse affect upon Tenant's use of or operation of its business from the Premises, then Minimum Rent and Additional Rent payable hereunder shall be abated proportionately with the degree to which Tenant's use of the Premises is impaired; provided, that Minimum Rent and Additional Rent payable hereunder shall be fully abated after such determination and until Tenant reopens for business if Tenant is prohibited by applicable laws from operating its business in the Premises until such remediation is completed or it is not reasonably practicable for Tenant to continue operation of its business from the standpoint of prudent business management after any such determination and during any period of remediation. Tenant shall continue the operation of its business in the Premises during any such period if permitted by applicable law and to the extent reasonably practicable from the standpoint of prudent business management and, except to the extent due to a Landlord Caused Release, Tenant shall not be entitled to any compensation or damages from Landlord for loss of use of the whole or any part of the Premises or the Building of which the Premises are a part, Tenant's personal property or any inconvenience or annoyance occasioned by such contamination or remediation.

(e)    Landlord represents and warrants to the best of its knowledge, as of the Effective Date, that neither the Premises nor the Building or underlying realty contains any Hazardous Materials requiring remediation in accordance with federal, state and local laws and regulations relating to Hazardous Materials.

22.4    Intentionally Left Blank.



LA:17690599.5

7/17/09 01:36 PM

HAWKEYE 02205

Case 1:19-bk-12102-MT   Doc 21-1   Filed 10/10/19   Entered 10/10/19 15:51:17   Desc
Exhibit Exhibits A - P   Page 36 of 132

Case 1:13-bk-16307-MT   Doc 343-3   Filed 01/05/16   Entered 01/05/16 18:45:32   Desc
Exhibit 4 to Part 2   Page 89 of 121

Case 1:13-bk-16307-MT   Doc 226-1   Filed 08/27/14   Entered 08/27/14 17:15:04   Desc
Exhibit A   Page 69 of 85



22.5    Force Majeure. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, special orders, enemy or hostile governmental acting civil commotion, fire or other casualty, and other causes (except financial) beyond the reasonable control of the party obligated to perform, shall excuse the performance by that party for a period equal to the prevention, delay or stoppage, except the obligations imposed with regard to Minimum Rent and Additional Rent to be paid by Tenant pursuant to this Lease; provided the party prevented, delayed or stopped shall have given the other party written notice thereof within thirty (30) days of such event causing the prevention, delay or stoppage.

22.6    Termination and Holding Over. This Lease shall terminate without further notice upon the expiration of the Term. Upon the expiration or earlier termination of the Term, Tenant shall peaceably and quietly surrender the Premises broom-clean condition, reasonable wear and tear and any damage to the Premises which Tenant is not required to repair pursuant to Article 10 Article 14 or Article 15 excepted (it being expressly acknowledged that Tenant has no obligation to repair or restore any portion of the Premises if this Lease is terminated under Article 14 or Article 15). Subject to the foregoing, Tenant may, during the thirty (30) day period after expiration of the Term or earlier termination of this Lease ("Removal Period"), remove from the Premises any or all of trade fixtures, furniture, equipment and signs owned by Tenant or used by Tenant in the conduct of its business, and Tenant may remove any and all improvements, additions and Alterations to the extent such items are not permanently affixed to the Premises, and Tenant shall immediately repair any damage occasioned to the Premises by reason of any such removal so as to leave the Premises in a neat and clean condition. Should Tenant hold over in the Premises beyond the Removal Period, the holding over shall not constitute a renewal or extension of this Lease or give Tenant any rights under this Lease. In such event, Landlord may, in its sole discretion, treat Tenant as a tenant at will, subject to all of the terms and conditions in this Lease, except that Minimum Rent shall be an amount equal to one and one-half (1-1/2) times the sum of Minimum Rent which was payable by Tenant for the twelve (12) month period immediately preceding the expiration or earlier termination of this Lease.

22.7    Security Measure. Tenant hereby acknowledges that the Minimum Rent payable to Landlord hereunder does not include the cost of guard service or other security measures, and that Landlord shall have no obligation whatsoever to provide same. Tenant assumes all responsibility for the protection of the Premises, Tenant, its agents and invitees and their property from the acts of third parties.

22.8    Guarantors. The Tenant's performance under this Lease shall be guaranteed by the individuals or entities, if any, as provided under Section 1.20 in the form attached hereto as Exhibit G and incorporated herein by reference. Tenant and Guarantor(s) hereby represent to Landlord that Guarantor(s) have financial interest in the Tenant's business and the said guarantees are executed in connection with the Guarantors' interest thereto.

22.9    Performance Under Protest. If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the party of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof, together with interest thereon at the Interest Rate from the date paid, as it was not legally required to pay.



LA:17690599.5

7/17/09 01:36 PM

HAWKEYE 02206

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 37 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 90 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 70 of 85



22.10   Mediation and Arbitration of Disputes. Any controversy or claim arising under this Lease shall, subject to agreement by the parties, be submitted to mediation.   If the parties do not agree to a mediation or if any mediation does not resolve any such controversy or claim, the parties agree to submit such controversy or claim to a binding arbitration in the County of Los Angeles, California under the rules of the American Arbitration Association. However, any action in unlawful detainer for the failure to pay Minimum Rent or Additional Rent shall not be subject to this Section 22.10; provided, however, that Landlord shall have no right to bring an unlawful detainer action (i) for the failure to pay Additional Rent with respect to any obligation under this Lease which expressly provides that any dispute with respect thereto is to be determined through the procedures(s) set forth in Section 22.10, or (ii) in connection with the exercise by Tenant of any offset right expressly provided in this Lease, and any dispute with respect thereto shall be resolved through the procedures(s) set forth in this Section 22.10.

22.11   Miscellaneous Provisions.

(a)     Any waiver by either party of a breach by the other party of a covenant of this Lease shall not be construed as a waiver of a subsequent breach of the same covenant. Whenever a party is entitled to consent to or approve of any matter herein (including any Exhibit hereof), such consent may not be unreasonably withheld, conditioned or delayed.   The consent or approval by either party to anything requiring such party's consent or approval shall not be deemed a waiver of such party's right to withhold consent or approval of any subsequent similar act.   No breach of a covenant of this Lease shall be deemed to have been waived by the other party unless the waiver is in writing and is signed by such party.

(b)     Except as provided herein to the contrary, the respective rights and remedies of the parties specified in this Lease shall be cumulative and in addition to any rights and remedies not specified in this Lease. It is understood that there are no oral or written agreements or representations between the parties hereto affecting this Lease and this Lease supersedes and cancels any and all previous negotiations, arrangements, representations, brochures, agreements and understandings, if any, between Landlord and Tenant. No provision of this Lease may be amended except by an agreement in writing signed by Landlord and Tenant. If any provision of this Lease or the application of such provision to any person, entity or circumstance is found invalid or unenforceable by a court of competent jurisdiction, such determination shall not affect the other provisions of this Lease and all other provisions of this Lease shall be deemed valid and enforceable.



(c)     As used in this Lease, the term "CPI" shall mean the Consumer Price Index published by the United States Department of Labor, Bureau of Labor Statistics (the "Bureau") "All Items" for All Urban Consumers in the Los Angeles-Anaheim-Riverside metropolitan area, (1982- 84=100). Should the Bureau discontinue the publication of the Index, publish the same less frequently or alter the same in some other manner, the most nearly comparable index or procedure as determined by Landlord shall be substituted therefor.

(d)     This Lease shall be governed by and construed in accordance with the laws of the State of California without giving effect to the choice of law provisions thereof.

(e)     Subject to the terms of this Lease, all rights and obligations of Landlord and Tenant under this Lease shall extend to and bind the respective heirs, executors, administrators and the permitted concessionaires, successors, subtenants and assignees of the parties. If there is more than one (1) Tenant hereunder, each shall be bound jointly and severally by the terms, covenants and agreements contained in this Lease.

(f)     Time is of the essence of all provisions of this Lease of which time is an element.

LA:17690599.5

7/17/09 01:36 PM

HAWKEYE 02207

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 38 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 91 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 71 of 85



(g)     If Tenant or Landlord is a corporation, partnership or limited liability company, each individual executing this Lease on behalf of the corporation, partnership or limited liability company (in his/her representative capacity only) represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the corporation, partnership or limited liability company and that this Lease is binding upon the corporation, partnership or limited liability company.

(h)     Tenant shall observe faithfully and comply with, and shall cause its employees and invitees to observe faithfully and comply with, reasonable and nondiscriminatory rules and regulations governing the Building as may from time to time be promulgated by Landlord, which rules and regulations currently include the provisions of Exhibit F.

(i)     Tenant waives any and all rights of redemption granted under any present and future laws in the event Landlord obtains the right to possession of the Premises in accordance with and pursuant to applicable law by reason of the violation by Tenant of any of the covenants and conditions of this Lease or otherwise.

(j)     Tenant represents and warrants to Landlord that it has not had any dealings with any realtors, brokers or agents in connection with the negotiation of this Lease, and hereby agrees to indemnify and hold Landlord and its Representatives harmless from any and all liability, loss, cost, damage or expense (including attorneys' fees and costs) arising from the breach of said representation and warranty.  Landlord represents and warrants to Tenant that it has not had any dealings with any realtors, brokers or agents in connection with the negotiation of this Lease, and hereby agrees to indemnify and hold Tenant and its Representatives harmless from any and all liability, loss, cost, damage or expense (including attorneys' fees and costs) arising from the breach of said representation and warranty.



(k)     Upon either party's request, the other party agrees to execute and acknowledge a short form memorandum of this Lease for recording purposes in a form reasonably acceptable to Landlord and Tenant, which short form may be recorded by Landlord or Tenant. In no other event shall this Lease or a short form memorandum of this Lease be recorded.

(l)     Should Landlord sell, exchange or assign this Lease (other than a conditional assignment as security for a loan), then Landlord, as transferor, shall be relieved of any and all obligations on the part of Landlord accruing under this Lease from and after the date of such transfer provided that Landlord has transferred the Security Deposit and any unapplied Prepaid Rent (as described in Section 1.24) to Landlord's transferee and provided that Landlord's successor in interest has assumed in writing Landlord's obligations under the Lease which accrue from and after such date. Written notice of any such transfer together with a copy of such assumption shall be given to Tenant. Nothing herein contained shall be construed to release Landlord or any successor owner as Landlord from any liability or obligation which otherwise matured prior to the effective date of any transfer.  Notwithstanding the foregoing, each successor transferee of Landlord's interest in the Premises shall, without further agreement, be bound by Landlord's covenants and obligations under this Lease until any further transfer by such successor transferee (together with the transfer of the Security Deposit and any unapplied Prepaid Rent), and written assumption of Landlord's covenants and obligations under this Lease by the transferee of such successor transferee as provided hereinabove.

(m)     Except where another rate of interest is specifically provided for in this Lease, any amount due from either party to the other under this Lease which is not paid when due, shall bear interest at the rate per annum ("Interest Rate") equal to the prime interest rate the prime rate published from time

LA:176905/99.5

7/17/09 01:36 PM

HAWKEYE 02208

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 39 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 92 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 72 of 85



to time by the Wall Street Journal plus two (2) percentage points (but in no event to exceed the maximum lawful rate) from the date such amount was originally due to and including the date of payment.

(n)    During the last one hundred eighty (180) days of the Term, Landlord shall have the right to go upon the Premises to show same to prospective tenants or purchasers during normal business hours and upon reasonable notice to Tenant.

(o)    Tenant shall pay all costs for work performed by or on account of it and shall keep the Premises and the Building free and clear of mechanics' liens or any other liens in connection therewith. Tenant shall give Landlord immediate notice upon Tenant receiving actual notice of any lien filed against the Premises or the Building as a result of any work of improvement performed by or on behalf of Tenant. Tenant shall immediately cause any lien to be discharged or removed off record by either paying the amount thereof or recording a statutory lien release bond in an amount equal to one hundred fifty percent (150%) of the amount of said lien, or such other amount as may be adequate to cause the lien to be released as an encumbrance against the Premises and the Building. If Tenant fails to do so, Landlord shall have the right, but not the obligation, in addition to all other rights and remedies available to Landlord under this Lease, and after ten (10) days prior written notice to Tenant, to either pay and discharge such lien, without regard to the validity thereof, or procure and cause to be recorded a statutory lien release bond and to (i) collect from Tenant as Additional Rent; or (ii) deduct from any tenant improvement allowance or any other amount payable by Landlord to Tenant under this Lease (A) all costs incurred by Landlord in paying and discharging such lien, or in procuring such bond, and (B) all reasonable third-party expenses incurred by Landlord in connection with such lien, including reasonable attorneys' fees and costs and recording fees. Landlord shall pay when due any amount due under a lien or encumbrance (including, without limitation, any mechanics' lien filed in connection with any work performed by or on account of Landlord) that could result in a termination of this Lease if not paid.

(p)    Intentionally Left Blank.



(q)    In the event that, at any time after the date of this Lease, either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease or any default hereunder, the party not prevailing in such action or proceeding shall reimburse the prevailing party for its actual attorneys' fees, and all fees, costs and expenses incurred in connection with such action or proceeding, including, without limitation, any post-judgment fees, costs or expenses incurred on any appeal or in collection of any judgment.

(r)    Landlord reserves the absolute right to effect such other tenancies in the Building as Landlord, in the exercise of its sole business judgment, shall determine to best promote the interests of the Building. Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or number of tenants shall occupy any space in the Building or operate business during the Term of this Lease.

(s)    Tenant shall be required to utilize Landlord's roofing contractor in the event Tenant or Tenant's agents desire to penetrate the roof of the Premises for any repairs, alterations or improvements permitted to be made to the Premises by Tenant pursuant to the terms of this Lease; provided, however, if Landlord and Tenant reasonably determine that Landlord's roofing contractor's rates are not reasonably competitive, Tenant shall have the right to utilize any other licensed and reputable roofing contractor reasonably acceptable to Landlord.



LA 176905995

7/17/09 01:36 PM

HAWKEYE 02209

Case 1:19-bk-12102-MT   Doc 21-1   Filed 10/10/19   Entered 10/10/19 15:51:17   Desc
Exhibit Exhibits A - P   Page 40 of 132

Case 1:13-bk-16307-MT   Doc 343-3   Filed 01/05/16   Entered 01/05/16 18:45:32   Desc
Exhibit 4 to Part 2   Page 93 of 121

Case 1:13-bk-16307-MT   Doc 226-1   Filed 08/27/14   Entered 08/27/14 17:15:04   Desc
Exhibit A   Page 73 of 85



(t)     Upon Landlord's request, Tenant shall provide Landlord with written notice of Tenant's designated representative for Landlord or its property manager to contact in the event of emergencies at the Building or Premises, and his or her name, address, phone number and facsimile number.

(u)     Tenant shall have the right to obtain independent security personnel for its Premises; and may provide security personnel which carry firearms as required by the CUP's conditions of approval and the Security Plan endorsed by the Los Angeles Police Department. Tenant shall at all times remain liable for such security personnel and shall indemnify, defend and protect Landlord against any claims or damages pursuant to the indemnification provisions set forth in Section 13.4.

22.12   Exhibits. The following Exhibits are attached to this Lease and, by this reference, made a part of this Lease:

| | |
|---|---|
| Exhibit A | Site Plan |
| Exhibit B | Legal Description |
| Exhibit C | Rent Commencement Date Certification |
| Exhibit D | Construction Provisions |
| Exhibit E | Intentionally Left Blank |
| Exhibit F | Rules and Regulations |
| Exhibit G | Guaranty |





LA:176905935
7/17/09 01:36 PM

HAWKEYE 02210

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 41 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 94 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 74 of 85



EXHIBIT D

CONSTRUCTION PROVISIONS

1.    Description of Tenant's Work. Unless otherwise provided in the Lease Agreement, all
work to be done in the Premises shall be provided by Tenant at Tenant's sole cost and expense (the
"Tenant's Work"). Tenant's Work shall include, but shall not be limited to, all leasehold improvements,
fixtures, equipment and personal property necessary for Tenant to open from the Premises for the use set
forth in Section 1.17.

1.1    High Rise Retrofit as Tenant Improvement. Landlord and Tenant both acknowledge and
agree that for the purposes of consolidating contractors, and for working in the most efficient manner
towards completing all required construction as imposed by local governmental and administrative
agencies, Tenant will oversee and manage the construction necessary to perform the Required Retrofit
Work (as defined in Section 5.8 of the Lease). The Required Retrofit Work will be performed by Tenant
as a part of Tenant's Work, subject to Landlord's payment of the cost of the Required Retrofit Work as
provided hereinbelow.



1.2    Limitation on Work:  Landlord expressly agrees that the Required Retrofit Work is
limited to the work as required by LADBS under the notice of noncompliance dated December 10, 2006
issued by Inspector John Jones. Any future notices of noncompliance per governmental or administrative
agencies that arise at a future date from the signing of the Lease will not be included under the Required
Retrofit Work and Landlord expressly agrees that, subject to Section 9.5 of the Lease, any such future
requirements for the Building will be the sole responsibility of Landlord. Landlord further represents and
warrants that no other notices of noncompliance, violations, or other such notices of similar character
exist to Landlord's knowledge as of the date of this Lease. In the event that any such governmental or
administrative agency notices come to light that are not expressly included in this agreement, any work
required will not be considered a part of Tenant's Work or the Required Retrofit Work s Tenant
Improvements or High Rise Retrofit work within the scope of work described herein, and will be borne at
the sole expense of Landlord.

1.3    High Rise Retrofit Expenses. Cost for the Required Retrofit Work shall be borne by
Landlord exclusively. As of the Effective Date, it is not anticipated that the cost of the Required Retrofit
Work will exceed $1.1 Million; however, Landlord agrees that it shall be solely responsible for any such
cost to the extent it exceeds $1.1 Million. In the event the cost of the Required Retrofit Work exceeds
$1.1 Million, Landlord may conduct, at Landlord's expense, an audit of Tenant's costs and expenses
related to the Required Retrofit Work. If Landlord's audit reveals that costs for the Required Retrofit
Work are overstated, then Tenant shall reimburse Landlord the amount of such overpayment within thirty
(30) days of receipt of documentation evidencing such overstatement and, if such audit reveals that costs
are overstated by more than five percent (5%), Tenant shall also reimburse Landlord for the reasonable
expenses of such audit within thirty (30) days of receipt of receipts or other documentation detailing the
costs for said audit. Landlord agrees to forward payment to Tenant for the completion of the Required
Retrofit Work in accordance with the schedule below. The detailed scope of the Required Retrofit Work
shall be agreed upon by both Landlord and Tenant prior to Tenant's commencement thereof. Approval of
such scope of work shall not to be unreasonably withheld by either party.

1.4    Tenant Improvement Allowance. The Tenant Improvement Allowance in the amount set
forth in Section 5.2 of the Lease shall be paid by Landlord to Tenant concurrent with the execution of the
Lease.

LA-376907739.2

7/6/09

HAWKEYE 02211

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 42 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 95 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 75 of 85



1.5    Required Retrofit Work Schedule. The funds for payment of the Required Retrofit Work shall be retained in the Client Trust Account of the Law Offices of Peter A. Kim for distribution according to the following schedule:

- $275,000 shall be disbursed upon execution of the Lease;

- $275,000 shall be disbursed upon issuance of building permit(s) for the Required Retrofit Work;

- $275,000 shall be disbursed at 50% completion of the Required Retrofit Work; and

- The balance required to complete the Required Retrofit Work upon Tenant (i) obtaining written sign off or approval from the fire department and building department for the Required Retrofit Work, and (ii) providing Landlord with unconditional waiver and lien releases from the contractors, including material and equipment suppliers, in the form required by California Civil Code Section 3262.

2.    Provisions For Completion of Plans and Specifications and Construction of Premises.

(a)    The procedure for approval of Tenant's plans and specifications is as follows:

(i)    Within thirty (30) days of the execution of this Lease, Tenant shall submit to Landlord four (4) sets of fully-dimensioned one-quarter inch (1/4") scale drawings and specifications prepared by Tenant's licensed architect at Tenant's expense, which drawings shall indicate clearly and in detail all specific changes and alterations to the Premises including, but not limited to, the storefront, interior partitions, fixture plans, plumbing, lighting, electrical outlets and all of Tenant's Work, as described above. Any and all such plans shall be subject to Landlord's prior written approval. Landlord shall have ten (10) business days within which to approve or disapprove Tenant's proposed plans. In the event Landlord shall disapprove Tenant's plans, Landlord shall provide Tenant with written specific objections, and Tenant shall have ten (10) business days within which to amend its proposed plans and incorporate Landlord's required changes.



(ii)    Upon Landlord's approval of Tenant's proposed plans, Tenant shall promptly submit such approved plans to the appropriate governmental authority for plan checking and the issuance of a building permit. In the event such governmental authority requires any changes to such approved plans prior to the issuance of a building permit, Tenant shall, at its sole cost and expense, promptly change such plans pursuant to such governmental request and submit such changed plans to Landlord for its approval. Landlord shall have five (5) business days within which to approve or disapprove such changed plans. In the event Landlord shall disapprove such changed plans, Landlord shall provide Tenant with written specific objections, and Tenant shall have five (5) business days within which to amend such plans and incorporate Landlord's required changes. Upon Landlord's approval of the changed plans, Tenant shall promptly resubmit such plans to the appropriate governmental authority for plan checking and the issuance of a building permit as previously set forth in this Subparagraph (ii). Upon Tenant's receipt of a building permit and any other necessary governmental approvals for Tenant's Work based upon plans approved by Landlord (the "Final Approved Plans"), and after the Turnover Date, Tenant shall immediately commence construction of Tenant's Work and shall diligently pursue such construction to completion in accordance with the Final Approved Plans.

(iii) No changes, modifications or alterations to the Final Approved Plans may be made without the prior written consent of Landlord. Any additional costs and expenses including, without limitation,

LA-176907;9.2

7/6/09

HAWKEYE 02212

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 43 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 96 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 76 of 85



increased fees which Landlord may be required to pay for architectural, engineering and other similar services arising by reason of any change, modification or alteration to the Final Approved Plans, any additional construction costs including costs of change orders charged by Landlord's contractor and any and all other costs, expenses and/or damages incurred or suffered by Landlord by reason of the changes, modifications or alterations to the Final Approved Plans and any delays directly or indirectly caused by such damages, modifications or alterations to the Final Approved Plans shall be at the sole cost and expense of Tenant and shall be paid by Tenant to Landlord before the performance of the work requested by Tenant.

(b)    Tenant shall not commence any work in the Premises unless and until the following conditions have been met: (i) Final Approved Plans shall have been achieved; (ii) Tenant shall require that each contractor have a valid license for purposes of executing the work from the California State Contractor's License Board ("SCLB") and no complaint has been filed against such contractor with SCLB; (iii) Tenant shall have obtained all permits and approvals from all appropriate governmental authorities for the Tenant's Work and shall furnish Landlord with copies of all such permits; (iv) Tenant, its contractor and subcontractors (collectively, "Tenant's Agents") shall have procured all insurance required under the provisions of the Lease and shall have furnished Landlord with certificates of such insurance in accordance with the provisions of the Lease; and (v) Tenant has transferred all utilities serving the Premises to Tenant's account. Upon delivery of possession of the Premises, Tenant shall be responsible for re-keying the doors of the Premises, and all costs associated with such change; provided, however, at such time as the doors of the Premises are re-keyed, Tenant shall promptly provide Landlord with three (3) keys for entering the Premises pursuant to the terms of this Lease.



(c)    (i)    The Tenant's Work shall be constructed in accordance with the Final Approved Plans in a good and workmanlike manner and in compliance with all applicable laws. Neither Landlord nor its Representatives shall interfere with, obstruct, or delay, any work in the Premises. Tenant and Tenant's Agents shall abide by all reasonable rules made by Landlord's contractor with respect to the storage of materials and coordination of work with other work being performed in the Building. Each of Tenant's Agents shall warrant that the portion of the Tenant's Work for which it is responsible shall be free from any defects in workmanship and materials for a period of not less than one (1) year from the date of completion thereof. Each of Tenant's Agents shall be responsible for the replacement or repair, without additional charge, of all work done or furnished in accordance with its contract that shall become defective within one (1) year after the completion of the work performed by such contractor or subcontractors. All such warranties or guarantees as to materials or workmanship of or with respect to the Tenant's Work shall be written such that such guarantees or warranties shall inure to the benefit of Landlord and Tenant, as their respective interests may appear, and can be directly enforced by any of them. Tenant covenants to give to Landlord any assignment or other assurances which may be necessary to effect such right of direct enforcement.

(ii) All of Tenant's Agents shall carry worker's compensation insurance covering all of their respective employees, and shall also carry public liability insurance, including property damage, with limits of not less than Two Million Dollars ($2,000,000.00) single limit coverage per occurrence with an annual aggregate of not less than Four Million Dollars ($4,000,000.00) for bodily injury, personal injury, death and property damage, issued by insurance companies with a general policy holder's rating of not less than "A" and a financial rating of not less than Class "VII", as rated in the most current available "Best's Key Rating Guide", and which are qualified to do business in California, and the policies shall insure to the benefit of Tenant and Landlord, as their interests may appear. In addition, during the course of performance of the Tenant's Work, Tenant shall carry "Builder's All Risk" insurance in an amount reasonably required to cover the construction of Tenant's Work. Certificates for all insurance carried



LA:17690739.2

7/6/09

HAWKEYE 02213

105

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 44 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 97 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 77 of 85



pursuant hereto shall be delivered to Landlord before the commencement of construction of the Tenant's Work and all such policies of insurance must contain a provision that the company writing said policy will give Landlord ten (10) days prior written notice of any cancellation or lapse of the effective date. In the event that the Tenant's Work is damaged by any cause during the course of the construction thereof, Tenant shall immediately repair the same at Tenant's sole cost and expense. Tenant's Agents shall maintain all of the foregoing insurance coverage in force until the Tenant's Work is completed. All insurance required hereunder (except Workers' Compensation) shall preclude subrogation claims by the insurer against anyone insured thereunder and shall provide that it is primary insurance as respects Landlord and that any other insurance maintained by Landlord and is excess and noncontributing with the insurance required hereunder.

(iii) Within ten (10) days after completion of construction of the Tenant's Work, Tenant shall cause a Notice of Completion to be recorded in the office of the Recorder of the County in which the Premises is located in accordance with the laws of the State of California, and shall furnish a copy thereof to Landlord upon such recordation. If Tenant fails to do so, Landlord may execute and file the same on behalf of Tenant as Tenant's agent for such purpose, at Tenant's sole cost and expense. Within thirty (30) days following the completion of the Tenant's Work, Tenant shall deliver to Landlord (i) a set of as-built drawings for the Premises (or a copy of the Final Approved Plans marked to show field changes), and (ii) a copy of all warranties, guaranties and operating manuals and information relating to the improvements, equipment, and systems in the Premises. Tenant shall exercise commercially reasonable efforts to obtain a certificate of occupancy for the Premises promptly following completion of the Tenant's Work.





LA:17690739.2

7/5/06

HAWKEYE 02214

106

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 45 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 98 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 78 of 85

SIGNATURE PAGE TO LEASE AGREEMENT BETWEEN
PAX AMERICA LLC AND HAWKEYE ENTERTAINMENT LLC

DATE:  *July 17, 2009*

PAX AMERICA DEVELOPMENT, LLC
2333 Beverly Blvd.
Los Angeles, California 90057

By: _____
Kevin K. Choe
President

DATE:

HAWKEYE ENTERTAINMENT, LLC.
14242 Ventura Blvd #212
Sherman Oaks, CA 91423

By: _____
Name:
Title:

*July 17th 2009*

HAWKEYE 02215

107

# Exhibit B

Case 1:19-bk-12102-MT   Doc 21-1   Filed 10/10/19   Entered 10/10/19 15:51:17   Desc
Exhibit Exhibits A - P   Page 47 of 132

Case 1:13-bk-16307-MT   Doc 343-3   Filed 01/05/16   Entered 01/05/16 18:45:32   Desc
Exhibit 4 to Part 2   Page 100 of 121

Case 1:13-bk-16307-MT   Doc 226-1   Filed 08/27/14   Entered 08/27/14 17:15:04   Desc
Exhibit A   Page 80 of 85

## FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT, dated as of August 19, 2014 (this "**First Amendment**"), for reference purposes only, is made by and between New Vision Horizon, LLC ("**Landlord**"), and Hawkeye Entertainment, LLC ("**Tenant**").

### RECITALS

Landlord is the current owner of certain real property located at 618 S. Spring Street, Los Angeles, California 90014 (the "**Property**").

A.     PAX America Development, LLC ("**PAX**") is the prior owner of the Property. PAX and Tenant entered into that certain Lease Agreement, dated for reference purposes only July 17, 2009, (the "**Lease**") with respect to certain Premises within the building located on the Property, all as described in the Lease. The Lease is attached hereto as Exhibit 1.

B.     PAX and Tenant allegedly executed three documents styled as "Amendment to Lease," [sic] dated August 5, 2009, August 17, 2009 and September 16, 2009, respectively, all of which purport to amend or modify the Lease in some fashion (the "**Alleged Amendments**").

C.     On August 31, 2009, Hawkeye, PAX, and PAX' s Lender, East West Bank, entered into a Subordination, Non-Disturbance and Attornment Agreement with respect to the PAX-Hawkeye Lease (the "**SNDA Agreement**").

D.     Landlord became the owner of the Property and the landlord under the Lease pursuant to Landlord's acquisition of the Property at a foreclosure sale on December 20, 2010.

E.     Certain disputes have arisen between Landlord and Tenant which have been resolved through a Settlement Agreement executed contemporaneously herewith (the "**Settlement Agreement**"). This First Amendment is an element of the settlement between the parties and is attached as Exhibit 4 to the Settlement Agreement, and incorporated therein by reference.

F.     Landlord and Tenant desire to amend the Lease on the terms and conditions set forth below.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and in the Settlement Agreement, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby covenant and agree as follows:

1.     **Recitals.** The Recitals stated above are hereby ratified by Landlord and Tenant as being true, accurate and correct and are incorporated into this Agreement by reference as though herein completely and fully rewritten.

USW 80463809.4
4817-3230-3388.1

1

109

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 48 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 101 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 81 of 85

    2.    Effective Date. The effective date of this First Amendment shall be the Effective Date as that term is defined in the Settlement Agreement.

    3.    Amendments. Landlord and Tenant hereby declare that the Alleged Amendments are null and void and of no force and effect as amendments of the Lease. Landlord and Tenant agree and covenant that neither shall attempt to enforce any provision of the Alleged Amendments. The Lease is hereby amended as hereinafter provided. This First Amendment is the only amendment of the Lease as of the date hereof. The amendments hereby made to the Lease are made and shall be effective notwithstanding any provision or provisions to the contrary in the Lease, and any such contrary provision or provisions, whether or not specifically described herein, are hereby either deleted or modified as is necessary to bring them into compliance with the amendments of the Lease hereinafter set forth. Except as amended hereby the Lease shall remain in full force and effect, and as amended hereby the Lease is hereby restated and reaffirmed by Landlord and Tenant. In the event of any conflict between the terms and provisions of the Lease and the terms and provisions of this First Amendment, the latter shall be controlling for all intents and purposes.

    4.    Exhibits. The following exhibits are hereby adopted by Landlord and Tenant as the exhibits cited in Section 22.12 of the Lease, and the following exhibits are attached to the Lease and are hereby incorporated into the Lease as though therein fully and completely rewritten:

| (a) | Exhibit A | Site Plan showing the Premises, Common Area and Landlord Office Space |
| (b) | Exhibit B | Legal Description |
| (c) | Exhibit C | Intentionally Deleted |
| (d) | Exhibit D | Construction Provisions |
| (e) | Exhibit E | Intentionally Deleted |
| (f) | Exhibit F | Rules and Regulations |
| (g) | Exhibit G | Form of Guaranty |

    5.    Except as set forth herein, there are no other Exhibits to the Lease. Landlord and Tenant agree that Exhibit E has never existed or been a part of the Lease. As to Exhibit C, Landlord and Tenant agree and acknowledge that with respect to the Rent Commencement Date Certification, the Tenant's obligations to provide such a certification have been met and that the Rent Commencement Date is as set forth herein. Additionally, Landlord and Tenant agree that, pursuant to the Settlement Agreement and this First Amendment, the obligations of each under Exhibit D are satisfied in full.

    6.    Premises. The Premises and Common Areas as those terms are used in the Lease are reflected as shown in Exhibit A. In addition to the Premises, Tenant shall be entitled to exclusive occupancy of the South half of the basement of the building on the Property, which

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 49 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 102 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 82 of 85

additional space is to be used by Tenant for storage purposes. Landlord shall be entitled to exclusive occupancy of the North half of the basement of the building. In the event Landlord leases space in the building to another tenant, and that tenant requests storage space in the basement, then, at Landlord's sole discretion, Tenant's allocated basement storage space may be reduced to one-quarter of the total basement space, with Landlord to allocate which quarter section of the basement in the South half of the basement that Tenant may then utilize for storage.

7.    Guarantors. Section 1.20 of the Lease is hereby amended to reflect that both William McAbian, an individual, and W.E.R.M. Investments, LLC, a limited liability company ("WERM"), shall, pursuant to Section 22.8 of the Lease, guarantee the performance of Tenant's obligations under the Lease by each executing a guaranty in the form provided in Exhibit G.

8.    Rent Commencement Date. Section 1.13 of the Lease is hereby deleted in its entirety and replaced with the following: "1.13 Rent Commencement Date: January 1, 2015."

9.    Term. Section 1.10 of the Lease is hereby deleted in its entirety and replaced with the following: "Initial Term: The Initial Term of this Lease shall be eleven (11) Lease Years commencing January 1, 2015, and expiring December 31, 2025, unless sooner terminated or extended pursuant to this Lease. "Lease Year" as used herein means each of the consecutive twelve (12) calendar month periods during the Term beginning on the first day of the calendar month in which the Rent Commencement Date occurs." Section 3.1 of the Lease is hereby amended as follows: the last sentence of this Section is hereby deleted in its entirety.

10.    Options. Sections 1.23 and 3.2 of the Lease are hereby amended as follows: Tenant shall have the option ("Option") to extend the Initial Term for one (1) period of five (5) Lease Years (the "Extension Period"), and all provisions of said Sections 1.23 and 3.2 are hereby amended to comply herewith. Except as so amended, the provisions of Section 3.2 of the Lease shall remain in full force and effect.

11.    Rent. Sections 1.14 and 6.1 are hereby amended as follows: Minimum Rent, as of the date of this First Amendment and through the end of the first Lease Year commencing on the Rent Commencement Date, shall be payable monthly in the amount of $35,000. Minimum Rent shall increase as of the commencement of each Lease Year ("Adjustment Date") by three percent (3%). Annual Minimum Rent increases shall be automatic without any requirement of notice from Landlord, and any acceptance by Landlord of a lesser amount that the amount actually due and payable shall not constitute a waiver by Landlord thereof. Minimum Rent and all Rent under the Lease shall be paid without demand, deduction or set-off.

12.    Notwithstanding the fact that the Rent Commencement Date shall not occur until January 1, 2015, Tenant shall pre-pay Landlord an amount equal to the Minimum Rent for the months of November 2014 and December 2014 and the Minimum Rent for the month of January, 2015 (for a total amount of $105,000) (the "Pre-Payment Amount"). The Pre-Payment Amount shall be paid by Hawkeye to Landlord within 5 business days after the Effective Date. Tenant shall additionally pay when otherwise due its prorated share of property taxes and utilities attributable to the period from November 1, 2014 through December 31, 2014.

USW 804638609 4
4847-3230-3398.1

3

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 50 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 103 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 83 of 85

Minimum Rent shall increase for the first Lease Year of the Extension Period to $62,500, and shall automatically increase thereafter as of the commencement of each Lease Year ("Adjustment Date") by three percent (3%).

13.    Rent Abatement. Section 6.2 of the Lease is hereby deleted in its entirety.

14.    Assignment and Subletting. Section 12.4 of the Lease is hereby deleted in its entirety. Landlord acknowledges and agrees that Tenant has sublet the Premises to WERM, and Landlord hereby approves of and accepts WERM as a sublessee of the Premises.

15.    Events of Default. Section 16.1 of the Lease is hereby amended to reflect that the thirty (30) day period for non-monetary defaults is reduced to fifteen (15) days and that wherever the term "thirty (30)" appears within Section 16.1 it is hereby replaced with the term "fifteen (15)".

16.    Ground Floor Office Space. Tenant shall provide Landlord with private, walled office space on the Ground Floor of the Premises as depicted in Exhibit A. Tenant's scope of work with respect to provision of office space for Landlord shall be limited to the following: installation of walls, and re-routing/rearrangement of fire sprinklers, exit signs, electrical outlets and alarms in the area currently designated at the "Lounge" on the first floor of the Premises necessary to enclose the space labeled as "Landlord's Office" in Exhibit A. Landlord shall be responsible for obtaining any necessary permits in connection with such work. Additionally, in connection with providing Landlord's office space, Tenant shall be entitled to re-install exit doors in the "Lounge" area to provide exit from the "Lounge" to the main entry corridor as depicted on Exhibit A. Landlord and Tenant agree to work together in good faith to complete the construction of "Landlord's Office" and exit doors within a reasonable amount of time after Landlord obtains any required permits.

17.    Insurance Limits. Section 1.18 of the Lease is replaced with the following: "Insurance Limits• Not less than Seven Million Dollars ($7,000,000) in single limit coverage per occurrence with an annual aggregate of not less than Eight Million Dollars ($8,000,000) for bodily injury, personal injury, death and property damage liability with liquor liability and assault and battery coverage endorsements."

18.    Insurance Policy Form. In addition to the additional insureds already required by Section 13.2 of the Lease, the following shall be included as additional insureds for any policies requiring Tenant to include additional insureds: New Vision Horizon, LLC, Michael Chang, Top Capital Partners, LLC and Top Properties Corporation.

19.    Additional Insurance. Tenant shall require any third parties using the Premises for special events or filming to include Landlord, Michael Chang, Top Capital Partners, LLC and Top Properties Corporation as additional insureds on any policies for which Tenant requires such third parties to include Tenant or WERM as an additional insured.

20.    Use of the Main Entrance to the Building. During those times that the Premises are in operation by Tenant or any subtenant or assignee of Tenant (the "Nightclub Operator"), the Nightclub Operator shall have the ability to control access to the Premises through the main

USW 804638609.4
4847-3230-3388.1

4

Case 1:19-bk-12102-MT   Doc 21-1   Filed 10/10/19   Entered 10/10/19 15:51:17   Desc
Exhibit Exhibits A - P   Page 51 of 132

Case 1:13-bk-16307-MT   Doc 343-3   Filed 01/05/16   Entered 01/05/16 18:45:32   Desc
Exhibit 4 to Part 2   Page 104 of 121

Case 1:13-bk-16307-MT   Doc 226-1   Filed 08/27/14   Entered 08/27/14 17:15:04   Desc
Exhibit A   Page 84 of 85

entrance to the Building, including but not limited to the use of crowd control mechanisms in the Common Area to control ingress and egress; provided that at no time shall Landlord or any other tenant of the building or their invitees be barred from entering. During those times that the Premises are not in operation by the Nightclub Operator, the main entrance to the Building shall remain locked. Or, during those times when the Premises are not in operation by the Nightclub Operator, and to the extent that Landlord requires that the main entrance be unlocked, whether for access by Landlord or other tenants of the Property, Landlord shall, at its own expense, provide security for the Building. Once Landlord has other tenants in the Building, Landlord shall be entitled to include any security so provided within the Common Area Costs. To help provide access to the Building and to avoid incurring additional costs for Landlord, Tenant agrees to open the Building and provide access for Landlord and Landlord's invitees during any time that Tenant has employees present at the Premises, provided reasonable notice is given.

    21.   Elevators. Section 5.6 of the Lease is hereby amended as follows: Notwithstanding any other provision in the Lease to the contrary, until such time as Landlord makes necessary changes in the lobbies in the upper floors (those floors above the fourth floor) and obtains approval from the Los Angeles Department of Building & Safety and/or the Los Angeles Fire Department to operate the elevator to those floors, Landlord and Tenant hereby agree that the elevator identified in yellow highlighting on Exhibit A hereto shall be the elevator referred to in Section 5.6 of the Lease and is for the non-exclusive use of Landlord and Tenant and their invitees ("5.6 Elevator"). Unless otherwise prohibited by applicable building or fire codes or regulations, Landlord or Tenant may alter the 5.6 Elevator such that the 5.6 Elevator cannot be used for access to particular floors in the absence of a key card or similar technology (the "Security Alterations"). In this way, for example, Tenant may control access to the leased Premises and Landlord may control access to other floors. Until there are other tenants in the Building, for so long as Tenant operates the 5.6 Elevator Tenant shall be solely responsible for all repair, maintenance, permitting, inspection and operating costs of the 5.6 Elevator (the "5.6 Elevator Costs"), and the Common Area Costs shall not include any cost incurred by Landlord in connection with the maintenance of elevators in the Building. Landlord and its invitees shall at all times have access to and the use of the elevators, and access to the floors of the building above the Premises, and Tenant shall not interfere with such access except as expressly provided in this First Amendment. Once the Landlord makes necessary changes in the elevator lobbies in the upper floors and obtains approval from the Los Angeles Department of Building & Safety and/or the Los Angeles Fire Department to operate the elevator to those floors, or when there are other tenants in the Building, Landlord shall assume control over the 5.6 Elevator and shall become responsible for all 5.6 Elevator Costs, and shall be permitted to include such costs within Common Area Costs. Additionally, at such time as Landlord assumes control over the 5.6 Elevator and any other elevators in the Building become operational, then to the extent that those elevators are capable of stopping at any of the floors within the Premises, Landlord and Tenant shall work together in good faith to ensure that Security Alterations are made to the elevators to control access to the Premises. Whether controlled by Tenant or Landlord, both agree that Landlord shall not be entitled to use the 5.6 Elevator for purposes of construction or movement of goods and materials by Landlord unless Landlord accepts in writing sole responsibility for all costs associated with the use of the 5.6 Elevator, including but not limited to repair, maintenance, refurbishment, inspection and permitting.

Case 1:19-bk-12102-MT    Doc 21-1    Filed 10/10/19    Entered 10/10/19 15:51:17    Desc
Exhibit Exhibits A - P    Page 52 of 132

Case 1:13-bk-16307-MT    Doc 343-3    Filed 01/05/16    Entered 01/05/16 18:45:32    Desc
Exhibit 4 to Part 2    Page 105 of 121

Case 1:13-bk-16307-MT    Doc 226-1    Filed 08/27/14    Entered 08/27/14 17:15:04    Desc
Exhibit A    Page 85 of 85

22.    **High Rise Retrofit.** Landlord and Tenant agree and acknowledge that with respect to the Required Retrofit Work set forth in the Lease and Exhibit D to the Lease, as of the Effective Date all of Tenant's obligations, if any, have been satisfied, and that all of Landlord's obligations, if any, to pay for the Required Retrofit Work have been similarly satisfied.

23.    **Tenant Improvement Allowance.** Landlord and Tenant agree and acknowledge that with respect to the Tenant Improvement Allowance and the Tenant Improvement Work, all of Tenant's obligations with respect to the Tenant Improvement Work, if any, have been satisfied, and that all of Landlord's obligations, if any, to pay for the Tenant Improvement Work, including but not limited to any obligation to pay any portion of the Tenant Improvement Allowance, have been satisfied.

24.    **Ratification.** Landlord and Tenant hereby ratify and confirm all of the terms and conditions of the Lease as modified by this First Amendment.

25.    **Entire Agreement.** The Lease, and this First Amendment, contains all of the agreements and understandings relating to the leasing of the Premises, and the obligations of Landlord and Tenant in connection with such leasing.

26.    **Remainder Of Lease Unmodified.** Except as set forth in this First Amendment, the parties agree that the Lease is unmodified and is in full force and effect. To the extent that the terms of the Lease conflict with the terms of this First Amendment, the terms of this First Amendment shall be controlling.

27.    **Counterparts.** The parties may execute several copies of this First Amendment. All copies of this First Amendment bearing signatures of the parties shall constitute one and the same First Amendment, binding upon all parties. The parties may exchange counterpart signatures by facsimile or email and the same shall constitute delivery of this First Amendment with respect to the delivering party.

IN WITNESS WHEREOF, this First Amendment is executed as of the day and year set forth below.

LANDLORD:                                    TENANT:

NEW VISION HORIZON, LLC                      HAWKEYE ENTERTAINMENT, LLC

By: Top Capital Partners, LLC, Its           By: Sabian Gourmet, LLC,
    Sole Member                                  Its Sole Member

    By: _____            By: _____
        Michael Chang                            Adi McAbian
    Its: Managing Member                     Its: Managing Member

USW 8G4638609.4
4847-3230-3388.1                              6

# Exhibit C

# STANDARD SUBLEASE

1. **PARTIES.**

This Sublease, dated for reference purposes only as October 1, 2009, is made by and between Hawkeye Entertainment, LLC., a California Limited Liability Company ("Sublessor") and WERM INVESTMENTS, LLC a California Limited Liability Company ("Sublessee").

2. **PREMISES.**

Sublessor hereby leases to Sublessee and Sublessee hereby subleases from Sublessor for the term set forth below in paragraph 3, at the rental rate set forth in paragraph 4 below, and upon all terms and conditions set forth herein, that certain real property, including all improvements therein, and commonly known by the street address of 618 S. Spring St. ("Premises"), City of Los Angeles, located in the County of Los Angeles, State of California as defined by "Master Lease" dated July 19th, 2009 and any amendments thereto incorporated herein by reference between Sublessor and PAX America Development LLC.

3. **TERM.**

3.1    The term of this Sublease ("Term") shall be for 120 months, commencing on the Rental Commencement Date as defined in the attached Master Lease, section 1.13 ("Commencement Date") and ending after one hundred twenty months (120) therefrom, unless sooner terminated pursuant to any provision hereof.

3.2    Notwithstanding anything to the contrary contained in this Sublease, the Commencement Date shall correspond with the Rent Commencement Date as defined in the Master Lease.

4. **RENT.**

4.1    BASE RENT. On the first day of each month of the Term, Sublessee shall pay to Sublessor Base Rent for the Premises. Monthly Base Rental shall be in equal payments of $30,000.00 in advance. Upon the execution hereof, Sublessee shall pay Sublessor $30,000 as Base Rent for the first month's Base Rent that will apply upon the commencement of the Term.

4.2    ADDITIONAL RENT.  All Additional Rent Due under the Master Lease shall be the sole obligation of the Sublessee.

4.3    RENT DEFINED. All monetary obligations (except for the Security Deposit) of Sublessee to Sublessor under the terms of this Sublease are deemed to be rent ("Rent"). Rent shall be payable in lawful money of the United States to Sublessor at the address stated herein or to such other persons or at such other places as Sublessor may designate in writing.

*Standard Sublease Agreement*
*Page 1 of 4*

5.    **USE.**

AGREED USE. The Premises shall be used and occupied only for the operation of a night club; gallery and general office use, but only to the extent permitted by the City of Los Angeles and all agencies and governmental authorities having jurisdiction thereof.

7.    **MASTER LEASE.**

7.1    Sublessor is the lessee of the Premises by virtue of a lease ("Master Lease"), a copy of which is attached hereto as Exhibit 1 and incorporated herein by this reference, wherein PAX America Development LLC. is the lessor ("Master Lessor").

7.2    This Sublease is and shall be at all times subject to the Terms and Conditions of the Master Lease.

7.3    During the Term and for all periods subsequent thereto with respect to obligations that have arisen prior to the termination of this Sublease, Sublessee does hereby expressly assume and agree to perform and comply with, for the benefit of Sublessor , each and every obligation of Sublessor under the Master Lease with respect to the Premise with the exception of Tennant Impovments, Tennant Work and obtaining of the Conditional Use Permit..

7.4    The obligations that Sublessee has assumed and agreed to perform under Paragraph 7.4 hereof are hereinafter referred to as the "Sublessee's Assumed Obligations". The obligations that Sublessee has not assumed or agreed to perform under Paragraph 7.4 hereof are hereinafter referred to as the "Sublessor's Remaining Obligations".

7.5    Sublessor hereby agrees for Sublessee's benefit to exercise Sublessor's diligent good faith efforts to require Master Lessor to perform Master Lessor's obligations pursuant to the Master Lease.

7.6    Sublessor agrees to maintain the Master Lease during the Term, subject, however, to any earlier termination of the Master Lease without the fault of Sublessor, and to comply with or perform Sublessor's Remaining Obligations and to hold Sublessee free and harmless from all liability, judgments, costs, damages, claims or demands arising out of Sublessor's failure to comply with or perform Sublessor's Remaining Obligations or its obligations under the Sublease.

8.    **AMENDMENT.**

This Sublease may not be modified or amended except by an instrument in writing approved by Sublessor and Sublessee and signed on their behalf.

9.    **HEADINGS.**

*Standard Sublease Agreement*
*Page 2 of 4*

117

The headings in this Sublease are for purposes of reference only and will not limit or define the meaning of any provision of this Sublease.

**10.     SUBLESSOR'S RIGHT OF ENTRY.**

Sublessor reserves the right to enter the Premises on reasonable notice and at reasonable times to Sublessee to inspect the Premises or the performance by Sublessee of the terms and conditions of this Sublease. In an emergency, no prior notice will be required for Sublessor's entry.

**11.     ENTIRE AGREEMENT.**

This Sublease hereto sets forth all the agreements between Sublessor and Sublessee concerning the Premises, and there are no other agreements either oral or written other than as set forth in this Sublease and, to the extent incorporated herein, the Master Lease.

**12.     INTERPRETATION.**

This Sublease has been fully negotiated at arms-length between the parties and after advice by counsel and other representatives chosen by the parties, and the parties are fully informed with respect thereto. No party shall be deemed the scrivener of this Sublease and the provisions of this Sublease and hereto shall be construed as a whole according to their common meaning and not strictly for or against any party.

//
//
//
//

[Signature Page to Follow]

*Standard Sublease Agreement*
*Page 3 of 4*

SIGNATURE PAGE

NOW, THEREFORE, Sublessor and Sublessee have executed this Sublease as of the date and year first hereinabove written.

**SUBLESSOR**

Signature:
Print Name: _William Kerbian_
Date: _10.1. 2009._

**SUBLESSEE**

Signature:
Print Name: _Ad. McAguin_
Date: _10/1/2009_

*Standard Sublease Agreement*
*Page 4 of 4*

119

# Exhibit D

August 5, 2019

Via Personal Delivery

| | |
|---|---|
| Hawkeye Entertainment, LLC<br>14242 Ventura Blvd., #212<br>Sherman Oaks, CA 91423<br>Attention: Adi McAbian | Hawkeye Entertainment, LLC<br>14242 Ventura Blvd., #303<br>Sherman Oaks, CA 91423<br>Attention: Viktoriya Khusit |
| Hawkeye Entertainment, LLC<br>618 S. Spring Street<br>Los Angeles, CA 90014<br>*Attention: Adi McAbian* | W.E.R.M. Investments, LLC<br>14242 Ventura Blvd., #212<br>Sherman Oaks, CA 91423<br>Attention: Adi McAbian |
| W.E.R.M. Investments, LLC<br>14242 Ventura Blvd., #212<br>Sherman Oaks, CA 91423<br>Attention: Viktoriya Khusit | W.E.R.M. Investments, LLC<br>618 S. Spring Street<br>Los Angeles, CA 90014<br>Attention: Adi McAbian |

Re: Default of Lease for Premises Located at 618 S. Spring Street, 1st, 2nd, 3rd and 4th Floors, Los Angeles, California 90004 (the "Premises")

Gentlemen:

Smart Capital Investments I, II, III, IV, V, LLC (collectively, "Landlord"), owner of the Premises and Landlord under that certain Lease dated July 17, 2009 as amended by the First Amendment dated August 19, 2014 (the "Lease") hereby provides formal written notice pursuant to Article 22.1 of the Lease that tenant Hawkeye Entertainment, LLC ("Tenant"), tenant under the Lease, is in default pursuant to Article 16 thereof.

In accordance with Article 16 of the Lease, when Tenant continues in default for a period of fifteen (15) days from the date of this notice, Tenant breaches the Lease and Landlord shall have the right, at Landlord's discretion, to terminate the Lease.

Pursuant to Article 16 of the Lease, Landlord hereby specifies the particular defaults of Tenant:

1. Compliance with Applicable Laws

Pursuant to Article 9.5 of the Lease, "Tenant shall promptly comply with any and all present and future governmental laws, ordinances, rules, regulation and orders applicable to the Premises and Tenant's use and occupancy thereof for the Permitted Use … Tenant's obligations hereunder shall include the making of alterations, additions and improvements to the Premises required by any Law for the conduct or continuance of the Permitted Use in the Premises."

Tenant has breached this provision in that, among other things, (i) it has not equipped the emergency fire doors with the required safety equipment and have failed to comply with law, and (ii) in violation of conditions set forth by City of Los Angeles ZA 1995-0830(CUB)(PA4). The City of Los Angeles entitlement is to permit the continued on-site sale of a full line of alcoholic beverages in conjunction with an existing nightclub. However, tenant utilizes property as a banquet hall with entertainment, church, and a concert hall. The following are violations:

1) Tenant is in violation of condition number 2, "The use and development of the property shall be in substantial conformance with the plot plan submitted with the application and marked Exhibit "A", except as may be revised as a result of this action."

   - Tenant is NOT in substantial conformance with Exhibit "A"
     a) Ground floor lounge area does not allow alcohol service, but tenant sells alcohol from this area.

2) Tenant is in violation of condition number 4, "All graffiti on the site shall be removed or painted over to match the color of the surface to which it is applied within 24 hours of its occurrence."

   - Tenant has not removed graffiti in front and rear of building.

3) Tenant is in violation of condition number 7, "The facility shall not exceed (10,159 sf of public space & 1,736 sf of office space)"

   - The tenant utilizes 14,006 sq ft of public space and 12,849 sq ft of office space.

4) Tenant is in violation of condition number 8, "A maximum of up to fifty all age events are permitted per year. Applicant shall notify the Los Angeles Police Department of each event at least one month prior to the event being held."

   - Tenant conducts more than 50 all age events per year. Tenant to provide notification sent to the Los Angeles Police Department regarding all age events

5) Tenant is in violation of condition number 22, "No alteration shall be made to the building façade pursuant to ZAI 145 (I-1000) only with approval of the historical committee."

   - Tenant has placed large banners on front façade, facing Spring Street without the consent of the Landlord or the Historical Committee.

6) Tenant is in violation of condition number 45, "VIP Rooms Doors shall be constructed of clear glass."

   - Tenant has solid doors at VIP area.

### 2. Unconsented Subletting of the Premises

Pursuant to Article 12.1 of the Lease, Tenant "agrees that any assignment or subletting of all or any portion of the Premises shall require[] prior written consent of Landlord which consent will not be unreasonably withheld..."

Tenant has breached this provision in that it has permitted a church, going by Fearless LA, to occupy portions of the Premises, without the prior written consent of Landlord.

### 3. Failure to Provide the Required Estoppel Certificate

Pursuant to Article 18.3 of the Lease, "each party shall execute and deliver to the other ... a written statement certifying the following information ..." and "[e]ach party shall deliver such estoppel statement within thirty (30) days of written request from the other party."

Tenant has breached this provision. Landlord provided written notice of its request for an estoppel certificate on May 14, 2019. Tenant failed to provide a signed estoppel certificate that complies with the requirements of the Lease by June 13, 2019, and has not provided such estoppel to date.

### 4. Failure to Provide Required Subordination

Pursuant to Article 18.1 of the Lease, "[u]pon written request of Landlord ... Tenant will subordinate its rights pursuant to this Lease in writing to the lien of any future mortgage..."

Tenant has breached this provision. Landlord provided written notice of its request for subordination on May 14, 2019. Tenant failed to provide a signed subordination in compliance with the requirements of the Lease by June 13, 2019, and has not provided such subordination to date.

**** 

Please be advised that, notwithstanding any action taken by Tenant, Landlord reserves all rights and remedies with respect to the Lease and any of Tenant's breaches or defaults thereunder, and any other rights and remedies that Landlord may have at law or in equity.

Very truly yours,

Smart Capital Investments I, II, III, IV, V, LLC

Michael Chang
Manager

# Exhibit E

# HAWKEYE ENTERTAINMENT, LLC
14242 Ventura Boulevard / Suite 210 / Sherman Oaks / CA 91423

August 19, 2019

By *Hand Delivery, Certified Mail and Federal Express Overnight*

Mr. Michael Chang, Manager
Smart Capital Investments I, LLC
Smart Capital Investments II, LLC
Smart Capital Investments III, LLC
Smart Capital Investments IV, LLC
Smart Capital Investments V, LLC
304 S. Kingsley Drive
Los Angeles, California 90020

**Re:    Response to Claim of Default of Lease for Premises Located at 618 S.
        Spring Street, Los Angeles (1st through 4th Floors) (the "Premises")**

Gentlemen,

I have tried to reach you by telephone and text numerous times to discuss the content of your letter dated August 5, 2019, and have not received any response. Therefore, I am compelled to contact you in writing on behalf of Hawkeye Entertainment, LLC and WERM Investments, LLC (collectively the "Businesses") regarding your letter dated August 5, 2019. Although this letter is intended to be congenial and not adversarial in addressing your allegations, this letter does request certain information necessary for us to thoroughly evaluate and respond to your allegations.

As a preliminary matter, the Businesses dispute the allegations contained in your letter as well as your contention that any purported default exists. Specifically, none of the Businesses have knowledge of any material breach or default under the Lease dated July 17, 2009 (as amended by its First Amendment dated August 19, 2014 (if addressed separately, the "Amendment") as characterized in your letter.

Regardless, each of the Businesses is investigating the suggestion in your letter that there exist defaults under the Lease with respect to (i) noncompliance with laws and (ii) failure to provide an estoppel statement and subordination. Note that the letter of August 5, 2019 does not specify "the particulars of the default" claimed but asserts

125

Mr. Michael Chang, Manager
Smart Capital Investments I, LLC and related entities
August 19, 2019
Page 2

defaults in general terms; as such, the August 5, 2019 letter does not comply with the notice required under Section 16.1 of the Lease, and, as such, does not trigger the cure period specified in the Lease.

In order to evaluate your claims, and properly respond to your letter in detail or, where necessary, effect cures to claimed defaults, it is necessary that you provide the additional information. In the meantime, below are our preliminary responses and requests for additional information:

1.      With respect to the alleged fire door issues, we are unaware of any notices of correction that remain unsatisfied. Can you please provide us with such notices and we are prepared to immediately commence any correction that is required? Are the emergency fire doors alleged to not be equipped with required safety equipment within the Premises or within the building and apart from the control of Tenant? If within the Premises, can you please specify the specific doors to which you refer.

2.      What "safety equipment" is alleged to be required and not installed? We need more specificity in order to adequately respond.

3.      With respect to alleged default (1), currently there is no alcohol sold on the ground floor lounge.

4.      Section 2.1 of the Lease defines the Premises as those floors and areas depicted on the Site Plan attached to the Lease. The Building (as defined in the Lease) includes the exterior walls, including those immediately adjacent to the Premises, and specifically excludes the exterior walls of the Building from the Premises. Condition No. 4 [each "Condition" herein referring to City of Los Angeles, Department of City Planning, Office of Zoning Administration conditions on Case No. ZA 1995-0830(CUB)(PA4) dated February 25, 2013] specifies, as a condition of occupancy of the "site" (e.g., the Premises) that "[A]ll graffiti on the site shall be removed or painted over to match the color of the surface to which it is applied within 24 hours of its occurrence". The Tenant has no knowledge of any graffiti currently within the Premises. With respect to alleged default (2), and noting that Tenant removes graffiti within the Premises, please advise how areas of the Building excluded from the definition of the Premises are the responsibility of Tenant as opposed to being matters related to common area maintenance or other leasable portions of the Building? Regardless, the Tenant has similarly removed graffiti from the Building area as well. Therefore, can you please point out the area to which you refer.

5.      With respect to alleged default (3), which correctly identifies the facility being conditioned upon use of 10,159 sf of public space and 1,736 sf of office space (Condition No. 7), please provide the basis for your calculation supporting your claim

Mr. Michael Chang, Manager
Smart Capital Investments I, LLC and related entities
August 19, 2019
Page 3

that Tenant allegedly uses 14,006 sf of public space and 12,849 sf of office space. Please provide a mark-up of the floor plans of the Premises reflecting such alleged use.

6.      With respect to alleged default (4), relating to Condition No, 8, please advise the dates and nature of all "all-age events" conducted or permitted by Tenant in each of the last three (3) years, and identify each instance for which Tenant has not provided the Los Angeles Police Department notification of such events.

7.      With respect to alleged default (5), Condition No, 22 provides in pertinent part that "[n]o alteration shall be made to the building façade pursuant to ZAI 145 (I-1000)" and prohibits signage "placed on" the façade unless approved by the Cultural Heritage Commission or the Department of City Planning, Office of Historic Resources.   No alteration to an exterior wall or face of the Building or its design elements (e.g., the "façade") have been made by Tenant.   Although we disagree that the banner to which you refer constitutes such a violation, we have commenced steps to remove the banner pending further discussion and resolution.

8.      You state that Condition No. 45 states that doors to VIP Rooms "shall be constructed of clear glass."   Please advise us as to which specific area in the venue you contend falls within Condition 45.   In the meantime, pending further discussion, we are looking into the matter further.

9.      Please provide the basis and evidence supporting your contention that use of the Premises by the Fearless LA church is pursuant to an assignment or sublet.   There is no written assignment or sublease agreement between Tenant and Fearless LA church. Fearless LA church does not use the Premises every week and does not use it more than 50 events per year. In any event, we have notified Fearless LA church to relocate pending further discussion with you.

10.     Tenant has been asked to provide an estoppel certificate.  As Landlord is aware, Tenant is willing and able to provide such an estoppel certificate, but cannot provide one which conforms to Section 18.3 as such a certificate would contain information known by Tenant and Landlord to be untrue.  Tenant has worked with Landlord and has provided Landlord drafts of estoppel certificates which can be provided.   However, Landlord has decided repeatedly to not pursue the issue.   Tenant disagrees with Landlord that this constitutes a contractual default, however, to cure the alleged default, Tenant again offers to provide an estoppel certificate.

11.     Tenant has been asked to acknowledge subordination to Landlord's lender's rights.  This has come in the form of a document combining the estoppel certificate with the subordination agreement.  As Landlord is aware, Tenant is willing and able to provide a subordination agreement, but cannot provide one which conforms to Section 18.1 when combined with an estoppel certificate containing information known by

Mr. Michael Chang, Manager
Smart Capital Investments I, LLC and related entities
August 19, 2019
Page 4

Tenant and Landlord to be untrue. Tenant disagrees with Landlord that this constitutes a contractual default, however, to cure the alleged default, Tenant once again offers to provide Landlord with a stand-alone subordination agreement.

We believe that the responses to the above questions will facilitate a quick resolution of the issues you raise. Please provide your responses for our review by Friday, August 23, 2019.

In advance, thank you for your cooperation.


Very truly yours,


Hawkeye Entertainment, LLC

By _____
William McAbian
on its behalf

# Exhibit F

Begin forwarded message:

**From:** Rogelio Dela Cruz Jr <37573@lapd.online>
**Date:** August 30, 2019 at 5:22:46 PM PDT
**To:** Adi McAbian <adi@exchangela.com>
**Subject: Re: FearlessLA Church Services**

Greetings Adi,

Thank you for reaching out to us. Per our conversation, we have no issues of you guys continuing your church services/special events, as stated on you CUP.

Should you have any questions, please feel free to contact us at anytime, at (213) 833-3747. Thank you.

Kindly,
Rogelio

Rogelio Dela Cruz, Sergeant
Central Area Vice
Los Angeles Police Department
(213) 833-3747

---

**From:** Adi McAbian <adi@exchangela.com>
**Sent:** Wednesday, August 28, 2019 9:53 PM
**To:** Rogelio Dela Cruz Jr
**Subject:** FearlessLA Church Services

Dear Sgt. De La Cruz,

Thank you for taking the time to speak with me yesterday. Your time and input are greatly appreciated.

As you know, FEARLESS LA has been conducting services on a near weekly basis for over 5 years. Per our conversation, I am reaffirming that the LAPD has no opposition to FEARLESS LA having conducted, and continuing to conduct, services at The Exchange on 618 S. Spring Street in compliance with Condition 8 of our CUP which allows us to have up to 50 all ages events with at least one months prior notice to LAPD.

Please let me know if at any time the LAPD has any issue whatsoever with us continuing to permit FEARLESS LA to hold services at our facility, or should it have any other questions or concerns of any kind.

Thank you so much.

All the best,

# Exhibit G

**LOS ANGELES CONSERVANCY**

523 West Sixth Street, Suite 826
Los Angeles, CA 90014

213  623  2489  OFFICE
213  623  3909  FAX
laconservancy.org

September 6, 2019

Michael Chang
3120 S. Main Street
Los Angeles, CA 90007

Mr. Chang,

On August 27, Adrian Scott Fine, Director of Advocacy, and I met with Adi McAbian during our annual conservation easement inspection. At that time we discussed the use of hanging banners on the **building's** Spring Street façade and the potential impacts on our easement agreement. After inspecting the existing sign attachments, the Los Angeles Conservancy does not find issues with the use of signs in their current locations when utilizing the existing attachments.

While the Conservancy does not find any issues with the existing conditions, all signage must be in compliance with City of Los Angeles codes and appropriate permits are to be submitted. Given the Historic Cultural Monument status of the Los Angeles Stock Exchange Building, the Conservancy requests that a representative notify Lambert Giessinger at the **city's Office of Historic Resources** regarding signage.

The Conservancy is the largest local historic preservation organization in the United States, with over 6,000 members throughout the Los Angeles area. Established in 1978, the Conservancy works to preserve and revitalize the significant architectural and cultural heritage of Los Angeles through advocacy and education. As stewards of a historic property, we greatly appreciate your help in achieving this goal.



Please feel free to contact me at 213-430-4206 or *evanbreene@laconservancy.org* with any questions or updates.

Sincerely,

Erik Van Breene
Preservation Coordinator



# Exhibit H

**3 DAY NOTICE TO PERFORM CONDITIONS AND COVENANTS OR QUIT**

[CCP § 1161 (3)]

TO: **Hawkeye Entertainment LLC, W.E.R.M. Investments LLC,** and all others in possession of 618 S. Spring Street, Los Angeles, California

This is notice pursuant to CCP § 1161 (3) that, within three days of service of this Notice on you, you must perform each and every one of the conditions and covenants of the First Amendment to Lease Agreement dated August 19, 2014 per the attached "Notice" delivered to you on August 5, 2019.

If you fail to comply with any and every one of the conditions and covenants as set forth in the attached "Notice" within three days of the date this is served on you, Landlord elects to terminate and forfeit your tenancy but you will continue to be liable for any rent due under the remaining term of the Lease.

Dated: August 19, 2019

Smart Capital Investments I, II, III, IV, V LLC

BY:

MICHAEL CHANG ("Landlord")

# Exhibit I

1  Sandford L. Frey (SBN 117058)
   Kim R. Gundlach (SBN 131390)
2  **CREIM MACIAS KOENIG & FREY LLP**
   633 West Fifth Street, 51st Floor
3  Los Angeles, CA 90071
   Telephone: (213) 614-1944
4  Facsimile: (213) 614-1961
   sfrey@cmkllp.com
5  kgundlach@cmkllp.com

6  Reorganization Attorneys for Hawkeye Entertainment, LLC
   Debtor and Debtor-In-Possession
7

8  Wayne Grajewski (SBN 71019)
   Aimee Wong (SBN 179369)
9  **McKENNA LONG & ALDRIDGE LLP**
   300 South Grand Ave., 14th Floor
10 Los Angeles, California 90071
   Telephone: (213) 687-2170
11 Facsimile: (213) 243-6330
   wgrajewski@mckennalong.com
12 aywong@mckennalong.com

13 Special Counsel for Hawkeye Entertainment, LLC
   Debtor and Debtor-In-Possession

14            UNITED STATES BANKRUPTCY COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16            SAN FERNANDO VALLEY DIVISION

17 In re                              CASE NO.: 1:13-bk-16307-MT

18 **HAWKEYE ENTERTAINMENT, LLC,**    Chapter 11

19                                    **STIPULATION FOR ASSUMPTION OF
              Debtor and Debtor-In-Possession.    NONRESIDENTIAL REAL PROPERTY
20                                    LEASE AND SUBLEASE FOR
                                      PREMISES LOCATED AT 618 SOUTH
21                                    SPRING STREET, LOS ANGELES,
                                      CALIFORNIA
22

23

24

25

26

27         This Stipulation to Assume the Lease and Sublease for the Premises located at 618 South

28 Spring Street, Los Angeles, California ("Stipulation") is made by and between Hawkeye

                                        1
   STIPULATION FOR ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE

1   Entertainment, LLC, the debtor and debtor in possession ("Debtor" or "Hawkeye"), W.E.R.M.

2   Investments, LLC ("WERM"), and New Vision Horizon, LLC (New Vision"), by and through

3   their counsel of record, or by its authorized representative with regard to the following facts:

4   **RECITALS**

5   A.    Prior to the filing of this chapter 11 case, on July 17, 2009, the Debtor entered into a

6   Lease Agreement ("Lease") with an entity known as Pax America Development, LLC ("Pax"),

7   the then owner of the real property and improvements located at 618 South Spring Street, Los

8   Angeles, California ("Property"). Pursuant to the Lease, the Debtor leased from Pax the first

9   four floors of the building located on the Property (as more fully described in the Lease as the

10  "Premises") to be used for the operation of a nightclub.

11      B.    Subsequently, Pax and the Debtor allegedly executed three documents styled as

12  "Ammendment to Lease," (*sic*) dated August 5, 2009, August 17, 2009 and September 16, 2009,

13  all of which purported to amend or modify the Lease in some fashion ("Alleged Amendments").

14      C.    On October 1, 2009, the Debtor entered into a Sublease Agreement ("Sublease")

15  with W.E.R.M. Investments, LLC ("WERM" and together with the Debtor and New Vision,

16  collectively referred to as the "Parties").

17      D.    On December 20, 2010, New Vision purchased the Property at a Trustee's Sale.

18      E.    Certain disputes have arisen between New Vision and the Debtor as to their

19  respective rights and obligations under the Lease and the Alleged Amendments.

20      F.    On July 11, 2011, in connection with some of those disputes, the Debtor brought

21  an action against New Vision in the Superior Court of California, County of Los Angeles,

22  entitled, *Hawkeye Entertainment, LLC v. New Vision Horizon, LLC*, Case No. BC464610 ("First

23  State Court Action"). The First State Court Action has been referred to arbitration, and remains

24  pending.

25      G.    On July 15, 2013, in connection with disputes arising out of the Lease and

26  Alleged Amendments, the Debtor brought a second action against New Vision in the Superior

27  Court of California, County of Los Angeles, entitled, *Hawkeye Entertainment, LLC v. New

28  Vision Horizon, LLC*, Case No. BC515124 ("Second State Court Action"). The Second State

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

2

1    Court Action remains pending.

2         H.    Thereafter, the Debtor filed a voluntary petition for relief under chapter 11 of the

3    United States Bankruptcy Code ("Bankruptcy Code") on September 30, 2013 ("Petition Date").

4         I.    On November 29, 2013, the Debtor timely filed within the time period required

5    under Bankruptcy Code §365(d)(4)(A)(i) its *Omnibus Motion of Hawkeye Entertainment, LLC,*

6    *Debtor And Debtor in Possession for an Order (1) Authorizing the Assumption of Non-*

7    *Residential Real Property Lease and Sublease for Premises Located at 618 South Spring Street,*

8    *Los Angeles; (2) Deeming the Debtor and Sublessor in Compliance with Bankruptcy Code §*

9    *365(B)(1)(A) and (B) Pending Adjudication of Debtor's State Court Claims; (3) Excusing or*

10   *Deeming Debtor in Compliance with Bankruptcy Code § 365(d)(3); or, (4) Alternatively,*

11   *Extending the Time Period within which the Debtor May Assume or Reject Unexpired Non-*

12   *Residential Leases and Executory Contracts and, if Applicable, the Time for Performance Under*

13   *Bankruptcy Code § 365(d)(3)* [Docket No. 40] ("Lease Assumption Motion").

14        J.    On December 26, 2013, Lessor, New Vision Horizons, LLC ("New Vision") filed

15   an opposition to the Debtor's Lease Assumption Motion [Docket No. 57] ("Opposition").

16        K.    On January 9, 2014, this Court held an initial hearing on the Lease Assumption

17   Motion. At the hearing, New Vision requested an evidentiary hearing. As a result, this Court

18   initially set an evidentiary hearing for August 22 and 25, 2014 ("Evidentiary Hearing").

19        L.    Thereafter, on January 28, 2014, the Court entered an agreed upon *Order (1)*

20   *Extending the Debtor's Exclusive Period to File a Plan Of Reorganization and to Obtain*

21   *Acceptances of its Plan; (2) Extending the Deadline Imposed by the Court for Filing a Plan;*

22   *and, (3) Extending the Deadline to Assume and Assign or Reject the Non-Residential Real*

23   *Property Lease and Sublease for Premises Located at 618 South Spring Street, Los Angeles; (4)*

24   *Approving Stipulation; and, (5) Acknowledging New Vision's Consent Pursuant to Bankruptcy*

25   *Code §365(d)(4)(B)(II)* [Docket No. 76] ("First Assumption Extension Order").

26        N.    Pursuant to the First Assumption Extension Order, the Court ordered the

27   following with the consent of New Vision:

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

3

STIPULATION FOR ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE

(i)    The deadline pursuant to Bankruptcy Code §365(d)(4) by which the Debtor must assume and assign or reject the Lease and sublease for the premises located at 618 South Spring Street, Los Angeles between the Debtor and New Vision was extended with the written consent of New Vision through and including September 15, 2014 ("First Consensual Extension Period").

(ii)    The exclusive period in which only the Debtor may file a plan of reorganization ("Plan Exclusivity Period") was extended through and including September 15, 2014; and, for purposes of maintaining the exclusive right to file its plan, the exclusive period in which only the Debtor may solicit acceptance of a plan ("Solicitation Exclusivity Period") was extended through and including November 17, 2014;

(iii)    The deadline initially fixed by the Court as the deadline by which the Debtor must file its Disclosure Statement and Plan of Reorganization imposed pursuant to the Court's *Order re Debtor's First Scheduling and Case Management Conference and Schedule of Important Dates* [Docket No. 34] was extended through and including September 15, 2014.

O.    The Parties have conducted extensive discovery in connection with the Evidentiary Hearing respecting the Lease Assumption Motion.

I.    On July 29, 2014, the Parties attended mediation before the Honorable Mitchel R. Goldberg ("Mediation").  Although the Parties were not successful in revolving the disputes at the Mediation, significant progress was made toward consensual resolution.

J.    Due to the progress made at mediation, the Parties continued negotiations subsequent to the Mediation, which has resulted in a proposed global resolution of the Lease Assumption Motion, First State Court Action, Second State Court Action, and the respective claims asserted by the Parties against each other arising under or related to the Lease and Sublease.  In furtherance thereof, contemporaneously with this Stipulation For Assumption, the Parties are entering into a *Settlement Agreement and Mutual Release of Claims* ("Global Settlement Agreement") whereby, among other things, the Debtor will be assuming the Lease and Sublease, with the consent of New Vision, subject to certain terms, conditions and modifications.  The Parties contemplate filing shortly with the Court a motion to approve the Global Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 ("9019

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

4

STIPULATION FOR ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE

1    Motion").

2    L.    In connection with the Global Settlement Agreement, the Parties are entering into

3    this Stipulation, subject to Bankruptcy Court approval.

4    *Now therefore*, for good and valuable consideration, receipt and sufficiency of which is

5    hereby acknowledged, the Parties inter into this Stipulation For Assumption, subject to

6    Bankruptcy Court approval, so as to provide sufficient opportunity to, among other things,

7    consummate the proposed Global Settlement Agreement, file and serve the 9019 Motion, obtain

8    approval from the Court, and conclude the chapter 11 case.

9                                    **AGREEMENT**

10            **IT IS HEREBY STIPULATED AND AGREED** that New Vision consents to entry of

11    an order by the Bankruptcy Court authorizing the Debtor to assume the Lease, as modified by the

12    Global Settlement Agreement, and by the First Amendment to Lease which was executed

13    contemporaneously with the Global Settlement Agreement.

14            **IT IS HEREBY FURTHER STIPULATED AND AGREED** that New Vision consents

15    to entry of an order by the Bankruptcy Court authorizing the Debtor to assume its Sublease with

16    WERM, subject to the modifications of the Global Settlement Agreement.

17            **IT IS HEREBY FURTHER STIPULATED AND AGREED** that upon entry of the

18    order granting assumption of the Lease and Sublease, the Lease and Sublease shall be deemed

19    current and reinstated as if no default exists or ever existed, and that any and all monetary and

20    non-monetary defaults alleged by New Vision are waived *ab initio*.

21            **IT IS HEREBY FURTHER STIPULATED AND AGREED** that upon entry of the

22    order granting assumption of the Lease and Sublease, the five day notice issued by New Vision

23    on September 20, 2013 shall be deemed revoked and of no further force and effect.

24            **IT IS HEREBY FURTHER STIPULATED AND AGREED** that the order assuming

25    the Lease and Sublease shall remain in full force and effect and survive entry of any order

26    dismissing the Debtor's bankruptcy case or confirming any plan of reorganization in this case.

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944



6

STIPULATION FOR ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE

CREIM MACIAS KOENIG & FREY LLP

By:    /s/ Sandford L. Frey
         SANDFORD L. FREY
Reoganization Atorneys for Hawkeye
Entertainment, LLC Debtor and Debtor in
Possession,


McKENNA LONG & ALDRIDGE LLP


By: _____
         WAYNE GRAJEWSKI
            AIMEE WONG
Special Counsel for Hawkeye Entertainment, LLC
Debtor and Debtor in Possession,


LEWIS BRISBOIS BISGAARD & SMITH LLP


By: _____
         JON P. KARDASSAKIS
         BRAD D. KRASNOFF

Attorneys for New Vision Horizon, LLC


WERM, Investments, LLC


By: _____


Title _____

USW 804638685.3

7

STIPULATION FOR ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE

# Exhibit J

Sandford L. Frey (SBN 117058)
Kim R. Gundlach (SBN 131390)
**CREIM MACIAS KOENIG & FREY LLP**
633 West Fifth Street, 51st Floor
Los Angeles, CA 90071
Telephone: (213) 614-1944
Facsimile: (213) 614-1961
sfrey@cmkllp.com
kgundlach@cmkllp.com

Reorganization Attorneys for Hawkeye Entertainment, LLC
Debtor and Debtor-In-Possession

Wayne Grajewski (SBN 71019)
Aimee Wong (SBN 179369)
**McKENNA LONG & ALDRIDGE LLP**
300 South Grand Ave., 14st Floor
Los Angeles, California 90071
Telephone: (213) 687-2170
Facsimile: (213) 243-6330
wgrajewski@mckennalong.com
aywong@ mckennalong.com

Special Counsel for Hawkeye Entertainment, LLC
Debtor and Debtor-In-Possession

**FILED & ENTERED**

**SEP 04 2014**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY Fisher    DEPUTY CLERK**

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## [SAN FERNANDO VALLEY DIVISION]

| | |
|---|---|
| In re | CASE NO.: 1:13-bk-16307-MT |
| **HAWKEYE ENTERTAINMENT, LLC,** | Chapter 11 |
| Debtor and Debtor-In-Possession. | **ORDER (1) APPROVING STIPULATION FOR ASSUMPTION OF NONRESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE FOR PREMISES LOCATED AT 618 SOUTH SPRING STREET, LOS ANGELES, CALIFORNIA; AND, (2) GRANTING OMNIBUS MOTION OF HAWKEYE ENTERTAINMENT, LLC, DEBTOR AND DEBTOR IN POSSESSION FOR AN ORDER AUTHORIZING THE ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE FOR PREMISES LOCATED AT 618 SOUTH SPRING STREET, LOS ANGELES** |
| | DATE:          September 4, 2014 |
| | TIME:          9:30 am |
| | CTRM:          302 |

1

ORDER RE: STIPULATION FOR ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE

145

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Court reviewed and considered the *Stipulation for Assumption of Nonresidential Real Property Lease and Sublease for Premises located at 618 South Spring Street, Los Angeles, California* ("Stipulation") between Hawkeye Entertainment, LLC, the debtor and debtor in possession ("Hawkeye"), WERM Investments, LLC ("WERM"), and New Vision Horizon, LLC ("New Vision"); which Stipulation was entered into in connection with the *Omnibus Motion of Hawkeye Entertainment, LLC, Debtor and Debtor in Possession for an Order (1) Authorizing the Assumption of Non-Residential Real Property Lease and Sublease for Premises Located at 618 South Spring Street, Los Angeles; (2) Deeming the Debtor and Sublessor in Compliance with Bankruptcy Code § 365(b)(1)(A) and (B) Pending Adjudication of Debtor's State Court Claims; (3) Excusing or Deeming Debtor in Compliance with Bankruptcy Code § 365(d)(3); or, (4) Alternatively, Extending the Time Period within which the Debtor May Assume or Reject Unexpired Non-Residential Leases and Executory Contracts and, if Applicable, the Time for Performance Under Bankruptcy Code § 365(d)(3)*, filed on November 29, 2013 [Docket No. 40] ("Lease Assumption Motion").

The Court held an initial hearing on the Lease Assumption Motion on January 9, 2014. At the hearing, New Vision requested an evidentiary hearing. As a result, this Court set an evidentiary hearing for August 22 and 25, 2014 ("Evidentiary Hearing"). On January 28, 2014, the Court entered an agreed upon *Order (1) Extending the Debtor's Exclusive Period to File a Plan Of Reorganization and to Obtain Acceptances of its Plan; (2) Extending the Deadline Imposed by the Court for Filing a Plan; and, (3) Extending the Deadline to Assume and Assign or Reject the Non-Residential Real Property Lease and Sublease for Premises Located at 618 South Spring Street, Los Angeles; (4) Approving Stipulation; and, (5) Acknowledging New Vision's Consent Pursuant to Bankruptcy Code §365(d)(4)(B)(II)* [Docket No. 76] ("First Assumption Extension Order").

Pursuant to the First Assumption Extension Order, the Court ordered, among other things, that with the consent of New Vision:

(i)      The deadline pursuant to Bankruptcy Code §365(d)(4) by which the Debtor must assume and assign or reject the Lease and sublease for the premises located at

2

ORDER RE: STIPULATION FOR ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE

618 South Spring Street, Los Angeles between the Debtor and New Vision was extended with the written consent of New Vision through and including September 15, 2014 ("First Consensual Extension Period").

The Parties have reached a proposed global resolution of the Lease Assumption Motion and other pending matters and disputes respecting the respective claims asserted by the Parties against each other arising under or related to the Lease and Sublease.  In furtherance thereof, the Parties entered into the Stipulation, whereby, among other things, the Debtor is authorized to assume the Lease and Sublease, with the consent of New Vision, subject to certain terms, conditions and modifications set forth in the Stipulation and documents entered into in connection therewith.

The Court finding, among other things, that the Debtor has met it burden of proof and demonstrated to the satisfaction of the Court, that (a) assumption of the Lease and Sublease for the Premises located at 618 South Spring Street, Los Angeles, is in the best interest of the chapter 11 estate; (b) sound business judgment exists for the Debtor's decision to assume the Lease and Sublease; (c) the Debtor has acted prudently, on an informed basis, and in good faith and in an honest belief that assumption benefits the bankruptcy estate; (d) each and every requirement for assumption under Bankruptcy Code § 365(b)(1) (A), (B) and (C) has been met by the Debtor; (e) no default or event of default exists as of the date of assumption; (f) no cure or compensation need be made to New Vision or any other party in interest as a condition of assumption of the Lease and Sublease; (g) adequate assurance of future performance has been adequately demonstrated by the Debtor; and (h) good cause appearing therefore, it is hereby:

**ORDERED** that the Lease Assumption Motion (as modified by the Stipulation) is **GRANTED** in its entirety; it is further,

**ORDERED** that the Lease, as modified by the Global Settlement Agreement, and by the First Amendment to the Lease (which was executed contemporaneously with the Global Settlement Agreement) is hereby **ASSUMED**; it is further,

**ORDERED** that the Sublease with WERM, subject to the modifications of the Global Settlement Agreement, is hereby **ASSUMED;** and that WERM is hereby deemed to be a

3

ORDER RE: STIPULATION FOR ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND SUBLEASE

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

properly authorized subtenant, and the Sublease a properly authorized Sublease, under, and pursuant to, the terms of the Lease with the express consent of New Vision; it is further,

ORDERED that upon entry of this order granting the assumption of the Lease and Sublease by the Debtor, the Lease and Sublease shall be deemed current and reinstated as if no default exists or ever existed, and that any and all monetary and non-monetary defaults alleged by New Vision are deemed cured, satisfied and/or waived *ab initio*; it is further,

ORDERED that the Debtor is in full and complete compliance each and every provision of Bankruptcy Code §365(b)(1) (A), (B) and (C); it is further,

ORDERED that the five day notice issued by New Vision on September 20, 2013 is hereby deemed revoked, void and of no further force and effect; it is further,

ORDERED that no cure payment or compensation need be paid to New Vision or any other party in interest in connection with the assumption of the Lease and Sublease; it is further,

ORDERED that the proceeds of the Debtor in Possession account established and maintained by the Debtor on behalf of New Vision in connection with Bankruptcy Code § 365(d)(3) are hereby ordered released free and clear of the claim of New Vision for use in connection with the general administration of the bankruptcy case in the discretion of the Debtor; it is further,

ORDERED that this order shall remain in full force and effect and survive entry of any order dismissing the Debtor's bankruptcy case or confirming any plan of reorganization in this case.

###

Date: September 4, 2014

Maureen A. Tighe
United States Bankruptcy Judge

4

ORDER RE: STIPULATION FOR ASSUMPTION OF NON-RESIDENTIAL REAL PROPERTY LEASE AND
SUBLEASE

# Exhibit K

### SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF CLAIMS

This SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF CLAIMS ("Agreement") dated August 19, 2014, is entered into by and between New Vision Horizon, LLC ("New Vision"), on the one hand, and Hawkeye Entertainment, LLC, Debtor and Debtor in Possession ("Hawkeye"), on the other hand.  New Vision and Hawkeye are sometimes hereinafter referred to individually as a "Party" and collectively as the "Parties."

This Agreement is made with reference to the following facts:

### RECITALS:

A.    On July 17, 2009, Hawkeye entered into a Lease Agreement (the "Lease") with Pax America Development, LLC ("Pax"), the then owner of the real property and improvements located at 618 South Spring Street, Los Angeles, California (the "Property").  Pursuant to the Lease, Hawkeye leased from Pax the first four floors of the building located on the Property (as more fully described in the Lease as the "Premises") to be used for the operation of a nightclub.

B.    Subsequently, PAX and Hawkeye allegedly executed three documents styled as "Ammendment to Lease," (*sic*) dated August 5, 2009, August 17, 2009 and September 16, 2009, all of which purported to amend or modify the Lease in some fashion (the "Alleged Amendments").

C.    On August 31, 2009, Hawkeye, PAX, and PAX's Lender, East West Bank, entered into a Subordination, Non-Disturbance and Attornment Agreement with respect to the PAX-Hawkeye Lease (the "SNDA Agreement").

D.    On October 1, 2009, Hawkeye entered into a Sublease Agreement (the "Sublease") with W.E.R.M. Investments, LLC ("WERM").

E.    On December 20, 2010, New Vision acquired the Property through foreclosure.



1

150

F.    Certain disputes have arisen between New Vision and Hawkeye as to their respective rights and obligations under the Lease and the Alleged Amendments.

G.    On July 11, 2011, in connection with some of those disputes, Hawkeye brought an action against New Vision in the Superior Court of California, County of Los Angeles, entitled, *Hawkeye Entertainment, LLC v. New Vision Horizon, LLC*, Case No. BC464610 (the "First State Court Action"). The First State Court Action has been referred to arbitration, and remains pending.

H.    On July 15, 2013, , Hawkeye brought a second action against New Vision in the Superior Court of California, County of Los Angeles, entitled, *Hawkeye Entertainment, LLC v. New Vision Horizon, LLC*, Case No. BC515124 (the "Second State Court Action"). The Second State Court Action remains pending.

I.    On September 30, 2013, Hawkeye filed a Voluntary Chapter 11 Petition in the United States Bankruptcy Court for the Central District of California, San Fernando Division ("Bankruptcy Court"), entitled *In re Hawkeye Entertainment, LLC*, Case No. 1:13-bk-16307-MT (the "Bankruptcy Proceeding"). In connection with the Bankruptcy Proceeding, Hawkeye filed an Omnibus Motion for an Order Authorizing the Assumption of the Lease (the "Lease Assumption Motion").

J.    On January 10, 2014, New Vision filed in the Bankruptcy Proceeding Proof of Claim No. 2 in the amount of $1,006,125.87 ("POC No. 2").

K.    Without admitting wrongdoing, fault, or liability to each other, and for the purpose of avoiding further inconvenience, costs, and expenses, the Parties now desire and intend to fully and finally settle and resolve all claims and disputes that exist, or that may exist between the Parties including, without limitation, all claims and disputes alleged, in, or which could be alleged in, or arise out of, or are related to the matters alleged in the First and Second State Court Actions, and all claims and disputes related to the Lease Assumption Motion.

NOW THEREFORE, FOR VALUABLE CONSIDERATION, AND SUBJECT TO THE APPROVAL BY THE COURT IN THE BANKRUPTCY

PROCEEDING OF HAWKEYE'S MOTION FOR THE ASSUMPTION OF THE LEASE, THE PARTIES AGREE AS FOLLOWS:

### SETTLEMENT TERMS:

1.  <u>Definitions</u>.  For purposes of this Agreement, in addition to the terms defined elsewhere in this Agreement, the following capitalized terms shall have the following meanings:

(a)  "Approval Order" means an order of the Bankruptcy Court in the Bankruptcy Proceeding approving this Agreement, which order shall be in form and substance reasonably acceptable to the Parties.

(b)  "Assumption Order" means an order of the Bankruptcy Court in the Bankruptcy Proceeding pursuant to the Lease Assumption Motion whereby the Bankruptcy Court approves assumption of the Lease and Sublease for the Premises, as modified by this Agreement and the Amendment to the Lease provided by this Agreement, in the form attached hereto as Exhibit 1.

(c)  "Claim" shall have the meaning assigned to such term in Bankruptcy Code § 101(5).

(d)  "Effective Date" means the first date on which all of the following have occurred:  (i) all of the Parties have executed this Agreement; (ii) the Bankruptcy Court has entered the Approval Order; (iii) the Bankruptcy Court has entered the Assumption Order; and, (iv) the Approval Order and Assumption Order have become Final Orders.  Each of the Parties hereby waives any right, pursuant to Federal Rules of Civil Procedure 59 and/or 60(b), as incorporated in Federal Rules of Bankruptcy Procedure 9023 and 9024, respectively, or under Bankruptcy Code § 502(j), or otherwise, to seek reconsideration of the Approval Order or Assumption Order referenced immediately above.  If the Effective Date does not occur within sixty (60) days after the date first set forth above, unless such date is extended by a writing signed by all Parties prior to the expiration of the sixty (60) day period, then this Agreement shall become null and void, and the Parties shall be returned to the status quo ante as if this Agreement had never been executed, including the recitals herein.

USW 804638285.3

(e)    "Final Order" means an order, decree or judgment entered by the Bankruptcy Court and with respect to which fifteen (15) days have passed since such entry, and the operation or effect of which has not been reversed, stayed, modified or amended. A "Final Order" shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, or the time to do any of the foregoing has not yet expired, but as to which the Parties, in their sole and absolute discretion, elect to proceed with the Effective Date.

2.    Bankruptcy Court Approval Of Hawkeye's Assumption Of The Lease And Sublease.  Upon execution of this Agreement, and the Amendment to the Lease provided for by this Agreement, the Parties will sign and file with the Bankruptcy Court in the Bankruptcy Proceeding a Stipulation and Proposed Assumption Order whereby Hawkeye assumes the Lease for the Premises and the Sublease.  The form of the Stipulation and Assumption Order are attached hereto collectively as Exhibit "1".  Notwithstanding anything herein or under applicable law to the contrary, on and after the Effective Date, the Assumption Order shall remain in full force and effect despite entry of an order dismissing the Bankruptcy Proceedings or confirming any plan of reorganization in this case.

3.    New Vision's Consent To A Further Extension Of The Deadline In Which The Bankruptcy Court Must Enter Its Order Approving Hawkeye's Assumption Of The Lease And Sublease.  By its signature below, New Vision hereby consents in writing to a further extension of the deadline pursuant to Bankruptcy Code §365(d)(4) by which Hawkeye must assume and assign or reject the Lease and Sublease in the Bankruptcy Proceeding from the current deadline of September 15, 2014 until and including November 28, 2014.  Regardless of whether or not the Effective Date occurs or the Agreement terminates for any reason prior to the Effective Date, New Vision's signature below memorializes (i) New Vision's voluntarily written consent pursuant to Bankruptcy Code §365(d)(4)(B)(ii) to entry of an order for a further extension of time from the current deadline of September 15, 2014 until and including November 28, 2014 for Hawkeye to assume and assign or reject the Lease and Sublease; (ii) New Vision's voluntarily consent and waiver in writing of its rights under Bankruptcy Code §365(d)(4) through and including such date; and, (iii) New Vision's voluntary consent to entry of an order by the Bankruptcy Court granting

4

USW 804638285.3

such extension. New Vision hereby further authorizes Hawkeye to lodge with the Bankruptcy Court in the Bankruptcy Proceeding an order extending the deadline consistent with the terms of this paragraph. Without limiting the generality of the foregoing authority to file such an order, New Vision shall, concurrently with the execution of this Agreement, execute the Stipulation and Proposed Order, attached hereto as Exhibit "2", extending such deadline, which Hawkeye is authorized to file with the Bankruptcy Court forthwith upon execution. New Vision's consent to the extension of time pursuant to this paragraph shall survive the termination of this Agreement.

4. <u>The Lease</u>. On and after the Effective Date, New Vision recognizes and adopts as the Lease between the Parties, the July 17, 2009 Lease between PAX and Hawkeye, attached hereto as Exhibit "3." As of the Effective Date, the Lease and Sublease shall be deemed current and reinstated as if no default exists or ever existed. On the Effective Date, the five-day notice issued by New Vision on September 20, 2013 shall be revoked and of no further force and effect. On the Effective Date the Alleged Amendments shall be deemed null and void and of no further force and effect.

5. <u>Amendment To The Lease</u>. Concurrently with the execution of this Agreement, the Parties shall execute that certain First Amendment to Lease Agreement attached hereto as Exhibit "4" (the "First Amendment"). On the Effective Date, the First Amendment shall become effective and shall be deemed to modify and amend the Lease.

6. <u>The WERM Sublease</u>. On the Effective Date, New Vision accepts and approves of WERM as Hawkeye's subtenant under the Sublease between WERM and Hawkeye.

7. <u>Rent Prepayment</u>. Within five (5) business days after the Effective Date, Hawkeye shall pay to New Vision the total sum of $105,000 representing payment of Minimum Rent (as set forth in the Lease as amended by the First Amendment) for the months of November 2014, December 2014, and January 2015.

8. <u>Dismissal Of The State Court Actions</u>. Within fourteen (14) days after the Effective Date, Hawkeye shall file a Request for Dismissal, with prejudice, of the First State Court Action and the Second State Court

5

Action. All Parties to the State Court Actions shall bear their own costs and attorneys' fees. Hawkeye represents that no other actions are pending involving New Vision or the Property.

9.    Lis Pendens. Within fourteen (14) days after the Effective Date, Hawkeye shall file and record a Notice of Withdrawal of the Lis Pendens recorded with the Los Angeles County Recorder's Office on July 18, 2013 as Document No. 20131060404. To the extent, if any, that any other documentation needs to be signed, filed, or recorded to cause the Lis Pendens to be withdrawn, Hawkeye shall sign and file or record such other documentation.

10.    General Releases:

(a)    On the Effective Date, except as otherwise provided in this Agreement, and except as to the Parties' rights and obligations under the Lease and the First Amendment, the Parties, on behalf of themselves and each of their predecessors, successors, assigns, officers, directors, members, agents, and all other persons or entities acting on their behalf, hereby fully and forever release each other, and each of their respective predecessors, successors, assigns, officers, directors, members, agents, employees, insurers, representatives and attorneys, from any and all claims, actions or causes of action, damages, demands, costs, expenses, losses, and attorneys' fees, which they have, or could claim to have against each other arising from or related to: (1) all claims alleged in the First or Second State Court Actions; (2) all claims alleged in, or related to the Lease Assumption Motion, including claims related to the Rent Commencement Date and any offsets to rent allegedly owed to Hawkeye by New Vision; (3) all claims related to the validity and enforceability of the Lease; (4) all claims related to the validity and enforceability of the Sublease; (5) all claims related to any Rent owed from the period July 17, 2009 through October 31, 2014; and (6) all the Claims of New Vision arising under or related to POC No. 2. It is the parties' mutual intent that by this SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF CLAIMS the parties are resolving all disputes between them. Notwithstanding the foregoing, nothing herein is intended to nor shall release claims, if any, that any Party may have against Pax or its principals.

(b)    It is the intention of the Parties that the releases provided in this Agreement, will be effective to bar all claims, demands,

6

controversies, causes of action, liabilities, costs, expenses, attorneys' fees, and damages of whatever character, nature and kind, known or unknown, suspected or unsuspected against one another. The Parties expressly waive any and all rights and benefits conferred upon them by California Civil Code section 1542, which states:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.;

(c)   The Parties acknowledge and agree that this Agreement, including without limitation the foregoing waiver of the provisions of California Civil Code section 1542, is intended to effectuate a full and complete release of any and all claims for relief, whether known or unknown, that may be asserted by them against each other; and

(d)   The Parties acknowledge that the foregoing waiver of the provisions of California Civil Code section 1542 is separately bargained for and expressly consented to, and that this Agreement shall be given full force and effect in accord with each and all of its terms and provisions, including those terms and provisions relating to known and unknown claims.

11.   <u>Entire Agreement</u>. This Agreement, including the Exhibits thereto, contain the entire agreement and understanding between the Parties concerning this matter, and this Agreement integrates and supersedes all other agreements of any kind concerning the subject matter of this Agreement. Each of the undersigned warrants that no promise or inducement has been offered except as set forth herein, and that this Agreement is executed without reliance upon any statement or representation by the person or Parties released or their representatives, except as set forth herein.

12.   <u>Legal Capacity</u>. Each Party to this Agreement, including all persons signing this Agreement on behalf of any Party, represents and warrants that they have the authority and capacity to enter into this Agreement, and to thereby bind the Party on whose behalf they have signed.

7

USW 8046382285.3

13.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

14.    <u>Legal Construction</u>.

(a)    This Agreement shall be governed in all respects, including validity, interpretation, and effect, by the Bankruptcy Code and the laws of the State of California, without giving effect to the principles of choice of law or conflicts of law thereof;

(b)    This Agreement shall be construed as though each Party participated equally in its drafting and any rule of construction causing a document to be construed against the drafting party shall not be applicable to this Agreement;

(c)    No alterations or changes to this Agreement may be effected except by a writing executed by the Parties;

(d)    This Agreement may be executed in any number of counterparts, any of which shall be enforceable as an original as if fully executed.  Each Party shall transmit its signature to every other Party to this Agreement by mail, e-mail, or facsimile.  Photocopies and e-mail or facsimile transmissions of signatures will be deemed equivalent to an original; and

(e)    Headings contained in this Agreement are for reference purposes only and shall be given no weight in the construction of this Agreement; and

(f)    If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions shall be severed therefrom and continue in full force and effect.

15.    <u>Legal Counsel</u>.  The Parties acknowledge, that at all times material hereto, they have had the opportunity to consult with legal counsel of their own choosing concerning their rights with respect to the form and content of this Agreement, and the advisability of executing same.

16.    <u>Further Assurances</u>.  Each of the Parties agrees, on demand, to execute such other instruments consistent with, and necessary or convenient to carry out the provisions and purposes of this Agreement.

8

USW 804638285.3

17.  Attorneys' Fees.  Each Party hereto shall bear its own attorneys' fees and costs incurred in connection with the Bankruptcy Proceeding, the State Court Actions and this Agreement and the exhibits entered into in connection with this Agreement.  In the event that any Party files or prosecutes any action to enforce or interpret the Agreement, or any action arising out of this Agreement, the prevailing Party in any such action shall be entitled to recover from the non-prevailing Party all reasonable costs and attorneys' fees incurred therein, including, without limitation, the costs and expenses of any expert witnesses.

18.  Assignment of Claims.  The Parties represent, warrant and agree that they are the lawful owner of the right, title, and interest in and to every claim or matter released herein, and that they have not assigned or transferred, nor purported to or attempted to assign or transfer, to any person or entity any claim or other matter released herein.

19.  Hawkeye represents that WERM and William McAbian have agreed to be Guarantors of Hawkeye's performance under the Lease and the First Amendment and that they will promptly each execute a written Guaranty to that effect.

20.  Jurisdiction.  Each Party consents to the exclusive jurisdiction of the Bankruptcy Court over any matter, action, or proceeding relating to this Agreement, including any proceeding brought in connection with this Agreement, and agrees that the Bankruptcy Court shall be the exclusive forum to hear, determine, and enter appropriate orders and judgments in all such matters, actions, or proceedings, provided, however, that in the event the Bankruptcy Court refuses to exercise jurisdiction over any proceeding related to or concerning this Agreement, the Parties consent to the jurisdiction of any state or federal court located in Los Angeles County, California that may properly exercise jurisdiction over any such proceeding.

21.  Plan of Reorganization.  After the Effective Date, New Vision shall not oppose, and shall vote in favor of, any plan of reorganization propounded by Hawkeye, so long as the terms of such plan are not inconsistent with the terms of this Agreement.  In the event that New Vision fails to submit a timely ballot in favor of any such plan, Adi McAbian is appointed attorney-in-fact, and further authorized under Bankruptcy Rule 7070 (and Federal Rule of Civil Procedure 70), to execute and deliver a ballot to Hawkeye on behalf of New Vision.  Alternatively, should Hawkeye in its absolute and sole discretion elect to seek dismissal of the case, New

9

USW 804638285.3

Vision shall not oppose or directly or indirectly cause any party in interest to oppose, such dismissal.

We, the undersigned, have read the foregoing Settlement Agreement and Release of Claims, and agree to all the terms, conditions and covenants therein.

Dated: August 28, 2014          Hawkeye Entertainment, LLC,
                                a California limited liability company


                                By:

Dated: August 20, 2014          New Vision Horizon, LLC,
                                a California limited liability company


                                By:

*[signatures continue on next page]*

10

USW 804638285.3

159

APPROVED AS TO FORM:

Dated: August __, 2014          Lewis Brisbois Bisgaard & Smith LLP

                                By: _____
                                     Jon Kardassakis
                                     Attorneys for New Vision Horizon, LLC

Dated: August __, 2014          McKenna Long & Aldridge LLP

                                By: _____
                                     Wayne S. Grajewski
                                     Attorneys for Hawkeye Entertainment, LLC

USW 804638285.3                          11

APPROVED AS TO FORM:

Dated: August 20, 2014          Lewis Brisbois Bisgaard & Smith LLP

                                By: _____
                                    Jon Kardassakis
                                    Attorneys for New Vision Horizon, LLC


Dated: August ___, 2014         McKenna Long & Aldridge LLP

                                By: _____
                                    Wayne S. Grajewski
                                    Attorneys for Hawkeye Entertainment, LLC

11

USW 804638285 3

161

APPROVED AS TO FORM:

Dated: August __, 2014          Lewis Brisbois Bisgaard & Smith LLP

                               By: _____
                                   Jon Kardassakis
                                   Attorneys for New Vision Horizon, LLC


Dated: August 20, 2014          McKenna Long & Aldridge LLP

                               By: *Wayne S. Grajewski*
                                   Wayne S. Grajewski
                                   Attorneys for Hawkeye Entertainment, LLC

USW 804638285.3

# Exhibit L

Sandford L. Frey (SBN 117058)
Kim R. Gundlach (SBN 131390)
**CREIM MACIAS KOENIG & FREY LLP**
633 West Fifth Street, 51st Floor
Los Angeles, CA 90071
Telephone: (213) 614-1944
Facsimile: (213) 614-1961
sfrey@cmkllp.com
kgundlach@cmkllp.com

Reorganization Attorneys for Hawkeye Entertainment, LLC
Debtor and Debtor-In-Possession

Wayne Grajewski (SBN 71019)
Aimee Wong (SBN 179369)
**McKENNA LONG & ALDRIDGE LLP**
300 South Grand Ave., 14th Floor
Los Angeles, California 90071
Telephone: (213) 687-2170
Facsimile: (213) 243-6330
wgrajewski@mckennalong.com
aywong@ mckennalong.com

Special Counsel for Hawkeye Entertainment, LLC
Debtor and Debtor-In-Possession

FILED & ENTERED

SEP 12 2014

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Fisher    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**[SAN FERNANDO VALLEY DIVISION]**

In re

**HAWKEYE ENTERTAINMENT, LLC,**

Debtor and Debtor in Possession

CASE NO.: 1:13-bk-16307-MT

Chapter 11

**ORDER GRANTING MOTION OF HAWKEYE ENTERTAINMENT, LLC, DEBTOR AND DEBTOR IN POSSESSION, FOR AN ORDER APPROVING GLOBAL SETTLEMENT BETWEEN THE DEBTOR AND NEW VISION HORIZON, LLC PURSUANT TO FRBP 9019**

DATE:        September 4, 2014
TIME:        9:30 a.m.
CTRM:        302

1

ORDER RE MOTION TO APPROVE GLOBAL SETTLEMENT PURSUANT TO FRBP 9019

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

The Motion of Hawkeye Entertainment, LLC, Debtor and Debtor in Possession ("Debtor") for an Order Approving Global Settlement between the Debtor and New Vision Horizon, LLC Pursuant to FRBP 9019 ("9019 Motion") came on for hearing on September 4, 2014 at 9:30 a.m. in Courtroom 302 before the Honorable Maureen A. Tighe, United States Bankruptcy Judge for the Central District of California, San Fernando Valley Division located at 21041 Burbank Boulevard, Woodland Hills, California.

The 9019 Motion seeks approval of, among other documents, the *Settlement Agreement and Mutual Release of Claims*, attached to the 9019 Motion as *Exhibit A* ("Settlement Agreement") and the *Stipulation to Assume the Lease and Sublease for the Premises located at 618 South Spring Street, Los Angeles, California*, attached to the 9019 Motion as *Exhibit B* ("Assumption Stipulation").

The official record of the hearing reflects the appearances that were made by counsel and for parties in interest. No opposition was filed to the 9019 Motion.

The Court has reviewed and considered, among other things, the 9019 Motion [Docket No. 226]; the Settlement Agreement; the Assumption Stipulation; the Lease Agreement, which is attached as Exhibit 3 to the Settlement Agreement; First Amendment to the Lease Agreement, which is attached as Exhibit 4 to the Settlement Agreement ("First Amendment"); the Sublease Agreement ("Sublease") with W.E.R.M. Investments, LLC ("WERM") dated October 1, 2009; and the record in the case.

The Court entered on September 4, 2014 [Docket No. 242], its *Order (1) Approving Stipulation for Assumption of Nonresidential Real Property Lease and Sublease for Premises located at 618 South Spring Street, Los Angeles, California; and, (2) Granting Omnibus Motion of Hawkeye Entertainment, LLC, Debtor and Debtor in Possession for an Order Authorizing the Assumption of Non-Residential Real Property Lease and Sublease for the Premises Located at 618 South Spring Street, Los Angeles* ("Assumption Order"), which approved and authorized the assumption of the Lease and Sublease, pursuant to the Assumption Stipulation; and,

The Court finding, among other things, that the Debtor has met its burden of proof and demonstrated to the satisfaction of the Court that the compromise set forth in the 9019 Motion

2

ORDER RE MOTION TO APPROVE GLOBAL SETTLEMENT PURSUANT TO FRBP 9019

and Settlement Agreement and the attached Exhibits between the Debtor and New Vision is in the best interests of the Chapter 11 estate and creditors; that the resolution of its dispute with New Vision allows for the assumption by Debtor of the Lease and Sublease at the Premises located at 618 South Spring Street, Los Angeles, California, and that such assumption is in the best interest of the Chapter 11 estate and creditors; that proper notice of the hearing on the 9019 Motion was given by the Debtor to parties entitled to notice thereof, and that such notice was proper and sufficient under the circumstances; and, good cause appearing; it is hereby:

ORDEDED that the 9019 Motion is **GRANTED**; and, it is further,

ORDERED that the executed Settlement Agreement between the Debtor and New Vision is hereby **APPROVED**.

\###

Date: September 12, 2014

Maureen A. Tighe
United States Bankruptcy Judge

*[Signatures on Next Page]*

3

ORDER RE MOTION TO APPROVE GLOBAL SETTLEMENT PURSUANT TO FRBP 9019

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944



1  CREIM MACIAS KOENIG & FREY, LLP

2

3  By: /s/ Sandford L. Frey
4      Sandford L. Frey
   Reorganization Attorneys for Hawkeye Entertainment, LLC,
5  Debtor and Debtor in Possession

6

7  LEWIS BRISBOIS BISGAARD & SMITH, LLP

8

9  By:
      Scott Lee
10  Attorneys for New Vision Horizon, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

ORDER RE MOTION TO APPROVE GLOBAL SETTLEMENT PURUSANT TO FRBP 9019

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 51ST FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

167

# Exhibit M

RECORDING REQUESTED BY
AND WHEN RECORDED RETURN TO:

PREFERRED BANK
601 S. Figueroa Street, 48th Floor
Los Angeles, California 90017
Attention: Note Department

Assessor's Parcel No.: _____

## SUBORDINATION, NONDISTURBANCE
## AND ATTORNMENT AGREEMENT

NOTICE:    THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT
AGREEMENT RESULTS IN THE LEASEHOLD ESTATE IN THE
PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY
THAN THE LIEN OF SOME OTHER OR LATER SECURITY
INSTRUMENT.

   THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT
AGREEMENT ("Agreement") made to be effective as of the_____day of April 2019, by and
among SMART CAPITAL INVESTMENTS I, LLC, a California limited liability company,
SMART CAPITAL INVESTMENTS II, LLC, a California limited liability company, SMART
CAPITAL INVESTMENTS III, LLC, a California limited liability company, SMART
CAPITAL INVESTMENTS IV, LLC, a California limited liability company, and SMART
CAPITAL INVESTMENTS V, LLC, a California limited liability company (individually and
collectively, "Borrower" or "Landlord"), PREFERRED BANK, a California banking corporation
("Lender"), and HAWKEYE ENTERTAINMENT, LLC, a California limited liability company
("Tenant");

W I T N E S S E T H

   WHEREAS, Lender is or will be the owner and holder of a (i) Deed of Trust, Assignment
of Rents, Security Agreement and Fixture Filing dated as of March 26, 2019, executed by
Borrower in favor of Lender (the "First Lien Deed of Trust"), covering the real property
described in EXHIBIT "A", attached hereto and made a part hereof for all purposes, and the
buildings and improvements thereon, provided in the Lease (as hereinafter defined) (hereinafter
collectively called the "Property"), and (ii) Deed of Trust, Assignment of Rents, Security
Agreement and Fixture Filing dated as of March 26, 2019, executed by Borrower in favor of
Lender (the "Second Lien Deed of Trust" and together with the First Lien Deed of Trust,
individually and collectively, the "Deed of Trust"), covering the Property, and each Deed of
Trust was recorded in the Official Records of Los Angeles County, California. The First Lien
Deed of Trust secures the payment of a loan (the "First Lien Loan") made by Lender to
Borrower pursuant to that certain Loan Agreement dated as of March 26, 2019 ("First Lien Loan
Agreement"), and that certain Promissory Note by Borrower in favor of Lender dated as of
March 26, 2019 ("First Lien Note"). The Second Lien Deed of Trust secures the payment of a

loan (the "Second Lien Loan" and together with the First Lien Loan, individually and collectively, the "Loan") made by Lender to SAM Property Investments LLC, a California limited liability company ("SAM") pursuant to that certain Loan Agreement dated as of March 26, 2019 ("Second Lien Loan Agreement" and together with the First Lien Loan Agreement, individually and collectively, the "Loan Agreement"), and that certain Promissory Note by SAM in favor of Lender dated as of March 26, 2019 ("Second Lien Note" and together with the First Lien Note, individually and collectively, the "Note"). The Loan Agreement, Note, Deed of Trust, and the other documents executed by Borrower and SAM in connection with the Loan being hereinafter sometimes referred to individually and collectively as "Loan Documents"); and

WHEREAS, Tenant is the holder of a leasehold estate pursuant to a lease entered into with Landlord's predecessor-in-interest dated July 17, 2009, as amended as of August, 2014 (hereinafter called the "Lease") covering a portion of the Property as more particularly described in Supplement I ("Premises"); and

WHEREAS, Borrower (with such party and its successors and assigns occupying the position of landlord under the Lease being referred to collectively hereinafter as "Landlord") has assigned its rights as landlord under the Lease to Lender to facilitate repayment of the Loan and performance of its obligations under the Deed of Trust; and

WHEREAS, Tenant and Lender desire to confirm their understanding with respect to the Lease and the Deed of Trust;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, Lender and Tenant hereby agree and covenant as follows:

1.      SUBORDINATION. The Lease is hereby made, and shall at all times continue to be, subject and subordinate in each and every respect, to the lien of the Deed of Trust and to any and all liens, interests and rights created thereby and to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust or the indebtedness or other obligations secured thereby.

2.      NONDISTURBANCE. So long as Tenant is not in default (beyond any period given Tenant to cure such default) in the payment of rent or additional rent or in the performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed, (a) Tenant's possession of the Premises and Tenant's rights and privileges under the Lease, or any extensions or renewals thereof, shall not be diminished or interfered with by Lender in the exercise of any of its rights under the Loan Documents or by any party who acquires the Property from Lender as a result of the exercise by Lender of any such rights, (b) Tenant's occupancy of the Premises shall not be disturbed by Lender in the exercise of any of its rights under the Loan Documents during the term of the Lease or any extensions or renewals thereof or by any party who acquires the Property from Lender as a result of the exercise by Lender of any such rights, and (c) Lender will not join Tenant as a party defendant in any action or proceeding for the purpose of terminating Tenant's interest and estate under the Lease because of any default under the Deed of Trust or any other instrument evidencing or securing the Loan.

3.      ATTORNMENT. If any proceedings are brought for the foreclosure of either Deed of Trust, or if the Property is sold pursuant to a trustee's sale under either Deed of Trust, or

if Lender becomes owner of the Property by acceptance of a deed or assignment in lieu of foreclosure or otherwise, Tenant shall attorn to the Lender or purchaser, as the case may be, upon any such foreclosure sale or trustee's sale, or acceptance by Lender of a deed or assignment in lieu of foreclosure, and Tenant shall recognize Lender or such purchaser, as the case may be, as the Landlord under the Lease for the remainder of the term thereof (including the extension periods, if Tenant elects or has elected to exercise its options to extend the term). Such attornment shall be effective and self-operative without the execution of any further instrument on the part of any of the parties hereto unless applicable law shall require such documentation at the time Lender exercises its remedies. Tenant agrees, however, to execute and deliver at any time, and from time to time, within five (5) business days after the request of Landlord, any holder(s) of any of the indebtedness or other obligations secured by the Deed of Trust, or any such purchaser, all instruments or certificates which, in the reasonable judgment of Landlord, such holder(s) or such purchaser, may be necessary or appropriate in any such foreclosure proceeding or otherwise to evidence such attornment. In the event of any such attornment, Tenant further waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect the Lease and the obligation of Tenant thereunder as a result of any such foreclosure proceeding or trustee's sale.

4.    LENDER'S RIGHTS, REMEDIES AND LIABILITY AS A LANDLORD OR LENDER IN POSSESSION. If Lender shall succeed to the interest of Landlord under the Lease in any manner, or if any purchaser acquires the Property upon any foreclosure of either Deed of Trust or any trustee's sale under either Deed of Trust, Lender or such purchaser, as the case may be, shall have the same remedies by entry, action or otherwise in the event of any default by Tenant (beyond any period given Tenant to cure such default) in the payment of rent or additional rent or in the performance of any of the terms, covenants and conditions of the Lease on Tenant's part to be performed that Landlord had or would have had if Lender or such purchaser had not succeeded to the interest of Landlord. Thereafter, Lender or such purchaser shall be bound to Tenant under all the terms, covenants, and conditions of the Lease, and Tenant shall, from and after the succession to the interest of Landlord under the Lease by Lender or such purchaser, have the same remedies against Lender or such purchaser for the breach of an agreement contained in the Lease that Tenant might have had under the Lease against Landlord if Lender or such purchaser had not succeeded to the interest of Landlord, and Tenant shall be bound to Lender or such purchaser under all of the terms, covenants and conditions of the Lease. However, Lender or such purchaser shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord) that is not then continuing under the Lease; provided, however, that Tenant's sole remedy against Lender with respect to any act or omission of any prior landlord (including Landlord) that is then continuing under the Lease shall be to assert against Lender any offsets of rent or other defenses which Tenant has against any landlord under the Lease (including Landlord) (subject to the limitation set forth in clause (ii) below); or

(b)    subject to offsets or defenses which Tenant might have against any prior landlord (including Landlord) (excepting offsets or defenses arising under the Lease, as amended); or

(c)    bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord (including Landlord), unless the same was paid to and received by Lender; or

(d)    bound by any representation or warranty contained in the Lease or made

by any party to Tenant (except any breach of an indemnity agreement contained in the lease by such new owner occurring after the new owner becomes the "Landlord" under the Lease), including, but not limited to, Landlord, or liable for any breach of representation or warranty of any prior landlord, including Landlord; or

(e)     bound by any amendment or modification of the Lease, or waiver of any of its terms, made without Lender's consent; or liable for any sum that any prior landlord, including Landlord, owed to Tenant, including without limitation any security deposit, unless the amount owed was actually delivered to Lender;

(f)     bound by any surrender, cancellation, or termination of the Lease, in whole or in part, agreed upon between Landlord and Tenant; or

(g)     liable for any construction obligation of any prior landlord, including Landlord.

Neither Lender (or such purchaser) nor any other party who from time to time shall be included in the definition of Lender hereunder, shall have any liability or responsibility under or pursuant to the terms of this Agreement or this Lease from the date it ceases to own an interest in or to the Property. Tenant further acknowledges and agrees that neither Lender nor any purchaser of the Property at any foreclosure sale nor any grantee of the Property named in a deed-in-lieu of foreclosure, nor any heir, legal representative, successor, or assignee of Lender or of any such purchaser or grantee, has or shall have any personal liability for the obligations of Landlord under the Lease, except to the extent of the rents, security deposits, and insurance and condemnation proceeds actually received and the equity in the Property then owned by such party.

5.     NO WAIVER. Nothing herein contained is intended, nor shall it be construed, to abridge or adversely affect any right or remedy of Landlord under the Lease in the event of any default by Tenant (beyond any period given Tenant to cure such default) in the payment of rent or additional rent or in the performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed.

6.     NOTICES. Tenant hereby acknowledges and agrees that:

(a)     From and after the date hereof, in the event of any act or omission of Landlord which would give Tenant the right, either immediately or after notice, the lapse of time, or both, to terminate the Lease or to claim a partial or total eviction, Tenant will not exercise any such right (i) until it has given written notice of such act or omission to Lender, and (ii) until the expiration of thirty (30) days following such giving of notice to Lender in which time period Lender shall be entitled to cure any such acts or omissions of Landlord, or begin the cure and diligently pursue the cure if such cure, by its nature, cannot reasonably be effected within such thirty (30) day period.

(b)     Tenant shall send to the Lender a copy of any default, notice or statement sent by Tenant to Landlord under the Lease, at the same time such default, notice or statement is sent to Landlord.

(c)      If Lender notifies Tenant of a default under either Deed of Trust and demands that Tenant pay its rent and all other sums due under the Lease to Lender, Tenant shall honor such demand and pay its rent and all of the sums due under the Lease directly to Lender or as otherwise required pursuant to such notice. In connection therewith, Landlord, by its execution of this Agreement, hereby acknowledges and agrees that in the event of a default under either Deed of Trust, Tenant may pay all rents and all of the sums due under the Lease directly to Lender as provided hereinabove upon notice from Lender that Landlord is in default. If Tenant shall make rental payments to the Lender following receipt of notice that Landlord is in default, Landlord hereby waives any claims against Tenant for the amount of such payments made by Tenant to Lender.

7.      <u>COVENANTS</u>. Tenant shall not, without obtaining the prior written consent of Lender, (a) prepay any of the rents, additional rents or other sums due under the Lease for more than one (1) month in advance of the due dates thereof, (b) voluntarily surrender the Premises or terminate the Lease without cause, or (c) assign the Lease or sublet the Premises other than pursuant to the provisions of the Lease.

8.      <u>AMENDMENTS/SUCCESSORS</u>. This Agreement and the Lease may not be amended or modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and permitted assigns, and any purchaser or purchasers at foreclosure of the Property, and their respective heirs, personal representatives, successors and assigns.

9.      <u>NOTICE OF DEED OF TRUST</u>. To the extent that the Lease shall entitle the Tenant to notice of either Deed of Trust, this Agreement shall constitute such notice to the Tenant with respect to the Deed of Trust and to any and all modifications, renewals, extensions, replacements and/or consolidations of the Deed of Trust and to any and all other Deed of Trusts or deeds of trust which may hereafter be subject to the terms of this Agreement as provided above. Tenant has not received notice of any assignment, hypothecation, deed of trust, or pledge of Landlord's interest in the Lease or the rents or other amounts payable thereunder other than that given to Lender. Tenant consents to the Deed of Trust and to the assignment of Landlord's rights under the Lease to Lender. Lender may, at its election, in its sole and absolute opinion and judgment, subordinate the lien of the Deed of Trust to the Lease and the leasehold interest created thereby, and make said lien subject to the Lease by providing Landlord and Tenant written notice of such election at any time prior to completion of a foreclosure of the Deed of Trust, whether judicial or through the power of sale contained in the Deed of Trust, or the acceptance of any assignment or deed in lieu of foreclosure. From and after delivery of such notice to Tenant, the lien of the Deed of Trust shall be subject and subordinate to the Lease and the leasehold estate created thereby.

10.      <u>MULTIPLE COUNTERPARTS</u>. This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all parties hereto, notwithstanding that all parties are not signatories to the original or the same counterpart.

11.      <u>CAPTIONS</u>. The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

12.    <u>MISCELLANEOUS</u>. Tenant and Landlord hereby authorize Lender to, and Lender hereby reserves the right to, (a) revise the legal description set forth in <u>Exhibit "A"</u> attached hereto, if required in order to correctly describe the Premises subject to the Deed of Trust, (b) insert the date of this Agreement and the dates of the Loan Documents identified in this Agreement to conform to the closing of the Loan, and (c) insert in this Agreement the date of the Lease and the common description of the Premises if the same has not been completed by Landlord or Tenant.

NOTICE:        THIS AGREEMENT CONTAINS A PROVISION WHICH MAY ALLOW
               THE PARTIES AGAINST WHOM YOU CLAIM AN EQUITABLE
               INTEREST IN REAL PROPERTY TO OBTAIN A LOAN A PORTION OF
               WHICH MAY BE EXPENDED FOR OTHER PURPOSES THAN
               IMPROVEMENT OF THE LAND.

IN WITNESS WHEREOF, the parties hereto have hereunto caused this Agreement to be duly executed as of the day and year first above written.

"Landlord"

SMART CAPITAL INVESTMENTS I, LLC,
a California limited liability company


By: _____
Name: Michael Sung Chang
Its: Manager


SMART CAPITAL INVESTMENTS II, LLC,
a California limited liability company


By: _____
Name: Michael Sung Chang
Its: Manager


SMART CAPITAL INVESTMENTS III, LLC,
a California limited liability company


By: _____
Name: Michael Sung Chang
Its: Manager


SMART CAPITAL INVESTMENTS IV, LLC,
a California limited liability company


By: _____
Name: Michael Sung Chang
Its: Manager


SMART CAPITAL INVESTMENTS V, LLC,
a California limited liability company


By: _____
Name: Michael Sung Chang
Its: Manager


[LENDER AND TENANT SIGNATURE ON NEXT PAGE]

"Lender"

PREFERRED BANK,
a California banking corporation

By:_____
Name:_____
Its: _____

"Tenant"

HAWKEYE ENTERTAINMENT, LLC,
a California limited liability company

By: _____
Name:_____
Title: _____

[ALL SIGNATURES MUST BE ACKNOWLEDGED]

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA          )
                                          ) ss
COUNTY OF_____  )

On_____, before me,_____, a Notary Public, personally appeared_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA          )
                                          ) ss
COUNTY OF_____  )

On_____, before me,_____, a Notary Public, personally appeared_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

177

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                              )
                                                 ) ss
COUNTY OF_____                   )

On_____, before me,_____, a Notary Public, personally appeared_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public


A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA                              )
                                                 ) ss
COUNTY OF_____                   )

On_____, before me,_____, a Notary Public, personally appeared_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

## EXHIBIT "A"
## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcel 1:

That portion of Block 16 of Ord's Survey, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 53 Page 66 et seq., of Miscellaneous Records, in the Office of the County Recorder of said County, described as follows:

Beginning at a point on the East line of Spring Street at its intersection with a line as described in party wall agreement recorded in Book 528 Page 102 of Deeds, Records of said County, said intersection being South 37° 50' West 159.91 feet along said East line of Spring Street from the Southerly line of Sixth Street; thence along the line as described in said Agreement South 52° 19' 15" East 146.11 feet to the West line of Harlem Place; thence along Harlem Place, South 43° 48' 10" West, 79.95 feet to a point in the North face of the North wall of a six-story building distant North 43° 48' 10" East, 180.34 feet from an angle point in the West line of said Harlem Place; thence along the North face of said wall, North 52° 26' 5" West 137.79 feet to a point in the East line of Spring Street, distant North 37° 50' East 349.65 feet from the North line of Seventh Street, 80 feet wide; thence along Spring Street North 37° 50' East 79.96 feet to the point of beginning.

Parcel 2:

A permanent easement for encroachment of the basement walls and the downward continuation thereof upon that portion of said property particularly described as follows:

That portion of Lot 9 in Block 16 of Ord's Survey, in the City of Los Angeles, as shown on Map recorded in Book 53 Page 66 at seq., of Miscellaneous Records, in the Office of the County Recorder of said County, bounded by the following described.

Beginning at a point in the Southeasterly line of Spring Street, 80 feet wide, as established by the City Engineer of said City and shown on Map M221 on file in the Office of said City Engineer, distant thereon, South 37° 50' 00" West, 159.91 feet from the Southwesterly line of Sixth Street, 60 feet wide, as shown on said Map M221, said point also being the most Westerly corner of the land described in deed to Sixth and Spring Corporation, recorded as Document No. 1680 on February 28, 1958, in Book 028 Page 736, Official Records, in the Office of the County Recorder of said County; thence along said Southeasterly line of said Spring Street,  North 37° 50' 00" East, 60 of a foot thence at right angles, South 52° 10' 00" East, 107.42 feet; thence at right angles, North 37° 50' 00" East, 25 of a foot; thence at right angles, South 52° 10' 00" East, 38.76 feet to a point on the Northwesterly line, of Harlem Place, 20 feet wide, as shown on said Map M221, said line also being the Southeasterly line of said lands described in said Deed to Sixth and Spring Corporation, thence along said line South 43° 49' 00" West, 46 of a foot to the most Southerly corner of said land, thence along the Southwesterly line of said land , North 52° 19' 15" West, 146.13 feet to the point of beginning.

APN:  5144-001-018

## SUPPLEMENT I

| | | |
|---|---|---|
| 1.1 | Date of Lease: | July 17, 2009, as amended August 19, 2014 |

| | | |
|---|---|---|
| | Present Landlord: | SMART CAPITAL INVESTMENTS I, LLC, SMART CAPITAL INVESTMENTS II, LLC, SMART CAPITAL INVESTMENTS III, LLC, SMART CAPITAL INVESTMENTS IV, LLC, and SMART CAPITAL INVESTMENTS V, LLC, as successor-in-interest to New Vision Horizon, LLC |

Present Tenant: HAWKEYE ENTERTAINMENT, LLC

Premises: 618 Spring Street
Los Angeles, CA 90014

1.2 Original Principal Amount
of First Lien Note: $11,200,000.00

First Lien Deed of
Trust Dated: March 26, 2019

Original Principal Amount
of Second Lien Note: $12,000,000.00

Second Lien Deed of
Trust Dated: March 26, 2019

County: Los Angeles

# Exhibit N

<u>TENANT ESTOPPEL CERTIFICATE</u>

To:     PREFERRED BANK
        601 S. Figueroa Street, 47th Floor
        Los Angeles, California 90017
        Attention: Note Department

Re:   Lease Dated:   July 17, 2009, as amended August 19, 2014

Landlord:    SMART CAPITAL INVESTMENTS I, LLC, a California limited liability company, SMART CAPITAL INVESTMENTS II, LLC, a California limited liability company, SMART CAPITAL INVESTMENTS III, LLC, a California limited liability company, SMART CAPITAL INVESTMENTS IV, LLC, a California limited liability company, and SMART CAPITAL INVESTMENTS V, LLC, a California limited liability company, as successor-in-interest to New Vision Horizon, LLC (successor-in-interest to PAX America Development, LLC)

Tenant:      HAWKEYE ENTERTAINMENT, LLC, a California limited liability company

Premises:    618 Spring Street, Floors 1-4, Los Angeles, CA 90014

Gentlemen:

As tenant under the above-referenced Lease which is attached hereto as Exhibit "A" in its entirety, and incorporated herein by this reference, the undersigned hereby acknowledges for the benefit of PREFERRED BANK, a California banking corporation ("Lender"), which has made or is about to make a loan to Landlord, secured in part by an assignment of Landlord's interest in the Lease and a lien upon the premises demised thereby, the truth and accuracy of the following statements pertaining to the Lease;

1.    The Lease is in full force and effect.

2.    Tenant has accepted, is satisfied with, and is conducting business in, and is in full possession of, said Premises, ~~including all improvements, additions and alterations thereto required to be made by Landlord under the Lease~~ noting that improvements, additions and alterations to the building of which the Premises are a part which were an inducement to Tenant to enter into the Lease have not been completed to commercially reasonable standards, the Premises are open for the use of Tenant, its customers, employees and invitees only through the efforts of Tenant, and Tenant and Landlord continue to address costs related to utility and safety issues related to the maintenance of service to the Premises.  Without limiting the generality of the foregoing, (i) the electrical distribution system (including breakers, panels, switchboards, wiring and the like) is not up to code and is generally incapable of repair, (ii) the mechanical systems

> Commented [WFB1]: Can we rep this?

182

(including elevator systems) servicing the Premises are not up to code, (iii) the heating ventilation and air conditioning (HVAC) system servicing the Premises is not up to code, (iv) the majority of the building on the Real Estate of which the Premises are a part are incapable of occupancy due to utility and safety issues, (v) the building of which the Premises are a part is continuously subject to citation and condemnation by the City of Los Angeles Department of Building and Safety, (vi) Tenant has expended over $200,000 of Tenant's funds, without reimbursement under the Lease, to repair the portion of the electrical distribution system serving the Premises and one of the elevators serving the Premises, (vii) the use of the one elevator serving the Premises by Owner and its employees and invitees for access to floors above the Premises jeopardizes Tenant's quiet enjoyment and licensed use of the Premises if such use renders the elevator inoperable, and (viii) Tenant's occupancy of the Premises is subject to termination for cause if there is not remedial action by Landlord or Lender to reimburse Tenant for out-of-pocket expenditures, repair of the Premises and building, and/or renegotiation of the Lease to provide concessions in lease rate and term.

3.  Tenant is not in default or breach of its obligations under the Lease, is paying the full rent stipulated therein, and has no offset, defense or claim of any kind. Further, there exists no facts or circumstances that, with the passage of time or the giving of notice, or both, would constitute a default or breach of the Lease by Tenant.

4.  To the best of Tenant's knowledge, Landlord has ~~not~~ been and is ~~not~~ presently in default or breach ~~under any~~ of a number of covenants or provisions of the Lease ~~by Landlord~~. Further, there exist~~s no~~ are various facts or circumstances that, with the passage of time or the giving of notice, or both, would constitute a default or breach of the Lease by Landlord.

5.  ~~There~~ With the exception of that certain Standard Sublease by and between Tenant, as Sublessor, and WERM Investments, LLC, a California limited liability company, dated as of October 1, 2009, there has not been and is now no other subletting of the Premises, or any part thereof, or assignment by Tenant of the Lease, or any rights therein, to any party.

6.  Landlord's predecessor-in-interest ~~has satisfactorily~~ generally complied with all of the requirements and conditions precedent to the commencement of the term of the Lease as specified in said Lease. Any and all improvements, alterations, modifications and/or additions to the Premises have not been made to the full satisfaction of Tenant. Tenant and Landlord continue to address costs related to utility and safety issues related to maintenance of service to the Premises as above

7.  The current monthly rent under the Lease is $_____. Rent has been paid through_____. No rent or other amount called for under the Lease is currently due and payable and no monies have been paid to Landlord in advance of the due date set forth in the Lease except:_____.

8.  The Lease is for a term of_____(months/years), and Tenant has been in occupancy and paying rent since the term commenced on

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

_____.

9.  The term of the Lease shall expire on_____. Tenant does not have an option or right of first refusal to purchase the Premises, or to extend or renew the Lease term, except as follows:_____.

10.  A security deposit of $_____has been given by Tenant under the terms of the Lease.

11.  Tenant hereby acknowledges (a) that there have been no modifications or amendments to the Lease other than herein specifically stated and that the Lease represents the entire agreement between the Landlord and the Tenant, (b) that it has no notice of prior assignment, hypothecation or pledge of rents or of the Lease, and (c) that notice of the assignment of Landlord's interest in said Lease may be given it by mail, at the Premises, or as otherwise directed herein.

12.  The Lease will not be modified or amended without Lender's prior written consent.

13.  There are no guaranties of the Lease except:_____.

14.  Any execution and delivery of this Certificate does not require any consent, vote or approval which has not been or taken. Each person executing this Certificate in a representative capacity has been duly authorized and empowered to do so.

This Certificate is executed and delivered by the undersigned with the knowledge that you will rely upon the statements contained herein in connection with a mortgage loan to be made by you to the Landlord. Regardless of the date of execution hereof, the undersigned will, without further request, advise you in writing, at the address set forth above of any change in the information contained in this Certificate.

Dated: April____, 2019

"TENANT"

HAWKEYE ENTERTAINMENT, LLC,
a California limited liability company

By: _____
Name:_____
Title: _____

Address to which notices are to be sent

if other than Premises)

_____

_____

# Exhibit O

## Sandford L. Frey

| | |
|---|---|
| **From:** | Sandford L. Frey |
| **Sent:** | Monday, June 3, 2019 5:07 PM |
| **To:** | Robert Odson |
| **Cc:** | William F. Bresee; dmulvaney@leechtishman.com |
| **Subject:** | RE: [EXT]--RE: Hawkeye Entertainment |
| **Attachments:** | 2019 04 28 SMART SNDA - Hawkeye - Preferred (Converted) 050719 WFB-Slf Anno.docx; 2019 04 21 SMART Tenant Estoppel - Hawkeye - Preferred (Converted) 050719 WFB - slf Anno.docx |

Rob

Suffice it to say, we have different viewpoints regarding the underlying facts, and I do not believe that continuing this dialog serves a useful purpose.

That said, please find attached our proposed comments to the SNDA and Estoppel.

Thank you, Sandy

**Sandford L. Frey | Partner**
sfrey@leechtishman.com

Certified Sommelier (WSA/NASA);
Vinomatica.com (Vice President/Legal advisor);
Certified Specialist of Italian Wine (AIS/NASA);
Certified Specialist of American Wine (NASA);
Certified Specialist of Wine (CSW) (Society of Wine Educators);
Certification Wine Education and Management (UCLA);
Master of Sangiovese (NASA);
Past Executive Board Member of North American Sommelier Association (Counselor/Legal advisor);
Frequent speaker on wines of Piemonte and Burgundy, UCLA Extension

**LEECH**TISHMAN
LEECH TISHMAN FUSCALDO & LAMPL, INC.
leechtishman.com

200 South Los Robles Avenue, Suite 210
Pasadena, CA 91101
T: 626.796.4000 | F: 626.795.6321
Toll-free: 844.750.1600 | D: 213.246.4960

**PITTSBURGH | CHICAGO | LOS ANGELES | NEW YORK | SARASOTA | WILMINGTON, DE**

**Privileged and Confidential:** The information contained in this email is (1) subject to attorney-client privilege; (2) attorney work product; and/or (3) confidential. It is intended only for the individual(s) designated above. You are hereby notified that any use, copying, disclosure or distribution of the information contained in this transmission by anyone other than the recipient(s) named above is unauthorized and strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at 412.261.1600. Unauthorized interception of this e-mail is a violation of federal criminal law.

## Sandford L. Frey

| | |
|---|---|
| **From:** | Sandford L. Frey |
| **Sent:** | Tuesday, June 18, 2019 10:27 AM |
| **To:** | Robert Odson |
| **Cc:** | William F. Bresee |
| **Subject:** | Hawkeye Entertainment |

Hi Rob:

I am just following up on the status of our comments to the SNDA and tenant estoppel, which we sent on June 3.

Thank you, Sandy

**Sandford L. Frey | Partner**
sfrey@leechtishman.com

Certified Sommelier (WSA/NASA);
Vinomatica.com (Vice President/Legal advisor);
Certified Specialist of Italian Wine (AIS/NASA);
Certified Specialist of American Wine (NASA);
Certified Specialist of Wine (CSW) (Society of Wine Educators);
Certification Wine Education and Management (UCLA);
Master of Sangiovese (NASA);
Past Executive Board Member of North American Sommelier Association (Counselor/Legal advisor);
Frequent speaker on wines of Piemonte and Burgundy, UCLA Extension

**LEECHTISHMAN**
**LEECH TISHMAN FUSCALDO & LAMPL, INC.**
leechtishman.com

200 South Los Robles Avenue, Suite 210
Pasadena, CA 91101
T: 626.796.4000 | F: 626.795.6321
Toll-free: 844.750.1600 | D: 213.246.4960

**PITTSBURGH | CHICAGO | LOS ANGELES | NEW YORK | SARASOTA | WILMINGTON, DE**

**Privileged and Confidential:** The information contained in this email is (1) subject to attorney-client privilege; (2) attorney work product; and/or (3) confidential. It is intended only for the individual(s) designated above. You are hereby notified that any use, copying, disclosure or distribution of the information contained in this transmission by anyone other than the recipient(s) named above is unauthorized and strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at 412.261.1600. Unauthorized interception of this e-mail is a violation of federal criminal law.

1

188

# Exhibit P

## SUBLEASE AMENDMENT

THIS SUBLEASE AMENDMENT ("Agreement") dated as of October 1, 2019, is made between Hawkeye Entertainment, LLC, a California Limited Liability Company ("Sub-Landlord") and W.E.R.M. INVESTEMENTS, LLC, a California Limited Liability Company ("Subtenant").

### RECITALS

A. Sub-Landlord is the tenant under that certain Lease Agreement dated as of July 17, 2009 ("Original Master Lease"), pursuant to which PAX AMERICA DEVELOPMENT, LLC, a California Limited Liability Company("PAX") leased to Sub-Landlord the real property located in the City of  Los Angeles, County of Los Angeles, State of California, described as 618 S. Spring Street, Los Angeles, portion of the basement, 1st, 2nd, 3rd and 4th floors, California 90014 ("Master Premises"). The entirety of the real property located at 618 S. Spring Street, Los Angeles, California 90014 is referred to herein as the "Property".

B. The Original Master Lease was amended by the following amendment:  First Amendment to Lease Agreement dated August 19, 2014 ("First Amendment") by and between NEW VISION HORIZON, LLC, a California Limited Liability Company ("Master Landlord"), who became the owner of the Property pursuant to its acquisition of the Property at a foreclosure sale on December 20, 2010, and Sub-Landlord. The Original Master Lease, together with any amendments, is collectively referred to as the "Master Lease."

C. A copy of the Master Lease is attached and incorporated in this Amendment as Exhibit A.

D. Subtenant is the subtenant under that certain Standard Sublease dated as of October 1, 2009 ("2009 Sublease") by and between Sub-Landlord and Subtenant, pursuant to which Sub-Landlord leased to Subtenant the Premises.

C. A copy of the 2009 Sublease is attached and incorporated in this Amendment as Exhibit B.

D. This Agreement amends the 2009 Sublease.  The 2009 Sublease and this Agreement are sometimes collectively referred to as the "Sublease". Sub-Landlord and Subtenant desire to enter into this Agreement on the terms and conditions set forth below.

### AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

### Section 1. Recitals

The Recitals set forth above are hereby ratified by Sub-Landlord and Subtenant as being true and correct and are incorporated into this Agreement by reference as though fully set forth herein.

### Section 2. Term

The term of the 2009 Sublease ("Term") is currently 120 months, commencing on January 1, 2015 as determined by the Rent Commencement Date established by the First Amendment, and maturing on December 31, 2025.  The current term of the Master Lease commenced on January 1, 2015 and matures on December 31, 2025.  The Master Lease contains an option to extend the term for one period of five lease years.  Once exercised, the term of the Master Lease will be extended to December 31, 2030.  The Term is hereby extended to coincide with the maturity date pursuant to the Master Lease.  "Lease Year" as used herein means each of the consecutive twelve (12) calendar month periods during the Term beginning on the first day of the calendar month in which the Rent Commencement Date occurs.

1

190

**Section 3. Rent**

**(a) Minimum Rent.**

Subtenant will pay to Sub-Landlord as Minimum Rent, without deduction, setoff, notice, or demand, at 14242 Ventura Boulevard, Suite 210, Sherman Oaks, California 91423, or at any other place Sub-Landlord designated by notice to Subtenant, the sum equal to the Minimum Rent (as defined in the Master Lease and as adjusted in accordance therewith), in advance of the first day of each month of the Term. If the Term begins or ends on a day other than the first or last day of a month, the rent for the partial months will be prorated on a per diem basis. Annual Minimum Rent increases shall be automatic without any requirement of notice from Sub-Landlord, and any acceptance by Sub-Landlord of a lesser amount than the amount actually due and payable shall not constitute a waiver by Landlord hereof.

**(b) Operating Costs.**

All Additional Rent due under the Master Lease shall be the sole obligation of the Sublessee. Additional Rent will be payable as and when due by Sub-Landlord to Master Landlord. If the Master Lease provides for payment by Sub-Landlord of Additional Rent on the basis of an estimate, then as and when adjustments between estimated and actual Additional Rent are made under the Master Lease, the obligations of Sub-Landlord and Subtenant will be adjusted in the same manner. If this adjustment occurs after the expiration or earlier termination of the Term, the obligations of Sub-Landlord and Subtenant under this Subsection will survive this expiration or termination. Sub-Landlord will, on request by Subtenant, furnish Subtenant with copies of all statements submitted by Master Landlord of the actual or estimated Additional Rent during the Term.

**Section 4. Use of Premises**

The Premises will be used and occupied only for the operation of a nightclub, restaurant, entertainment venue and related lawful businesses along with storage use in the basement area, unless agreed to by Sub-Landlord in writing.

**Section 5. Assignment and Subletting**

Subtenant will not assign this Sublease or further sublet all or any part of the Premises without the prior written consent of Sub-Landlord (and the consent of Master Landlord, if this is required under the terms of the Master Lease). Master Landlord has consented to Sub-Landlord's sublease of the Premises to Subtenant.

**Section 6. Other Provisions of Sublease**

All applicable terms and conditions of the Master Lease are incorporated into and made a part of the Sublease as if Sub-Landlord were the landlord, Subtenant the tenant, and the Premises the Master Premises. Subtenant assumes and agrees to perform the tenant's obligations under the Master Lease during the Term to the extent that these obligations are applicable to the Premises. However, the obligation to pay rent and operating costs to Master Landlord under the Master Lease will be considered performed by Subtenant to the extent and in the amount rent and operating costs are paid to Sub-Landlord in accordance with Section 3 of this Agreement. Subtenant will not commit or suffer any act or omission that will violate any of the provisions of the Master Lease. Sub-Landlord will exercise due diligence in attempting to cause Master Landlord to perform its obligations under the Master Lease for the benefit of Subtenant. If the Master Lease terminates, at the option of Master Landlord, the Sublease will terminate and the parties will be relieved of any further liability or obligation under the Sublease. However, if the Master Lease terminates as a result of a default or breach by Sub-Landlord or Subtenant under the Sublease or the Master Lease, the defaulting party will be liable to the nondefaulting party for the damage suffered as a result of the termination. Regardless, if the Master

2

191

Lease gives Sub-Landlord any right to terminate the Master Lease in the event of the partial or total damage, destruction, or condemnation of the Master Premises or the building or project of which the Master Premises are a part, the exercise of this right by Sub-Landlord will not constitute a default or breach.

## Section 7. Attorney Fees

If either party commences an action against the other in connection with the Sublease, the prevailing party will be entitled to recover costs of suit and reasonable attorney's fees.

## Section 8. No Broker

Sub-Landlord and Subtenant each warrant that they have not dealt with any real estate broker in connection with this transaction. Sub-Landlord and Subtenant each agree to indemnify, defend, and hold the other harmless against any damages incurred as a result of the breach of the warranty contained in the Sublease.

## Section 9. Notices

All notices and demands that may be required or permitted by either party to the other will be in writing. All notices and demands by the Sub-Landlord to Subtenant will be sent by United States Mail, postage prepaid, addressed to the Subtenant at the Premises, and to the address in this Agreement below, or to any other place that Subtenant may from time to time designate in a notice to the Sub-Landlord. All notices and demands by the Subtenant to Sub-Landlord will be sent by United States Mail, postage prepaid, addressed to the Sub-Landlord at the address in this Agreement, and to any other person or place that the Sub-Landlord may from time to time designate in a notice to the Subtenant.

To Sub-Landlord: Hawkeye Entertainment, LLC, 14242 Ventura Boulevard, Suite 210, Sherman Oaks, California 91423.
To Subtenant: W.E.R.M. Investments, LLC, 14242 Ventura Boulevard, Suite 212, Sherman Oaks, California 91423.

## Section 10. Successors and Assigns

The Sublease will be binding on and inure to the benefit of the parties to it, their heirs, executors, administrators, successors in interest, and assigns.

## Section 11. Attornment

If the Master Lease terminates, Subtenant will, if requested, attorn to Master Landlord and recognize Master Landlord as Sub-Landlord under the Sublease. However, Subtenant's obligation to attorn to Master Landlord will be conditioned on Subtenant's receipt of a nondisturbance agreement.

## Section 12. Entry

Sub-Landlord reserves the right to enter the Premises on reasonable notice to Subtenant to inspect the Premises or the performance by Subtenant of the terms and conditions of the Sublease and, during the last four months of the Term, to show the Premises to prospective subtenant. In an emergency, no notice will be required for entry.

**Section 13. Late Charge and Interest**

The late payment of any Rent will cause Sub-Landlord to incur additional costs, including the cost to maintain in full force the Master Lease, administration and collection costs, and processing and accounting expenses. If Sub-Landlord has not received any installment of Rent within five (5) days after that amount is due, Subtenant will pay five percent (5%) of the delinquent amount, which is agreed to represent a reasonable estimate of the cost incurred by Sub-Landlord. In addition, all delinquent amounts will bear interest from the date the amount was due until paid in full at a rate per annum ("Applicable Interest Rate") equal to the greater of (a) five percent (5%) per annum plus the then federal discount rate on advances to member banks in effect at the Federal Reserve Bank of San Francisco on the 25th day of the month preceding the date of the Sublease or (b) ten percent (10%). However, in no event will the Applicable Interest Rate exceed the maximum interest rate permitted by law that may be charged under these circumstances. Sub-Landlord and Subtenant recognize that the damage Sub-Landlord will suffer in the event of Subtenant's failure to pay this amount is difficult to ascertain and that the late charge and interest are the best estimate of the damage that Sub-Landlord will suffer. If a late charge becomes payable for any three (3) installments of Rent within any twelve (12) month period, the Rent will automatically become payable quarterly in advance.

**Section 14. Entire Agreement**

This Agreement, together with the 2009 Sublease (the "Sublease") set forth all the agreements between Sub-Landlord and Subtenant concerning the Premises, and there are no other agreements either oral or written.

**Section 15. Time of Essence**

Time is of the essence.

**Section 16. Consent by Master Landlord**

Pursuant to the First Amendment, Master Landlord acknowledged and agreed that Sub-Landlord has sublet the Premises to Subtenant, and Master Landlord approved of and accepted Subtenant as a sublessee of the Premises.

**Section 17. Governing Law**

This Agreement will be governed by and construed in accordance with California law.

**Section 18. Ratification**

Sub-Landlord and Sub-Tenant hereby ratify and confirm all of the terms and conditions of the 2009 Sublease as modified by this Agreement.

**Section 19. Remainder of Sublease Unmodified**

Except as set forth in this Agreement, the parties agree that the 2009 Sublease is unmodified and is in full force and effect.  To the extent that the terms of the 20019 Sublease conflict with the terms of this Agreement, the terms of this

4

193

Agreement shall be controlling.

**Section 20. Counterparts**

The parties may execute several copies of this Agreement.  All copies of this Agreement bearing signatures of the parties shall constitute one and the same Agreement, binding upon all parties.  The parties may exchange counterpart signatures by facsimile or email and the same shall constitute delivery of this Agreement with respect to the delivering party.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SUB-LANDLORD:

HAWKEYE ENTERTAINMENT, LLC, a California limited liability company

By: ............................................................

Name: ............................................................

Its: ............................................................

SUBTENANT:

W.E.R.M INVESTMENTS, LLC, a California limited liability company

By: ............................................................

Name: ............................................................

Its: ............................................................

5

194