David S. Kupetz (CA Bar No. 125062)
  *dkupetz@sulmeyerlaw.com*
Steven F. Werth (CA Bar No. 205434)
  *swerth@sulmeyerlaw.com*
**Sulmeyer**Kupetz
A Professional Corporation
333 South Grand Ave., Suite 3400
Los Angeles, California 90071
Telephone: 213.626.2311
Facsimile: 213.629.4520

Richard Wideman (CA Bar No. 41185)
  *riwlaw@gmail.com*
Frederick's Court # 232
485 Alisal Road
Solvang, California 93463
Telephone:  805.245.8916
Facsimile:  805.688.9424

Attorneys for
Smart Capital Investments I, LLC
Smart Capital Investments II, LLC,
Smart Capital Investments III, LLC,
Smart Capital Investments IV, LLC, and
Smart Capital Investments V LLC,
Landlord

*(left margin, vertical text)* **Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | CASE NO. 1:19-bk-12102-MT |
| HAWKEYE ENTERTAINMENT, LLC, | Chapter 11 |
| Debtor. | **LANDLORD'S OPPOSITION TO DEBTOR'S MOTION TO ASSUME LEASE AND REQUESTING ADDITIONAL RELIEF; DECLARATION OF MICHAEL S. CHANG IN SUPPORT** |
| | **[Real Property at 618 S. Spring St., Los Angeles, CA]** |
| | DATE:   November 6, 2019<br>TIME:   10:00 a.m.<br>PLACE: Courtroom 302<br>         21041 Burbank Boulevard<br>         Woodland Hills. CA 91367 |

SFW 2687067v9

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION AND BACKGROUND ........................................................2

II. THE MOTION SHOULD BE CONTINUED, AND ........................................4

THIS MATTER SET FOR EVIDENTIARY HEARING...........................................4

    A.    The Issue Of Assumption Of The Lease/Sublease Should Be Deemed A
Contested Matter ......................................................................................4

    B.    The Court Should Set An Evidentiary Hearing.........................................5

    C.    The Court Should Continue The Hearing On The Motion..........................6

III. THE MOTION SHOULD BE DENIED ........................................................6

    A.    The Debtor Has Breached The Lease, Causing Damage To Smart Capital.............6

        1.    The Debtor's Refusal To Sign A Subordination Agreement And
Estoppel Certificate ........................................................................6

        2.    The Debtor's Use Of The Premises To Hold Too Many Events, For
Unpermitted Purposes ..................................................................11

        3.    Alcohol .........................................................................................13

        4.    Minors In The Tower ...................................................................13

        5.    Other Defaults ..............................................................................14

    B.    Assuming The Lease Is Not In The Best Interest Of Creditors ..............14

    C.    The Court Should Deny The Motion As It Relates To The Lease, As The
Lease Is Not In The Best Interests Of The Estate ..................................18

    D.    In The Alternative, The Debtor Must Cure All Defaults Under The Lease
And Provide Adequate Assurance Of Future Performance .....................19

    E.    The Court Should Deny The Motion As It Relates To The Sublease ....................20

IV. RESERVATION OF RIGHTS .....................................................................21

V. CONCLUSION .............................................................................................21

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

In re Bidermann Industries U.S.A., Inc.,
     203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) ........................................................ 20

In re C.M. Systems, Inc.,
     64 B.R. 363, 364 (Bankr. M.D. Fla. 1986)........................................................ 19

In re Global Int'l Airways,
     35 B.R. 881, 886-88 (Bankr. W.D. Mo. 1983)................................................ 19

In re Klein Sleep Products, Inc.,
     78 F.3d 18, 28 (2d. Cir. 1996) ........................................................................ 19

In the Matter of Holloway,
     955 F.2d 1008, 1010-11 (5th Cir. 1992) ........................................................ 21

Westship, Inc. v. Trident Shipworks, Inc.,
     247 B.R. 856, 865 (D. Fla. 2000)................................................................... 21

## **STATUTES**

11 U.S.C. § 365(b) .......................................................................................... 19, 20

11 U.S.C. § 365(b)(1)(A) ....................................................................................... 1

11 U.S.C. 365(b)(1)(C) .................................................................................... 3, 20

## **RULES**

Federal Rule of Bankruptcy Procedure 6006(a)..................................................... 5

Federal Rule of Bankruptcy Procedure 9014 .......................................................... 5

Smart Capital Investments I, LLC, a California limited liability company, Smart Capital Investments II, LLC, a California limited liability company, Smart Capital Investments III, LLC, a California limited liability company, Smart Capital Investments IV, LLC, a California limited liability company, and Smart Capital Investments V, LLC, a California limited liability company (collectively, "Smart Capital") hereby opposes Hawkeye Entertainment, LLC's ("Debtor") "Notice Of Motion And Motion Of Hawkeye Entertainment, LLC, Debtor And Debtor-In-Possession For An order (1) Authorizing The Assumption of Non-Residential Real Property Lease And Sublease, (2) Determining The Debtor And Sublessor Not To Be In Breach Or Default, Thereby Deeming Them In Compliance With Bankruptcy Code §365(b)(1)(A) And Excusing The Debtor From Any Additional Compliance With § 365(b)(1))B), And (C), And (3) Authorizing the Debtor To Enter Into A Revised Sublease That Amends And Extends The Sublease; Or Alternatively, Extending The Time Period Within Which The Debtor May Assume Or Reject Unexpired Non-Residential Lease And Executory Contracts" [Docket No. 21] (the "Motion").

Smart Capital is the owner of the real property located at 618 South Spring Street, Los Angeles, California (the "Property").  The Debtor leases a portion of the Property pursuant to a lease which is the subject of the Motion.

Prior to filing this opposition to the Motion, counsel for Smart Capital discussed with counsel for the Debtor the possibility of entering into a stipulation resolving certain scheduling issues relating to the Motion, including converting the hearing on the Motion into a status conference and setting further deadlines relating to discovery and an evidentiary hearing.  Smart Capital understands that the parties are in the process of finalizing the terms of that stipulation.

Part of the stipulation that Smart Capital and the Debtor are at this time negotiating relates to the parties agreeing to a discovery schedule and reserving their rights to add other and further evidence and argument both in favor of granting the Motion, and in opposition to granting the Motion.  Smart Capital anticipates that that stipulation will also waive the Debtor's deadline to file a reply to this opposition prior to the November 6, 2019 hearing—with such deadline to continue to some further date as set by the Court in

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   connection with an Evidentiary Hearing, or otherwise.  With that in mind, Smart Capital

2   reserves the right to supplement this opposition to the Motion at such further date as the

3   Court sets, and does not waive its right to identify additional evidence that supports denial

4   of the Motion.  Smart Capital likewise acknowledges that the Debtor seeks to reserve the

5   same right, and agrees that both parties' rights are so preserved to present their full

6   arguments to the Court at a later date by way of other pleadings or briefing as the Court

7   deems appropriate.

8        Nevertheless, because the aforementioned stipulation has not yet been approved by

9   the Court, Smart Capital files this opposition to the Motion which (1) requests that the

10  Court set certain deadlines in connection with this contested matter, that the parties are

11  currently discussing by way of a separate stipulation, and (2) in the alternative, deny the

12  Motion.

13                                      **I.**

14                   **INTRODUCTION AND BACKGROUND**

15       The Property consists of a twelve-story building commonly known as the Pacific

16  Stock Exchange Building ("Building").  The Debtor leases the first four floors and a

17  portion of the basement of the Building pursuant to a lease with Smart Capital's affiliate

18  and predecessor-in-interest—the "Lease" identified in the Motion.  Smart Capital refers to

19  the portion of the Building subject to the Lease as the "Premises".  The portion of the

20  Building which is not subject to the Lease is referred to as the "Tower").

21       The Debtor subleases the Premises to its affiliate, W.E.R.M. Investments, LLC

22  ("Werm")—the "Sublease" identified in the Motion.  Through the Motion, the Debtor also

23  seeks to enter into a new sublease with Werm to extend the maturity date of the Sublease.

24       This Court may be familiar with some background of this case.  The Debtor

25  commenced a bankruptcy case in 2013 before this Court, in Case No. 1:13-bk-16307 (the

26  "Prior Bankruptcy Case").  There, the Debtor also sought to assume the Lease.  The

27  landlord at the time was Smart Capital's affiliate and predecessor-in-interest New Vision

28  Horizon, LLC ("New Vision"), who acquired the Property through a foreclosure sale.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    In the Prior Bankruptcy Case, the dispute between the Debtor and New Vision

2    largely related to whether the Debtor was required to pay New Vision rent under the Lease.

3    The parties ultimately resolved their dispute.  As part of that resolution, the parties entered

4    into an amendment to the Lease—the "<u>First Amendment</u>" referred to in the Motion, and a

5    "<u>Global Settlement Agreement</u>," also referred to in the Motion.  In the Global Settlement

6    Agreement, the parties released each other from all claims that could be asserted as of that

7    date regarding the Lease.  This Court approved the Global Settlement Agreement in the

8    Prior Bankruptcy Case by order dated September 12, 2014.  Thereafter, the Bankruptcy

9    Court closed the Prior Bankruptcy Case.

10    Smart Capital respectfully submits that the Court should address the Motion in the

11    same way it addressed the Debtor's motion to assume the Lease in the Prior Bankruptcy

12    Case (the "<u>Prior Assumption Motion</u>").  The Prior Assumption Motion, filed on November

13    29, 2013, resulted in (1) continuance of the hearing on Prior Assumption Motion so that

14    the parties could conduct discovery, (2) a stipulated extension of the Debtor's deadline to

15    assume or reject the Lease, (3) mediation on July 29, 2014, and (4) settlement of the

16    disputes underlying the Prior Assumption Motion by agreement signed August 20, 2014.

17    Specifically, Smart Capital requests that the Court (a) deem the Motion a contested

18    matter subject to the adversary proceeding rules, (b) allow parties to conduct discovery,

19    and (c) set an evidentiary hearing ("<u>Evidentiary Hearing</u>") to determine the issues raised in

20    the Motion, including, (i) whether the Debtor has breached the Lease, (ii) if a breach of the

21    Lease has occurred, whether the Debtor was damaged by such breach, (iii) if a breach of

22    the Lease has occurred, whether the breach is curable, (iv) the cure amount that the Debtor

23    must pay to cure any curable breach, (v) whether the Debtor has provided "assurance of

24    future performance" pursuant to 11 U.S.C. 365(b)(1)(C), and (vi) whether the Debtor can

25    meet the "best interest of the creditors" test both with respect to the Lease and the

26    Sublease.

27    Smart Capital disputes many of the assertions made in the Motion.  While the

28    Debtor has made monthly rental payments to Smart Capital under the Lease, the Debtor is

currently in breach under the Lease and remains in breach, as set forth more fully below. Those breaches have resulted in significant damage to Smart Capital.  Nor has the Debtor provided evidence of adequate assurance of future performance.  For example, the Debtor provides no financial information relating to Werm, the sole source of income for the Debtor.  The Motion is not in best interests of creditors, in part because it provides no net income to the Debtor, and also in part because it is uncertain who the creditors are of this Estate other than Smart Capital.

All of these assertions are set forth in greater detail below.  While Smart Capital respectfully requests that the Court continue the hearing on the Motion and set an Evidentiary Hearing, this Opposition also contains, below, a brief summary of the Debtor's breaches, Smart Capital's damages, and the inability of the Debtor to meet the best interest of the creditors test, based on the evidence that Smart Capital currently possesses.  Smart Capital anticipates that further evidence of the Debtor's breaches will be revealed in discovery.  To the extent that the Court does not want to continue the hearing on the Motion, Smart Capital requests that the Court simply deny it.

Based on the foregoing, Smart Capital requests that the Court enter an order:  (a) deferring final ruling on the Motion, (b) deeming the Motion to be a contested matter, (c) and setting an Evidentiary Hearing to adjudicate these critical issues before ruling on the Motion.  In the alternative, Smart Capital requests that the Court deny the Motion.

## II.

## THE MOTION SHOULD BE CONTINUED, AND

## THIS MATTER SET FOR EVIDENTIARY HEARING

### A.    The Issue Of Assumption Of The Lease/Sublease Should Be Deemed A Contested Matter

Section III of this Opposition, below, identifies the Debtor's breaches of the Lease and related issues.  Due to the numerous disputed facts and law regarding, among other things (a) the Debtor's breach of the Lease, (b) Smart Capital's damages as a result of these breaches, (c) whether the Debtor has demonstrated adequate assurance of future

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

performance, and (d) whether the Motion is in the best interests of creditors, Smart Capital

respectfully submits that the Court will be best served in ruling on the Motion if the parties

are permitted to conduct discovery and obtain witness testimony.  Federal Rule of

Bankruptcy Procedure ("<u>FRBP</u>") 9014 states that:

> In a contested matter not otherwise governed by these rules, relief
> shall be requested by motion, and reasonable notice and opportunity
> for hearing shall be afforded the party against whom relief is sought.
> No response is required under this rule unless the court directs
> otherwise.

Moreover, FRBP 6006(a) states:

> A proceeding to assume, reject, or assign an executory contract or
> unexpired lease, other than as part of a plan, is governed by Rule
> 9014.

It appears to Smart Capital that the Court, in adjudicating the Motion, would be best

served by a full, accurate understanding of the nature and extent of the Debtor's breaches

under the Lease, and the damage those breaches caused to Smart Capital, as well as an

understanding of facts that relate to adequate assurance of future performance and the

interest of the Estate's creditors.  Smart Capital assumes that the Debtor will dispute many

of the assertions made in Section III below regarding its breaches.  As such, Smart Capital

respectfully submits that discovery is needed in order for the parties to present and the

Court to properly consider the Motion.

**B.**    **<u>The Court Should Set An Evidentiary Hearing</u>**

Due to the dispute between the Debtor and Smart Capital on the issues identified in

Section III below, Smart Capital respectfully submits that an Evidentiary Hearing will be

necessary to adjudicate those issues.  Those issues relate to specific instances of the Debtor

breaching the Lease, Smart Capital's damage as a result of such breaches, the Debtor's lack

of adequate assurance that it will perform under the Lease, the identity of the Debtor's

creditors other than Smart Capital, and that it is not in the best interest of creditors to

permit the Debtor to amend the Sublease which is an admittedly below-market lease with

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    the Debtor's affiliate, and thus confer a substantial benefit on the Debtor's insider at the

2    cost of saddling creditors of the Estate with a below-market lease.

3    **C.**     **The Court Should Continue The Hearing On The Motion**

4        While the parties prepare for an evidentiary hearing to present the Court with

5    documentary and testimonial evidence, Smart Capital is agreeable to the Court continuing

6    the hearing on the Motion.  Smart Capital believes that a continuance into March 2020 (the

7    date requested in the Motion) is not appropriate at this time, but agrees that some

8    continuance is appropriate and that the question of a further continuance can be revisited at

9    the next continued hearing.

10    <div align="center">**III.**</div>

11    <div align="center">**THE MOTION SHOULD BE DENIED**</div>

12    **A.**     **The Debtor Has Breached The Lease, Causing Damage To Smart Capital**

13        **1.**     **The Debtor's Refusal To Sign A Subordination Agreement And**

14              **Estoppel Certificate**

15        One of Smart Capital's disputes with the Debtor relates to the Debtor's obligation to

16    provide Smart Capital with a Subordination Non-Disturbance And Attornment Agreement

17    ("SNDA") and Estoppel Certificate.  The Debtor has never provided either, despite

18    numerous requests that it do so.  The Debtor ceased communicating with Smart Capital

19    regarding these documents on June 3, 2019, when its counsel stated that "I do not believe

20    that continuing this dialog serves a useful purpose."  *See* Motion, Exhibit O.

21        The Lease subjects the Debtor to different obligations regarding each of the SNDA

22    and Estoppel Certificate as discussed below.

23            **a.**     **Subordination Agreement**

24        The Lease states in part:

25            18.1     Subordination.  Upon written request of Landlord, Landlord's
26            mortgagee, the beneficiary of a deed of trust of Landlord or a lessor
        of Landlord, Tenant will subordinate its right pursuant to this Lease
27            in writing to the lien of any future mortgage, deed of trust or the
        interest of any future lease in which the Landlord is the lessee (or, at
28            Landlord's option, cause the lien of said mortgage, deed of trust or

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1

2

3

4

5

6

> the interest of any lease in which Landlord is the lessee to be
> subordinated to this Lease) and to all advances hereafter to be made
> upon the security thereof, provided, however, that as a condition to
> such subordination, the subordination instrument shall be reasonably
> acceptable to Tenant and shall include a non-disturbance agreement
> confirming that Tenant's rights under the Lease and right to
> possession of the Premises will be recognized and not disturbed
> upon a foreclosure, sale or other transfer under any mortgage or deed
> of trust, or termination of any lease in which Landlord is the lessee.

7

Motion, Exhibit A.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

In early 2018, Smart Capital requested that the Debtor sign a SNDA required by iBorrow (the "First Lender"), Smart Capital's first lender.  The Debtor failed to provide this document, after numerous requests that it do so, and this resulted in Smart Capital falling into default with the First Lender.  Smart Capital was then subjected to a default rate of interest of 24% under its loan agreement with the First Lender, which gave Smart Capital no other choice than to look for financing elsewhere.  During the time period between which this default occurred due to Debtor's refusal to sign a SNDA, and the date the Debtor located a second financing source, the First Lender accrued nearly $800,000 in default interest due to the 24% default interest rate (up from 10.25%).  Smart Capital retained attorneys to assist it with contesting this default and help settle this dispute with the First Lender.  Ultimately, that counsel was able to settle this dispute with the First Lender regarding default interest for a payment of $50,000.  Smart Capital incurred $25,766.10 in legal fees to accomplish this settlement, as well as other charges relating to Smart Capital being required to refinance with a second lender, relating to an appraisal fee ($7,500), an environmental report ($1,750), escrow and title charges ($18,065.45), and other lender charges ($59,611.24).

24

25

26

27

28

The Motion asserts that the Debtor was not required to provide the SNDA, because the Debtor never proposed a form of an SNDA which was reasonably acceptable to it. Evidence at trial will show, however, that the proposed forms that Smart Capital provided were reasonable, and that the Debtor's additional demanded terms (reflected in Exhibit M to the Motion) were unreasonable.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    Further, evidence at trial will show that the Debtor has weaponized this portion of

2  the Lease, and used it as leverage in an attempt to extract concessions from Smart Capital.

3  On March 8, 2018, Debtor's counsel emailed Smart Capital and proposed that if Smart

4  Capital agreed to a change in terms of the lease rate, it might agree to a certain amendment

5  to the terms of the Estoppel Certificate.  A true and correct copy of this email is attached

6  hereto as **Exhibit 1**.  While this email references only the Estoppel Certificate, Smart

7  Capital requested that the Debtor sign both the SNDA and Estoppel Certificate

8  simultaneously, and thus any refusal to sign one document (or threat of refusal absent rent

9  concessions) related simultaneously to the other document.

10              **b.    Estoppel Certificate**

11    The Lease states in part:

12        18.3    Estoppel Certificates.  From time to time (but not more than
        twice in any calendar year), each party shall execute and deliver to
13        the other (or to any third party specified by the requesting party), a
        written statement certifying the following information:  (i) this Lease
14        is in full force and effect and has not been amended, except for any
        amendments specifically stated, (ii) the expiration date of the Term
15        of this Lease, subject to Tenant's right to extend the Term under
        Section 3.2, (iii) a statement that there are not, to such party's actual
16        knowledge, uncured defaults on the part of the requesting party, or
        specifying such defaults if any are claimed, (iv) a statement that, to
17        such party's actual knowledge, such party has no claims or offsets
        against the requesting party, or specifying such claims or offsets if
18        any are claimed, and (v) the then current monthly Minimum Rent
        payable under this Lease and the date through which such monthly
19        Minimum Rent has been paid.  Each party shall deliver such
        estoppel statement within thirty (30) days of a written request from
20        the other party.  Any such estoppel statement may be relied on by
        any prospective purchaser, lender, assignee or subtenant of the
21        Premises.

22

23

24  Motion, Exhibit A.

25    The Debtor has never issued an Estoppel Certificate, despite Smart Capital's

26  requests to do so.  The Motion asserts that this refusal is reasonable because the Debtor's

27  proposed changes to the latest Estoppel Certificate identified in Exhibit N (the "Marked-

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    Up Certificate") are reasonable.  Motion, 22:26–23:9, Exhibit N.

2        A review of the Marked-Up Certificate demonstrates otherwise.  That document is

3    the Debtor's latest proposed revisions to a version of an Estoppel Certificate provided by

4    Smart Capital.  In those revisions, the Debtor sought to add the following exception to the

5    statement that the Debtor accepts and is satisfied with the Premises:

> "[…] noting that improvements, additions and alterations to the
> building of which the Premises are a part which were an inducement
> to Tenant to enter into the Lease have not been completed to
> commercially reasonable standards, the Premises are open for the
> use of Tenant, its customers, employees and invitees only through
> the efforts of Tenant, and Tenant and Landlord continue to address
> costs related to utility and safety issues related to the maintenance
> and service to the Premises.  Without limiting the generality of the
> foregoing, (i) the electrical distributions systems (including breakers,
> panels, switchboards, wiring and the like) is not up to code and is
> generally incapable of repair, (ii) the mechanical systems (including
> elevator systems) servicing the Premises are not up to code, (iii) the
> heating ventilation and air conditioning (HVAC) system servicing
> the Premises is not up to code, (iv) the majority of the building on
> the Real Estate of which the Premises are a part are incapable of
> occupancy due to utility and safety issues, (v) the building of which
> the Premises are a part is continuously subject to citation and
> condemnation by the City of Los Angeles Department of Building
> and Safety, (vi) Tenant has expended over $200,000 of Tenant's
> funds, without reimbursement under the Lease, to repair the portion
> of the electrical distribution system serving the Premises and one of
> the elevators serving the Premises, (vii) the use of the one elevator
> serving the Premises by Owner and its employees and invitees for
> access to floors above the Premises jeopardizes Tenant's quiet
> enjoyment and licensed use of the Premises if such use renders the
> elevator inoperable, and (viii) Tenant's occupancy of the Premises is
> subject to termination for cause if there is not remedial action by
> Landlord or Lender to reimburse Tenant for out-of-pocket
> expenditures, repair of the Premises and building, and/or
> renegotiation of the Lease to provide concessions in lease rate and
> term.

26    Motion, Exhibit N.

27        The Marked-Up Certificate should give this Court pause.  The Motion states that,

28    "the Debtor is unaware of any citation from any governmental authority in connection with

Sulmeyer Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1   the Premises of the type asserted in the Landlord's August 5 Default Letter…"  Motion,

2   14:9.  The Marked-Up Certificate, however, states that the Premises is a safety hazard.

3   Breakers, panels, and switches are "not up to code and generally incapable of repair".  The

4   elevator is "not up to code."   The majority of the Premises "is incapable of occupancy due

5   to utility and safety issues."  The Building is "continually subject to citation and

6   condemnation".

7       So, which is it?  Is the Debtor wholly unaware of any safety citation relating to the

8   Premises, or are the Premises full of known safety hazards, and continually subject to

9   citation and condemnation?  Smart Capital is confident that it can demonstrate at trial that

10   that the Debtor's proposed statements in the Marked-Up Certificate are not supported by

11   the evidence.  In fact one of assertions, regarding to the HVAC system, relates to an issue

12   that is the sole responsibility of the Debtor.  *See* Lease, Section 5.7.

13       Further, the Debtor's proposed changes in the Marked-Up Certificate appear largely

14   to relate to matters that were settled by way of the Global Settlement Agreement—attached

15   as Exhibit K to the Motion.  The Debtor makes this same assertion against allegations of

16   breach raised by Smart Capital.  Motion, 29:12-16 ("the purported defaults … are all

17   conditions that predate the settlement with the Landlord in the Prior Chapter 11 Case.").  In

18   other words, the supposed defaults identified by the Debtor in  the Marked-Up Certificate

19   were mostly, if not wholly, in existence long before the Debtor and New Vision entered

20   into the Global Settlement Agreement, and pursuant to assumption in the Prior Bankruptcy

21   Case, were not required to be 'cured" and were in essence deemed not to be matters of

22   default.

23       Smart Capital acknowledges that any "new" breaches of the Lease that occurred

24   after the date the parties entered into the Global Settlement Agreement are not released, as

25   the parties are still required to perform pursuant to the terms of the Lease.  Any "old"

26   breaches that existed or could have existed as of the Global Settlement Agreement are

27   released.  Smart Capital believes the breaches identified in the Marked-Up Certificate all

28   relate to "old" breaches" and thus are released.  Smart Capital is confident that at trial it

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    will be able to prove that the Debtor improperly refused to provide an Estoppel Certificate,

2    which is a breach of the Lease.  This breach continues to this day.  The Motion indicates

3    that the Debtor is unwilling to issue an Estoppel Certificate and SNDA that takes into

4    account the releases made in the Global Settlement Agreement.

5        The Debtor's breach of these provisions in the Lease relating to the SNDA and the

6    Estoppel Certificate resulted in significant harm to Smart Capital.  As set forth above, the

7    First Lender declared a default under the Lease and forced Smart Capital to find a second

8    lender, resulting in Smart Capital incurring significant expenses.  In order to obtain

9    replacement lender, Smart Capital had to offer another property owned by an affiliated

10   entity as cross-collateral.  Fortunately for Smart Capital, a second lender (Preferred Bank,

11   the "Second Lender") agreed to a refinance on a fairly short timeline (at the same loan

12   base), enabling Smart Capital to pay off the First Lender.

13       However, Smart Capital incurred fees in connection with this cross-collateral

14   refinance that included an appraisal fee ($7,500), an environmental report ($1,750), escrow

15   and title charges ($19,060.45), lender charges ($60,477.00), and also had to pay a

16   prepayment penalty of $212,826.54 to the lender on the cross-collateralized property.

17   Moreover, Smart Capital's interest rate on the loan with the Second Lender--6.0%--was

18   more than with the First Lender--4.25%--which has resulted in additional interest expenses

19   to date of at least $72,420.14, and this amount will only continue during the life of the loan

20   with the Second Lender.

21       The Second Lender has also required an Estoppel Certificate and SNDA from the

22   Debtor.  Still, the Debtor refuses to sign, or even communicate further with Smart Capital

23   as set forth in the email attached to the Motion as Exhibit O.

24       Ultimately due to the Debtor's refusal to sign a SNDA and Estoppel Certificate,

25   Smart Capital was put at risk from various lenders and was ultimately damaged by paying

26   legal fees, lender fees, higher interest rates, and other related fees for immediate

27   refinancing.  These fees and other charges incurred to date are at least $536,726.92.

28       **2.        The Debtor's Use Of The Premises To Hold Too Many Events, For**

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

## Unpermitted Purposes

The Debtor's use of the Premises is governed by an additional document:  a February 25, 2013, conditional use beverage letter from the City of Los Angeles (the "CUB") which amended a prior agreement permitting the on-site sale of alcoholic beverages.  A true and correct copy of the CUB is attached hereto as **Exhibit 2**.  Section 9.5 of the Lease requires the Debtor to comply with laws and regulations relating to the Premises, and the CUB falls within that category.

The CUB imposes certain restrictions on the Debtor' use of the Premises.  One of those restrictions is the Debtor's ability to host all-age events at the Premises.  Paragraph 8 of the CUB states in part:  "A maximum of up to fifty (50) all ages events are permitted per year.  The applicant shall notify the Los Angeles Police Department (LAPD) of each event at least one month prior to the event being held."  *See* Exhibit 2.

Smart Capital is confident that at trial, it will be able to demonstrate that the Debtor held more than 50 all-age events at the Premises in 2018, and potentially even in 2019. The Motion recognizes that the Premises have been used for religious services on Sundays (Motion, 4:25) though does not identify when those services began.  Smart Capital believes, based upon its review of publicly-available information, that the Debtor permitted in excess of 50 per-year all-age events at the Premises.  The Debtor does not identify the number of such events.  Instead, the Debtor states that it wants Smart Capital to identify each of these events (Motion, 17:23) and Smart Capital intends to conduct discovery against the Debtor and Werm to do just that.

Additionally, the Lease requires, in Section 1.17, that the Premises be used "solely for the operation of a nightclub, restaurant, entertainment venue and related lawful businesses along with the storage use (collectively the "Permitted Use").  The Premises may not be used for any other purpose without the Landlord's prior written consent. (Article 9)."  The Sublease states, in Section 7.2, that it is subject to the terms and conditions of the Lease.  The Motion asserts that Werm entered into an "event agreement" with a church to hold events at the Premises.  The Motion does not identify the number of

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL  213.626.2311 • FAX  213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  those events that occurred, nor what the Debtor/Werm was paid to permit such events.

2  Regardless, Smart Capital did not consent to the use of the Premises as a church.  Whether

3  Werm has entered into a sublease with that church (which Smart Capital did not

4  authorize), or whether Werm entered into an "event agreement" is irrelevant to the issue.

5  As such, the Debtor's use of the Premises as a church violated the Lease, regardless of the

6  number of church events held there, and regardless of whether Werm entered into a

7  sublease or some other agreement with that church..

8        **3.    Alcohol**

9        The CUB states that the use of the Premises must be in substantial conformance

10  with the plot plan submitted with the application.  See Exhibit 2, paragraph 2.  This plan

11  identifies that alcohol may not be sold from the ground floor lounge area.  See **Exhibit 2**.

12        While the Motion states that "currently there is no alcohol being sold on the ground

13  floor lounge," (Motion, 16:6), the Motion does not dispute that alcohol has been served

14  there in the past.  Again, the Debtor has requested that Smart Capital provide the Debtor

15  with the dates that alcohol was served from that lounge area—despite the Debtor and

16  Werm being in possession of this information.  Smart Capital intends to conduct discovery

17  against the Debtor and Werm and will provide that information when it obtains it.

18        **4.    Minors In The Tower**

19        Smart Capital has also recently learned that during certain church events that the

20  Debtor has held at the Premises, unidentified minors have accessed the upper floors of the

21  Tower.  This cannot happen, as the Motion recognizes also in stating that "customers of the

22  business may not use the Tower".  Motion, 9:1.

23        The First Amendment (Motion, Exhibit B) describes, in paragraph 21, the safety

24  protocol that should have been put in place to prevent this:  that an elevator--identified as

25  the "5.6 Elevator"--allow access only to the Premises unless a key card is used to allow

26  access to the upper floors.  Smart Capital is not aware of how any unauthorized person is

27  obtaining access to the upper levels of the Tower, but such access creates an immediate

28  and obvious fire and safety hazard (in addition to being a breach of the Lease) which Smart

1    Capital intends to address and regarding which Smart Capital hopes to conduct immediate

2    discovery.

3         **5.**    **Other Defaults**

4        Smart Capital believes that the Debtor is breaching the Lease in other ways as well,

5    including by (1) occupying more office space than is permitted by the CUB (the CUB

6    permits only 10,159 square feet of public area and 1,736 square feet of offices (See Exhibit

7    3, Section 7), and (2) that the Debtor breached the Lease improperly maintaining fire

8    doors.  Smart Capital was made aware in 2017 that certain fire doors needed repair, in

9    particular two double doors that lead to the first floor main lobby elevator, double doors

10   leading to the lobby restrooms, and double doors leading to the basement elevator.  The

11   doors did not have top hinges to help keep the doors closed when the magnetic strips were

12   released.  All requests by Smart Capital to fix these doors went unheeded by the Debtor

13   until only very recently.

14   **B.**    **Assuming The Lease Is Not In The Best Interest Of Creditors**

15       The Motion states, in numerous places, that assuming the Lease is in the best

16   interests of the Estate's creditors.  Motion, 12:25, 25:11, 25:27, 34:26.  However, Smart

17   Capital cannot determine, from the Motion, whether there are any creditors other than

18   Smart Capital in this bankruptcy case.

19       On September 4, 2019, the Debtor filed its Schedules in this case. [Docket No. 15]

20   (the "2019 Schedules").  The 2019 Schedules identify seven general unsecured creditors in

21   this case.  Those unsecured creditors, along with their scheduled claim amounts, are as

22   follows:

23       Ahmed Al Goud:  $300,000

24       Laurentiu Beada:  $175,000

25       Rene Vardapour:  $145,000

26       Robert Guichard:  $27,000

27       Saybian Gourmet Inc.:  $1,587,919.23

28       Dentons US LLP:  $114,197.00

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    Social Entertainment Group $265,000.

2    A true and correct copy of the relevant portion of the Schedules is attached hereto

3  as **Exhibit 3**.

4    Five of these alleged creditors were creditors in the Prior Bankruptcy Case.  In the

5  Prior Bankruptcy Case, the Debtor filed its schedules on October 29, 2013.  [Docket No.

6  25 in the Prior Bankruptcy Case] (the "2013 Schedules").  The unsecured creditors

7  identified in the 2013 Schedules overlap significantly with those identified in the 2019

8  Schedules—Ahmed Goud, Laurentiu Beada, Rene Vardapour, and Robert Guichard are all

9  identified as having claims in identical amounts in both cases.  Attached as **Exhibit 4** is a

10  true and correct copy of the relevant portion of the 2013 Schedules.

11    In the Prior Bankruptcy Case, the Debtor filed a Disclosure Statement (Docket No.

12  343 in the Prior Bankruptcy Case, the "Disclosure Statement") on January 5, 2016 and

13  Plan (Docket No. 360 in the Prior Bankruptcy Case, the "Plan").  The Plan proposed that

14  general unsecured creditors would be given an option to either have their claim converted

15  into an equity interest in WERM, or be given the treatment afforded "Class 1" creditors.  A

16  true and correct cop of the relevant portion of the Plan is attached hereto as **Exhibit 5**.

17    Additionally, the Disclosure Statement stated that Robert Guichard would not

18  receive a ballot for his $27,000 scheduled claim, because his claim had been paid in full.

19  A true and correct cop of the relevant portion of the Disclosure Statement is attached

20  hereto as **Exhibit 6**.

21    On February 25, 2016, the Debtor filed its "Analysis Of Ballots For Accepting Or

22  Rejecting Plan Of Reorganization Proposed By Debtor, Hawkeye Entertainment, LLC"

23  [Docket No. 351 in Prior Bankruptcy Case] (the "Plan Analysis").  A true and correct copy

24  of the Plan Analysis is attached hereto as **Exhibit 7**.  As set forth in the Plan Analysis,

25  Rene Vardapour elected to have her claim converted into an equity interest in WERM.

26  Ahmed Al-Gourd and Laurentiu Badea declined to convert their claim, and instead receive

27  the treatment provided in the Plan for Class 1 creditors.

28    The Disclosure Statement sets for that creditors in Class 1 will be treated as follows:

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

> Class 1 Deferred Plan Payment(s). After the Effective Date
> (and after payment in full of the Administrative Claims,
> Classified Priority Claims), commencing on a date selected
> by the Reorganized Debtor that is a Business Day which is at
> least thirty (30) days after the Effective Date, the Reorganized
> Debtor shall distribute each month to each Holder of Allowed
> General Unsecured Claim in Class 1, an amount determined
> at the discretion of the Reorganized Debtor, based cash flow
> and profitability; such payments shall continue over a period
> of twenty-four (24) months following the Effective Date, until
> such time as each Holder of an Allowed General Unsecured
> Claim in Class 1 has received the present value of One
> Hundred percent (100%) of its Allowed General Unsecured
> Claim. To the extent that any Holder of an Allowed General
> Unsecured Claim in Class 1 has not received the present
> value of One Hundred percent (100%) of its Allowed General
> Unsecured Claim by the end of twenty-four (24 months) after
> the Effective Date, it shall receive a final payment in the
> twenty-fifth (25th) month in an amount necessary so that the
> aggregate of all payments received is equal to the present
> value of its Allowed General Unsecured Claim.

16

*See* Exhibit 6.

17  The Court confirmed the Plan by order dated June 20, 2016. [Docket No. 363 in the

18  Prior Bankruptcy Case]. Pursuant to the Plan, the Effective Date was within 60 days of the

19  date of confirmation of the Plan. The Debtor stated in its "Notice Of Effective Date Of

20  Plan Of Reorganization Proposed By Debtor, Hawkeye Entertainment, LLC" [Docket No.

21  387 in the Prior Bankruptcy Case] that the Effective Date was September 2, 2016.

22  On April 27, 2017, the Debtor filed in the Prior Bankruptcy case a "Notice Of

23  Motion And Motion Of Hawkeye Entertainment, LLC, The Reorganized Debtor, For entry

24  Of An Order For Final Decree And Closing Chapter 11 Case" [Docket No. 390 in Prior

25  Bankruptcy Case] (the "<u>Final Decree Motion</u>"). A true and correct copy of the Final

26  Decree Motion is attached hereto as **Exhibit 8**. The Final Decree Motion states in part:

27

28

> "Distributions required to be made on the Effective Date of the Plan,
> including the initial payments to the administrative claims
> ("Administrative Claims"), have been made. It is estimated that

payments will continue to be made under the Plan over a period of two years from the operations of the Debtor. Distributions under the Plan are the only remaining matter, as there are no pending matters or open proceedings remaining, and all final motions for approval of compensation and reimbursement of expenses have been approved by the Court. In short, the Debtor's Bankruptcy Estate has been substantially consummated and should therefore be closed. All outstanding fees to the Office of the United States Trustee, to the extent not paid, will be paid prior to the entry of the Final Decree. In addition, the Debtor has submitted all of its requisite monthly operating reports."

Final Decree Motion, Exhibit 6, p. 9, lines 4-13.

As set forth in the Final Decree Motion, as of April 27, 2017, the Debtor had begun making its installment payments to the creditors receiving distributions in Class 1 of the Plan. As such distributions would go for only a 24-month period, those claims were paid in full by no later than April, 2019.

It appears that the Debtor may likely have misrepresented in its 2019 Schedules that Ahmed Goud, Laurintiu Beada, Rene Vadapour, and Robert Guichard possessed claims against the Debtor as of the Petition Date.

Additionally, the 2013 Schedules identify Saybian Gourmet Inc. ("Saybian"), which is the sole member of the Debtor, as holding a claim in the amount of "unknown". Saybian did not file a proof of claim in the Prior Bankruptcy Case however, and in the Disclosure Statement, the Debtor stated that "The Plan leaves unaltered the interest of Saybian Gourmet, LLC on and after the Effective Date, which shall continue to manage the Reorganized Debtor after the Effective Date." A true and correct copy of the relevant portion of the Disclosure Statement is attached hereto as **Exhibit 9**. Saybian was not treated as a creditor in the Plan, did not receive a distribution, nor did it vote for the Plan. See Plan Analysis, Exhibit 7.

There are only two potential creditors remaining in the 2019 Schedules whose claims were not resolved by confirmation of the Plan: Dentons US LLP and Social Entertainment Group. Smart Capital does not possess information sufficient to determine

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  whether these two entities are in fact creditors of the Debtor, and intends to conduct

2  discovery on that issue.  If these entities also are illusory creditors, then this bankruptcy

3  case is essentially a two-party dispute and any analysis that takes into account the interests

4  of the Estate's creditors must take into account Smart Capital's interests alone, and not

5  those of illegitimate alleged creditors.

6  **C.**    **The Court Should Deny The Motion As It Relates To The Lease, As The Lease**

7        **Is Not In The Best Interests Of The Estate**

8        As framed by the Motion, there appears to be no financial benefit to the Estate by

9  assumption of the Lease.  The Debtor should have, but failed, to present the Court with a

10  detailed analysis of what the benefits and burdens of the Lease are, and what impact the

11  denial of the Motion will be on the estate.  Instead, the facts of the Motion indicate that the

12  Debtor is a mere holding company which has no source of income other than Werm on the

13  Sublease.  The Debtor's lease obligation is currently $39,392.81 per month.  Motion, 3:12.

14  Werm's monthly payment obligation under the Sublease is $30,000, although Werm does

15  agree that "All Additional Rent Due under the Master Lease shall be the sole obligation of

16  the Sublessee."  Sublease, Motion, Exhibit C, Section 4.1

17        If the Motion is to be believed, the Debtor has no net income and no likelihood of

18  making any income to pay any party other than Smart Capital—assuming other creditors

19  exist at all.  The Debtor is a "holding company for the Lease."  Motion, 7:22.  The Motion

20  states that the Lease is providing income "for the Landlord".  Motion, 1:23.  No income for

21  the use of any other "creditor" is identified.

22        There is no positive benefit for the Debtor in assuming the Lease.  At best, it will

23  result in a net zero gain.  More likely, it will in additional expenses of the estate to the

24  extent the Debtor continues to breach Lease terms.  Given the safety issues that

25  purportedly exist at the Building, as identified the Marked-Up Certificate, and other safety

26  concerns raised above, the Lease exposes the Debtor to significant further risk of loss.  The

27  Court should not permit the assumption of a lease which presents a risk of loss

28  disproportionate to the prospect for profit.  In re C.M. Systems, Inc., 64 B.R. 363, 364

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    (Bankr. M.D. Fla. 1986); <u>In re Global Int'l Airways</u>, 35 B.R. 881, 886-88 (Bankr. W.D.

2    Mo. 1983).

3          From a cash flow perspective, the Lease provides the Debtor the same benefit as if

4    there were no Lease at all.  To the contrary, the risk of loss is significant.  The Motion is

5    written as if the Court must take into account the assets and liabilities of Werm in

6    considering this factor, but unless and until Werm is substantively consolidated into the

7    Debtor, there is no basis to do so.

8          In reviewing the Debtor's business judgment in moving for the approval of the

9    Lease, the Court must question what benefit such agreement provides to the entire

10   bankruptcy estate.  The answer is that there is no benefit.  The bankruptcy estate only

11   stands to lose from the assumption of the Lease.  In addition to the potential damages that

12   could result from the Debtor operating at a purportedly unsafe business location, the effect

13   of the assumption will be to convert any potential claims arising out of a post-petition

14   breach of the Lease from general unsecured claims to administrative priority claims.  <u>In re</u>

15   <u>Klein Sleep Products, Inc.</u>, 78 F.3d 18, 28 (2d. Cir. 1996).

16   **D.      In The Alternative, The Debtor Must Cure All Defaults Under The Lease And**

17   **Provide Adequate Assurance Of Future Performance**

18   Bankruptcy Code Section 365(b) provides as follows:

19   (b)(1)  If there has been a default in an executory contract or unexpired lease of the

20   debt the trustee may not assume such contract or lease unless, at the time of

21   assumption of such contract or lease, the trustee:

22          (A)  cures, or provides adequate assurance that the trustee will promptly

23          cure, such default . . .:

24          (B)  compensates, or provides adequate assurance that the trustee will

25          promptly compensate, a party other than the debtor to such contract or lease,

26          for any actual pecuniary loss to such party resulting from such default; and

27          (C)  provides adequate assurance of future performance under such contract

28          or lease.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1  *See* 11 U.S.C. § 365(b)

2  The Motion recognizes that as part of assumption, "it is incumbent upon the Debtor

3  to cure any defaults." Motion, 6:27. As set forth above, the Debtor remains in default due

4  to its refusal to sign a SNDA and Estoppel Certificate, and is also in default of the Lease in

5  that the Debtor is allowing—somehow—access to the upper floors of the Tower which

6  poses such a safety hazard that Smart Capital must take the necessary steps to stop it

7  immediately regardless of all other considerations.

8  As set forth above, these defaults regarding the SNDA and Estoppel Certificate

9  alone have caused damage to the Debtor of at least $536,726.92 to date. Any cure of the

10  Lease would require payment to Smart Capital of at least that amount. Smart Capital

11  intends to conduct discovery as to further breaches by the Debtor of the Lease, and will set

12  forth additional evidence regarding its damages incurred as a result of such breaches, at

13  trial.

14  Additionally, the Debtor has not met the requirements of Section 365(b)(1)(C), as

15  the Motion does not demonstrate adequate assurance of future performance. The Motion

16  states that the Debtor can meet this requirement "based on cashflow derived from the

17  Sublease, the financial resources of the Debtor's equity holders, and those of WERM and

18  its equity holders." Motion, 13:5. However, no such evidence is attached to the Motion.

19  Also, the Debtor has no cashflow other than payments it receives from Werm, and as such,

20  the financial resources of Werm, as opposed to the Debtor, but be evaluated to meet this

21  requirement.

22  **E.**  **The Court Should Deny The Motion As It Relates To The Sublease**

23  The Motion seeks to assume and modify the Sublease. Courts usually apply a

24  "business judgment" test in determining whether to authorize a rejection or assumption of

25  an unexpired lease. However, as a general matter, insider transactions should be subjected

26  to more careful scrutiny. See, e.g., In re Bidermann Industries U.S.A., Inc., 203 B.R. 547,

27  551 (Bankr. S.D.N.Y. 1997) (holding that sales to insiders "'necessarily are subjected to

28  heightened scrutiny because they are rife with the possibility of abuse.'"); Westship, Inc. v.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    <u>Trident Shipworks, Inc.</u>, 247 B.R. 856, 865 (D. Fla. 2000) (concluding that, although it is

2    unclear whether heightened scrutiny is required in the context of a motion to assume an

3    unexpired lease, "it was prudent of the Bankruptcy Court to look closely at the

4    assumption.").  <u>See also</u>, <u>In the Matter of Holloway</u>, 955 F.2d 1008, 1010-11 (5th Cir.

5    1992) (recognizing that the term "insider" necessarily includes those entities with a

6    closeness to the debtor such that their conduct is "'subject to closer scrutiny than those

7    dealing at arm's length with the debtor.'").

8         Here, the Sublease is a deal with an insider.  As discussed above, the Sublease

9    requires Werm to pay the Debtor only $30,000 per month (approximately $10,000 less

10   than the current monthly rent on the Lease) leaving Werm responsible for all additional

11   rent owed under the Lease.  The Debtor's net gain from this relationship is zero.  Any

12   benefit of the Lease is being passed wholly to Werm at the expense of creditors of this

13   Estate.  As such, the Sublease is not a benefit to any purported creditors of the Estate, other

14   than Smart Capital.

15        For these reasons, the Court should deny the Motion as it relates to the Sublease.

16                                   **IV.**

17                      **RESERVATION OF RIGHTS**

18        Smart Capital expressly reserves its rights to supplement and amend this

19   Opposition, its rights to introduce evidence supporting this Opposition at the hearing on

20   the Motion, and its right to submit additional and supplemental objections at the

21   conclusion of discovery.

22                                   **V.**

23                           **CONCLUSION**

24        Smart Capital respectfully requests that the Court enter an order:  (1) sustaining

25   Smart Capital's opposition, (2) denying the Motion, (3) alternatively, deeming the Motion

26   a contested matter and setting an evidentiary hearing to determine the rights, if any, of the

27   Debtor and Smart Capital with respect to the Lease/Sublease, and (4) granting such

28   additional relief as the Court deems proper.

1 | DATED: October 23, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz
A Professional Corporation

By: _____
      David S. Kupetz
      Steven F. Werth
      Attorneys for Landlord

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

SFW 2687067v9

22

## DECLARATION OF MICHAEL S. CHANG

I, Michael S. Chang, declare as follows:

1.      I am an individual over the age of 18 and am the manager of Smart Capital Investments I, LLC, a California limited liability company, Smart Capital Investments II, LLC, a California limited liability company, Smart Capital Investments III, LLC, a California limited liability company, Smart Capital Investments IV, LLC, a California limited liability company, and Smart Capital Investments V, LLC, a California limited liability company (collectively, "Smart Capital").

2.      I make this declaration in my capacity as the Manager of Smart Capital.

3.      I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently to such facts under oath.

4.      This declaration is being submitted in support of the attached "Landlord's Opposition To Debtor's Motion To Assume Lease And Requesting Additional Relief" (the "Opposition").  Capitalized terms in this declaration have the meaning given them in the Opposition.

4.      I am informed by my counsel that prior to filing this opposition to the Motion, my counsel discussed with counsel for the Debtor the possibility of entering into a stipulation resolving certain scheduling issues relating to the Motion, including converting the hearing on the Motion into a status conference and setting further deadlines relating to discovery and an evidentiary hearing.  I understand that the parties are in the process of finalizing the terms of that stipulation.

5.      Smart Capital is the owner of the Property.

6.      The Property consists of a twelve-story building commonly known as the Pacific Stock Exchange Building.  The Debtor leases the first four floors and a portion of the basement of the Building pursuant to a lease with Smart Capital's affiliate and predecessor-in-interest.

7.      The Debtor subleases the Premises to its affiliate, Werm.

SulmeyerKupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

8.      The Debtor commenced a bankruptcy case in 2013 before this Court, in Case No. 1:13-bk-16307.  There, the Debtor also sought to assume the Lease.  The landlord at the time was Smart Capital's affiliate and predecessor-in-interest New Vision Horizon, LLC, who acquired the Property through a foreclosure sale.

9.      In the Prior Bankruptcy Case, the dispute between the Debtor and New Vision largely related to whether the Debtor was required to pay New Vision rent under the Lease.  The parties ultimately resolved their dispute.  As part of that resolution, the parties entered into an amendment to the Lease and a settlement agreement.  In the Global Settlement Agreement, the parties released each other from all claims that could be asserted as of that date regarding the Lease.  Thereafter, the Bankruptcy Court closed the Prior Bankruptcy Case.

10.     I dispute many of the assertions made in the Motion.  While the Debtor has made monthly rental payments to Smart Capital under the Lease, the Debtor is currently in breach under the Lease and remains in breach.  Those breaches have resulted in significant damage to Smart Capital.

11.     One of Smart Capital's disputes with the Debtor relates to the Debtor's obligation to provide Smart Capital with a SNDA and Estoppel Certificate.  The Debtor has never provided either, despite numerous requests that it do so.

12.     In early 2018, Smart Capital requested that the Debtor sign a SNDA required by iBorrow, Smart Capital's first lender.  The Debtor failed to provide this document, after numerous requests that it do so, and this resulted in Smart Capital falling into default with the First Lender.  Smart Capital was then subjected to a default rate of interest of 24% under its loan agreement with the First Lender, which gave Smart Capital no other choice than to look for financing elsewhere.  During the time period between which this default occurred due to Debtor's refusal to sign a SNDA, and the date the Debtor located a second financing source, the First Lender accrued nearly $800,000 in default interest due to the 24% default interest rate (up from 10.25%).

13.     Smart Capital retained attorneys to assist it with contesting this default and

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    help settle this dispute with the First Lender.  Ultimately, that counsel was able to settle

2    this dispute with the First Lender regarding default interest for a payment of $50,000.

3    Smart Capital incurred $25,766.10 in legal fees to accomplish this settlement, as well as

4    other charges relating to Smart Capital being required to refinance with a second lender,

5    relating to an appraisal fee ($7,500), an environmental report ($1,750), escrow and title

6    charges ($18,065.45), and other lender charges ($59,611.24).

7         14.    On March 8, 2018, Debtor's counsel emailed Smart Capital and proposed

8    that if Smart Capital agreed to a change in terms of the lease rate, it might agree to a

9    certain amendment to the terms of the Estoppel Certificate.  A true and correct copy of this

10   email is attached hereto as **Exhibit 1**.  While this email references only the Estoppel

11   Certificate, Smart Capital requested that the Debtor sign both the SNDA and Estoppel

12   Certificate simultaneously, and thus any refusal to sign one document (or threat of refusal

13   absent rent concessions) related simultaneously to the other document.

14        15.    The Debtor's breach of the Lease relating to the Debtor's obligations to

15   provide a SNDA and Estoppel Certificate resulted in significant harm to Smart Capital.

16   The First Lender declared a default under the Lease and forced Smart Capital to find a

17   second lender, resulting in Smart Capital incurring significant expenses.  In order to obtain

18   replacement lender, Smart Capital had to offer another property owned by an affiliated

19   entity as cross-collateral.  Fortunately for Smart Capital, a second lender (Preferred Bank)

20   agreed to a refinance on a fairly short timeline (at the same loan base), enabling Smart

21   Capital to pay off the First Lender.

22        16.    However, Smart Capital incurred fees in connection with this cross-collateral

23   refinance that included an appraisal fee ($7,500), an environmental report ($1,750), escrow

24   and title charges ($19,060.45), lender charges ($60,477.00), and also had to pay a

25   prepayment penalty of $212,826.54 to the lender on the cross-collateralized property.

26   Moreover, Smart Capital's interest rate on the loan with the Second Lender--6.0%--was

27   more than with the First Lender--4.25%--which has resulted in additional interest expenses

28   to date of at least $72,420.14, and this amount will only continue during the life of the loan

1    with the Second Lender.

2        17.    The Second Lender has also required an Estoppel Certificate and SNDA

3    from the Debtor.

4        18.    Ultimately due to the Debtor's refusal to sign a SNDA and Estoppel

5    Certificate, Smart Capital was put at risk from various lenders and was ultimately damaged

6    by paying legal fees, lender fees, higher interest rates, and other related fees for immediate

7    refinancing.  These fees and other charges incurred to date are at least $536,726.92.

8        19.    The Debtor's use of the Premises is also governed by the CUB.  A true and

9    correct copy of the CUB is attached hereto as **Exhibit 2**.

10       20.    I believe, based upon my investigation and review of relevant documents,

11   that the Debtor held more than 50 all-age events at the Premises in 2018.

12       21.    Further, at no time has Smart Capital consented to the use of the Premises as

13   a church.

14       22.    I believe, based upon my investigation and review of relevant documents,

15   that prior to commencing this bankruptcy case, the Debtor and/or Werm was selling

16   alcohol from the ground floor lounge area of the Premises.

17       23.    I have recently been informed that during certain church events that the

18   Debtor has held at the Premises, unidentified minors have accessed the upper floors of the

19   Tower.  I am not aware of how any unauthorized person is obtaining access to the upper

20   levels of the Tower, but such access creates an immediate and obvious fire and safety

21   hazard.

22       24.    I believe that the Debtor is breaching the Lease in other ways as well,

23   including by (1) occupying more office space than is permitted by the CUB, and (2)

24   improperly maintaining fire doors.  I learned in 2017 that certain fire doors at the Premises

25   needed repair, in particular two double doors that lead to the first floor main lobby

26   elevator, as well as double doors leading to the lobby restrooms.  Both doors do not have

27   top hinges that help keep the doors closed when the magnetic strips are released.  The fire

28   doors must not be able to be manually opened from pushing once the door magnets are

1  released.  The double doors leading to the basement elevator have the same problem, and

2  are also not able to close fully.  All requests by Smart Capital to fix these doors remained

3  unheeded until only very recently.

4        25.     A true and correct copy of a portion of the Schedules is attached hereto as

5  **Exhibit 3**.

6        26.     Attached as **Exhibit 4** is a true and correct copy of a portion of the 2013

7  Schedules.

8        27.     A true and correct copy of a portion of the Plan is attached hereto as **Exhibit**

9  **5**.

10        28.     A true and correct copy of a portion of the Disclosure Statement is attached

11  hereto as **Exhibit 6**.

12        29.     A true and correct copy of the Plan Analysis is attached hereto as **Exhibit 7**.

13        30.     A true and correct copy of the Final Decree Motion is attached hereto as

14  **Exhibit 8**.

15        31.     A true and correct copy of the portion of the Disclosure Statement is attached

16  hereto as **Exhibit 9**.

17       I declare under penalty of perjury under the laws of the United States of America

18  that the foregoing is true and correct to the best of my knowledge, information, and belief.

19       Executed this 23rd day of October, 2019, at Los Angeles, California.

20

21  By: _____

22       Michael S. Chang

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

# EXHIBIT 1

0028

## Alex Lee

| | |
|---|---|
| **From:** | William F. Bresee <WBresee@LeechTishman.com> |
| **Sent:** | Friday, March 9, 2018 10:37 AM |
| **To:** | rchang@smartassetus.com |
| **Cc:** | Sandford L. Frey; alee@smartassetus.com |
| **Subject:** | Hawkeye SNDA and Estoppel certificates |

| | |
|---|---|
| **Importance:** | High |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Mr. Chang,

We have received, from our client and from your lender, increased pressure to finalize the estoppel certificate related to your recent loan.  My partner, Sandy Frey, and I reached out to you yesterday and left our contact information with your office; neither of us have heard back from you.

We are authorized to address open issues with you on behalf of our client.  Primarily, the estoppel certificate as demanded by your lender, requires representations regarding landlord compliance with the lease and waivers which our client cannot provide.  You are well-aware of the non-compliance of the building and landlord actions with the representations sought.  The lender has requested that, to make the estoppel certificate truthful, our client list the deficiencies and failures in a manner which makes the certificate accurate.  In spite of the time this must necessarily take, this we are doing; as you know, the list is long.



There may be a work-around which permits accepting the estoppel representations as accurate.  That requires, however, the drafting of a short amendment to the lease through which the landlord undertakes to correct building deficiencies or agrees to lease rate stabilization and an increase lease term in consideration of our client having made required repairs and improvements to the mechanical, electrical and other building systems serving the leased premises.

We called you yesterday.  We are available today.  Please get in touch with us to that this matter can be addressed.

Kind regards,

**William F. Bresee**
wbresee@leechtishman.com

**LEECH**TISHMAN
LEECH TISHMAN FUSCALDO & LAMPL, INC.
T: 626.796.4000 | F: 626.795.6321 | Toll-free: 844.750.1600 | M: 626.437.8459
The Walnut Plaza, 215 North Marengo Avenue, Third Floor | Pasadena, CA 91101
leechtishman.com

PITTSBURGH | CHICAGO | LOS ANGELES | NEW YORK | SARASOTA | WILMINGTON

*Committed to sustainable business practices - please consider the environment before printing this email.*

**Privileged and Confidential:** The information contained in this email is (1) subject to attorney-client privilege; (2) attorney work product; and/or (3) confidential. It is intended only for the individual(s) designated above. You are hereby notified that any use, copying, disclosure or distribution of the information contained in this transmission by anyone other than the recipient(s) named above is unauthorized and strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone at (412) 261-1600. Unauthorized interception of this e-mail is a violation of federal criminal law.

**Tax Advice Disclaimer:** In accordance with IRS Circular 230, any tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties under the Internal Revenue Code nor may any such tax advice be used to promote, market or recommend to another party any transaction or matter addressed within this document. If you would like such advice, please contact us

# EXHIBIT 2

0030

‚'LINN K. WYATT
CHIEF ZONING ADMINISTRATOR

ASSOCIATE ZONING ADMINISTRATORS
R. NICOLAS BROWN
SUE CHANG
LOURDES GREEN
CHARLES J. RAUSCH JR
FERNANDO TOVAR
MAYA E. ZAITZEVSKY

# CITY OF LOS ANGELES
## CALIFORNIA



ANTONIO R. VILLARAIGOSA
MAYOR

DEPARTMENT OF
CITY PLANNING

MICHAEL J. LOGRANDE
DIRECTOR

OFFICE OF
ZONING ADMINISTRATION
200 N. SPRING STREET, 7TH FLOOR
LOS ANGELES, CA 90012
(213) 978-1318
FAX: (213) 978-1334
www.planning.lacity.org

February 25, 2013

Adi McAblan (A)
14242 Ventura Boulevard, Suite 212
Sherman Oaks, CA 91423

Pax America Development, LLC (O)
2333 Beverly Boulevard
Los Angeles, CA 90057

Elizabeth Peterson (R)
Elizabeth Peterson Group, Inc.
400 South Main Street, #808
Los Angeles, CA 90013

CASE NO. ZA 1995-0830(CUB)(PA4)
PLAN APPROVAL
618 South Spring Street (612-618 South
Spring Street)
Central City Planning Area
Zone   : C2-4D
D. M.  : 127.5A211
C. D.   : 14
CEQA : ENV 2012-3046-CE
Legal Description :  Lot 9, Block 16,
Ord's            Survey            tract

Pursuant to Los Angeles Municipal Code Section 12.24-M, I hereby <u>APPROVE</u>:

plans to permit the continued on-site sale of a full line of alcoholic beverages in conjunction with an existing nightclub,

and retain the following conditions contained in Case No. ZA 1995-0830(CUB)(PA3) issued on November 2, 2009 as modified herein (strike-out and double underline):

1.   All other use, height and area regulations of the Municipal Code and all other applicable government/regulatory agencies shall be strictly complied with in the development and use of the property, except as such regulations are herein specifically varied or required.

2.   The use and development of the property shall be in substantial conformance with the plot plan submitted with the application and marked Exhibit "A", except as may be revised as a result of this action.

3.   The authorized use shall be conducted at all times with due regard for the character of the surrounding district, and the right is reserved to the Zoning Administrator to impose additional corrective Conditions, if, in the Administrator's

0031

opinion, such Conditions are proven necessary for the protection of persons in the neighborhood or occupants of adjacent property.

4.   All graffiti on the site shall be removed or painted over to match the color of the surface to which it is applied within 24 hours of its occurrence.

5.   A copy of the first page of this grant and all Conditions and/or any subsequent appeal of this grant and its resultant Conditions and/or letters of clarification shall be printed on the building plans submitted to the Zoning Administrator and the Department of Building and Safety for purposes of having a building permit issued.

6.   Indemnification. The applicant shall defend, indemnify and hold harmless the City, its agents, officers, or employees from any claim, action, or proceeding against the City or its agents, officers, or employees to attack, set aside, void or annul this approval which action is brought within the applicable limitation period. The City shall promptly notify the applicant of any claim, action, or proceeding and the City shall cooperate fully in the defense. If the City fails to promptly notify the applicant of any claim action or proceeding, or if the City fails to cooperate fully in the defense, the applicant shall not thereafter be responsible to defend, indemnify, or hold harmless the City.

7.   The facility shall not exceed:

   a.   10,159 square feet of public area
   b.   1,736 square feet of offices

8.   **MODIFIED:** Hours of operation shall not exceed ~~7 p.m.~~ 8 a.m. to 3 a.m. on any night the location is operation for business. However, the location is permitted to have up to 104 events per year where the location is permitted to close at 6:00 a.m. For those days the location is open until 3:00 a.m., dancing and music shall cease at 2:45 a.m. ~~No after-hours uses of the establishment is permitted. For the days, the location is open until 6:00 a.m., dancing and music shall cease at 5:45 a.m. Live music/entertainment and televisions shall not be permitted in the outdoor patio.~~

   A maximum of up to fifty (50) all ages events are permitted per year. The applicant shall notify the Los Angeles Police Department (LAPD) of each event at least one month prior to the event being held.

9.   ~~Occupancy shall not exceed a maximum of 934 patrons.~~ Maximum occupancy shall be as determined by the Los Angeles Fire Department.

10.  Prior to any sign-off by the Zoning Administrator, the applicant shall submit plans to the Fire Department for approval of occupancy, access, and fire suppression.

CASE NO.  ZA 1995-0830(CUB)(PA4)                                         PAGE 3

11. The applicant shall provide security at a minimum of 1 security guard per 50 patrons or less if approved by the Los Angeles Police Department (LAPD). The security guard shall patrol both inside and outside the nightclub during the hours and until one hour after closing.  The security plan shall be reviewed by the Los Angeles Police Department and their recommendations shall be incorporated into the security plan.  A copy of the security plan shall be provided to the case file.

12.   The Security Plan shall stipulate to the following:

   a.   State-licensed, uniformed security officers shall patrol the interior and exterior of the premises and all associated parking areas during all operating hours.

   b.   The security officers shall not double in his/her duties as managers or in any other capacity other than that of security officers. The security officers shall cooperate with any law enforcement conducting official duties. The security officers shall be made completely familiar with these conditions and implement them as necessary.

   c.   The security officers shall possess two-way communication devices so that they are in constant communication with one another. The security officers shall ensure no loitering occurs at the entrance or in any other location under the control of the applicant. Security officers shall be responsible for requesting individuals loitering to leave the area.

   d.   The security officers shall be employees of an independent security guard state-licensed company in good standing with the Department of Consumer Affairs. The security officers shall possess their permanent guard card permit at all times with photo identification and present them to law enforcement personnel upon request.

   e.   The security officer shall maintain a daily security log. They shall document each incident involving illegal activity or unusual observation(s) in the club, parking areas or on roving patrol and shall state how the incident(s) occurred. The logbook shall be produced when requested by law enforcement personnel.

   f.   Immediately terminate from service any security officer arrested for selling, possessing, storing, serving, keeping, using, manufacturing or giving away any controlled substance.

   g.   The operator shall not hire supervisory staff that has been convicted of a felony in the last five years.

   h.   The applicant shall contact the Vice Division quarterly to meet and discuss reports of incidents, if any, and also to discuss concerns. A log shall be maintained at the premises regarding these meetings.

CASE NO.  ZA 1995-0830(CUB)(PA4)                                    PAGE 4

     i.    Under no circumstances shall the operator allow patrons to bring in bottles of their own beverage or provide the patrons with set-ups of glasses, mixers and ice for use with the consumption of beverages brought on the site.

13.    Exterior lights shall be installed such that the lights are directed onto the subject site and shielded to prevent the light source from being viewed by adjacent residential uses. Lighting shall be adequate so as to render objects or persons clearly visible.

14.    All areas adjacent to the site over which the applicant has control and parking areas utilized shall be maintained free of litter.  Litter shall be removed before, during and after each event.

15.    **MODIFIED:** During the hours when the nightclub is in operation until one hour after closing, a minimum of 400 150 off-site parking spaces shall be provided at 724 South Main Street within reasonable proximity of the subject site.  Valet services shall be provided during the hours of operation and valet service shall operate from the front entrance to the club with service through the time of closing. A copy of a valid agreement with the valet operator indicating the location and number of off-site parking spaces shall be submitted for the case file.

16.    **DELETED:** The applicant shall annually provide a copy of a one year lease to the file for the 78 parking spaces required showing that such parking is available from opening until closing of the nightclub.

17.    All advertising (whether written or oral) of the nightclub shall include specific reference to the fact that valet parking is available.

18.    The applicant shall post a sign at its entrance indicating the availability of valet parking.

19.    When the 4th floor V-VIP area is in use, the VIP area on the 2nd floor (698 square foot "Green Room") shall be closed thereby not "adding" square footage or adding to the occupancy limit.

20.    Any public telephones on the property shall be located within the building where employees and management of the facility can readily monitor them.

21.    A 24-hour "hotline" telephone number for receipt of complaints from the community regarding the subject operation shall be distributed to the surrounding owners and occupants of all residential and commercial property and shall be posted on the site near the entrance of the facility and at the reception area. The sign shall include the name and phone number of the responsible person who shall respond within 24 hours. A log shall be maintained to record community complaints. The log shall be maintained on the premises and made available to Vice Division upon request.

0034

22.   No alteration shall be made to the building facade pursuant to ZAI 145 (I-1000).
      Any sign placed on the facade for purposes of identifying the club is subject to
      approval by the Cultural Heritage Commission or the Department of City
      Planning, Office of Historic Resources.

      **DELETE**:   The project shall be reviewed by the Redevelopment Agency for
      compliance with the Redevelopment plans. (Note: second condition no. 22 is a
      typographical numbering error).

23.   These Conditions of Approval shall be retained on the property at all times and
      shall be produced immediately upon the request of the Police Department.

24.   The applicant shall secure a City permit decal denoting approval of alcoholic
      beverage sales and/or dancing from a Planning Department public counter
      subsequent to the Zoning Administrator's signature on the Planning Department
      sign-off form and mount it on either the inside of the window of the subject site
      facing the front street or on the outside of the building (if inside mounting is not
      possible). The decal shall be visible at all times and mounted before the
      privileges granted herein are utilized.

25.   Within six months of the effective date of this determination, all personnel serving
      or dispensing alcohol and acting in the capacity of a manager of the premises
      shall attend a Standardized Training for Alcohol Retailers (STAR) session
      sponsored by the Los Angeles Police Department. All employees who serve
      alcoholic beverages shall attend initial or follow-up STAR classes every 24
      months. The business operator shall submit to the Zoning Administrator evidence
      from the Police Department that such training was completed within 30 days of
      the training event. All new employees, acting in the same capacity as above
      hired after the approval of this grant shall adhere to this requirement.

26.   Any music, sound or noise emitted from the subject business shall comply with
      the noise regulations in the Los Angeles Municipal Code. All outside personnel
      associated with music performance and/or acoustical sound shall be apprised of
      the City=s noise regulations and required to comply.

27.   The operator shall abide by all laws and manage the premises with due diligence
      to discourage narcotics and gang-related criminal activity. Immediately inform the
      LAPD if any person is observed engaged in narcotics or gang-related criminal
      activity on the premises.

28.   The business operator shall not permit any employee to solicit in or upon the
      licensed premises, the purchase or sale of any beverage, any part of which is
      intended for the consumption or use of such employee or to permit any
      employee. Additionally, any person(s) employed by the operator as a waitress or
      hostess (s) shall not be allowed to sit with patrons of the establishment.

29.   There shall be no patron or employee dancing or entertainment involving 12.70
      Adult Entertainment@ use, including nude or obscene presentations.

0035

CASE NO.  ZA 1995-0830(CUB)(PA4)                                    PAGE 6

30.     The sale of alcoholic beverages for consumption off the premises is prohibited.
        No alcoholic beverages shall be consumed on any property adjacent to the
        licensed premises under the control of the licensee.

31.     The business shall establish a designated driver program that may include signs
        on each table and bar alerting patrons of the program, or post signs in prominent
        locations.

32.     **MODIFIED:** The facility shall provide free hot coffee ~~between the hours of 12
        midnight and 1:30 a.m.~~ beginning two hours prior to closing time until closing
        time to any person who requests it. Coffee signs shall be 12 inches by 16 inches
        in size and shall be placed behind all bars or in other prominent places, notifying
        customers that free coffee is available.

33.     Patrons shall not be allowed to enter the location without identification.

34.     There shall be no re-admittance to the venue.

35.     Electronic age verification devices which can be used to determine the age of
        any individual attempting to purchase alcoholic beverages or tobacco products
        shall be provided at each point-of-sale location. This device(s) shall be
        maintained in an operational condition and all employees shall be instructed in
        their use prior to the sale of any alcoholic beverage or tobacco product.

36.     A "No loitering or Public Drinking" shall be posted beside the front doors. The
        signs shall be in English and Spanish.

37.     No coin operated electronic, video or mechanical game machines nor billiard
        tables are permitted on the premises.

38.     There shall be no pay phones on the exterior of the property.

39.     The operator shall install and maintain surveillance cameras in all areas of the
        site, including entrances and exits. A minimum of four weeks worth of video
        coverage shall be maintained, of all common areas of the business. The footage
        shall be made available to the Police Department upon request.

40.     The business operator of the premises shall maintain on the premises, and
        present upon request to any law enforcement officer, a copy of the Business
        Permit, Insurance information and a valid emergency contact phone number for
        any valet or security service used by the business.

41.     Loitering is prohibited on or around the premises or the area under the control of
        the applicant.

42.     A manager shall be on-site at all times when the facility is operational.

43.   No employee or agent shall be permitted to accept money or any other thing of value from a customer for the purposes of sitting or otherwise spending time with customers while in the premises, nor shall the licensee provide, permit or make available, either gratuitously or for compensation, male or female patrons who act as escorts, companions or guest of and for the customer.

44.   The petitioner shall maintain a security log of events, incidents, and evictions. This log shall be maintained in the office on the premises at all times and shall be immediately produced upon request of any Los Angeles Police Officer.

45.   VIP Rooms

   a.   Door to said rooms shall be constructed of clear glass.

   b.   For each room, there shall be a 24-inch wide by 6-foot high clear glass sidelight. At no time shall these sidelight windows be obscured so as to prevent a clear view of any occupants of the room.

   c.   The rooms shall be equipped with sufficient lighting to illuminate and make easily discernable the appearance and activities of all persons in the booth at all times.

   d.   There shall be no "dimmer" type lighting controls on the interior of said rooms.

   e.   No obstructions shall be attached, fastened or connected to the glass doors or windows in rooms.

   f.   Door to said rooms will remain unlocked and shall not have any form of locking mechanism attached to the door.

46.   **MODIFIED:**  ~~Within one year of the effective date of this action, the applicant shall file a Plan Approval application and associated fees pursuant to Section 19.01-I of the Los Angeles Municipal Code at the Planning Department Public Counter. A public hearing shall be conducted with notification of all owners and occupants of property within a 500-foot radius. The purpose of the plan approval will be to review the effectiveness of , and compliance with the express terms of the Conditions of this grant. Upon review of the effectiveness of and compliance with the conditions, the Zoning Administrator may modify such conditions, delete or add new ones as appropriate and require a subsequent plan approval, as necessary~~.

   Any future operator or owner must file a new Plan Approval application and associated fees pursuant to Section 19.01-I of the Los Angeles Municipal Code at the Planning Department Public Counter. A public hearing shall be conducted with notification of all owners and occupants of property within a 500 foot radius.

CASE NO.  ZA 1995-0830(CUB)(PA4)                              PAGE 8

47.  **MODIFIED:** The term of the grant shall be limited to a maximum of ~~3~~ 10 years
     <u>from the effective date of the instant grant</u>.  ~~and may not be extended under the~~
     ~~provisions of the code for time extensions~~. Thereafter, a new ~~Conditional Use~~
     <u>authorization</u> is required to continue the use.

48.  Within 60 days of the effective date of this action, a covenant acknowledging and
     agreeing to comply with all the terms and conditions established herein shall be
     recorded in the County Recorder=s Office. The agreement (standard master
     covenant and agreement form CP-6770) shall run with the land and shall be
     binding on any subsequent owners, heirs or assigns.  The agreement with the
     conditions attached must be submitted to the Zoning Administrator for approval
     before being recorded. After recordation, a certified copy bearing the Recorder=s
     number and date shall be provided to the Zoning Administrator for attachment to
     the subject case file.

**Conditions Nos. 49 a through f are alcoholic beverage specific conditions
previously volunteered by the applicant and shall be complied with and condition
49 e was volunteered by the applicant in connection with the instant grant:**

49.  **MODIFIED:** VOLUNTEERED CONDITIONS

     a.  There shall be no signs on the exterior advertising the sale of alcohol.

     b.  **DELETED:** ~~There shall be no "Happy Hour" or reduced price drinks~~
         ~~allowed including, but not limited to, time periods during which patrons~~
         ~~may purchase alcoholic beverages at a discounted price.~~

     c.  There shall be no minimum drink requirement for patrons.

     d.  The premises shall not be maintained nor operated as a private club.

     e.  All employees shall become familiar with these conditions as well as
         conditions attached to other permits and licenses. A copy of all conditions
         shall be provided to each and every employee.

     f.  The premises shall not operate as a hostess dance club, nor karaoke
         music studio.

     g.  The operator shall not allow "Promotional Nights." Promotional nights
         include, but are not limited to time periods during which female patrons
         may purchase beverages at a discount price encouraging patrons to come
         to the premises for alcoholic beverages after an entertainment event at
         another location, selling certain brands and/or types of beverages at a
         discounted price to bring attention to these brands and/or beverages.

     h.  **NEW:** <u>Hours of alcoholic beverage sales shall be limited from 11:00 a.m.</u>
         <u>to 2:00 a.m.</u>

CASE NO.  ZA 1995-0830(CUB)(PA4)                                    PAGE 9

## OBSERVANCE OF CONDITIONS - TIME LIMIT - LAPSE OF PRIVILEGES - TIME EXTENSION

All terms and Conditions of the approval shall be fulfilled before the use may be established.  The instant authorization is further conditional upon the privileges being utilized within three years after the effective date of approval and, if such privileges are not utilized or substantial physical construction work is not begun within said time and carried on diligently to completion, the authorization shall terminate and become void.

## TRANSFERABILITY

This authorization runs with the land.  In the event the property is to be sold, leased, rented or occupied by any person or corporation other than yourself, it is incumbent that you advise them regarding the conditions of this grant.

## VIOLATIONS OF THESE CONDITIONS, A MISDEMEANOR

Section 12.29 of the Los Angeles Municipal Code provides:

> "A variance, conditional use, adjustment, public benefit or other quasi-judicial approval, or any conditional approval granted by the Director, pursuant to the authority of this chapter shall become effective upon utilization of any portion of the privilege, and the owner and applicant shall immediately comply with its Conditions. The violation of any valid Condition imposed by the Director, Zoning Administrator, Area Planning Commission, City Planning Commission or City Council in connection with the granting of any action taken pursuant to the authority of this chapter shall constitute a violation of this chapter and shall be subject to the same penalties as any other violation of this Code."

Every violation of this determination is punishable as a misdemeanor and shall be punishable by a fine of not more than $1,000 or by imprisonment in the county jail for a period of not more than six months, or by both such fine and imprisonment.

## APPEAL PERIOD - EFFECTIVE DATE

The applicant's attention is called to the fact that this grant is not a permit or license and that any permits and licenses required by law must be obtained from the proper public agency.  Furthermore, if any Condition of this grant is violated or if the same be not complied with, then the applicant or his successor in interest may be prosecuted for violating these Conditions the same as for any violation of the requirements contained in the Municipal Code.   The Zoning Administrator's determination in this matter will become effective after March 12, 2013 unless an appeal there from is filed with the City Planning Department.  It is strongly advised that appeals be filed early during the appeal period and in person so that imperfections/incompleteness may be corrected before the appeal period expires.  Any appeal must be filed on the prescribed forms, accompanied by the required fee, a copy of the Zoning Administrator's action, and received and receipted at a public office of the Department of City Planning on or before the above date or the appeal will not be accepted.  **Forms are also available on-line at**

0039

CASE NO.  ZA 1995-0830(CUB)(PA4)                                PAGE 10

**http://planning.lacity.org.**  Public offices are located at:

| | |
|---|---|
| Figueroa Plaza | Marvin Braude San Fernando |
| 201 North Figueroa Street, |   Valley Constituent Service Center |
|   4th Floor | 6262 Van Nuys Boulevard, Room 251 |
| Los Angeles, CA  90012 | Van Nuys, CA  91401 |
| (213) 482-7077 | (818) 374-5050 |

If you seek judicial review of any decision of the City pursuant to California Code of Civil
Procedure Section 1094.5, the petition for writ of mandate pursuant to that section must
be filed no later than the 90th day following the date on which the City's decision
became final pursuant to California Code of Civil Procedure Section 1094.6.  There may
be other time limits, which also affect your ability to seek judicial review.

## NOTICE

The applicant is further advised that all subsequent contact with this office regarding this
determination must be with the Zoning Administrator who acted on the case.  This
would include clarification, verification of condition compliance and plans or building
permit applications, etc., and shall be accomplished **BY APPOINTMENT ONLY**, in
order to assure that you receive service with a minimum amount of waiting.  You should
advise any consultant representing you of this requirement as well.

## FINDINGS OF FACT

After thorough consideration of the statements contained in the application, the plans
submitted therewith, the report of the Zoning Analyst thereon, the statements made at
the public hearing on January 30, 2013, all of which are by reference made a part
hereof, as well as knowledge of the property and surrounding district, I find that the
requirements for authorizing a conditional use plan approval under the provisions of
Section 12.24-M have been established by the following facts:

## BACKGROUND

The subject property is a level, rectangular-shaped, interior, record lot consisting of
11,344 square feet of lot area with 79.76 linear feet of frontage on the east side of
Spring Street.  The lot depth varies from 137.75 to 142 feet.

The property is improved with a 12-story, commercial building, with basement, and
containing 69,844 square feet of floor area.  The building constructed in the 1930's and
has no on-site parking.  Pedestrian access to the building is via the front doors on
Spring Street or through the rear doors located off of Harlem Place, the north/south
alley running along the east side of the property.

"Versus" is the lessee of floors 1 through 4 which have been remodeled to
accommodate the nightclub venue.  These floors were originally constructed in the
1930's as the trading floor of the Los Angeles Stock Exchange.  This area was first
converted to the nightclub use in 1986 by an operator unrelated to the subject applicant.

Floors 5 through 12 contain commercial office space which has been vacant for at least the last 20 years.

Properties to the north are classified in the C2-4D Zone and developed with a 17-story commercial office building currently under renovation to be used as residential, and other commercial, residential, and mixed-use multi-story buildings.

Properties to the east, across Harlem Place, a 20-foot-wide alley, classified in the C2-4D Zone and are developed with a large surface parking lot that fronts onto Main Street.

Properties to the south are classified in the C2-4D Zone and developed with a six-story residential building, other commercial office and residential buildings and a surface parking lot.

Properties to the west are classified in the C5-4D Zone and developed with a 12-story residential building, a surface parking lot, and a 525-unit low income hotel.

Spring Street, adjoining the property to the west, is a designated one-way southbound Secondary Highway dedicated to a variable width of 80 to 83 feet and is improved.

Harlem Place, adjoining the property to the east, is a through alley improved with asphalt pavement and concrete gutter within a 20-foot dedication.

**Previous zoning related actions on the site include:**

Case No. ZA 95-0830(CUB)(PA3) - On November 2, 2009, the Zoning Administrator approved Plans to permit the continued on-site sale of a full line of alcohol in a nightclub.

Case No. DIR 2005-0174(RV) - On December 12, 2005, the Zoning Administrator issued a second Letter of Correction amending Condition No. 12.

Case No. DIR 2005-0174(RV) - On November 22, 2005, the Zoning Administrator issued a Letter of Correction amending Condition Nos. 12, 14b, and deleting Condition No. 14m.

Case No. DIR 2005-0174(RV) - On October 20, 2005, the Zoning Administrator found that the subject nightclub constituted a nuisance and amended the conditions of previous approvals resulting in corrective conditions of the RV case.

Building and Safety Order to Comply - Issued September 13, 2005, to owner for failure to comply with regulations of the Los Angeles Municipal Code and ordering owner to abate electrical violations on second and third floor. A compliance inspection was conducted on November 20, 2004 and the electrical violations had been abated. The Order to Comply was closed on November 30, 2004.

Case No. ZA 95-0830(CUB)(PAB)(PA2)-A1 - On June 10, 2003, the Central Area Planning Commission issued its determination, granting the appeal, overturned the

0041

action of the Zoning Administrator and granted the Plan Approval for extended hours,
modifying the prior conditions.

Case No. ZA 95-0830(CUB)(PAB)(PA2) - On February 21, 2003, the Zoning
Administrator denied applicant's request for Approval of Plans, to modify Condition No.
8 of the underlying Case No. ZA 95-0830(CUB)(PAB)(approved March 15, 2002 by the
Zoning Administrator and on appeal by the Central Area Planning Commission effective
July 24, 2002) to allow the hours of operation of a nightclub to be extended to 6 a.m. for
Friday and Saturday only, from the 2 a.m. closing hour established by Condition No. 8.

Case No. ZA 95-0830(CUB)(PAB)-A1 - On July 24, 2002, the Central Area Planning
Commission issued a determination granting an appeal, sustained the Zoning
Administrator and modified the conditions.

Case No. ZA 95-0830(CUB)(PAB) - On March 15, 2002, the Zoning Administrator
approved a request for Approval of Plans, as required by Condition No. 10, to continue
the sale of alcoholic beverages for on-site consumption.

Case No. ZA 95-0830(CUB)(PAB) - On January 27, 2000, the Zoning Administrator
approved a request for Approval of Plans, as required by Condition No. 10 of the
underlying case to continue the sale of alcoholic beverages for on-site consumption.

Case No. ZA 88-0964(ZV) – On November 9, 1988, the Zoning Administrator approved
a zone variance to permit 78 leased, off-site parking spaces on an adjoining easterly
surface parking lot (known as Joe's Auto Parks), not guaranteed by recorded
agreement, to serve the proposed nightclub facility, located at 618 South Spring Street.
The grant was for three years.  Condition No. 8 indicates that after the applicant has
operated the nightclub for 18 months, a plan approval request shall be filed with the
Planning Department for Zoning Administrator review of compliance with required
conditions including the availability of off-site parking.

Building and Safety Board File - Dated June 2, 1988, a request to permit the use of the
basement, second, third and fourth floors of a Type 1 construction, 11-story building as
an A2.1 occupancy nightclub/dance hall/restaurant without a Certificate of Occupancy
which was withheld.  The Building and Safety Commission denied the request however,
approved the temporary use of the basement, second, third, and fourth floors without a
Certificate of Occupancy subject to several conditions (several of the conditions were
Fire Department conditions, attached to the Board File document); also included was
the failure to correct non-approved conditions from the Department of Building and
Safety Correction Notices No. H74211, H80554 dated March 4, 1988; and June 1,
1988; failure to comply with handicap accessibility, failure to provide off-street parking
and failure to comply with Fire/Life Safety Violation Order Nos. 03567 and 035671 from
the Los Angeles Fire Department dated June 1, 1988 which address improper operating
automatic sprinklers/automatic alarm and fire warning system; omission of approved
assemblies at their shaft penetrations; inoperable elevators; and omission of shaft
enclosures at vertical openings through floors.  An additional hearing was scheduled for
August 2, 1988.

Building and Safety Board File - Approved July 23, 1987, to allow the owner of the subject building to obtain a Building Permit for a change of occupancy from offices to a nightclub on the second, third and fourth floors, and to obtain a temporary Certificate of Occupancy prior to providing a conforming off-site parking affidavit.

Case No. ZA 86-0901(CUB)(CUX) - On October 1, 1986 the Zoning Administrator approved a conditional use to permit the sale and dispensing of alcoholic beverages for on-site consumption in conjunction with a proposed nightclub facility with dancing accommodating approximately 1,100 patrons and having the hours of operation from 4 p.m. to 2 a.m.

## Previous Cases, Affidavits, Permits, and Orders on Surrounding Properties:

Case No. ZA 2012-2294(CUB) – On December 10, 2012, the Zoning Administrator approved a Conditional Use to allow the sale and dispensing of a full line of alcoholic beverages for on-site consumption in conjunction with a new bar in the C2-2D Zone and located at 656 South Main Street.

Case No ZA 2012-967(CUB) – On August 21, 2012, the Zoning Administrator approved two Conditional Uses to allow the on-sale and dispensing of a full-line of alcoholic beverages and live entertainment in conjunction with an existing 1,932 square-foot bar located at 626 South Spring Street.

Case No. ZA 2009-1069(CUB) – On April 6, 2012, the Chief Zoning Administrator terminated the above case due to the applicant's inactivity.

Case No. ZA 2011-2547(CUB) – On February 24, 2012, the Zoning Administrator approved a Conditional Use to allow the sale and dispensing of beer and wine for on-site consumption, in conjunction with an existing 1,371 square-foot cafe, "Coffee Bar", in the C2-4D Zone located at 600 South Spring Street, R-1

Case No ZA 2011-2123(CUB)(CUX) – On January 18, 2012, the Zoning Administrator approved a Conditional Use to allow the sale and dispensing of a full-line of alcoholic beverages for on-site consumption in conjunction with the operation of a proposed two-story, approximately 13,146 square foot restaurant and bar within an existing two-story commercial with operating hours between the hours of 11 :00 a.m. to 2:00 a.m. daily within the [Q]C5-4D-CDO Zone and located at 618 South Broadway.

Case No. ZA 2010-3384(CUB)(CUX) – On April 13, 2011, the Zoning Administrator approved Conditional Uses to allow live entertainment, patron dancing and the sale and dispensing of a full-line of alcoholic beverages for on-site consumption and beer and wine for off-site consumption in conjunction with the expansion of an existing restaurant for a total of 45,000 square feet of floor area on five floors in the [Q]C5-4D-CDO Zone and located at 648-654 South Broadway.

Case No. ZA 2009-3928(CUB)(CUX) – On March 8, 2011, the Zoning Administrator approved a Conditional Use to allow the sale and dispensing of a full line of alcoholic beverages for on-site consumption with patron dancing and live entertainment in the C2-4D Zone and located at 650 South Spring Street.

Case No. ZA 2010-2511(CUB) – On December 7, 2010, the Zoning Administrator approved a Conditional Use to allow the sale and dispensing of full line of alcoholic beverages for on-site consumption in conjunction with a 2,015 square-foot bar-lounge in the [Q]C5-4D-CDO Zone and located at 221 West 7th Street.

Case No. ZA 2009-1889(CUB) – On October 6, 2009, the Zoning Administrator approved a Conditional Use to allow the sale and dispensing of a full line of alcoholic beverages for on-site consumption in conjunction with a bar with live entertainment in the C2-4D Zone located at 626 South Spring Street, Unit A.

Case No. ZA 2007-5442(CUB) – On August 12, 2009, the Zoning Administrator approved a Conditional Use to permit the sale and dispensing of a full line of alcoholic beverages for on-site consumption, live entertainment and public dancing, in conjunction with a proposed approximately 40,000 square-foot restaurant and bar within the ground floor, mezzanine and split level basement of an existing 13-story building in the C2-4D Zone and located at 650 South Spring Street.

Case No. ZA 2008-2225(CUB) – On March 18, 2009, the Zoning Administrator approved a Conditional Use to allow the sale and dispensing of beer and wine for on-site consumption in conjunction with a restaurant in the C2-4D Zone and located at 640-642 South Main Street.

Case No. ZA 2006-385(CUB)(CUX)1A – On May 18, 2008, the Central Area Planning Commission granted the appeal and approved a Conditional Use to allow the sale of alcoholic beverage sales and dancing locations within the subject premises and to exempt the five stand alone venues associated with the theater from further Plan Approval review for locations in the C5-4D Zone and located at 615 South Broadway.

Case No. ZA 2005-7016(CUB)(CUX) – On November 7, 2007, the Central Area Planning Commission overturned the Zoning Administrator's denial and approved Conditional Uses to permit the sale and dispensing for consideration of: a full line of alcoholic beverages for on-site consumption as a use accessory to a 6,634 square-foot restaurant with 202 seats at 101 East 6th Street; a full line of alcoholic beverages as a use accessory to a 5,499 square-foot restaurant with 126 seats (10 of which are on the sidewalk) at 129-131 East 6th Street; beer and wine for off-site consumption at 129-131 East 6th Street; a full line of alcoholic beverages for on-site consumption at a 3,627 square-foot bar with public dancing and live entertainment with 140 seats at 103 East 6th Street; beer and wine as a use accessory to a 1,467 square-foot restaurant with 8 seats at 117 East 6th Street; and beer and wine as a use accessory to a 1,757 square-foot restaurant with 20 seats at 119 East 6th Street, and a Conditional Use to permit public dancing in conjunction with the establishment of a bar at 103 East 6th Street.

Case No. ZA 2005-2361(CUB)(CUX)1A – On December 5, 2006, the Central Area Planning Commission granted in part the appeal and approved Conditional Uses to allow the sale and dispensing of a full line of alcoholic beverages for on-site consumption and dancing in the basement level in conjunction with a three level theater complex in the C5-4D Zone and located at 626 South Broadway.

Case No. ZA 2005-7018(CUB)(CUX) – On August 18, 2006, the Zoning Administrator approved Conditional Uses to allow the sale and dispensing of a full line of alcoholic beverages for on-site consumption, in conjunction with a proposed 2,475 square-foot

bar-lounge having 102 seats, live cafe entertainment and public patron dancing located at 110 East 6th Street, and allow the sale and dispensing of beer and wine for on-site consumption, in conjunction with a proposed 3,225 square-foot cafe having 95 seats, live cafe entertainment and incidental patron dancing located at 126 East 6th Street in the C2-2D Zone.

Case No. ZA 2005-5628(CUB) – On December 1, 2005, the Zoning Administrator approved a Conditional Use for the sale and dispensing of a full line of alcoholic beverages for on-site consumption, in conjunction with a proposed restaurant and bar in the C2-4 Zone located at 626 South Spring Street.

The Central City Community Plan designates the property for Regional Center Commercial land uses with corresponding zones of C2, C4, C5, P, and PB, and Height District No. 4D.

The subject site is located within the Downtown Adaptive Reuse Incentive Area and the City Center Redevelopment Project Area.  Additionally, the building is identified as Historic Cultural Monument #205 and is located within the National Register designated Spring Street Financial District.

Spring Street, adjoining the property to the west, is a designated one-way southbound Modified Secondary Highway dedicated to a variable width of 80 to 83 feet and is improved.

Harlem Place, adjoining the property to the east, is a through alley improved with asphalt pavement and concrete gutter within a 20-foot dedication.

Correspondences

Letters of support for the project were received from the Downtown Los Angeles Neighborhood Council, Council District 14, and State Senator Kevin De Leon (D-22).

Public Hearing

The public hearing was held on January 30, 2013 at City Hall.  The hearing was attended by the applicant's representative, the operator of the nightclub, the representative of the Council District No. 14, a representative of the Los Angeles Police Department and members of the public.

Elizabeth Peterson, the applicant's representative, made the following statements in support of the request:

- Plan Approval to extend the term of the grant and modify certain existing conditions to accommodate an expanded range of events. Current operator has been in operation since 2009;
- Specifically requested are modifications to the hours of operation, occupancy load, allowance of all ages events, and modification of parking requirements (reduced from 400 to 200)
- Alcohol will be limited to an over 21 area.

0045

CASE NO.  ZA 1995-0830(CUB)(PA4)                                    PAGE 16

- Capacity will be determined by the Los Angeles Fire Department
- New hours of operation will allow for greater range of events
- Modify security requirement. Provide 6-12 security guards, many of which art off-duty LAPD officers. They monitor the street door (along Spring Street) and keep the sidewalks clear. With extended hours of operation, club is not letting our mass amounts of people at 2:00 a.m.
- Have support from the Downtown Los Angeles Neighborhood Council and support from local business owners

Officer Maria Crescenzo of the Los Angeles Police Department made the following statements in regards to the request;

- Concerned with 6:00 a.m. closing due to deployment issues. Will continue to meet with the applicant.
-

General Jeff, Downtown Los Angeles Neighborhood Council made the following statements in support to the request:

- Speaking as individual and not board member
- Current operation is first class operation
- With new proposal, venue can capitalize on events related to Grammy Awards and others big awards shows held downtown

Eric Schomof, made the following statements in support of the request;

- In support of proposal.  The block is densely populated with great jobs and can support later hours of operation

Kai Change, local resident made the following statements in support of the request:

- Supports request
- Has lived in the neighborhood for four years. Operation has been profession and has the support of the community.

Adi McAblan, the applicant made the following statements in support of the request:

- 6:00 a.m. closing time is part of strategy to expand range of events and will have no strain police resources;
- No vacancies in surrounding buildings
- Goal is to have world class talent and revenue from non alcohol sales in order to grow the business

The Zoning Administrator took the case under advisement to receive comments from LAPD regarding the extended hours of operation to 6:00 am for 104 events per year.

CASE NO.  ZA 1995-0830(CUB)(PA4)                                    PAGE 17

## AUTHORITY FOR PLAN APPROVAL

Section 12.24-M of the Los Angeles Municipal Code provides in part:

"M." Development, Change or Discontinuance of Uses:

1. Development of Site.  On any lot or portion thereof on which a conditional
   use is permitted pursuant to the provisions of this section, new buildings or
   structures may be erected, enlargements may be made to existing buildings,
   existing uses may be extended on an approved site, and existing institutions
   or school developments may be expanded as permitted in Subsection L of
   this Section, provided plans therefore are submitted to and approved by the
   Commission or by a Zoning Administrator, whichever has jurisdiction at that
   time.

## BASIS FOR CONDITIONAL USE PERMITS

A particular type of development is subject to the conditional use plan approval process
because it has been determined that such use of property should not be permitted by
right in a particular zone.  All uses requiring a conditional use permit from the Zoning
Administrator are located within Section 12.24-W of the Los Angeles Municipal Code.
In order for the sale of beer and wine for on-site consumption to be authorized, certain
designated findings have to be made.   In these cases, there are additional findings in
lieu of the four standard findings for most other conditional use categories.

## MANDATED FINDINGS

Following (highlighted) is a delineation of the findings and the application of the relevant
facts to same:

1. **The project will enhance the built environment in the surrounding
   neighborhood or will perform a function or provide a service that is
   essential or beneficial to the community, city, or region.**

   The applicant has requested an approval of plans to permit modifications to
   existing conditions of approval in order to expand hours of operation and to allow
   the venue's maximum occupancy to be based on the Fire Department's
   standards in lieu of the maximum 934 patrons permitted in order to appeal to a
   broader market  and to accommodate a wider range of events for the existing
   nightclub. The granting of an approval of plans for the continued sale of alcoholic
   beverages in conjunction with the existing nightclub will provide for expanded
   nightlife within the Central City area of the city.  The Community Plan encourages
   a mix of uses resulting in an active, 24-hour downtown environment and the
   proposed request is consistent with on-going revitalization efforts in the historic
   core. The grant permits the continued use and preservation of a historic structure
   in downtown.  The request does not involve any increase in floor area or any
   physical alteration to the existing club. The operation of the facility with the hours
   and capacity proposed and approved herein, will allow the nightclub to continue

0047

to serve their existing clientele while expanding range of events that will cater to the surrounding residents and well as those who are visiting the downtown Los Angeles area.

2.    **The project's location, size, height, operations and other significant features will be compatible with and will not adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, and safety.**

The subject property is a level, rectangular-shaped, interior, record lot consisting of 11,344 square feet of lot area with 79.76 linear feet of frontage on the east side of Spring Street.  The lot depth varies from 137.75 to 142 feet.

The property is improved with a 12-story, commercial building, with basement, and containing 69,844 square feet of floor area.  The building constructed in the 1930's and has no on-site parking.  Pedestrian access to the building is via the front doors on Spring Street or through the rear doors located off of Harlem Place, the north/south alley running along the east side of the property.

"Versus" is the lessee of floors 1 through 4 which have been remodeled to accommodate the nightclub venue.  These floors were originally constructed in the 1930's as the trading floor of the Los Angeles Stock Exchange.  This area was first converted to the nightclub use in 1986 by an operator unrelated to the subject applicant.  Floors 5 through 12 contain commercial office space which has been vacant for at least the last 20 years.

The grant authorized herein incorporates a number of conditions which have been imposed upon the use as well as many which have been volunteered by the applicant to ensure the venue operates with due regard to surrounding uses. The current operator has a good track record and has managed the venue responsibly.  While LAPD expressed concerns about expanding after hours use due to limited available resources and LAPD shifts that coincide with the proposed 6 a.m. closing time, the venue will not operate until 6 a.m. 365 days a year but is restricted to a maximum of 104 days per calendar year to operate until 6 a.m. The site is not located in close proximity to other venues that maintain after hours until 6 a.m. such that deployment at closing time should not result in any problems with crowd control or congestion.  Residents who live adjacent to the premises and on the same street testified the applicant is a good neighbor and supported the applicant's request.  The conditions of operation will continue to make the use more compatible with other uses in the surrounding community. A number of conditions address and continue to require adequate off-site parking and valet service.  The applicant indicates that the venue does not generate parking demand for the 400 parking spaces previously required and this requirement has been reduce to 150 spaces.   There was no testimony or evidence presented indicating the parking has been a problem and there are adequate public parking lots and garages in the area available to serve the venu. In addition, security personnel is maintained on the premises and the hours of alcohol sales are limited from 11 a.m. to 2 a.m.

In view of the applicant's good track record, the subject grant is authorized for a term of ten years, after which time the applicant will have to request a new authorization for the continue the sales of alcohol and operation of the nightclub. Additionally, a Plan Approval will be required for any new operator or owner. Thus, as continued operation of the nightclub at this location is not anticipated to adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare and safety.

3.   **The project substantially conforms with the purpose, intent and provisions of the General Plan, the applicable community plan, and any applicable specific plan.**

The Central City Community Plan designates the property for Regional Center Commercial land uses with corresponding zones of C2, C4, C5, P, and PB, and Height District No. 4D.  The plan includes the following relevant policies:

**Policy 1-1.1** "Maintain zoning standards that clearly promote housing and limit ancillary commercial to that which meets the needs of neighborhood residents or is compatible with residential uses."

**Policy 2-1.2** "To maintain a safe, clean, attractive, and lively environment."

**Objective 2-3** "To promote land uses in Central City that will address the needs of all the visitors to Downtown for business, conventions, trade shows, and tourism."

**Objective 2-4** "To encourage a mix of uses which create an active, 24-hour downtown environment for current residents and which would also foster increased tourism."

Conditions have been imposed designed to address potential impacts on the surrounding uses including residential uses.  Although the property has been the site of numerous nightclubs, the area surrounding includes many new residential units.  The approval herein, with the conditions imposed will be consistent with the various policies and objectives of the plan in that it provides for entertainment uses; will contribute to an active downtown and will contribute to a more lively environment. However, strict compliance with the conditions and an operation sensitive to the needs of the surrounding residential units is essential.

4.   **The proposed use will not adversely affect the welfare of the pertinent community.**

The granting of an approval of plans for the operation of the proposed nightclub will provide for expanded nightlife within the Central City area of the city.  The plan encourages a number of venues designed to create a mix of uses resulting in an active, 24-hour downtown environment. The use of the structure will result in the renovation and re-use of a significant structure in downtown. While the structure is part of the downtown fabric, the surrounding uses have been

converted to or resulted in the development of new residential uses. The operation of the facility with the hours proposed and approved herein, without substantial protective conditions, would not be compatible. Therefore a number of conditions are imposed including conditions addressing, parking, noise, occupancy, and security.

**5. The granting of the application will not result in an undue concentration of premises for the sale or dispensing for consideration of alcoholic beverages, including beer and wine, in the area of the City involved, giving consideration to applicable State laws and to the California Department of Alcoholic Beverage Control's guidelines for undue concentration; and also giving consideration to the number and proximity of these establishments within a one thousand foot radius of the site, the crime rate in the area (especially those crimes involving public drunkenness, the illegal sale or use of narcotics, drugs or alcohol, disturbing the peace and disorderly conduct), and whether revocation or nuisance proceedings have been initiated for any use in the area.**

According to the State of California Department of Alcoholic Beverage Control (ABC) licensing criteria, 3 on-sale and 2 off-sale licenses are allocated to subject Census Tract No. 2073.02. There are currently thirty-nine (39) existing licenses for the sale of alcohol within the census tract. There are thirty-one (31) active licenses for sale of alcohol for on-site consumption, five (5) active licenses for sale of alcohol for off-site consumption, one (1) license for on-site sales related to Theaters, and two (2) surrendered licenses.

Within a 1,000-foot radius of the subject property, the following types of alcoholic beverage licenses are active or pending:

(2)          Type 20 – Off-Sale – Beer and Wine
(2)          Type 21 – Off-Sale – General
(0)          Type 40 – On-Sale – Beer
(5)          Type 41 – On-Sale – Beer and Wine – Eating Place
(1)          Type 42 – On-Sale – Beer and Wine – Public Premises
(7)          Type 47 – On-Sale – General – Eating Place
(7)          Type 48 – On-Sale – General – Public Premises
(1)          Type 58 – Cater Permit

The subject site is served by the Central Division of the Los Angeles Police Department (LAPD). Statistics from the LAPD reveal that in the subject Crime Reporting District No. 164 which has jurisdiction over the subject property, a total of 118 crimes (67 Part I crimes and 51 Part II crimes), were reported in 2011, and compared to the citywide average of 144 crimes and 173 crimes in the high crime reporting district for 2011. Part 1 Crimes reported by LAPD include; Rape (3), Robbery (7), Aggravated Assault (4), Burglary (11), Burglary Theft from Vehicle (11), Personal Theft (1), Automobile Theft (3) and Other Theft (27). Part II Crimes reported include, Other Assault (9), Weapons Violation (1), Sex Offences (1),

Offences against Families (1), Drugs (17), DWI related (2) and other offences (20).

The subject site is located within a census tract where the crime rate is well below the city average and there is no evidence to link the venue to any criminal or nuisance activity in the area.  On the contrary, testimony by local residents and LAPD indicate that the applicant is responsible operator and the site has not been the subject of any nuisance activity.  Moreover, the ABC license on the premises is existing and the instant action allows the continued sale of a full-line of alcoholic beverages and will not increase the number of existing ABC licenses and is not expected contribute to the area's crime rate.

6.     **The proposed use will not detrimentally affect nearby residentially zoned communities in the area of the City involved, after giving consideration to the distance of the proposed use from residential buildings, churches, schools, hospitals, public playgrounds and other similar uses, and other establishments dispensing, for sale or other consideration, alcoholic beverages, including beer and wine.**

The following sensitive uses are located within a 1,000-foot radius as stated on the applicant submitted radius map of the project site:

- Pershing Square Park (532 South Olive Street)
- Multi-family residences
- New City Church of LA (514 S. Spring Street)
- European School of Makeup (548 S. Spring Street, #109)
- Iglesia Universal Church (707 S. Broadway)
- Jardin De La Infancia (307 E. 7th Street)
- American Friends Services Committee (634 S. Spring Street, 3rd Floor)
- Seal My Prayer (635 S. Hill Street)
- Universidad Nacional Autonoma (634 S. Spring Street, #100)

The surrounding neighborhood has been and continues to be a community commercial neighborhood with a mixture of commercial, office, and residential uses. The request is supported by local residents who live adjacent to the venue and testify that the applicant is a responsible operator.  There are no parks, hospitals or public schools in the 1,000-foot radius of the site.  The conditions imposed are designed to protect the surrounding uses from adverse impacts resulting from the operation of a nightclub.  It is incumbent upon the operator to strictly comply with the conditions and operate the facility with regard for the surrounding residents and commercial uses.

**ADDITIONAL MANDATORY FINDINGS**

7.     The National Flood Insurance Program rate maps, which are a part of the Flood Hazard Management Specific Plan adopted by the City Council by Ordinance No. 172,081, have been reviewed and it has been determined that this project is located in Zone C, areas of minimal flooding.

CASE NO. ZA 1995-0830(CUB)(PA4)                                   PAGE 22

**8.**    On December 26, 2012, the project was issued a Notice of Exemption
(Subsection c, Section 2, Article II, City CEQA Guidelines), log reference ENV
2012-2006-CE, for a Categorical Exemption, Class 1, Category 22, Article III,
Section 1, City CEQA Guidelines (Sections 15300-15333, State CEQA
Guidelines). I hereby adopt that action.

I concur with the report prepared by Jordann Turner, Planning Staff for the Office of
Zoning Administration, on this application and approve same.

Jordann Turner
City Planner
(213) 978-1365

FERNANDO TOVAR
Associate Zoning Administrator

FT:JT:lmc

cc:    Councilmember Jose Huizar
  Fourteenth District
Adjoining Property Owners



ZA-95-0830(CUB)(PA4)

**CLUB VERSUS**
618 S. Spring St.
Los Angeles, CA 90014

SPRING ST.

HARLEM PL.

**ADDRESS / LEGAL INFORMATION**

SITE ADDRESS:          618 S. Spring St.
                       Los Angeles, CA 90014

PROJECT DESCRIPTION:   Plan Approval for Existing
                       Night Club

**LEGAL DESCRIPTION**

BUILDING HEIGHT:       13 Stories
LOT AREA (calculated): 11,334 Sq. Ft.
BUILDING AREA:         68,041 Sq. Ft.
APN#                   5144820018
PIN NUMBER:            127-5A211.53
ZONING:                C2-4D
CASE #:                ZA 1995-0830(CUB)(PA8)(PA2)
                       DIR 2003-0074(REV)
OCCUPANCY:             B, A-2
CONSTRUCTION TYPE:     TYPE I-A
SPRINKLERS:            Nightclub YES, Upper Floors not
                       in use NO
PARKING:               No parking on site, 76 spaces
                       provided off-site via valet.

TRACT: ORD'S SURVEY
MAP REFERENCE: M R 33-5073
BLOCK: 15
LOT: PT 9
ARB (lot c.4 reference): 2
MAP SHEET: 127-5A211

CLIENT:
AAAN ENTERTAINMENT
DBA VERSUS NIGHTLIFE
618 S. SPRING ST.
LOS ANGELES, CA 90014

DRAWING:

**Plot Plan**

DATE:        12/22/08
SHEET:

**P**

PROJECT
NORTH

SCALE

ZA 1995-830-0053
PA4



BASEMENT FLOOR

FIRST FLOOR

CLUB VERSUS

618 S. Spring St
Los Angeles, CA 90014

Basement &
1st Floor Plans

SHEET:

01

0054



CLUB VERSUS

0055



**CLUB VERSUS**



# EXHIBIT 3

Fill in this information to identify the case:

Debtor name   Hawkeye Entertainment, LLC

United States Bankruptcy Court for the:   CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)   1:19-BK-12102-MT

☐ Check if this is an
amended filing

## Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims
12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims.
List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on Schedule A/B: Assets - Real and
Personal Property (Official Form 206A/B) and on Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G). Number the entries in Parts 1 and
2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

**Part 1:   List All Creditors with PRIORITY Unsecured Claims**

1.  Do any creditors have priority unsecured claims? (See 11 U.S.C. § 507).

■ No. Go to Part 2.

☐ Yes. Go to line 2

**Part 2:   List All Creditors with NONPRIORITY Unsecured Claims**

3.  List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill
out and attach the Additional Page of Part 2.

| | | Amount of claim |
|---|---|---|
| 3.1 | Nonpriority creditor's name and mailing address<br>**Ahmed Al Goud**<br>P O Box 10211<br>Dubai, UAE<br><br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim: _<br><br>Is the claim subject to offset? ■ No  ☐ Yes | $300,000.00 |
| 3.2 | Nonpriority creditor's name and mailing address<br>**Dentons US LLP**<br>601 S Figueroa Street<br>Suite 2500<br>Los Angeles, CA 90017<br><br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim: _<br><br>Is the claim subject to offset? ■ No  ☐ Yes | $114,197.00 |
| 3.3 | Nonpriority creditor's name and mailing address<br>**Laurentiu Beada**<br>10626 Valley Spring Unit 204<br>North Hollywood, CA 91602<br><br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim: _<br><br>Is the claim subject to offset? ■ No  ☐ Yes | $175,000.00 |
| 3.4 | Nonpriority creditor's name and mailing address<br>**Rene Vardapour**<br>943 Andover Drive<br>Burbank, CA 91504<br><br>Date(s) debt was incurred _<br>Last 4 digits of account number _ | As of the petition filing date, the claim is: *Check all that apply*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>Basis for the claim: _<br><br>Is the claim subject to offset? ■ No  ☐ Yes | $145,000.00 |

| Debtor | Hawkeye Entertainment, LLC | Case number (if known) | 1:19-BK-12102-MT |
|---|---|---|---|
| | Name | | |

| | | | |
|---|---|---|---|
| 3.5 | **Nonpriority creditor's name and mailing address**<br>Robert Guichard<br>1578 35th Avenue<br>San Francisco, CA 94122 | As of the petition filing date, the claim is: *Check all that apply*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $27,000.00 |
| | Date(s) debt was incurred _<br>Last 4 digits of account number _ | Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | |
| 3.6 | **Nonpriority creditor's name and mailing address**<br>Saybian Gourmet Inc<br>14242 Ventura Blvd Suite 212<br>Sherman Oaks, CA 91423 | As of the petition filing date, the claim is: *Check all that apply*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $1,587,919.23 |
| | Date(s) debt was incurred _<br>Last 4 digits of account number _ | Basis for the claim: _<br>Is the claim subject to offset? ■ No ☐ Yes | |
| 3.7 | **Nonpriority creditor's name and mailing address**<br>Smart Capital Investments I LLC<br>304 S Kingsley Drive<br>Los Angeles, CA 90020 | As of the petition filing date, the claim is: *Check all that apply*<br>■ Contingent<br>■ Unliquidated<br>■ Disputed | Unknown |
| | Date(s) debt was incurred _<br>Last 4 digits of account number _ | Basis for the claim: Disputed Lease Defaults<br>Is the claim subject to offset? ■ No ☐ Yes | |
| 3.8 | **Nonpriority creditor's name and mailing address**<br>Smart Capital Investments II LLC<br>304 S Kingsley Drive<br>Los Angeles, CA 90020 | As of the petition filing date, the claim is: *Check all that apply*<br>■ Contingent<br>■ Unliquidated<br>■ Disputed | Unknown |
| | Date(s) debt was incurred _<br>Last 4 digits of account number _ | Basis for the claim: Disputed Lease Defaults<br>Is the claim subject to offset? ■ No ☐ Yes | |
| 3.9 | **Nonpriority creditor's name and mailing address**<br>Smart Capital Investments III LLC<br>304 S Kingsley Drive<br>Los Angeles, CA 90020 | As of the petition filing date, the claim is: *Check all that apply*<br>■ Contingent<br>■ Unliquidated<br>■ Disputed | Unknown |
| | Date(s) debt was incurred _<br>Last 4 digits of account number _ | Basis for the claim: Disputed Lease Defaults<br>Is the claim subject to offset? ■ No ☐ Yes | |
| 3.10 | **Nonpriority creditor's name and mailing address**<br>Smart Capital Investments IV LLC<br>304 S Kingsley Drive<br>Los Angeles, CA 90020 | As of the petition filing date, the claim is: *Check all that apply*<br>■ Contingent<br>■ Unliquidated<br>■ Disputed | Unknown |
| | Date(s) debt was incurred _<br>Last 4 digits of account number _ | Basis for the claim: Disputed Lease Defaults<br>Is the claim subject to offset? ■ No ☐ Yes | |
| 3.11 | **Nonpriority creditor's name and mailing address**<br>Smart Capital Investments V LLC<br>304 S Kingsley Drive<br>Los Angeles, CA 90020 | As of the petition filing date, the claim is: *Check all that apply*<br>■ Contingent<br>■ Unliquidated<br>■ Disputed | Unknown |
| | Date(s) debt was incurred _<br>Last 4 digits of account number _ | Basis for the claim: Disputed Lease Defaults<br>Is the claim subject to offset? ■ No ☐ Yes | |

0060

| Debtor | Hawkeye Entertainment, LLC | Case number (if known) | 1:19-BK-12102-MT |
|---|---|---|---|
| | Name | | |

| 3.12 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $265,000.00 |
|---|---|---|---|
| | **Social Entertainment Group**<br>**17412 Ventura Boulevard**<br>**Suite 35**<br>**Encino, CA 91316** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred _ | Basis for the claim: _ | |
| | Last 4 digits of account number _ | Is the claim subject to offset? ■ No ☐ Yes | |

## Part 3:    List Others to Be Notified About Unsecured Claims

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

   If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|

## Part 4:    Total Amounts of the Priority and Nonpriority Unsecured Claims

5. Add the amounts of priority and nonpriority unsecured claims.

| | | | Total of claim amounts | |
|---|---|---|---|---|
| 5a. Total claims from Part 1 | 5a. | $ | | 0.00 |
| 5b. Total claims from Part 2 | 5b. | + $ | | 2,614,116.23 |
| 5c. Total of Parts 1 and 2<br>Lines 5a + 5b = 5c. | 5c. | $ | | 2,614,116.23 |

# EXHIBIT 4

0062

B6F (Official Form 6F) (12/07)

In re    **Hawkeye Entertainment, LLC**                                         Case No.    **1:13-bk-16307-MT**
                                   _____
                                                    Debtor

# SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report this total also on the Statistical Summary of Certain Liabilities and Related Data.

☐   Check this box if debtor has no creditors holding unsecured claims to report on this Schedule F.

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | Husband, Wife, Joint, or Community | | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|---|
| | | H | W J C | | | | | |
| Account No. | | | | Loan | | | | |
| Ahmed Al-Goud PO Box 10211 Dubai UAE | - | | | | | | | 300,000.00 |
| Account No. | | | | Trade Debt | | | | |
| E & A Mechanical Inc 7323 Elmo St Tujunga, CA 91402 | - | | | | | | | 120,000.00 |
| Account No. | | | | Trade Debt | | | | |
| G & A Fire Protection Corp 14617 Keswick St Van Nuys, CA 91405 | - | | | | | | | 23,000.00 |
| Account No. | | | | Trade Debt | | | | |
| Jasper Watt 10310 Riverside Dr Toluca Lake, CA 91602 | - | | | | | | | 185,000.00 |
| __2__   continuation sheets attached | | | | Subtotal (Total of this page) | | | | 628,000.00 |

B6F (Official Form 6F) (12/07) - Cont.

In re   **Hawkeye Entertainment, LLC**                                          Case No.   **1:13-bk-16307-MT**
_____
                                    Debtor

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | CODEBTOR | Husband, Wife, Joint, or Community | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| Account No.<br><br>Laurentiu Badea<br>10626 Valley Spring # 204<br>North Hollywood, CA 91602 | | - | Loan | | | | 175,000.00 |
| Account No.<br><br>McKenna Long & Aldridge<br>303 Peachtree St Suite 5300<br>Atlanta, GA 30308 | | - | Legal Services | | | | 75,000.00 |
| Account No.<br><br>New Vision Horizon<br>3122 S Main St<br>Los Angeles, CA 90007 | | - | Disputed Rent | X | X | X | 945,224.00 |
| Account No.<br><br>Rene Vardapour<br>943 Andover Dr<br>Burbank, CA 91504 | | - | Loan | | | | 145,000.00 |
| Account No.<br><br>Robert Guichard<br>1578 35th Ave<br>San Francisco, CA 94122 | | - | Consulting Services | | | | 27,000.00 |

Sheet no. __1__ of __2__  sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page)     | 1,367,224.00 |

B6F (Official Form 6F) (12/07) - Cont.

In re   **Hawkeye Entertainment, LLC**                                    Case No.  **1:13-bk-16307-MT**
                                                      ,
                                    Debtor

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | Husband, Wife, Joint, or Community | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE. | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|---|
| Account No. | | | Loan/Capital Advance | | | | | |
| **Saybian Gourmet Inc**<br>**14242 Ventura Blvd 3rd Fl**<br>**Sherman Oaks, CA 91423** | - | | | | | | | **Unknown** |
| Account No. | | | | | | | | |
| | | | | | | | | |
| Account No. | | | | | | | | |
| | | | | | | | | |
| Account No. | | | | | | | | |
| | | | | | | | | |
| Account No. | | | | | | | | |

Sheet no. __2__ of __2__ sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page)    0.00

Total
(Report on Summary of Schedules)    1,995,224.00

Software Copyright (c) 1996-2013 - Best Case, LLC - www.bestcase.com                    0065

Best Case Bankruptcy

# EXHIBIT 5

**A.**    CLASS 1 - CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS OF THE HOLDERS OF
GENERAL UNSECURED CLAIMS, EXCEPT ANY CLAIMS THAT ELECT TREATMENT IN CLASS
**2.**

Class 1 consists of the Allowed Claims of the Holders of General Unsecured Claims, except those
that elect for treatment in Class 2. The Holders of Claims in this Class are impaired under the Plan and
entitled to vote on the Plan.

After the Effective Date, the Holders of the General Unsecured Claims in Class 1 will receive
deferred payments equal to the present value of the full amount of their Allowed Claims.

After the Effective Date, each Holder of an Allowed Claim in Class 1 shall receive in full, final and
complete satisfaction of its Allowed Claim, the following:

> **Class 1 Deferred Plan Payment(s)**. After the Effective Date (and after payment in full of the
> Administrative Claims, Classified Priority Claims), commencing on a date selected by the
> Reorganized Debtor that is a Business Day which is at least thirty (30) days after the Effective
> Date, the Reorganized Debtor shall distribute each month to each Holder of Allowed General
> Unsecured Claim in Class 1, an amount determined at the discretion of the Reorganized Debtor,
> based cash flow and profitability; such payments shall continue over a period of twenty-four
> (24) months following the Effective Date, until such time as each Holder of an Allowed General
> Unsecured Claim in Class 1 has received the present value of One Hundred percent (100%) of
> its Allowed General Unsecured Claim. To the extent that any Holder of an Allowed General
> Unsecured Claim in Class 1 has not received the present value of One Hundred percent (100%)
> of its Allowed General Unsecured Claim by the end of twenty-four (24 months) after the
> Effective Date, it shall receive a final payment in the twenty-fifth (25th) month in an amount
> necessary so that the aggregate of all payments received is equal to the present value of its
> Allowed General Unsecured Claim.

**Discount/Interest Rate from the Effective Date.** The applicable rate to be applied to the General
Unsecured Claims in Class 1 shall be simple interest calculated at the Federal interest rate on civil
judgments as set by the Federal Reserve on the Confirmation Hearing Date, commencing from and after
the Effective Date on the Allowed General Unsecured Claims in Class 1 (or such other applicable rate as
found by the Bankruptcy Court).

**Reservation of Defenses/Objections/Counterclaims and Other Rights.** Any defenses,
objections, counterclaims, rights, rights of offset or recoupment of the Debtor or the Estate with respect to
such Claims shall vest in and inure to the benefit of the Reorganized Debtor.

**Further Assurances.** The Holders of the Allowed Class 1 Claims shall promptly execute and
deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate
or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan.

**Maximum Distribution.** In no event shall the aggregate Distributions to be made under the Plan
to each Holder of a Class 1 Allowed Claim exceed the present value of such Holder's Allowed Class 1
Claim.

**B.**    CLASS 2 - CLASSIFICATION AND TREATMENT OF ALLOWED CLAIMS OF THE HOLDERS OF
GENERAL UNSECURED CLAIMS, ELECTING TO ACCEPT EQUITY IN WERM, EXCLUDING ANY
CLAIMS TREATED IN CLASS 1.

Class 2 consists of the Allowed Claims of the Holders of General Unsecured Claims that voluntarily
elect to convert their Allowed General Unsecured Claim to equity in WERM. The Holders of Claims in
this Class are impaired under the Plan and entitled to vote on the Plan.

0067

Class 2 Claims are Claims against the Debtor that would otherwise be General Unsecured Claims in Class 2, so long as the Holder of such General Unsecured Claim (a) elects on the Ballot to be treated as a Class 2 Claim; and, (b) holds a General Unsecured Claim that is an Allowed Claim. In consideration for making the election and receiving the treatment provided in Class 2, such General Unsecured Creditor waives as of the Effective Date: (i) any and all other General Unsecured Claims; (ii) any and all other rights against the Debtor and Reorganized Debtor of any kind or nature whatsoever; and, (iii) any and all right to receive any other future distribution from the Debtor and Reorganized Debtor or under the Plan of any kind or nature whatsoever, including the right to receive any distribution in Class 1.

> On the Effective Date, each Holder of an Allowed General Unsecured Claim electing treatment in Class 2 will receive on account of, and in full, complete and final satisfaction of, such Allowed Claim against the Debtor, an equity interest in WERM as set forth in **_Schedule I_** to be filed on or before the Exhibit Filing Date.

**Reservation of Defenses/Objections/Counterclaims and Other Rights**.    Any defenses, objections, counterclaims, rights, rights of offset or recoupment of the Debtor or the Estate with respect to such Claims shall vest in and inure to the benefit of the Reorganized Debtor.

**Further Assurances**.    The Holders of the Allowed Class 2 Claims shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan.

## C.    CLASS 3 – CLASSIFICATION AND TREATMENT OF CLAIMS OF NEW VISION.

Class 3 consists of the claims of New Vision. Such Holder shall receive the treatment provided under and pursuant to the New Vision Settlement Documents, the terms of which are incorporated by reference as if set forth in full herein. Accordingly, the Plan leaves unaltered all legal, equitable, and contractual rights of the such Holder. Class 3 is <u>unimpaired</u> under the Plan.

## D.    CLASS 4 – CLASSIFICATION AND TREATMENT OF THE HOLDERS OF THE INTERESTS IN THE DEBTOR.

Class 4 consists of the Holders of the Interests in the Debtor. Such Holders shall retain their equity ownership Interests and voting Interests in the Reorganized Debtor, which shall remain unaltered by the Plan. The Plan leaves unaltered all legal, equitable, and contractual rights of the Interest Holders. Class 4 is <u>unimpaired</u> under the Plan.

## VI.    MEANS OF EFFECTUATING THE PLAN

### A.    SOURCES OF DISTRIBUTION

#### 1.    _The source of all Distributions and payments under the Plan will as follows:_

##### a.    Available Cash

The Plan will be funded from revenue contributed by rent income generated from the sublease to WERM and from contributions from WERM.

0068

# EXHIBIT 6

0069

| CLASS NO. | DESCRIPTION | TREATMENT |
|-----------|-------------|-----------|
|           |             | the present value of such Holder's Allowed Class 1 Claim. |

The Debtor has no Secured Claims and no POC's have been filed on behalf of any Secured Creditors.  Two POC's have been filed in the Case -- one by New Vision (which has been withdrawn pursuant to the New Vision Settlement Agreement) -- and the other by Mckenna, Long & Aldridge, LLP, in the approximate amount of $118,000.  There are approximately $1,050,000 of Scheduled General Unsecured Claims (including Mckenna, Long & Aldridge, LLP), excluding the disputed claim of New Vision.

Most of the Scheduled claims were asserted both against the Debtor and against WERM.  Accordingly, WERM has been continuing to make payments to such creditors in the ordinary course of its business.  As of the date of this Disclosure Statement, the Debtor believes that the principal balances due to the Holders of General Unsecured Claims is as follows:

- E & A Media's current balance has been reduced from $120,000 to $80,000;

- G & A Fire Protection Corp has been paid in full;

- Jasper Watt's current balance has been reduced from $185,000 to $119,000;

- Mckenna, Long & Aldridge, LLP asserts a General Unsecured Claim in the amount of $102,466;

- Robert Guichard has been paid in full.

Accordingly, the Allowed General Unsecured Claims qualifying for, and electing treatment in, Class 1 is estimated to be $274,000.

Based upon negotiations with the General Unsecured Creditors, the Debtor anticipates that the following General Unsecured Claims will elect treatment in Class 2:

- Ahmed Al-Goud in the amount of approximately $300,000;

- Laurentiu Badea in the amount of approximately $175,000;

- Rene Vardapour in the amount of $145,000.

# EXHIBIT 7

1  Sandford L. Frey (SBN 117058)
   **CREIM MACIAS KOENIG & FREY LLP**
2  633 West Fifth Street, 48th Floor
   Los Angeles, CA 90071
3  Telephone: (213) 614-1944
   Facsimile:  (213) 614-1961
4  sfrey@cmkllp.com
   skoenig@cmkllp.com
5
   Reorganization Attorneys for Hawkeye
6  Entertainment LLC, Debtor and Debtor in
   Possession
7

8                 UNITED STATES BANKRUPTCY COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10               [SAN FERNANDO VALLEY DIVISION]

11  In re                                CASE NO.:  1:13-bk-16307-MT

12  **HAWKEYE ENTERTAINMENT, LLC,**      Chapter 11

13        Debtor and Debtor-in-Possession.   **ANALYSIS OF BALLOTS FOR
                                             ACCEPTING OR REJECTING PLAN**
14                                           **OF REORGANIZATION PROPOSED
                                             BY DEBTOR, HAWKEYE**
15                                           **ENTERTAINMENT, LLC;
                                             DECLARATION OF KELLI NIELSEN**
16                                           **IN SUPPORT THEREOF**

17                                           ***Confirmation Hearing***
                                             DATE:        March 3, 2016
18                                           TIME:        9:30 a.m.
                                             CTRM.:       304
19

20

21

22

23

24

25

26

27

28

I:\slf\20210 (Hawkeye)\Analysis of Ballots.docx            1

0072

1

Hawkeye Entertainment, LLC, debtor and debtor in possession ("<u>Debtor</u>") in this chapter

2

11 bankruptcy case, hereby files its Analysis of Ballots for Accepting or Rejecting its *Plan of*

3

*Reorganization Proposed by Debtor, Hawkeye Entertainment, LLC* ("<u>Plan</u>") as set forth in the

4

declaration of the Ballot Tabulator attached below.

5

6

DATED: February 25, 2016            CREIM MACIAS KOENIG & FREY LLP

7

8

By:    /s/ Sandford L. Frey
    SANDFORD L. FREY

9

Reorganization Attorneys for Hawkeye
Entertainment, LLC, Debtor and Debtor in

10

Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

0073

# DECLARATION OF KELLI NIELSEN

I, Kelli Nielsen, hereby declare as follows:

1.      I am over 18 years of age.   Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify competently thereto.

2.      I am an employee with the law firm of Creim Macias Koenig & Frey, LLP, reorganization counsel for the Debtor[1] in this chapter 11 bankruptcy case.

3.      Pursuant to the Plan, I was designated to be the official Ballot Tabulator for the Debtor.  In that capacity, I was responsible for receiving and tabulating the Ballots to the Plan.

4.      In the regular and ordinary course of business of Debtor's Counsel, the mail respecting the Debtor's case was routed to me.  I personally opened the envelopes and collected the Ballots.

5.      I have reviewed the Ballots and recorded the pertinent information in the chart below.  To the best of my knowledge and belief, in this declaration, I have accounted for each and every Ballot received by me whether it was received before or after the Ballot Deadline.

6.      The chart below reflects all of the Ballots which I received <u>prior</u> to the Ballot Deadline by any method, including U.S. Mail, Email and Facsimile.

7.      I have maintained the original Ballots in my possession.  True and correct copies of each and every Ballot received by me are attached hereto as follows:  (i) *Exhibit A* for Class 1; and (ii) *Exhibit B* for Class 2.

9.      My specific findings with regard to the *timely* acceptances or rejections of the Plan are tabulated in the following chart:

| Class | Voting Status/Results | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting |
|---|---|---|---|---|---|
| Class 1 (Impaired) | 100 % Accepting | 4 | 0 | $697,466.15 | $0 |

---

[1]  Capitalized terms shall have the meaning ascribed to them in the Plan or in the above pleading, unless otherwise defined herein.

I:\slf\20210 (Hawkeye)\Analysis of Ballots.docx

3

| Class | Voting Status/Results | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting |
|-------|----------------------|------------------|------------------|------------------|------------------|
| Class 2 (Impaired) | 100 % Accepting | 2 | 0 | $330,000.00 | $0 |

10.    To the best of my knowledge and belief, I have received no Ballots (timely or late filed) voting to reject the Plan.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct, and that this declaration is executed on February 25, 2016, in Los Angeles, California.

_____

KELLI NIELSEN

CREIM MACIAS KOENIG & FREY LLP
633 WEST FIFTH STREET, 48TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 614-1944

EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

| IN RE:<br><br>HAWKEYE ENTERTAINMENT, LLC<br><br>    DEBTOR AND DEBTOR IN POSSESSION. | Case No.: 1:13-bk-16307-MT<br><br>CHAPTER 11 |
|---|---|

BALLOT FOR CLASSES 1 AND 2
FOR ACCEPTING OR REJECTING

AND

VOLUNTARY ELECTION TO BE TREATED IN CLASS 2

*PLAN OF REORGANIZATION PROPOSED BY DEBTOR, HAWKEYE ENTERTAINMENT, LLC ("PLAN")*

STEP 1.    TYPE AND AMOUNT OF CLAIM.  THE UNDERSIGNED ENTITY HOLDS A GENERAL UNSECURED CLAIM AGAINST THE DEBTOR IN THE AMOUNT OF $ _____

STEP 2.    VOTING.  WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOTES TO:

☒    ACCEPT THE PLAN              ☐    REJECT THE PLAN

*YOU MAY CHECK ONLY ONE BOX IN STEP 2.  YOUR VOTE WILL BE DEEMED TO ACCEPT THE PLAN IF YOU DO NOT CHECK A BOX OR IF YOU CHECK BOTH BOXES.*

STEP 3.    CLASS 2 VOLUNTARY ELECTION.  WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOLUNTARILY ELECTS TO HAVE ITS CLAIM TREATED IN CLASS 2:

☐    BY CHECKING THIS BOX THIS CLAIMANT HERBY VOLUNTARILY ELECTS TO BE TREATED IN CLASS 2 UNDER THE PLAN, AND HEREBY WAIVES TREATMENT IN CLASS 1

*YOU MAY CHECK THE BOX IN STEP 3 TO HAVE YOUR GENERAL UNSECURED CLAIM TREATED IN CLASS 2.  YOUR GENERAL UNSECURED CLAIM WILL BE TREATED IN CLASS 1 IF YOU DO NOT CHECK THE BOX.*

STEP 4.    CREDITOR INFORMATION AND SIGNATURE.  BY SIGNING THIS BALLOT, YOU ACKNOWLEDGE THAT YOU RECEIVED A COPY OF THE PLAN AND THE *DISCLOSURE STATEMENT PROPOSED THE DEBTOR*

SIGNATURE: _____

IF BY AUTHORIZED AGENT, NAME AND TITLE:

AHMED AL-COEED
*(PRINT OR TYPE NAME)*

DATE COMPLETED: Feb. 2nd 16

STEP 5.    SUBMISSION OF BALLOT.  YOU MUST RETURN THIS BALLOT TO THE BALLOT TABULATOR BY US MAIL, EMAIL OR FACSIMILE SO THAT IT IS RECEIVED BY NO LATER THAN 5:00 P.M. PACIFIC TIME ON FEBRUARY 18, 2016 TO:  CREIM MACIAS KOENIG & FREY LLP,  ATTN:  KELLI NIELSEN, BALLOT TABULATOR,  633 WEST FIFTH STREET, 48TH FLOOR, LOS ANGELES, CALIFORNIA 90071, FACSIMILE (213) 614-1961.

*(INSTRUCTIONS CONTINUE ON NEXT PAGE)*

1

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

| IN RE:<br><br>HAWKEYE ENTERTAINMENT, LLC<br><br>DEBTOR AND DEBTOR IN POSSESSION. | Case No.: 1:13-bk-16307-MT<br><br>CHAPTER 11 |
| --- | --- |

BALLOT FOR CLASSES 1 AND 2
FOR ACCEPTING OR REJECTING

AND

VOLUNTARY ELECTION TO BE TREATED IN CLASS 2

*PLAN OF REORGANIZATION PROPOSED BY DEBTOR, HAWKEYE ENTERTAINMENT, LLC ("PLAN")*

STEP 1.    TYPE AND AMOUNT OF CLAIM.  THE UNDERSIGNED ENTITY HOLDS A GENERAL UNSECURED CLAIM AGAINST THE DEBTOR IN THE AMOUNT OF $_____

STEP 2.    VOTING.  WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOTES TO:

☒    ACCEPT THE PLAN          ☐    REJECT THE PLAN

*YOU MAY CHECK ONLY ONE BOX IN STEP 2.  YOUR VOTE WILL BE DEEMED TO ACCEPT THE PLAN IF YOU DO NOT CHECK A BOX OR IF YOU CHECK BOTH BOXES.*

STEP 3.    CLASS 2 VOLUNTARY ELECTION.  WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOLUNTARILY ELECTS TO HAVE ITS CLAIM TREATED IN CLASS 2:

☐    BY CHECKING THIS BOX THIS CLAIMANT HERBY VOLUNTARILY ELECTS TO BE TREATED IN CLASS 2 UNDER THE PLAN, AND HEREBY WAIVES TREATMENT IN CLASS 1

*YOU MAY CHECK THE BOX IN STEP 3 TO HAVE YOUR GENERAL UNSECURED CLAIM TREATED IN CLASS 2.  YOUR GENERAL UNSECURED CLAIM WILL BE TREATED IN CLASS 1 IF YOU DO NOT CHECK THE BOX.*

STEP 4.    CREDITOR INFORMATION AND SIGNATURE.  BY SIGNING THIS BALLOT, YOU ACKNOWLEDGE THAT YOU RECEIVED A COPY OF THE PLAN AND THE *DISCLOSURE STATEMENT PROPOSED THE DEBTOR*

SIGNATURE:

_____

IF BY AUTHORIZED AGENT, NAME AND TITLE:

_____
*(PRINT OR TYPE NAME)*

DATE COMPLETED: 2. 2. 2016.

STEP 5.    SUBMISSION OF BALLOT.  YOU MUST RETURN THIS BALLOT TO THE BALLOT TABULATOR BY US MAIL, EMAIL OR FACSIMILE SO THAT IT IS RECEIVED BY NO LATER THAN 5:00 P.M. PACIFIC TIME ON FEBRUARY 18, 2016 TO:  CREIM MACIAS KOENIG & FREY LLP, ATTN:  KELLI NIELSEN, BALLOT TABULATOR, 633 WEST FIFTH STREET, 48TH FLOOR, LOS ANGELES, CALIFORNIA 90071, FACSIMILE (213) 614-1961.

*(INSTRUCTIONS CONTINUE ON NEXT PAGE)*

1

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
<u>SAN FERNANDO VALLEY DIVISION</u>

| | |
|---|---|
| IN RE:<br><br>HAWKEYE ENTERTAINMENT, LLC<br><br><div style="text-align:right">DEBTOR AND DEBTOR IN POSSESSION.</div> | Case No.: 1:13-bk-16307-MT<br><br>CHAPTER 11 |

BALLOT FOR <u>CLASSES 1 AND 2</u>
FOR <u>ACCEPTING</u> OR <u>REJECTING</u>

AND

VOLUNTARY ELECTION TO BE TREATED IN CLASS 2

*PLAN OF REORGANIZATION PROPOSED BY DEBTOR, HAWKEYE ENTERTAINMENT, LLC ("PLAN")*

**STEP 1.** TYPE AND AMOUNT OF CLAIM. THE UNDERSIGNED ENTITY HOLDS A GENERAL UNSECURED CLAIM AGAINST THE DEBTOR IN THE AMOUNT OF $_____

**STEP 2.** VOTING. WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOTES TO:

☑ **ACCEPT THE PLAN** ☐ **REJECT THE PLAN**

*YOU MAY CHECK ONLY ONE BOX IN STEP 2. YOUR VOTE WILL BE DEEMED TO ACCEPT THE PLAN IF YOU DO NOT CHECK A BOX OR IF YOU CHECK BOTH BOXES.*

**STEP 3.** CLASS 2 VOLUNTARY ELECTION. WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOLUNTARILY ELECTS TO HAVE ITS CLAIM TREATED IN CLASS 2:

☐ **BY CHECKING THIS BOX THIS CLAIMANT HERBY VOLUNTARILY ELECTS TO BE TREATED IN CLASS 2 UNDER THE PLAN, AND HEREBY WAIVES TREATMENT IN CLASS 1**

*YOU MAY CHECK THE BOX IN STEP 3 TO HAVE YOUR GENERAL UNSECURED CLAIM TREATED IN CLASS 2. YOUR GENERAL UNSECURED CLAIM WILL BE TREATED IN CLASS 1 IF YOU DO NOT CHECK THE BOX.*

**STEP 4.** CREDITOR INFORMATION AND SIGNATURE. BY SIGNING THIS BALLOT, YOU ACKNOWLEDGE THAT YOU RECEIVED A COPY OF THE PLAN AND THE *DISCLOSURE STATEMENT PROPOSED THE DEBTOR*

SIGNATURE: _____

IF BY AUTHORIZED AGENT, NAME AND TITLE:

*Laurentiu Badea*
(PRINT OR TYPE NAME)

DATE COMPLETED: 2/2/2016

**STEP 5.** SUBMISSION OF BALLOT. YOU MUST RETURN THIS BALLOT TO THE BALLOT TABULATOR BY US MAIL, EMAIL OR FACSIMILE SO THAT IT IS RECEIVED BY NO LATER THAN <u>5:00 P.M. PACIFIC TIME ON FEBRUARY 18, 2016</u> TO: CREIM MACIAS KOENIG & FREY LLP, ATTN: KELLI NIELSEN, BALLOT TABULATOR, 633 WEST FIFTH STREET, 48TH FLOOR, LOS ANGELES, CALIFORNIA 90071, FACSIMILE (213) 614-1961.

<u>*INSTRUCTIONS CONTINUE ON NEXT PAGE]*</u>

1

IMLP02020 (HAWKEYE/BALLOT - GENERAL - CLASSES 1 AND 2 AND ELEC (1-6-16 FINAL VER).DOC

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

| IN RE:<br><br>**HAWKEYE ENTERTAINMENT, LLC**<br><br>DEBTOR AND DEBTOR IN POSSESSION. | CASE No.: 1:13-bk-16307-MT<br><br>CHAPTER 11 |
|---|---|

**BALLOT FOR CLASSES 1 AND 2**
FOR ACCEPTING OR REJECTING

AND

**VOLUNTARY ELECTION TO BE TREATED IN CLASS 2**

*PLAN OF REORGANIZATION PROPOSED BY DEBTOR, HAWKEYE ENTERTAINMENT, LLC ("PLAN")*

**STEP 1.**   TYPE AND AMOUNT OF CLAIM. THE UNDERSIGNED ENTITY HOLDS A GENERAL UNSECURED CLAIM AGAINST THE DEBTOR IN THE AMOUNT OF $ 102,466.15

**STEP 2.**   VOTING. WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOTES TO:

☒   **ACCEPT** THE PLAN          ☐   **REJECT** THE PLAN

*YOU MAY CHECK ONLY ONE BOX IN STEP 2. YOUR VOTE WILL BE DEEMED TO ACCEPT THE PLAN IF YOU DO NOT CHECK A BOX OR IF YOU CHECK BOTH BOXES.*

**STEP 3.**   CLASS 2 VOLUNTARY ELECTION. WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOLUNTARILY ELECTS TO HAVE ITS CLAIM TREATED IN CLASS 2:

☐   **BY CHECKING THIS BOX THIS CLAIMANT HERBY VOLUNTARILY ELECTS TO BE TREATED IN CLASS 2 UNDER THE PLAN, AND HEREBY WAIVES TREATMENT IN CLASS 1**

*YOU MAY CHECK THE BOX IN STEP 3 TO HAVE YOUR GENERAL UNSECURED CLAIM TREATED IN CLASS 2. YOUR GENERAL UNSECURED CLAIM WILL BE TREATED IN CLASS 1 IF YOU DO NOT CHECK THE BOX.*

**STEP 4.**   CREDITOR INFORMATION AND SIGNATURE. BY SIGNING THIS BALLOT, YOU ACKNOWLEDGE THAT YOU RECEIVED A COPY OF THE PLAN AND THE *DISCLOSURE STATEMENT PROPOSED THE DEBTOR*

SIGNATURE:

IF BY AUTHORIZED AGENT, NAME AND TITLE:
John A. Moe, II   Attorney
McKenna, Long & Aldridge, LLP.
*(PRINT OR TYPE NAME)*

DATE COMPLETED: 2/4/16

**STEP 5.**   SUBMISSION OF BALLOT. YOU MUST RETURN THIS BALLOT TO THE BALLOT TABULATOR BY US MAIL, EMAIL OR FACSIMILE SO THAT IT IS RECEIVED BY NO LATER THAN **5:00 P.M. PACIFIC TIME ON FEBRUARY 18, 2016** TO: CREIM MACIAS KOENIG & FREY LLP, ATTN: KELLI NIELSEN, BALLOT TABULATOR, 633 WEST FIFTH STREET, 48TH FLOOR, LOS ANGELES, CALIFORNIA 90071, FACSIMILE (213) 614-1961.

**(INSTRUCTIONS CONTINUE ON NEXT PAGE)**

1
[\\SLP\20210 (HAWKEYE)\BALLOT - GENERAL - CLASSES 1 AND 2 AND ELEC (1-5-16 FINAL VER).DOC

0080

Case 1:13-bk-16307-MT    Doc 351    Filed 02/28/16    Entered 02/28/16 16:56:35    Desc
Main Document    Page 10 of 14

**EXHIBIT "B"**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

| IN RE:<br><br>HAWKEYE ENTERTAINMENT, LLC<br><br>　　　　　　　　　DEBTOR AND DEBTOR IN POSSESSION. | Case No.: 1:13-bk-16307-MT<br><br>CHAPTER 11 |
|---|---|

BALLOT FOR <u>CLASSES 1 AND 2</u>
FOR <u>ACCEPTING</u> OR <u>REJECTING</u>

AND

VOLUNTARY ELECTION TO BE TREATED IN CLASS 2

*PLAN OF REORGANIZATION PROPOSED BY DEBTOR, HAWKEYE ENTERTAINMENT, LLC ("<u>PLAN</u>")*

STEP 1.　TYPE AND AMOUNT OF CLAIM. THE UNDERSIGNED ENTITY HOLDS A GENERAL UNSECURED CLAIM AGAINST THE DEBTOR IN THE AMOUNT OF $ _____

STEP 2.　VOTING. WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOTES TO:

　　　☒　　ACCEPT THE PLAN　　　　　☐　　REJECT THE PLAN

*YOU MAY CHECK ONLY ONE BOX IN STEP 2. YOUR VOTE WILL BE DEEMED TO ACCEPT THE PLAN IF YOU DO NOT CHECK A BOX OR IF YOU CHECK BOTH BOXES.*

STEP 3.　CLASS 2 VOLUNTARY ELECTION. WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOLUNTARILY ELECTS TO HAVE ITS CLAIM TREATED IN CLASS 2:

　　　☒　　BY CHECKING THIS BOX THIS CLAIMANT HERBY VOLUNTARILY ELECTS TO BE TREATED IN CLASS 2 UNDER THE PLAN, AND HEREBY WAIVES TREATMENT IN CLASS 1

*YOU MAY CHECK THE BOX IN STEP 3 TO HAVE YOUR GENERAL UNSECURED CLAIM TREATED IN CLASS 2. YOUR GENERAL UNSECURED CLAIM WILL BE TREATED IN CLASS 1 IF YOU DO NOT CHECK THE BOX.*

STEP 4.　CREDITOR INFORMATION AND SIGNATURE. BY SIGNING THIS BALLOT, YOU ACKNOWLEDGE THAT YOU RECEIVED A COPY OF THE PLAN AND THE *DISCLOSURE STATEMENT PROPOSED THE DEBTOR*

　　　SIGNATURE: _____

　　　IF BY AUTHORIZED AGENT, NAME AND TITLE:

　　　Jasper Watt

　　　　　　　　　　　　　　*(PRINT OR TYPE NAME)*

　　　DATE COMPLETED: 2/01/16

STEP 5.　SUBMISSION OF BALLOT. YOU MUST RETURN THIS BALLOT TO THE BALLOT TABULATOR BY US MAIL, EMAIL OR FACSIMILE SO THAT IT IS RECEIVED BY NO LATER THAN <u>5:00 P.M. PACIFIC TIME ON FEBRUARY 18, 2016</u> TO: CREIM MACIAS KOENIG & FREY LLP, ATTN: KELLI NIELSEN, BALLOT TABULATOR, 633 WEST FIFTH STREET, 48TH FLOOR, LOS ANGELES, CALIFORNIA 90071, FACSIMILE (213) 614-1961.

*(INSTRUCTIONS CONTINUE ON NEXT PAGE)*

1

0082

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

| In re: | Case No.: 1:13-bk-16307-MT |
| HAWKEYE ENTERTAINMENT, LLC | Chapter 11 |
| Debtor and Debtor in Possession | |

BALLOT FOR CLASSES 1 AND 2
FOR ACCEPTING OR REJECTING

AND

VOLUNTARY ELECTION TO BE TREATED IN CLASS 2

PLAN OF REORGANIZATION PROPOSED BY DEBTOR, HAWKEYE ENTERTAINMENT, LLC ("PLAN")

STEP 1.    TYPE AND AMOUNT OF CLAIM.  THE UNDERSIGNED ENTITY HOLDS A GENERAL UNSECURED CLAIM AGAINST THE DEBTOR IN THE AMOUNT OF $ _____

STEP 2.    VOTING.  WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOTES TO:

☒    ACCEPT THE PLAN            ☐    REJECT THE PLAN

*YOU MAY CHECK ONLY ONE BOX IN STEP 2.  YOUR VOTE WILL BE DEEMED TO ACCEPT THE PLAN IF YOU DO NOT CHECK A BOX OR IF YOU CHECK BOTH BOXES.*

STEP 3.    CLASS 2 VOLUNTARY ELECTION.  WITH RESPECT TO THE PLAN, SUCH CLAIMANT HEREBY VOLUNTARILY ELECTS TO HAVE ITS CLAIM TREATED IN CLASS 2:

☒    BY CHECKING THIS BOX THIS CLAIMANT HERBY VOLUNTARILY ELECTS TO BE TREATED IN CLASS 2 UNDER THE PLAN, AND HEREBY WAIVES TREATMENT IN CLASS 1

*YOU MAY CHECK THE BOX IN STEP 3 TO HAVE YOUR GENERAL UNSECURED CLAIM TREATED IN CLASS 2.  YOUR GENERAL UNSECURED CLAIM WILL BE TREATED IN CLASS 1 IF YOU DO NOT CHECK THE BOX.*

STEP 4.    CREDITOR INFORMATION AND SIGNATURE.  BY SIGNING THIS BALLOT, YOU ACKNOWLEDGE THAT YOU RECEIVED A COPY OF THE PLAN AND THE *DISCLOSURE STATEMENT PROPOSED THE DEBTOR*

SIGNATURE: _____

IF BY AUTHORIZED AGENT, NAME AND TITLE:

RENE VARDAPOUR
                                        *(PRINT OR TYPE NAME)*

DATE COMPLETED: 2/1/16

STEP 5.    SUBMISSION OF BALLOT.  YOU MUST RETURN THIS BALLOT TO THE BALLOT TABULATOR BY US MAIL, EMAIL OR FACSIMILE SO THAT IT IS RECEIVED BY NO LATER THAN 5:00 P.M. PACIFIC TIME ON FEBRUARY 18, 2016 TO:  CREIM MACIAS KOENIG & FREY LLP, ATTN: KELLI NIELSEN, BALLOT TABULATOR, 633 WEST FIFTH STREET, 48TH FLOOR, LOS ANGELES, CALIFORNIA 90071, FACSIMILE (213) 614-1961.

*(INSTRUCTIONS CONTINUE ON NEXT PAGE)*

1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

633 W. Fifth Street, 48th Floor, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (specify): **ANALYSIS OF BALLOTS FOR ACCEPTING OR REJECTING PLAN OF REORGANIZATION PROPOSED BY DEBTOR, HAWKEYE ENTERTAINMENT, LLC; DECLARATION OF KELLI NIELSEN IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On February 25, 2016, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| | |
|---|---|
| Katherine Bunker | kate.bunker@usdoj.gov |
| Sandford L. Frey | sfrey@cmkllp.com; knielsen@cmkllp.com |
| Amy L. Goldman | goldman@lbbslaw.com |
| Michael K. Grimaldi | |
| Stuart I. Koenig | skoenig@cmkllp.com; knielsen@cmkllp.com |
| Michael S. Kogan | mkogan@koganlawfirm.com |
| Brad Krasnoff | krasnoff@lbbslaw.com; danninggill@gmail.com; bkrasnoff@ecf.inforuptcy.com |
| Scott Lee | slee@lbbslaw.com; Monique.talamante@lewisbrisbois.com |
| John Moe | john.moe@dentons.com; glenda.spratt@dentons.com; herlinda.rodriguez@dentons.com; laurie.soledad@dentons.com; Jennifer.wall@dentons.com |
| US Trustee (SV) | ustpregion16.wh.ecf@usdoj.gov |
| Marta C. Wade | mwade@cmkllp.com; knielsen@cmkllp.com |
| Aimee Y. Wong | aywong@mckennalong.com; jryan@mckennalong.com |

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (date) February 25, 2016, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Maureen Tighe
United States Bankruptcy Court
21041 Burbank Blvd.
Woodland Hills, CA 91367

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 25, 2016 | Kelli Nielsen | /s/ Kelli Nielsen |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-3.1.PROOF.SERVICE
0084

## 2. SERVED BY UNITED STATES MAIL

| | | |
|---|---|---|
| Hawkeye Entertainment, LLC<br>14242 Ventura Boulevard # 300<br>Sherman Oaks, CA  91423 | Ahmed Al-Goud<br>PO Box 10211<br>Dubai UAE | E & A Mechanical Inc<br>7323 Elmo St<br>Tujunga, CA 91402 |
| Franchise Tax Board<br>Bankruptcy Section MS:  A-340<br>PO Box 2952<br>Sacramento, CA 95812-2952 | G & A Fire Protection Corp<br>14617 Keswick St<br>Van Nuys, CA  91405 | Internal Revenue Service<br>PO Box 7346<br>Philadelphia, PA  19101-7346 |
| Jasper Watt<br>2707 W. Burbank Blvd., Apt. 201<br>Burbank, CA 91505-2399 | ~~Jasper Watt~~<br>~~10310 Riverside Dr.~~<br>~~Toluca Lake, CA  91602-2456~~<br>*[Returned Mail]* | Laurentiu Badea<br>10626 Valley Spring # 204<br>North Hollywood, CA 91602 |
| L.A. County Tax Collector<br>Bankruptcy Unit<br>PO Box 54110<br>Los Angeles, CA  90054-0110 | Los Angeles City Clerk<br>PO Box 53200<br>Los Angeles, CA  90053-0200 | McKenna Long & Aldridge<br>303 Peachtree St Suite 5300<br>Atlanta, GA 30308 |
| New Vision Horizon<br>3122 S Main St<br>Los Angeles, CA 90007 | New Vision Horizon, LLC<br>c/o Lewis Brisbois Bisgaard & Smith<br>633 W. Fifth St., Ste. 4000<br>Los Angeles, CA  90071 | Peter F Harris<br>Lewis Brisbois Bisgaard & Smith LLP<br>650 Town Center Drive Suite 1400<br>Costa Mesa, CA 92626 |
| Rene Vardapour<br>943 Andover Dr<br>Burbank, CA 91504 | Robert Guichard<br>1578 35th Ave<br>San Francisco, CA 94122 | Saybian Gourmet, Inc.<br>14242 Ventura Blvd., 3rd Fl.<br>Sherman Oaks, CA  91423 |
| Securities Exchange Commission<br>444 South Flower Street, Suite 900<br>Los Angeles, CA 90071 | Michael T. Delaney<br>Baker & Hostetler LLP<br>11601 Wilshire Blvd., Ste. 1400<br>Los Angeles, CA  90025 | WERM Investments, LLC<br>14242 Ventura Blvd., 3rd Fl.<br>Sherman Oaks, CA  91423 |
| Samuel R. Biggs, CPA<br>SLBiggs, a Division of SingerLewak<br>10960 Wilshire Blvd., 7th Floor<br>Los Angeles, CA  90024 | U.S. Attorney's Office<br>Federal Bldg, Rm 7516<br>300 N. Los Angeles St.<br>Los Angeles, CA  90012 | US Dept of Justice<br>Ben Franklin Station<br>PO Box 683<br>Washington, DC 20044 |
| US Dept of Justice<br>Ben Franklin Station<br>PO Box 683<br>Washington, DC 20044 | US Trustee<br>915 Wilshire Blvd., Ste. 1850<br>Los Angeles, CA  90017 | L.A. County Tax Collector<br>Bankruptcy unit<br>P.O. Box 54110<br>Los Angeles, CA 90054-0110 |
| City of Los Angeles Office of Finance<br>LA  City Attorney's Office<br>Attn: Wendy Loo<br>200 N Main St Sts 920<br>Los Angeles, CA 90012-4128 | Internal Revenue Service<br>PO Box 7346<br>Philadelphia, PA 19101-7346 | U.S. Securities & Exchange<br>Commission<br>Attn:  Bankruptcy Counsel<br>444 S. Flower Street, #900<br>Los Angeles, CA  90071 |
| Employment Development Department<br>Bankruptcy Group MIC 92E<br>PO  BOX  826880<br>Sacramento, CA  95814 | | |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# EXHIBIT 8

Sandford L. Frey (SBN 117058)
Stuart I. Koenig (SBN 102764)
**LEECH TISHMAN FUSCALDO & LAMPL LLP**
100 Corson Street, Third Floor
Pasadena, CA 91103
Telephone: (626) 796-4000
Facsimile: (626) 795-6321
sfrey@leechtishman.com
skoenig@leechtishman.com

Reorganization Attorneys for Hawkeye Entertainment,
LLC, Reorganized Debtor

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## [SAN FERNANDO VALLEY DIVISION]

| | |
|---|---|
| In re | CASE NO.: 1:13-bk-16307-MT |
| **HAWKEYE ENTERTAINMENT, LLC,** | Chapter 11 |
| Reorganized Debtor. | **NOTICE OF MOTION AND MOTION OF HAWKEYE ENTERTAINMENT, LLC, THE REORGANIZED DEBTOR, FOR ENTRY OF AN ORDER FOR FINAL DECREE AND CLOSING CHAPTER 11 CASE; DECLARATION OF ADI McABIAN IN SUPPORT THEREOF** |
| | [No Hearing Required] |

**TO THE HONORABLE MAUREEN TIGHE, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; AND ALL CREDITORS AND PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Hawkeye Entertainment, LLC, the Reorganized Debtor, ("<u>Debtor</u>" or "<u>Reorganized Debtor</u>") will, and hereby does, move this Court for issuance of an Order closing this Chapter 11 case and entering a Final Decree ("<u>Motion</u>") pursuant to 28 U.S.C. §§ 157(b) and 1334 of the Bankruptcy Code, and Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("<u>LBR</u>"). This Motion is being made upon the grounds that the Debtor's Plan of Reorganization ("<u>Plan</u>") was confirmed at a hearing

1

0087

held on March 3, 2016, and the Order of Confirmation was entered on June 20, 2016 [Docket No. 363]. The Effective Date of the Plan was September 2, 2016 ("<u>Effective Date</u>").

All initial distributions required to be made on the Effective Date of the Plan have been made, and the balance of the payments are ongoing. Further, there are no pending matters or open proceedings remaining, and all final motions for approval of compensation and reimbursement of expenses have been approved by the Court. In short, the Debtor's Bankruptcy Estate has been substantially consummated and should therefore be closed. All outstanding fees to the Office of the United States Trustee, to the extent not paid, will be paid prior to the entry of the Final Decree.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion, the Motion and the Memorandum of Points and Authorities and Declaration of Adi McAbian, filed herein, the entire record in this case, and any other evidence properly presented to the Court.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(o) (1) and (4), any interested party that wishes to respond to the relief requested in this Motion must request a hearing and file a written response or brief **within fourteen (14) days** of the date of this Notice. The written response or brief must be filed with the Clerk of the Bankruptcy Court, located at 21051 Warner Center Lane, Woodland Hills, California 91367, and served upon the Office of the United States Trustee, located at 915 Wilshire Boulevard, Suite 1850, Los Angeles, California 90017, and counsel for the Reorganized Debtor at the address set forth in the upper left-hand corner of the first page of this Notice. Unless a hearing date is requested, no hearing date shall be set.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1 (h), failure to file and serve a timely response may be deemed consent to the relief requested in the Motion.

**PLEASE TAKE FURTHER NOTICE** that if a timely objection to the requested relief or a request for a hearing is not made, the Court may enter an order granting the relief by default.

2

0088

1

**WHEREFORE**, the Reorganized Debtor moves the Court to enter an Order pursuant to

2

Rule 3022 of the Federal Rules of Bankruptcy Procedure entering a final decree and closing this

3

case.

4

5

Dated: February 9, 2017                    LEECH TISHMAN FUSCALDO & LAMPL LLP

6

7

By: */s/ Stuart I. Koenig*

8

SANDFORD L. FREY
STUART I. KOENIG

9

Reorganization Attorneys for Hawkeye Entertainment,
LLC, Reorganized Debtor

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). Venue of this matter in this district is proper pursuant to 28 U.S.C. § 1409. The relief requested herein is pursuant to section 350(a) of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 3020-1(d).

# II.

## STATEMENT OF FACTS

On September 30, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

By an Order entered on June 20, 2016 (the "Confirmation Order") [Docket No. 363] this Court confirmed the Debtor's Chapter 11 Plan of Reorganization (the "Plan"). The Plan is the result of a settlement reached between the Debtor and its landlord New Vision Horizon LLC, ("New Vision") which provided for, among other things, the assumption by the Debtor of the lease for Spring Street Premises which consists of first four floors and a portion of the basement of the building located at 618 So. Spring Street, Los Angeles, California ("Spring Street Building"). The Spring Street Building is a fourteen story building (including the basement) located on Spring Street in Los Angeles, which is commonly known as the *Pacific Stock Exchange Building*. As part of the settlement, New Vision voted in favor of the Debtor's Plan. In addition, the Debtor received unanimous support for its Plan from those classes of creditors voting on the Plan. The reorganization case and Plan achieves excellent results under challenging circumstances.

As of the Effective Date of the Plan, September 2, 2016, Adi McAbian ("McAbian") has served as the managing member of the Reorganized Debtor, and shall continue to oversee the day to day operations of the Reorganized Debtor.

On October 20, 2016, the Court heard the final fee applications of the Debtor's professionals. Final fees were approved and an Order approving the final fees of Debtor's professionals was entered on November 9, 2016 [Docket No. 385]. The Court set the date of

4

0090

1    October 20, 2016 a hearing date on the Debtor's First Post-Confirmation Status Conference.  The

2    Debtor filed its Post-Confirmation Status Report on October 6, 2016 [Docket No. 379].  At the

3    hearing on the First Post-Confirmation Status Conference, the Court set a date of August 17,

4    2017 for the Second Post-Confirmation Status Conference.

5        The Reorganized Debtor has filed all of its requisite monthly operating reports and paid

6    its United States Trustee quarterly fees through December 31, 2016.

7    **A.    HISTORY OF DEBTOR AND EVENTS LEADING TO CHAPTER 11 CASE.**

8        The Debtor is a California limited liability company.   The Debtor commenced its

9    bankruptcy case by filing in the Court a voluntary petition for relief under chapter 11 of the

10   Bankruptcy Code on the Petition Date (September 30, 2013).  An official committee of creditors

11   holding unsecured claims was not formed during the Case.

12       The Debtor's most valuable asset is a written lease agreement, along with its amendments

13   for the Spring Street Building.  The Debtor is a holding company for the lease for the Spring

14   Street Premises, which premises are sublet to an entity known as WERM.  WERM operates a

15   popular and highly successful entertainment venue for private parties, corporate events, live

16   entertainment, fashion shows and more, and which has been operating, and continues to operate

17   successfully, from the Spring Street Premises.

18       Prior to the filing of this Case, on July 17, 2009, the Debtor entered into the Spring Street

19   Original Lease with an entity known as Pax, the then owner of the Spring Street Property,

20   pursuant to which the Spring Street Premises was leased for the operation of a nightclub.

21   Subsequently, Pax and the Debtor executed three documents styled as "Amendment to Lease,"

22   (*sic*) dated August 5, 2009, August 17, 2009 and September 16, 2009, all of which purported to

23   amend or modify the Spring Street Original Lease in some fashion ("***Pre-Petition Lease***

24   ***Amendments***").   Thereafter, the Debtor entered into the Spring Street Original Sublease with

25   WERM.

26       After leasing the Spring Street Premises, millions of dollars in improvements to the

27   Spring Street Building and Spring Street Premises were made in reliance upon its leasehold

28   interest.   The Debtor was also compelled to spend substantial additional dollars and incur

5

0091

significant additional liability for repairs and City of Los Angeles code compliance, which was the responsibility of the prior landlord and owner Pax and its successor under the terms of the Debtor's commercial Lease.

Pursuant to governmental regulation, the Spring Street Tower cannot be occupied or used. Despite that, the Spring Street Tower area must nevertheless be in compliance with certain health, safety and fire regulations in order for the club to operate the business from the Spring Street Premises. In other words, although customers of the business may not use the Spring Street Tower, the City of Los Angeles, Los Angeles Police Department and Los Angeles Fire Department, concerned about the health, safety and welfare of the patrons of the business, nevertheless require that the Spring Street Tower must comply with fire safety regulations.

Under the Spring Street Original Lease and Pre-Petition Lease Amendments, it was the responsibility of the lessor to retrofit, repair and maintain the Spring Street Tower for the benefit of the Debtor's continued use and occupancy of the Spring Street Premises as well as the health, safety and welfare of the customers of the operating business.

Pax and its successor, New Vision, having failed to perform or pay for the required work, the Debtor asserted that they were in material default of the Spring Street Original Lease and Pre-Petition Lease Amendments. The Debtor was required to pay for repairs to the Spring Street Building in order to bring it into compliance, which it alleged was the responsibility of the lessor.

When Pax initially breached the Lease, the Debtor's related predecessor[1] asserted significant damages against Pax. The Debtor's related predecessor attempted to resolve this situation amicably by entering into a number of settlement agreements, which Pax also subsequently defaulted on.

In addition, the Spring Street Original Lease and Pre-Petition Lease Amendments provide, among other things, for: (a) rent abatements and rent credits totaling thirteen (13) full calendar months after the rent commencement date; (b) payment by the lessor of $540,000 to the

---

[1] The Debtor was formed contemporaneously with the settlement with Pax, and the Lease and amendments assigned to the Debtor.

6

Debtor as a tenant improvement allowance; and (c) payment by the lessor of $1,100,000 to the Debtor as reimbursement for the required retrofit work performed by the Debtor. The Debtor asserts that there was a failure to perform these terms as well by the lessor. Ultimately, the Debtor was forced to assert an offset rights pursuant to the terms of the Spring Street Original Lease and Pre-Petition Lease Amendments.

In the meantime, the Debtor was informed and believed that Pax also defaulted on its own loan with Pax's lender. Following a series of bankruptcy filings by Pax and related entities, Pax eventually lost the Spring Street Property as the result of a foreclosure. New Vision purports to have purchased the note owed by Pax from Pax's lender and then foreclosed on Pax's interest in the Spring Street Property. New Vision alleges that it purchased the Spring Street Property at a Trustee's Sale on December 20, 2010.

After the purchase of the Spring Street Property, there developed disputes between New Vision and the Debtor as to their respective rights and obligations under the Spring Street Original Lease and the Pre-Petition Lease Amendments. On July 11, 2011, in connection with some of those disputes, the Debtor commended an action against New Vision in the Superior Court of California, County of Los Angeles, entitled, *Hawkeye Entertainment, LLC v. New Vision Horizon, LLC*, Case No. BC464610 ("***First State Court Action***"). The First State Court Action was referred to arbitration, where it was pending as of the Petition Date.

On July 15, 2013, in connection with disputes arising out of the Spring Street Original Lease and the Pre-Petition Lease Amendments, the Debtor brought a second action against New Vision in the Superior Court of California, County of Los Angeles, entitled, *Hawkeye Entertainment, LLC v. New Vision Horizon, LLC*, Case No. BC515124 ("***Second State Court Action***" and together with the First State Court Action, the "***State Court Actions***".). The Second State Court Action was also pending as of the Petition Date. Prior to the Petition Date, New Vision issued a five-day notice on September 30, 2013. Shortly thereafter, the Debtor filed its Chapter 11 petition on the Petition Date.

After the Petition Date, on August 20, 2014, the Debtor and New Vision executed the New Vision Settlement Agreement. Pursuant to the New Vision Settlement Agreement, the

7

0093

Debtor and New Vision entered into the New Vision Assumption Stipulation.  Under the terms of the New Vision Settlement Agreement, New Vision adopted the Spring Street Amended Lease dated July 17, 2009, which was executed between the Debtor and Pax, and the Spring Street Amended Lease was deemed current and reinstated as if no default existed.

Concurrently with the execution of the New Vision Settlement Agreement, New Vision and the Debtor entered into the Spring Street Lease First Amendment.  Under the terms of the New Vision Settlement Agreement, the Debtor paid New Vision the total sum of $105,000 upon the effective date of the New Vision Settlement Agreement, which sum was agreed to represent the monthly rental payments in advance for the months of November 2014, December 2014 and January 2015.

Pursuant to the New Vision Settlement Agreement, among other things, New Vision withdrew its Opposition to the New Vision Assumption Motion and to entry of an order assuming the Spring Street Amended Lease (as modified) and Spring Street Original Sublease; the Spring Street Amended Lease and Spring Street Original Sublease were deemed current; the Debtor's First State Court Action and the Second State Action were dismissed with prejudice with each side bearing their own costs and attorneys' fees; and, New Vision withdrew its POC. Finally, the New Vision Settlement Agreement provided for general mutual releases between the Debtor and New Vision.

The Court approved the settlement, New Vision Settlement Motion, and New Vision Settlement Documents by order entered on September 12, 2014 [Docket No. 257].

**B.   THE COURT APPROVES THE DEBTOR'S DISCLOSURE STATEMENT AND CONFIRMS PLAN**

The Debtor filed its Disclosure Statement on August 12, 2015.  [Docket No. 317].   On December 10, 2015, a hearing was held to consider the adequacy of the Debtor's Disclosure Statement ("Disclosure Statement").  The Order approving the Disclosure Statement was entered by the Court on January 8, 2016 [Docket No. 344]. The Debtor filed its Solicitation Package consisting of, among other documents, the Disclosure Statement, the Plan, and the Ballots.  At a hearing on March 3, 2016, the Court confirmed the Debtor's Plan.  The Confirmation Order was

8

entered on June 20, 2016 [Docket No. 363].  The Effective Date of the Plan was September 2, 2016 [Docket No. 387].

## C.  THE PLAN HAS BEEN SUBSTANTIALLY CONSUMMATED.

Distributions required to be made on the Effective Date of the Plan, including the initial payments to the administrative claims ("Administrative Claims"), have been made.  It is estimated that payments will continue to be made under the Plan over a period of two years from the operations of the Debtor.  Distributions under the Plan are the only remaining matter, as there are no pending matters or open proceedings remaining, and all final motions for approval of compensation and reimbursement of expenses have been approved by the Court.  In short, the Debtor's Bankruptcy Estate has been substantially consummated and should therefore be closed. All outstanding fees to the Office of the United States Trustee, to the extent not paid, will be paid prior to the entry of the Final Decree.  In addition, the Debtor has submitted all of its requisite monthly operating reports.

## D.  DISCHARGE AND RELEASES / ASSUMPTION AND REJECTION OF AGREEMENTS.

All settlements, compromises, discharges, injunctions, exculpations and releases provided for in the Plan were negotiated at arm's length and in good faith and are fair, equitable, reasonable, and in the best interests of the Debtor, the Estate, all creditors, interest holders and the Reorganized Debtor, including, without limitation, those specifically provided for in Section VIII, subsections A, B C and D.

With respect to the assumption of the Assumed Agreements, including but not limited to the Spring Street Amended Lease, such assumption is within the Debtor's sound business judgment.  In addition, the Debtor has, within the meaning of Bankruptcy Code § 365(b)(1)(C), established adequate assurance of future performance with respect to all of the Assumed Agreements.  Further, no cure payments or compensation was required under the Assumed Agreements in accordance with Bankruptcy Code §§ 365(b)(1)(A) and (B).  Nothing herein or in the Confirmation Order is a waiver of any defenses, claims, or counterclaims that the Debtor and/or the Reorganized Debtor may have against any party to any Assumed Agreement

9

**E.    UNITED STATES TRUSTEE COMPLIANCE.**

As indicated above, the Reorganized Debtor has submitted all of its required Monthly

Operating Reports for the period from the Petition Date through June 30, 2016.  In addition, all

quarterly fees to the office of the United States Trustee have been paid.

<div align="center">

**III.**

**RELIEF REQUESTED**

</div>

The Reorganized Debtor seeks entry of an Order and final decree closing the Debtor's

Chapter 11 case pursuant to section 350(b) of the Bankruptcy Code, Bankruptcy Rule 3022, and

Local Rule 3020-1(d), with such order deemed effective as of the date of entry.    The

Reorganized  Debtor further requests that such case-closing order be without prejudice to or

otherwise affect the continuing effect of the Plan and applicable provisions of the Confirmation

Order, and any other agreements that will survive the closing of the Reorganized Debtor's case,

and that such case-closing order authorize and direct all actions by the Debtor, its employees,

professionals, and other representatives necessary or appropriate in connection with the closing,

including but not limited to, the completion of final audits, the filing of final estate tax returns,

the issuance to beneficiaries and filing of final tax statements, the filing of a notice to shorten the

period for audit of such final returns, responding to any audit, the filing and issuance of forms

1099, and the closing of bank accounts.

The Reorganized Debtor believes that issuing a Final Decree and closing the case is in

the best interest of creditors and the Estate, and is made without prejudice.  Closing the case, at

this time, and entering a discharge, will not only free up the Court's time and calendar, but will

allow the Reorganized Debtor to continue manage the operations of its business and preserve

assets.

<div align="center">

**IV.**

**BASIS FOR RELIEF**

</div>

Section 350(a) of the Bankruptcy Code provides that "[a]fter an estate is fully

administered ... the court shall close the case."  11 U.S.C. § 350(a).  Bankruptcy Rule 3022

similarly provides that "[a]fter an estate is fully administered in a chapter 11 reorganization, the

<div align="center">10</div>

court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case." Fed.R.Bankr.P. 3022. Local Bankruptcy Rule 3020-1(d) provides for the issuance of a final decree in a chapter 11 case, and provides as follows:

(1)    After an estate is fully administered in a chapter 11 reorganization case, a party in interest may file a motion for a final decree in the manner provided in LBR 9013-1(o).

(2)    Notice of the motion must be served upon all parties upon whom the plan was served.

The above-noted provisions evidence a long-standing policy in favor of terminating bankruptcy court supervision over a debtor after its reorganization plan has been confirmed. *See generally North Amer. Car Corp. v. Peerless Weighing & Vending Machine Corp.*, 143 F.2d 938, 940 (2d Cir. 1944). The Advisory Committee note to Bankruptcy Rule 3022 sets forth six factors that a court should consider in determining whether a case is fully administered:

1.    Whether the order confirming the plan has become final;

2.    Whether deposits required by the plan have been distributed;

3.    Whether the property proposed by the plan to be transferred has been transferred;

4.    Whether the debtor has assumed the business or the management of the property dealt with by the plan;

5.    Whether payments under the plan have commenced; and

6.    Whether all motions, contested matters and adversary proceedings have finally been resolved.

Not all of these factors need to exist before the court may enter a final decree. *See, e.g., In re Mold Makers, Inc.*, 124 B.R. 766, 768 (Bankr. N.D. Ill. 1990). Moreover, the factors listed in the Advisory Committee note are not exclusive. *See, e.g., In re Jordan Mfg. Co.*, 138 RR. 30, 35 (Bankr. C.D. Ill. 1992). Rather, courts use these factors "as a guide in assisting the ... decision to close the case." *Mold Makers*, 124 B.R. at 768. "The court should not keep the case open only because of the possibility that the court's jurisdiction may be invoked in the future." *In re Ground Systems, Inc.*, 213 Bankr. 1016, 1019 (B.A.P. 9th Cir. 1997).

11

0097

In the case at hand the factors articulated in the Advisory Committee note have been satisfied, because: (a) the Confirmation Order has become final; (b) all deposits, distributions, and transfers of property contemplated by the Plan have been made; (c) the Debtor is continuing its business pursuant to the Plan; (d) payments under the Plan have been commenced; and (e) all motions and contested matters have been finally resolved. The Debtor anticipates that it will complete the submission of its final quarterly report and payment of quarterly fees.

Section VI. E of the Plan provides that after the Estate has been fully administered the Debtor shall petition the Bankruptcy Court for closing of the Debtor's case. The Debtor contends that this case has been or will be fully administered, and therefore, the entry of an Order closing the case is appropriate as there is no bankruptcy purpose for the case to remain open.

The Reorganized Debtor submits that the Chapter 11 Case is fully administered as contemplated by the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Local Ru1es, and that the Debtor's case should now be closed and a discharge entered.

Accordingly, it is appropriate for the Court to enter a final decree closing the Debtor's case.

### V.

### NOTICE

Notice of this Motion has been given to (a) all creditors, (b) the Office of the United States Trustee and (c) those persons who have requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### VI.

### NO PRIOR REQUEST

No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests entry of a final decree closing the Debtor's case pursuant to section 350 of Bankruptcy Code, Rule 3022 of the Bankruptcy Rules,

12

0098

1  and Rule 3020-1 (d) of the Local Rules, and granting such other and further relief as this Court

2  deems just and proper.

3

4  Dated:  February 9, 2017                    LEECH TISHMAN FUSCALDO & LAMPL LLP

5

6                                              By:  */s/ Stuart I. Koenig*
                                                    SANDFORD L. FREY
7                                                   STUART I. KOENIG
                                               Reorganization Attorneys for Hawkeye Entertainment,
8                                              LLC, Reorganized Debtor

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

## **DECLARATION OF ADI MCABIAN**

I, ADI MCABIAN, declare as follows:

1.   I am the manager of Hawkeye Entertainment, LLC, the Reorganized Debtor[2] ("Debtor") herein.  I manage the Debtor's day-to-day financial operations, and am familiar with its business and operations.  If called to testify, I could and would testify competently concerning the contents of this Declaration.  My knowledge of the facts set forth herein is based on my personal knowledge of the non-Debtor's books and records as well as my observations of the non-Debtor's asset in a commercial office building.  I make this declaration in support of the Debtor's Motion for Order closing this Chapter 11 case and entering a Final Decree ("Motion") pursuant to 28 U.S.C. §§ 157(b) and 1334 of the Bankruptcy Code, and Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

2.   On June 20, 2016 (the "Confirmation Order") [Docket No. 363] this Court confirmed the Debtor's Chapter 11 Plan of Reorganization (the "Plan").  The Effective Date of the Plan was September 2, 2016. Under the Plan, the Debtor will continue to operate the business as the Reorganized Debtor.

3.   Pursuant to the Confirmation Order, the Court retained jurisdiction to, among other things, oversee the implementation of the Plan.  The Reorganized Debtor has filed all of its required Monthly Operating Reports for the period from the Petition Date through June 30, 2016. In addition, the Reorganized Debtor has paid all quarterly fees associated therewith.

4.   As the manager of the Debtor I am responsible for the payment of Administrative Claims after the Effective Date of the Plan. The Debtor has been making payments on the Administrative Claims.  As of this date, there are no pending matters or open proceedings remaining, and all final motions for approval of compensation and reimbursement of expenses have been approved by the Court.   Therefore, the Debtor's Plan has been substantially consummated and the case may be closed and a Final Decree entered by the Court.

---

[2] Capitalized terms shall have the meaning ascribed to them in the Motion, unless defined otherwise herein.

14

5.    The Reorganized Debtor has completed its review and analysis of all filed and scheduled claims in this case.  All objections to claims have been resolved by Orders of this Court.

6.    I believe that issuing a Final Decree and closing the case, at this time, is in the best interest of creditors and the Estate, because it is made without prejudice to all parties.

I declare under penalty of perjury that under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on February___, 2017, at Sherman Oaks, California.

_____
ADI MCABIAN

15

0101

# EXHIBIT 9

0102

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| | | in and inure to the benefit of the Reorganized Debtor.<br><br>**Further Assurances.** The Holders of the Allowed Class 2 Claims shall promptly execute and deliver any and all documents and take such other or further actions as are reasonably necessary, appropriate or requested by the Debtor and/or Reorganized Debtor to effectuate the provisions of the Plan. |

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| **CLASS 3** | **CLASSIFICATION AND TREATMENT OF CLAIMS OF NEW VISION**<br><br>POC Claim Amount= $1,006,125.87 per POC No. 2-1<br><br>Scheduled Claim = $946,224 (disputed, contingent and unliquidated)<br><br>Amount of the Claim per New Vision Settlement Agreement = $0 | Class 3 consists of the claims of New Vision. Such Holder shall receive the treatment provided under and pursuant to the New Vision Settlement Documents, the terms of which are incorporated by reference as if set forth in full herein.<br><br>Accordingly, the Plan leaves unaltered all legal, equitable, and contractual rights of such Holder. Class 3 is <u>unimpaired</u> under the Plan. |

| CLASS NO. | DESCRIPTION | TREATMENT |
|---|---|---|
| **CLASS 4** | **CLASSIFICATION AND TREATMENT OF THE HOLDERS OF THE** | Class 4 consists of the Holders of the Interests in the Debtor. Such Holders shall retain their equity ownership Interests and voting Interests |

| CLASS NO. | DESCRIPTION | TREATMENT |
|-----------|-------------|-----------|
| | INTERESTS IN THE DEBTOR. | in the Reorganized Debtor, which shall remain unaltered by the Plan. The Plan leaves unaltered all legal, equitable, and contractual rights of the Interest Holders.<br><br>Class 4 is <u>unimpaired</u> under the Plan. |

## D.   TREATMENT OF NON-CONSENTING CLASSES

Even if all Classes do not consent to the proposed treatment of their Claims under the Plan, the Plan may nonetheless be confirmed if the dissenting Classes are treated in a manner prescribed by the Bankruptcy Code. The process by which dissenting Classes are forced to abide by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Code allows dissenting Classes to be crammed down if the Plan does not "discriminate unfairly" and is "fair and equitable." These are complex statutory provisions and the explanations contained in the succeeding paragraphs do not purport to be exhaustive. The Bankruptcy Code does not define discrimination, but it does provide a minimum definition of "fair and equitable."

The term "fair and equitable" can mean that secured claimants retain their liens and receive Cash payments whose present value equals the value of their security interest. For example, if a creditor lends the hypothetical debtor $100,000 and obtains a security interest in property that is worth only $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash payments whose present value equals $80,000 and not $100,000.

The term "fair and equitable" also means that no Claim or Interest that is junior to the General Unsecured Claimants will receive or retain anything under the Plan, unless the Plan provides for full satisfaction of such senior Class of General Unsecured Claims. However, there are exceptions to this general rule. Therefore, if a class of General Unsecured Claims votes against the Plan, the Plan cannot be confirmed where a Class of Equity Interest Holders will receive or retain any property under the Plan, unless the Plan provides that the class of General Unsecured Claims shall be paid in full with interest or an exception to the general rule applies. ("Fair and equitable" also means that each Holder of an Interest must receive the value of such Interest or else no junior Interest is entitled to receive anything.)

Notwithstanding the foregoing, one of the exceptions to the "fair and equitable" is where the plan contemplates an infusion of "new value" in which case General Unsecured Creditors need not be paid in full.

In this Case, New Vision has agreed to accept the treatment under the Plan consistent with the New Vision Settlement Agreement.

0104

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): **LANDLORD'S OPPOSITION TO DEBTOR'S MOTION TO ASSUME LEASE AND REQUESTING ADDITIONAL RELIEF; DECLARATION OF MICHAEL S. CHANG IN SUPPORT**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)  October 23, 2019  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Sandford L. Frey on behalf of Debtor Hawkeye Entertainment, LLC
sfrey@leechtishman.com, lmoya@leechtishman.com;dmulvaney@leechtishman.com

David S Kupetz on behalf of Interested Party Courtesy NEF
dkupetz@sulmeyerlaw.com, dperez@sulmeyerlaw.com;dperez@ecf.courtdrive.com;dkupetz@ecf.courtdrive.com

S Margaux Ross on behalf of U.S. Trustee United States Trustee (SV)
margaux.ross@usdoj.gov

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Steven Werth on behalf of Interested Party Courtesy NEF
swerth@sulmeyerlaw.com, cblair@sulmeyerlaw.com;mviramontes@sulmeyerlaw.com;swerth@ecf.inforuptcy.com

☐ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  October 23, 2019 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  October 23, 2019 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA PERSONAL DELIVERY
The Honorable Maureen A. Tighe
U.S. Bankruptcy Court
Bin on 1st Floor outside entry to Intake Section
21041 Burbank Blvd.
Woodland Hills, CA 91367

☐ Service information continued on attached page.

SFW 2687067v9

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 23, 2019 | Maria R. Viramontes | /s/Maria R. Viramontes |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

SFW 2687067v9 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

ADDITIONAL SERVICE INFORMATION (if needed):

## 2. SERVED BY U.S. MAIL

**Debtor**
Hawkeye Entertainment, LLC, Debtor
14242 Ventura Boulevard # 300
Sherman Oaks, CA 91423

Ahmed Al Goud
P O Box 10211
Dubai, UAE

Dentons US LLP
601 S Figueroa Street
Suite 2500
Los Angeles, CA 90017

Laurentiu Beada
10626 Valley Spring Unit 204
North Hollywood, CA 91602

New Vision Horizon LLC
304 S Kingsley Drive
Los Angeles, CA 90020

Rene Vardapour
943 Andover Drive
Burbank, CA 91504

Robert Guichard
1578 35th Avenue
San Francisco, CA 94122

Saybian Gourmet Inc
14242 Ventura Blvd Suite 212
Sherman Oaks, CA 91423

Social Entertainment Group 17412
Ventura Boulevard Suite 35
Encino, CA 91316

WERM Investment LLC 14242
Ventura Blvd. Suite 212 Sherman
Oaks, CA 91423

William McAbian
14242 Ventura Blvd Suite 210
Sherman Oaks, CA 91423

SFW 2687067v9 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                F 9013-3.1.PROOF.SERVICE