# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SAN FERNANDO VALLEY DIVISION

**FILED & ENTERED**

**SEP 10 2020**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** fisherl    **DEPUTY CLERK**

| | |
|---|---|
| In re:<br><br>Hawkeye Entertainment, LLC,<br><br>Debtor(s), | Case No.: 1:19-bk-12102-MT<br><br>Chapter: 11<br><br>**NOTICE OF TENTATIVE RULING RE: MOTION FILED JOINTLY BY DEBTOR AND DEBTOR-IN-POSSESSION AND SUBTENANT, W.E.R.M, INVESTMENTS, LLC FOR ORDER AUTHORIZING THE USE OF THE LEASED PREMISES FOR VIRTUAL MUSIC EVENTS AND FILM SHOOTS PURSUANT TO THE LEASE AND/OR SECTION 363 OF THEBANKRUPTCY CODE**<br>Date: September 9, 2020<br>Time: 10:30 a.m.<br>Location: Courtroom 302 (via Zoom.gov) |

At the above date and time, the Court held a hearing on the Motion of the Debtor and Debtor-in-Possession and Subtenant W.E.R.M., Investments, LLC for an Order Authorizing the Use of the Leased Premises for Virtual Music Events and Film Shoots Pursuant to the Lease and/or Section 363 of the Bankruptcy Code (the "Motion"), filed by the Debtor and Debtor-In-Possession and Subtenant. Appearances are as noted on the record for the hearing. At the hearing, the Court adopted its tentative ruling on the Motion. A copy of the Court's tentative ruling is attached to this cover page.

//

On August 21, 2020, Hawkeye Entertainment LLC, ("DIP") filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code to protect its' lease in real property located at 618 South Spring Street, Los Angeles, CA (commonly known as the Pacific Stock Exchange Building). According to the lease agreement, the DIP is entitled to use the first four floors and the basement of the building, which in turn the DIP subleases to W.E.R.M. Investments, LLC ("WERM"). WERM uses the property to host various large-scale events.

The restrictions placed on public gatherings as a result of the Covid-19 pandemic have prevented WERM from hosting events and the building is not actively being used by the DIP or WERM to generate income. Recently, the DIP and WERM filed a motion seeking Court approval to use the building for religious service events in the ordinary course of its business and/or pursuant to section 363 of the Bankruptcy Code (Docket No. 81) ("Religious Event Motion"). The Court authorized the use of the property for religious service events and entered an order on July 17, 2020 (Docket No. 108). Although the Court authorized the use of the property to hold religious events, recent regulations have prevented these religious services from occurring at the property.

To make use of the unused property, the DIP and WERM have arranged for virtual events and related filming to begin taking place at the property. The DIP and WERM believe that these types of events would be considered ordinary use of the property and do not need the Court's approval prior to hosting them at the property. To that end, the DIP and WERM filed this joint motion seeking the Court's approval. Smart Capital objects.

Section 363's horizontal and vertical tests:

11 U.S.C. § 363(b)(1) provides, in pertinent part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." The Bankruptcy Code does not provide a definition of the important term "ordinary course of business." Two tests have emerged for determining whether a transaction is within the ordinary course of business for purposes of § 363(c) -- the vertical dimension, or creditor's expectation, test, and the horizontal dimension test. Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.), 853 F.2d 700, 704 (9th Cir. 1988).  If both tests are satisfied, the court must conclude that the challenged transaction occurred in the debtor's ordinary course of business. Id. *at 705*; *see also* Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer), 95 B.R. 143, 147 & n.4 (B.A.P. 9th Cir. 1988) (stating that "the Ninth Circuit has determined that a transaction which meets both the 'horizontal' and 'vertical' dimension tests is in the ordinary course of business…").

The vertical dimension, or creditor's expectation test, views the disputed transaction 'from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit.'" In re Dant & Russell, Inc.*,* 853 F.2d at 705. In determining whether the transaction meets the vertical dimension test, courts often look to the debtor's prepetition business practices. Aalfs v. Wirum (In re Straightline Invs.), 525 F.3d 870, 879 (9th Cir. 2008).

Under the horizontal dimension test, the question is "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *In re Dant & Russell, Inc.*, 853 F.2d at 704 (citations omitted). For example, "raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business." Johnston v. First St. Cos. (In re Waterfront Cos., Inc.)*,* 56

B.R. 31, 35 (Bankr. D. Minn. 1985). The purpose of the horizontal test is " 'to assure that neither the debtor nor the creditor [did] anything abnormal to gain an advantage over other creditors . . .*"* In re Dant & Russell, Inc., 853 F.2d at 704

Here the lease provides at paragraph 1.17 for the premises to be used as an "entertainment venue" and for "related lawful business". Pursuant to the terms laid out in Section 5 of the sublease, WERM is not allowed to operate the property for anything other than a night club, gallery and general office space. While the parties disagree as the meaning of these provisions it is undisputed that the DIP and WERM used the property to film prepetition. Filming was something the DIP and WERM were involved with prepetition and the parties should have anticipated that filming would continue post-petition. Further, the use of the property by WERM as a dance venue, and for music events, such as concerts and DJ events has been going on since 2009 and the inception of the sublease. Converting such events to ones held virtually does not change the character of the event. It simply allows events to occur that would have been prohibited by the "no gathering" laws in effect in California and locally. Using this property for streaming and filming purposes satisfies the vertical test.

One of the positive aspects this Covid-19 pandemic has shown us has been the ingenuity and creativity of the human spirt. No place is that truer than the entertainment industry. Musicians have performed live concerts through streaming services and television stations, and movies that were set to hit the theaters instead redirected and went directly to streaming platforms. Streaming and filming live performances are just one of the ways the entertainment industry has adapted to the pandemic; other adaptations include socially distant concerts and the resurgence of drive through movie theaters. For a large indoor venue designated as an entertainment venue, streaming and filming is the only viable entertainment related option

available at this time. Since the entertainment industry has leaned in on streaming services in the last few months, recording and streaming events have become the "new normal" and a growing trend for this industry. The use of the property to film and stream events satisfies the horizontal test under the reasonable expectations of people in this industry. Accordingly, the Court finds that filming and streaming are considered uses of the property in the ordinary course of business.

Assuming, arguendo, that the use of the property for streaming and filming were considered not in the ordinary course of business, the Court could still approve such a use after notice and a hearing. Right now, this property is not being used to conduct any events, there is no end in sight as to the pandemic restrictions pertaining to large indoor public events, and there is no revenue being generated. After the DIP and WERM sought and obtained this Court's approval in the Religious Event Motion, the restrictions regarding large religious gatherings changed, and the property could no longer be used to host church services. Considering the ongoing restrictions, the use of the property to film or stream events maybe only way to generate funds and make use of an otherwise vacant property. Even if the benefit to the estate is merely making enough to pay the rent, or contribute something to the rent payment, it is better than the alternative. Outside of the argument that streaming live events and filming are against the terms of the lease, Smart Capital is unable to cite one valid reason justifying why the property should sit vacant during this time instead of being used to generate some form of income. Accordingly, the Court would still allow the property to be used to film and stream events even if these events were not deemed in the ordinary course of business.

Adversary Objection

Similar to the Religious Events Motion, Smart Capital asserts that this motion is nothing more than a comfort order seeking equitable relief. As such, this should be brought by way of an Adversary Proceeding in accordance to Federal Rule of Bankruptcy Procedure 7001. Smart Capital's reliance on In Re Automationsolutions Int'l, L.L.C. 274 B.R. 527 (Bankr. N.D. Cal 2002) is inapplicable in this context. Unlike in Automationsolutions, the issues necessary for the Court to make this determination pursuant to Section 363 of the Bankruptcy Code are properly before this Court, and the only party with an objection to the relief requested has been afforded due process. There is no alteration of the parties' property interests being sought. Here the DIP properly brought the motion pursuant to Section 363 of the Bankruptcy Code seeking Court approval of the use of the Premises for Virtual Events and Filming after notice and a hearing. The Court overrules this objection in Smart Capital's opposition.

Sublease or License Issue

Smart Capital's argument that the DIP seeks the approval of an assignment or sublease is unfounded. A lease (or sublease) is an agreement that grants to the tenant the rights of exclusive possession and use of the real property for a specified period time, thus creating a possessory estate in real property. Howard v. County of Amador, 269 Cal. Rptr. 807, 813 (Cal. App. 1990). A license, in contrast, gives authority to a licensee to perform an act or acts on the property of another pursuant to the express or implied permission of the owner. Golden West Baseball Co. v. City Anaheim, 31 Cal. Rptr. 2d 378, 394 (Cal. App. 1994). "Whether an agreement for the use of property constitutes a license or a lease generally is determined by the nature of the possession granted. If the contract gives exclusive possession of the premises against all the world, including the owner, it is a lease; if it merely confers a privilege to occupy

the premises under the owner, it is a license." <u>Qualls v. Lake Berryessa Enters.</u>, 91 Cal. Rptr. 2d 143, 147 (Cal. App. 1999).

The proposed agreement that the DIP and WERM have entered appears to be a license for a party to use the property to film and not a sublease or an assignment of the exclusive rights to the property. Nothing in the lease or California law prohibits the DIP and WERM from granting a license to use the property. The Court is willing to include language in the order clarifying this point to ensure the protection in Smart Capital's interests and rights.

The DIP's and WERM's joint motion to use the property for streaming live events and filming pursuant to 11 U.S.C. § 363 is GRANTED.

###

Date: September 10, 2020

Maureen A. Tighe
United States Bankruptcy Judge