1   David S. Kupetz (CA Bar No. 125062)
      *dkupetz@sulmeyerlaw.com*
2   Steven F. Werth (CA Bar No. 205434)
      *swerth@sulmeyerlaw.com*
3   **Sulmeyer**Kupetz
    A Professional Corporation
4   333 South Grand Avenue, Suite 3400
    Los Angeles, California 90071
5   Telephone: 213.626.2311
    Facsimile: 213.629.4520
6
    Attorneys for Smart Capital Investments I, LLC,
7   Smart Capital Investments II, LLC,
8   Smart Capital Investments III, LLC,
    Smart Capital Investments IV, LLC, and
9   Smart Capital Investments V LLC,
10  Landlord

11          **UNITED STATES BANKRUPTCY COURT**

12          **CENTRAL DISTRICT OF CALIFORNIA**

13          **SAN FERNANDO VALLEY DIVISION**

14  In re                          | Case No. 1:19-bk-12102-MT

15  HAWKEYE ENTERTAINMENT, LLC,    | Chapter 11

16          Debtor.                | **APPENDIX OF UNREPORTED DECISIONS IN SUPPORT OF LANDLORD'S FURTHER BRIEF IN OPPOSITION TO MOTION FOR ATTORNEY'S FEES**

19                                 | [LBR 9013-2(c)(3)(D)]

20
21                                 | [Relates To Docket No. 275, Filed Concurrently]

22                                 | Date:   January 19, 2021
23                                 | Time:   10:30 a.m.
                                   | Place:  Courtroom 302
24                                 |         21041 Burbank Boulevard
                                   |         Woodland Hills, CA  91367
25

26

27  **TO THE HONORABLE MAUREEN A. TIGHE, UNITED STATES**

28  **BANKRUPTCY JUDGE, AND PARTIES ENTITLED TO NOTICE:**

SFW 2708286v1

Pursuant to Local Bankruptcy Rule 9013-2(c)(3)(D), Smart Capital Investments I, II, II, IV, and V, LLC hereby submits its appendix of the following unreported decisions in support of its "Landlord's Further Brief In Opposition To Debtor's Motion For Attorney's Fees"  [Docket No. 275]:

1.    *Chase Manhattan Bank v. Grasso*, CV990173244, 2001 Conn. Super. LEXIS 111 (Super. Ct. Jan. 17, 2001), an unmarked, complete copy of which is attached hereto as **Exhibit 1.**

2.    *Sawyer v. Sawyer*, No. G056510, 2020 Cal. App. Unpub. LEXIS 3889 (June 23, 2020),  an unmarked, complete copy of which is attached hereto as **Exhibit 2.**

3.    *Stegman v. Bank of Am.*, 156 Cal.App. 3d, 843, 203 Cal. Rptr. 103 (1984), an unmarked, complete copy of which is attached hereto as **Exhibit 3.**

4.    *Wallace v. Busch Entm't Corp.*, No. 09-cv-2785-L(RBB), 2013 U.S. Dist. LEXIS 11975 (S.D. Cal. Jan. 25, 2013), an unmarked, complete copy of which is attached hereto as **Exhibit 4.**

Dated:  December 29, 2020

**Sulmeyer**Kupetz
A Professional Corporation

By: _____
        David S. Kupetz
        Steven F. Werth
        Attorneys for Landlord

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

# EXHIBIT 1

ⓘ Cited
As of: December 16, 2020 8:05 PM Z

# *Chase Manhattan Bank v. Grasso*

Superior Court of Connecticut, Judicial District of Stamford - Norwalk, At Stamford

January 17, 2001, Decided ; January 17, 2001, Filed

CV990173244

**Reporter**
2001 Conn. Super. LEXIS 111 *

Chase Manhattan Bank v. Joseph Grasso

**Notice:** **[*1]** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**Disposition:** Court grants plaintiff's motion for summary judgment as to liability only against defendants.

**Overview**

Defendants filed an answer and two special defenses to plaintiff bank's foreclosure action. Neither special defense attacked the making, enforcement, or validity of the note or mortgage and neither arose out of the same transaction as the foreclosure action. Plaintiff informed defendants of their right to reinstate after acceleration. Defendants claimed that the notice of default was not effective because it violated the automatic stay provision in bankruptcy. The sending of the notice, however, was not a judicial, administrative, or other action or proceeding against the debtor. The notice of default did not violate the bankruptcy's automatic stay provision because it did not constitute the initiation of a judicial proceeding against defendants.

## Core Terms

notice of default, summary judgment motion, summary judgment, acceleration, reinstate, judicial proceedings, effective, estopped, genuine issue of material fact, automatic stay provision, special defense, instant action, continuation, foreclosure

**Outcome**

The court granted plaintiff's motion for summary judgment as to liability only against defendants, since there was no issue as to whether the notice of default was effective, and the notice did not violate the automatic stay provision in bankruptcy.

## Case Summary

**Procedural Posture**

Plaintiff bank sought to foreclose on a mortgage and note. Plaintiff moved for summary judgment as to liability on the ground that no genuine issue of material fact existed, and plaintiff was entitled to foreclosure of the note.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

*HN1*[⬇] **Summary Judgment, Entitlement as Matter of Law**

The standards governing the appellate court's review of a trial court's decision to grant a motion for summary judgment are well established. Conn. Gen. Prac. Book § 384 (now Conn. Gen. Prac. Book, R. Super. Ct. § 17-49) provides that summary judgment shall be rendered forthwith if the pleadings, affidavits, and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Bankruptcy Law > ... > Automatic Stay > Scope of Stay > Claims Against Debtors

Civil Procedure > ... > Entry of Judgments > Stays of Judgments > Automatic Stays

Bankruptcy Law > Case Administration > General Overview

Bankruptcy Law > Administrative Powers > Automatic Stay > General Overview

Bankruptcy Law > ... > Automatic Stay > Scope of Stay > General Overview

Bankruptcy Law > ... > Bankruptcy > Case Administration > Notice

*HN2*[⬇] **Scope of Stay, Claims Against Debtors**

*Section 362 of the Bankruptcy Code* provides that the filing of a bankruptcy petition creates an automatic stay

against the commencement or continuation of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case.The sending of a notice of default is not a judicial, administrative, or other action or proceeding against the debtor. An action is defined to be any judicial proceeding, which, if conducted to a determination, will result in a judgment or decree.

Bankruptcy Law > Administrative Powers > Automatic Stay > General Overview

Civil Procedure > ... > Entry of Judgments > Stays of Judgments > Automatic Stays

Governments > Courts > Clerks of Court

*HN3*[⬇] **Administrative Powers, Automatic Stay**

The simple and "ministerial" act of the entry of a judgment by the court clerk does not constitute the continuation of a judicial proceeding under *§ 362(a)(1) of the Bankruptcy Code*.

**Judges:** RESHA, J.

**Opinion by:** RESHA

# Opinion

*ORDER*

The plaintiff, Chase Manhattan Bank f/k/a Chemical Bank, moves for summary judgment as to liability as against Joseph M. Grasso a/k/a Joseph Grasso and Joanne M. Grasso a/k/a Joanne Mercede Grasso a/k/a Joanne Grasso (the defendants) on the ground that no genuine issue of material fact exists that the plaintiff is entitled to foreclosure. *HN1*[⬆] "The standards governing our review of a trial court's decision to grant a motion for summary judgment are well established. Practice Book § 384 [now § 17-49] provides that

summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Witt v. St. Vincent's Medical Center, 252 Conn. 363, 368, 746 A.2d 753 (2000)*. To the complaint, **[*2]** defendant filed an answer and two special defenses as follows: that "the plaintiff is barred and estopped from pursuing the instant action as plaintiff has failed to properly account for all payments and credits properly due Joanne and Joseph Grasso, and is thereby barred and estopped from bringing the instant action" and "the plaintiff is barred and estopped from collecting late charges for payments not made." Neither special defense attacks the making, enforcement, or validity of the note or mortgage and neither arises out of the same transaction as the foreclosure action.

In an order dated August 2, 2000, the court ( *Rodriguez, J.*) denied the plaintiff's prior motion for summary judgment on the ground that the plaintiff failed to submit any evidence that it informed the defendants of their right to reinstate after acceleration. In its memorandum dated September 20, 2000, the plaintiff states it "provided the notice of default as an exhibit to the Motion for Summary Judgment, which notifies the Defendants of their right to reinstate after acceleration. The Plaintiff further supplied the court with its Supplemental Affidavit dated March 18, 2000 which is a sworn testimonial to **[*3]** the fact that the Notice of Default was sent." The court, however, did not find the notice of default attached as an exhibit to the motion for summary judgment dated March 15, 2000, but does find the notice of default attached as an exhibit to the motion for summary judgment dated September 20, 2000. Here, the notice of default states "you have the right to be reinstated after acceleration." Consequently, the court finds that no genuine issue of material fact exists that the plaintiff informed the defendants of their right to reinstate after acceleration.

The plaintiff's notice of default was effective notwithstanding the defendants' pending bankruptcy action. *HN2*[↑] "*Section 362 of the Bankruptcy Code* provides that the filing of a bankruptcy petition creates an automatic stay against 'the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case.' " *Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 527 (2nd Cir. 1994)*. Here, the defendants claim that the notice of default was not effective because it violated the automatic stay provision in **[*4]** bankruptcy. The sending of the notice, however, is not a "judicial, administrative, or other action or proceeding against the debtor." An action "is defined to be any judicial proceeding, which, if conducted to a determination, will result in a judgment or decree." Black's Law Dictionary (7th Ed. 1999). The notice of default did not violate the bankruptcy's automatic stay provision because it did not constitute the initiation of a judicial proceeding against the defendants. Cf. *Rexnord Holdings, Inc. v. Bidermann, supra, 21 F.3d 527* ("we do not believe that *HN3*[↑] the simple and 'ministerial' act of the entry of a judgment by the court clerk constitutes the continuation of a judicial proceeding under *Section 362(a)(1)*"). Consequently, the court finds that the notice of default was effective.

Accordingly, the court grants the plaintiff's motion for summary judgment as to liability only against **[*5]** the defendants.

RESHA, J.

---

**End of Document**

# EXHIBIT 2

🔴 Warning

As of: December 16, 2020 8:06 PM Z

## *Sawyer v. Sawyer*

Court of Appeal of California, Fourth Appellate District, Division Three

June 23, 2020, Opinion Filed

G056510

**Reporter**

2020 Cal. App. Unpub. LEXIS 3889 *; 2020 WL 3423477

WENDY SAWYER et al., Plaintiffs, Cross-Defendant, and Appellants, v. STEPHEN D. SAWYER, Defendant, Cross-Complainant, and Appellant; JASON SAWYER et al., Defendants and Respondents.

**Notice:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. *CALIFORNIA RULES OF COURT, RULE 8.1115(a)*, PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY *RULE 8.1115(b)*. THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF *RULE 8.1115*.

**Subsequent History:** Related proceeding at *In re Sawyer, 2020 Cal. App. Unpub. LEXIS 3905 (Cal. App. 4th Dist., June 23, 2020)*

**Prior History: [*1]** Appeal from a judgment of the Superior Court of Orange County, No. 30-2016-00855339, Thomas A. Delaney, Judge.

**Disposition:** Affirmed.

## Core Terms

trial court, attorney's fees, partner, damages, gambling, lawsuit, fiduciary duty, plaintiffs', partnership, stealing, moving party, attorney's fees provision, conversation, prevailing party, cross-complaint, argues, costs, fees and costs, confession, defending, breach of fiduciary duty, directed verdict motion, extrinsic evidence, prior statement, embezzled, breached, parties, stolen, divorce judgment, future claim

**Counsel:** Buchalter, Michael W. Caspino, Robert M. Dato and Megan M. Holbrook for Plaintiffs, Cross-defendants and Appellants Wendy Sawyer, Sawyer Consulting, LLC, Sunset Coast Properties, LLC, WAW Consulting Inc., IWC Holdings, LLC, and Industrial Insurance Services, Inc.

Robie & Matthai, Edith R. Matthai and T. John Fitzgibbons for Defendant, Cross-complainant and Appellant, Stephen D. Sawyer.

Klinedinst, Earl M. Pott, Harold C. Trimmer and Robert M. Shaughnessy for Defendants and Respondents, Jason R. Sawyer and Sawyer & Sawyer.

**Judges:** ARONSON, ACTING P. J.; FYBEL, J., IKOLA, J. concurred.

**Opinion by:** ARONSON, ACTING P. J.

## Opinion

This appeal and cross-appeal arise out of a tragic embezzlement case in which a son with a gambling problem stole thousands of dollars from his mother while acting as her attorney. The mother sued her ex-husband, a retired attorney who once had been the son's law partner, for breach of fiduciary duty when he failed to warn her of their son's gambling and thievery.

The jury found for the ex-husband on the breach of fiduciary duty claim. The jury also found for him on his cross-complaint **[*2]** against his ex-wife for breaching their marital settlement agreement by suing him for claims released in that agreement.

In this appeal, the ex-wife challenges the trial court's order denying her motion for a directed verdict against her ex-husband for breach of fiduciary duty. She also challenges an order excluding certain evidence. In the cross-appeal, the ex-husband challenges only the amount of damages awarded on the cross-complaint. We find neither appeal well taken and, accordingly, affirm the judgment in all respects.

I

BACKGROUND

A. *The Early Days*

Stephen and Wendy Sawyer[1] married in 1983. Together, they raised four children: Jason and Anne, Stephen's children from a prior marriage, and Matthew and Stephanie, the two children they had together. When he married Wendy, Stephen was an attorney with a solo practice. In 1999, son Jason was admitted to the Bar and joined Stephen's practice. In 2004, the firm became "Sawyer & Sawyer," a limited liability partnership. In approximately 2008, Stephen retired from the firm. Despite his retirement, Stephen continued to perform legal work for, and manage, several companies owned by Wendy.

B. *The 2012 Marital Separation*

In early 2012, Wendy and **[*3]** Stephan separated. Near the end of 2012, Stephen reduced his share in Sawyer & Sawyer to one percent, with Jason holding the remaining 99 percent. Because Stephen "was no longer working there," Stephen and Jason discussed dissolving Sawyer & Sawyer. When they learned the firm had to stay in existence to maintain its group medical insurance policy, however, Stephen decided to retain his one percent interest, ensuring he and other family members, including Wendy, would remain insured under the group policy.

In February 2013, Wendy fired Stephen and transferred to Jason all the legal and management work Stephen had been performing for her and her companies. By that point, Wendy and Stephen were no longer speaking to each other. From February 2013 onward, Wendy barred Stephen from access to any information about her, her finances, or her businesses. Wendy stated she had "lost trust in what he said he was doing to help" her. Wendy instructed their four children not to give Stephen any information about her.

C. *Jason's Embezzlement from Wendy and Her Companies*

After taking over Stephen's management and law-related duties in 2013, Jason began embezzling from Wendy and her companies (collectively, **[*4]** plaintiffs). Between 2013 and 2016, Jason embezzled from plaintiffs a total of $558,371. Jason accomplished the embezzlement primarily by writing checks to Sawyer & Sawyer from the companies' accounts, depositing those checks in Sawyer & Sawyer's operating account, and then writing checks from that account to himself. Jason also took $121,600 in cash from Wendy's safe deposit box. Jason used the money to gamble and lost it all.

D. *Jason's 2015 Confessions to Stephanie and Stephen*

In April 2015, Jason tearfully confessed to his sister Stephanie he had a gambling problem and had stolen an undisclosed amount of money from Wendy. He told Stephanie he was getting help from a counselor and from Gamblers Anonymous. Jason said he was working on paying Wendy back, and begged Stephanie not to tell Wendy about the gambling or theft. He promised to tell Wendy once he had repaid the stolen funds.

At trial, Stephanie testified she believed Jason was no longer gambling when he made this confession to her. She testified she believed then the amount Jason owed Wendy was between $20,000 and $30,000, and she thought Jason could repay the debt by foregoing the monthly retainer of $25,000 Wendy was paying **[*5]** him for his work.

In a telephone conversation in June 2015, Jason confided to Stephen his marriage was crumbling and he

---

[1] Because the parties and many of the witnesses in this case share the same surname, we will refer to them by their first names for clarity. No disrespect is intended.

had a gambling problem. Jason also informed Stephen he had "received some advanced fees from Wendy." Jason told Stephen he was attending Gamblers Anonymous meetings, seeing a counselor for his gambling addiction, and working to catch up on the advanced fees he had taken.

E. *Jason's 2016 Confession to Wendy and Examination Under Oath*

In late April 2016, just before leaving for a trip to China, Stephen met his children Jason and Anne for breakfast. During the meal, Jason confessed to Stephen and Anne he was gambling again and had stolen over $120,000 from Wendy's safe deposit box. Stephen testified he was "shocked and angry" at the news. Stephen left the breakfast with the understanding Jason and Stephanie "would be meeting with Wendy very soon" to discuss the situation. Days later, Stephen left for China.

The next week, Jason met with Wendy, accompanied by his siblings Stephanie and Matt. Jason told Wendy he had stolen over $100,000 in cash from her safe deposit box and thousands of dollars from her companies. He further admitted he lost all the money gambling. By all **[*6]** accounts, the meeting was an emotionally searing experience which left Wendy hurt and furious, and Jason frightened and desperate about the impact of his malfeasance on his future and on his children. Wendy demanded Jason prepare that night a written confession and a full accounting of everything he had stolen from her. She also insisted he submit to an examination under oath taken by her attorney, Michael Caspino, in which Jason would admit his guilt and confirm the details of the written confession and accounting. Jason complied with Wendy's demands.

When Jason appeared for the examination under oath, Stephen was still in China and received no notice of the examination. In his sworn testimony, Jason admitted stealing $558,371 from Wendy and her companies, and losing all the money gambling. Jason also authenticated the written accounting he had given Wendy detailing the amount he had stolen from each account, and the dates of the thefts.

During the examination under oath, Caspino asked Jason a series of questions focused on Stephen. Caspino asked Jason if he "had had discussions with [Stephen] in the past wherein you confessed to him that you had taken money illegally" from Wendy. Jason **[*7]** responded, "I had told him that I was - I believe in my conversation with him I indicated that I had paid myself more than I was entitled to get paid." When Caspino

asked about "the amount" mentioned to Stephen, Jason said, "I don't remember if I told him a number." Caspino then asked, "Do you recall when you told [Stephen] that you had illegally taken money from [Wendy]?" Jason answered, "It would have been probably maybe mid 2015." This colloquy became the subject of an evidentiary ruling at trial which Wendy challenges in this appeal. (See below, at p. 16.)

Caspino also probed Stephen's relationship with Sawyer & Sawyer, asking whether Stephen was actively practicing law, billing time, receiving income, or coming into the office. Jason answered no to all these inquiries.

F. *Attempts at a Negotiated Settlement*

After his confession to Wendy, Jason sent an e-mail to Stephen in China pleading for help. Jason feared Wendy would report him to the police and the State Bar, and implored Stephen to do what he could to prevent this.[2] Responding while still in China, Stephen presented a plan for how he could help Jason begin to pay Wendy back the embezzled funds. Stephen offered to defer his receipt **[*8]** of a $1.5 million equalizing payment Wendy owed him from their divorce settlement. Stephen also offered to give Wendy $125,000 from his own funds toward repayment of Jason's debt, and to return to work at Sawyer & Sawyer to help Jason build up his practice so Jason could generate fees from which he could repay Wendy. Stephen suggested Jason also could forgo his large monthly retainer and provide free legal service to Wendy's companies.

There were two roadblocks to achieving a settlement. The first was Stephen's discovery he could not ethically condition his offer on Wendy's agreement not to report Jason to the police or the State Bar. The second was Wendy's demand Stephen agree to a stipulated judgment in Wendy's favor for $1.5 million. Caspino wrote, "Essentially, we are asking you to guarantee the proposal that you put forward that repays Wendy and keeps your son out of jail." Stephen refused.

Thereafter, Wendy filed a police report, a State Bar complaint, and the underlying lawsuit.

F. *The Complaint, Cross-Complaint, and Trial*

Wendy and five of her businesses filed a complaint against Jason, Sawyer & Sawyer, and Stephen,

---

[2] Jason's siblings also e-mailed Stephen in China, pleading for Stephen to "rescue" Jason from the terrible consequences that would follow if Wendy reported his conduct to authorities.

essentially alleging, "During the time period of 2011 to 2015, [*9] Defendants misappropriated, embezzled or converted funds in excess of $1 million." The stated causes of action included breach of contract, conversion, and breach of fiduciary duties. Along with his answer, Stephen filed a cross-complaint against Wendy alleging she breached her marital settlement agreement by suing on claims she had released in the agreement.

Jason and Sawyer & Sawyer did not contest liability at trial. Jason refused to testify, invoking his Fifth Amendment privilege against self-incrimination. The only jury issue for these two defendants was damages.

Plaintiffs based their sole theory of liability on Stephen's alleged breach of his fiduciary duties by failing to warn Wendy of Jason's gambling and stealing. According to plaintiffs, had Stephen warned Wendy in mid-2015, when he purportedly learned Jason had a gambling problem and was stealing, Wendy could have acted to greatly reduce her losses, most of which occurred in late 2015. Consequently, a crucial disputed issue at trial was *when* Stephen discovered Jason had stolen from Wendy.

The only evidence on the issue came from two witnesses: Stephen, who testified he only learned of Jason's theft in 2016, and Stephanie, who testified [*10] Stephen knew about the theft in mid-2015. Stephanie testified she and Stephen had a telephone conversation in April 2015 in which they discussed Jason's "stealing and gambling." Stephanie said Stephen advised her in that conversation not to tell Wendy about "the embezzlement, the gambling," because "he thought it would shatter her and ruin the family and hurt Jason."

G. *Exclusion of Part of Jason's Prior Sworn Statement*

Before trial, Stephen filed a motion in limine to exclude Jason's testimony at the prelitigation examination under oath as inadmissible hearsay, among other grounds for exclusion. The trial court agreed to exclude on hearsay grounds that portion of Jason's prior statement which concerned his mid-2015 conversation with Steven. Essentially, the court ruled inadmissible Jason's colloquy with attorney Caspino in which Jason said he had "indicated" to Stephen, in a "mid 2015" conversation, "that I had paid myself more than I was entitled to get paid." The court rejected plaintiffs' contention the prior statement was admissible under the hearsay exception for a "declaration against interest." (*Evid. Code, § 1230.*) The court additionally excluded the statement under *Evidence Code section 352*, finding

it more prejudicial [*11] than probative."

At trial, plaintiffs renewed their effort to introduce into evidence Jason's excluded prior statement about his mid-2015 conversation with Stephen. Plaintiffs wanted Jason's prior statement admitted to bolster Stephanie's trial testimony she and Stephen had discussed Jason's "stealing and gambling" over the telephone in April 2015. In their opening brief, plaintiffs characterize the issue as a "classic 'he said, she said'" dispute, citing Stephen's testimony Stephanie lied when she testified the two of them talked in 2015 "about Jason stealing[.]" Stephen testified he knew nothing about Jason's "stealing" in 2015; Stephen insisted he first learned Jason had stolen from Wendy in late April 2016 when he, Jason, and Anne had breakfast together before his trip to China. Stephen testified that in 2015 he knew only that Jason had taken "advanced fees," which Stephen did not consider "stealing."[3]

Plaintiffs' counsel Caspino argued he should be allowed to use Jason's prior sworn statement to impeach Stephen's assertion he knew nothing in 2015 of Jason's "stealing." Caspino argued Jason's prior statement regarding what he told his father in mid-2015 "is clear-as-day impeachment [*12] of what [Stephen] just said up here." Caspino stated, "[Stephen] says Jason never said, 'I stole . . . .' . . . And I have a statement from Jason saying, 'I told my dad I illegally took money.'" The trial court, however, disagreed with Caspino's characterization of the excluded statement.

The trial court stated, "I don't see anything in this - from the part that was excluded . . . where Jason says . . . that he told his dad that he stole." The court went on, "There's no doubt that Jason admits to illegal conduct . . . throughout his examination under oath. What you're trying to do is get testimony where he said, 'I told my dad it was illegal.' . . . [¶] And that's the impeachment I don't see here."[4] Accordingly, the court refused to allow

---

[3] Stephen testified he did not consider Jason's taking advanced fees "to be a problem" because of his own experience receiving advanced fees in his "30-year legal career." Stephen stated he would put advanced fees in his firm's operating account and then "do work for the client and bill against the advanced fee." Stephen also testified Jason's admission of his gambling problem did not cause him to suspect Jason of stealing from Wendy. Stephen explained his own father had a serious gambling problem, but never stole from anyone.

[4] Stephen's counsel pointed out Jason did *not* say in the excluded statement he told Stephen he had "illegally" taken

Caspino to introduce the excluded statement into evidence by way of impeachment. The court stated, "So I am going to stick with my prior ruling that this is hearsay[.]"

H. *Wendy's Motion for Directed Verdict*

At the close of evidence, plaintiffs moved for a directed verdict on their breach of fiduciary claim against Stephen.[5] Plaintiffs argued they had established their claim based solely on Stephen's testimony. The trial court denied the motion, finding **[*13]** Stephen had presented sufficient evidence to show he did not breach his fiduciary duty.

I. *The Verdict and Posttrial Motions*

On the complaint, the jury awarded plaintiffs damages against Jason and Sawyer & Sawyer in the amount of $740,645.84. The jury found Stephen did not breach a fiduciary duty to any of the plaintiffs.

On the cross-complaint, the jury found Wendy breached the marital settlement agreement which was incorporated into the divorce judgment, and the breach caused harm to Stephen. The parties had stipulated during the trial that in the event the jury found Wendy had breached the agreement, the trial court would determine the damages owed to Stephen. The fees awarded as damages turned on the trial court's interpretation of the attorney fees clause of the agreement, discussed below. The trial court awarded Stephen attorney fees of $221,292.82 as damages on the cross-complaint, out of the $597,740.34 in attorney fees Stephen incurred in defending the action.

Plaintiffs moved for a new trial, arguing the trial court erred in excluding Jason's sworn statement about his mid-2015 conversation with Stephen. Wendy also filed a motion for judgment notwithstanding the verdict on Stephen's **[*14]** cross-complaint. Stephen opposed both motions, and the trial court denied both.

Wendy filed the instant appeal from the judgment, challenging the trial court's order denying the motion for directed verdict and the evidentiary ruling excluding Jason's prior statement about his mid-2015

conversation with Stephen.

Stephen also appealed from the judgment, challenging only the amount of damages awarded on the cross-complaint.

II

DISCUSSION

A. *The Trial Court Properly Denied Plaintiffs' Motion for Directed Verdict*

Plaintiffs contend the trial court erred in denying their motion for a directed verdict against Stephen on their breach "of fiduciary duties" claim. Essentially, plaintiffs argue "undisputed" evidence established both that Stephen as a partner of Sawyer & Sawyer owed them fiduciary duties, and that Stephen breached those duties by failing to warn Wendy of Jason's gambling and theft. Plaintiffs' argument lacks merit. As we explain below, substantial evidence supports the finding Stephen was not a partner with Sawyer & Sawyer. That finding necessarily dooms the breach of fiduciary duties claim because Stephen's purported partnership status was the only basis for plaintiffs' contention he **[*15]** owed them fiduciary duties. Consequently, the trial court properly denied plaintiffs' motion for directed verdict.

1. The Standard of Review

In an appeal challenging the denial of a directed verdict, our task is to determine whether substantial evidence supports the verdict. (*Howard v. Owens Corning (1999) 72 Cal.App.4th 621, 630, 85 Cal. Rptr. 2d 386* (*Howard*).) "Only if there was *no* substantial evidence in support of the verdict could it have been error for the trial court earlier to have denied [appellant]'s motion for directed verdict." (*Ibid.*; accord, *Miller v. Elite Ins. Co. (1980) 100 Cal.App.3d 739, 757, 161 Cal. Rptr. 322* [directed verdict is proper only if "'no other reasonable conclusion is legally deducible from the evidence'"].)

Our review is "governed by the well-established standard of review applicable to any claim that a judgment or finding is not supported by the evidence in the record. . . . [W]e must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citations.] . . . [¶] . . . Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial

---

[5] Plaintiffs also moved for a directed verdict against Jason and Sawyer & Sawyer, who did not oppose the motion. The trial court entered a directed verdict against both these defendants on the issue of liability, finding they breached fiduciary duties owed to plaintiffs.

the advanced fees, only that he had taken them: "The illegally taking money, of course, is Mr. Caspino's words."

evidence, contradicted or uncontradicted, in support of the judgment." (*Howard, supra, 72 Cal.App.4th at pp. 630-631*.)[6]

2. The Factual Dispute Over Whether Stephen Was a Partner

Plaintiffs argued in their motion for directed verdict that undisputed evidence established Stephen was a partner of Sawyer & Sawyer when he admittedly learned in mid-2015 Jason had a gambling problem and had taken "advanced fees" from Wendy. Establishing Stephen was a partner was essential to the breach of fiduciary duties claim because, as plaintiffs explain, "[T]he source of Stephen's fiduciary duties is the fact that he was a partner of the law firm of Sawyer & Sawyer and all of the plaintiffs were firm clients." (Italics omitted.) In other words, if Stephen lacked partnership status, he owed no fiduciary duties to plaintiffs as clients of the firm.

Plaintiffs argued in their motion, and contend on appeal, three undisputed facts establish as a matter of law Stephen was a Sawyer & Sawyer partner at the relevant times. The three undisputed facts were as follows: Stephen was then a one percent owner of Sawyer & Sawyer; he was included on the firm's malpractice policy; and "Sawyer & Sawyer's website still described Stephen as senior partner."

Not surprisingly, plaintiffs cite no authority supporting their contention these three **[*17]** facts alone compel a finding Stephen was a law firm partner with fiduciary

---

[6] Sidestepping the rule we review the denial of a directed verdict for substantial evidence, plaintiffs argue we must review *de novo* the finding Stephen owed no fiduciary duties to plaintiffs because "'[t]he existence and scope of a fiduciary duty is a question of law[.]' [Citation.]" This argument fails to recognize that where the existence of a fiduciary relationship is a factual question upon which the parties offered conflicting evidence, the trier of fact's finding on that question is reviewed for substantial evidence. (*Liodas v. Sahadi (1977) 19 Cal.3d 278, 284, 137 Cal. Rptr. 635, 562 P.2d 316* (*Liodas*) [rejecting argument attorney was fiduciary as a matter of law because "it is clear that the existence of a fiduciary relationship, and the termination thereof, was a factual question upon which conflicting evidence was presented to the jury"].)

Plaintiffs argue in *Liodas* **[*16]** there was conflicting evidence on whether a fiduciary duty existed, but here the existence of Stephen's fiduciary duty can be decided as a matter of law based on three undisputed facts. As we explain in the next subpart of this opinion, the three facts plaintiffs cite do not compel a finding as a matter of law that Stephen was a partner of Sawyer & Sawyer at the relevant times.

duties owed to firm clients. The law, of course, is otherwise.

3. The Law on What Constitutes a Partnership

The Corporations Code defines a partnership as "an association of two or more persons to carry on as coowners a business for profit formed under *Section 16202*, predecessor law, or comparable law of another jurisdiction . . . ." (*Corp. Code, § 16101, subd. (9)*.) The case law holds the "defining attributes" of a partnership are co-ownership of partnership property and the sharing of profits and losses. (*Carolina Casualty Ins. Co. v. L.M. Ross Law Group, LLP (2012) 212 Cal.App.4th 1181, 1193, fn. 6, 151 Cal. Rptr. 3d 628*, citing *Chambers v. Kay (2002) 29 Cal.4th 142, 151, 126 Cal. Rptr. 2d 536, 56 P.3d 645* (*Chambers*).) "Whether a partnership . . . exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom. [Citations.]" (*Bank of California v. Connolly (1973) 36 Cal.App.3d 350, 364-365, 111 Cal. Rptr. 468* [substantial evidence supported finding no partnership existed where purported partners did not share business losses and lacked "essential element of right to joint control" of business].)

*Chambers, supra, 29 Cal.4th 142*, involved a fee dispute between two attorneys who served as cocounsel on a contingency fee case. Only one of the two attorneys had been retained by the client. In *Chambers* the two attorneys maintained separate practices, although they shared office space and occasionally **[*18]** worked together. The lawyers agreed in writing to split the contingency fee on the client's case, but they failed to obtain the client's consent to the fee sharing arrangement in violation of Rule 2-200(A)(1) of the California Rules of Professional Conduct, which prohibits an attorney from splitting a legal fee "'with a lawyer who is not a partner of, associate of, or shareholder with the member,'" absent written consent from the client after full disclosure of the fee-splitting agreement. (*Chambers, supra, 29 Cal.4th at p. 145*.)

When the retained attorney refused to share the eventual fee with his "nonretained" cocounsel, the latter sued on a theory of quantum meruit. The trial court entered summary judgment for the defendant attorney on the ground noncompliance with the ethical rule barred court-ordered apportionment of the fee. The Supreme Court in *Chambers, supra, 29 Cal.4th 142*, affirmed. One of the issues on appeal was whether the two attorneys were "partners" and therefore exempt from the ethics rule. The Supreme Court concluded the

evidence was to the contrary.

"Chambers and Kay were not in a partnership and were not each other's partner as those terms are commonly understood." (*Chambers, supra, 29 Cal.4th at p. 150.*) After quoting the Corporations Code provision defining a partnership as "'an association of two or more persons to carry on as **[*19]** coowners a business for profit,'" the high court summarized the case law on what makes a partnership: "Generally, a partnership connotes co-ownership in partnership property, with a sharing in the profits and losses of a continuing business. [Citation.] Here, no evidence suggests that Chambers and Kay acted as co-owners of a law firm or law office, or that they contemplated sharing in the profits and losses of a continuing business engaged in the practice of law." (*Id. at pp. 150-151.*)

Under the case law, Stephen's status as a Sawyer & Sawyer partner depended on proof Stephen and Jason shared profits and losses and otherwise "acted as coowners" of the firm at the relevant times. (*Chambers, supra, 29 Cal.4th at pp. 150-151.*) We found no authority supporting plaintiffs' contention Stephen's one percent ownership interest in Sawyer & Sawyer, inclusion in the firm's malpractice policy, and website listing as a partner, established he was a partner as a matter of law.

3. Substantial Evidence Supports the Finding Stephen Owed No Fiduciary Duties to Plaintiffs

At trial, Stephen presented ample evidence disputing plaintiffs' assertion he was a Sawyer & Sawyer partner at the relevant times. Specifically, Stephen testified he had retired from the firm in **[*20]** 2008 and retained his one percent interest in the firm only to keep the firm in existence so it could continue offering its group medical insurance policy to his family members. Stephen testified since 2008 he received no income from the firm, paid none of its expenses, and did not work for firm clients.[7] The evidence also showed Jason was the sole signatory on Sawyer & Sawyer's client trust account and

operating account.

Stephen also presented evidence showing that although in 2015 he remained listed as an insured on the firms' legal malpractice policy, in January 2014 he sent an e-mail to Sawyer & Sawyer's insurance broker confirming he had retired from the practice of law years earlier. Finally, in counterpoint to plaintiffs' evidence the firm's website still identified Stephen as a partner in 2016, Stephen testified he did not hold himself out as a partner, despite the representations on the website.

Without offering supporting authority or argument, plaintiffs flatly assert Stephen's testimony he "had retired from the practice of law by early 2013" and "did not share in the revenue or expenses of the firm" is "irrelevant" to determining whether he was a partner in the firm during **[*21]** the relevant times. The contention is meritless. As the Supreme Court held in *Chambers, supra, 29 Cal.4th 142*, attorneys are not partners unless they *act as coowners* of the law practice and share in the firm's profits and losses. (*Id. at pp. 150-151.*)

We conclude substantial evidence supports the finding Stephen was not a partner of the firm and, therefore, owed no fiduciary duties to plaintiffs.[8] Accordingly, the trial court correctly denied plaintiffs' motion for a directed verdict on their claim for breach of fiduciary duties. (*Howard, supra, 72 Cal.App.4th at p. 630.*)[9]

B. *Because Stephen Owed No Fiduciary Duties to Plaintiffs, the Exclusion of Jason's Prior Testimony Could Not Constitute Reversible Error*

Plaintiffs argue, as an alternative basis for reversing the judgment, the trial court committed prejudicial error in excluding Jason's prior sworn statement about his 2015 conversation with Stephen. Plaintiffs contend the court wrongly excluded the prior statement as hearsay based on a "misunderstanding" of the law regarding the hearsay exception for a declaration against interest (*Evid. Code, § 1230*).[10] Plaintiffs also argue the court

---

[7] Though Stephen continued to provide legal services to his then-wife Wendy and her companies after his 2008 retirement, that attorney-client relationship ended when Wendy fired him in February 2013. From then on, Stephen performed no legal work for her or her businesses, and Wendy explicitly cut Stephen off from access to any information about her, her finances, or her businesses. Moreover, given Wendy's testimony she fired Stephen because she lost trust in him, there was no basis for implying a confidential relationship between them which could give rise to fiduciary duties.

[8] As stated above, plaintiffs maintain that "the source of Stephen's fiduciary duties is the fact that he was a partner of the law firm of Sawyer & Sawyer and all of the plaintiffs were firm clients." (Italics omitted.)

[9] We need not discuss plaintiffs' additional argument "undisputed" evidence established Stephen breached his fiduciary duties as a matter of law. Stephen could not breach a nonexistent duty.

[10] Plaintiffs argue Jason's prior testimony was also admissible

abused its discretion in ruling the evidence inadmissible on the additional ground it was more prejudicial than probative (*Evid. Code, § 352*). We need not reach the merits **[*22]** of these arguments, however, because even assuming the trial court erred in excluding Jason's prior testimony, that ruling would not constitute reversible error.

Appellate courts will reverse a judgment only if the error resulted in a miscarriage of justice. (*F.P. v. Monier (2017) 3 Cal.5th 1099, 1107-1108, 225 Cal. Rptr. 3d 504, 405 P.3d 1076* [California Constitution prohibits reversal for improper rejection of evidence or other procedural error "'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has *resulted in a miscarriage of justice*].)'" "[T]rial error is usually deemed harmless in California unless there is a 'reasonabl[e] probab[ility]' that it affected the verdict. (*People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243*.)" (*College Hospital Inc. v. Superior Court (1994) 8 Cal.4th 704, 715, 34 Cal. Rptr. 2d 898, 882 P.2d 894*.)

In attempting to demonstrate reversible error here, plaintiffs argue Jason's prior sworn statement had significant probative value. Plaintiffs assert, "Besides Stephanie's testimony, Jason's declaration was the only other piece of evidence establishing that Stephen knew in mid-2015 of the acts of theft." Plaintiffs argue Jason's prior testimony would have buttressed Stephanie's testimony she and Stephen discussed Jason's stealing in mid-2015, providing vital corroboration in a case that had devolved into **[*23]** a bitter "he said, she said" credibility contest between father and daughter. Plaintiffs argue Jason's corroboration would have swung the contest in Stephanie's favor. They assert, "Had Jason's statement been admitted, it is reasonably probable that the jury would have reached a different verdict."

Plaintiffs further contend the *timing* of Stephen's discovery of Jason's thefts was of "critical importance . . . in light of the uncontradicted expert testimony that Stephen's failure to act *once he was on notice* would be a breach of his fiduciary duties[.]" (Italics added.) Consequently, proof Stephen got that "notice" in mid-2015 would establish *when* Stephen breached his fiduciary duties to plaintiffs. That proof, in turn, was relevant to plaintiffs' damages claim because plaintiffs contend Wendy could have reduced her damages

substantially had Stephen warned her of Jason's thievery when he learned of it in mid-2015 before her biggest losses occurred.

There is a fatal defect in plaintiffs' argument: It presumes Stephen had a *duty* to warn Wendy of Jason's gambling and stealing. As discussed in the preceding section, the jury found Stephen did not owe fiduciary duties to plaintiffs, and substantial **[*24]** evidence supports that finding. Because Stephen had no legal duty to warn Wendy of Jason's gambling and stealing, the wrongful exclusion of evidence on *when* Stephen learned about Jason's gambling and stealing could not have affected the verdict.

C. *The Trial Court Applied the Proper Measure of Damages for Wendy's Breach of the Marital Settlement Agreement*

In his cross-appeal, Stephen argues the trial court applied the wrong measure of damages for Wendy's breach of their marital settlement agreement (MSA). The MSA was incorporated into the family law judgment, which was entered on June 4, 2014. Essentially, Stephen argues the court erred in interpreting the attorney fees provision in the MSA as allowing an award of only the fees he incurred in defending claims released in the MSA, rather than his fees in defending the *entire* case. Stephen also argues, in the event we affirm that interpretation, we still must reverse the damages award because the trial court abused its discretion in excluding the attorney fees incurred during trial. Neither argument has merit.

1. Background Facts and Procedure

The MSA included a broad, comprehensive waiver of all claims, known and unknown, that Wendy and **[*25]** Stephen had against each other on the date the court entered the divorce judgment. The MSA also included an attorney fees provision which stated: "If either party brings an action against the other concerning or otherwise trying to [enforce] a right, matter or claim being released hereunder, then the moving party shall pay all reasonable attorney fees and costs of the other party to defend such action."[11] (MSA, ¶ 10.)

In his cross-complaint, Stephen alleged Wendy breached the MSA's mutual release provision by suing him for released claims. Stephen further alleged

---

under the hearsay exception for a vicarious admission (*Evid. Code, § 1224*).

---

[11] The parties agree the MSA contained a typographical error in this provision, replacing the intended word "enforce" with the incorrect word "endorse."

Wendy's breach made her liable under the MSA for all his attorney fees and costs incurred in defending the lawsuit. After the jury found Wendy breached the MSA, and the breach caused damages to Stephen, the trial court decided the issue of damages pursuant to an earlier stipulation of the parties.

In his motion for attorney fees, Stephen requested all the fees and costs he incurred in the lawsuit, which amounted to $597,740.34. In opposition, Wendy argued Stephen was entitled under the MSA to recover only attorney fees incurred to defend waived claims, i.e., claims stemming from actions before entry of the divorce judgment. The **[*26]** court ordered supplemental briefing on the question of whether the word "action" in the attorney fees provision was ambiguous, and how the court should interpret "action" as used in the provision. The court also invited Stephen to "include a proposed apportionment(s) of attorney's fees and costs in light of the court's finding the term 'action' may be ambiguous."

Stephen argued in his supplemental brief the word "action" was unambiguous and meant "civil suit." Under the plain meaning of "action," Stephen argued, he was entitled to recover all his fees and costs in defending the entire lawsuit. Wendy challenged Stephen's assertion "the term 'action' includes the 'entire proceeding,' *regardless of the breadth of said proceeding*[.]" (Original italics.) She asserted Stephen's interpretation was "at odds with the terms of the MSA and the facts," and argued, "The terms of the MSA need to be read in context with common sense." Wendy contended Stephen was entitled to recover only attorney fees incurred in the defense of claims predating the judgment because, she explained, "The MSA unambiguously states that the only claims being released are those that had accrued at the time of signing."

The **[*27]** trial court received extrinsic evidence to resolve the ambiguity. Both parties relied on the correspondence their family law attorneys exchanged in negotiating the language of the attorney fees provision. There was no dispute regarding this evidence; the parties simply disagreed as to what the letters and e-mails meant. Both sides argued the correspondence supported their respective interpretation of the MSA. Wendy also submitted a recent declaration from her family law attorney, Cara Elkin, who stated it was never the parties' intent to release any claim for future acts performed after entry of the judgment.

Though Stephen insisted the word "action" as used in the MSA was unambiguous and entitled him to recover all his fees, he provided at the trial court's request a proposed apportionment of fees. Stephen based the apportionment on the damages awarded against Jason and Sawyer & Sawyer, 46 percent which applied to acts that predated the divorce judgment. Stephen argued in the event the court ruled apportionment was necessary, he should be awarded at least 46 percent of the total fees and costs he incurred in defending the case.

## 2. The Trial Court's Ruling

The trial court ruled Stephen **[*28]** could not recover all the fees and costs he incurred in the action. Of the nearly $598,000 Stephen sought as damages under the MSA, the court awarded Stephen $221,292.82.

The court explained its reasoning as follows: "Here, the term 'action' is susceptible to two reasonable interpretations when applied to the circumstances of this case. (See *Dore v. Arnold Worldwide, Inc. (2006) 39 Cal.4th 384, 46 Cal. Rptr. 3d 668, 139 P.3d 56*.) Interpreting the term 'action' to broadly cover this entire civil action would not give effect to the parties' original intent, as evidenced by the agreement and extrinsic evidence. The indemnification clause is part of the larger release in Section 10 of the MSA. That release applies only to claims accruing 'before the date of execution of this Agreement.' The extrinsic evidence shows that in negotiating the release and indemnification in Section 10, the parties intended 'to protect both [sides] from the other one bringing any civil suit.' There is no evidence that the parties intended to prevent the other from bringing future claims that had not yet accrued as of the date of the agreement."

The trial court further found "the majority of time expended after February 2, 2018 was not reasonably incurred in the defense of released claims" because on that date the court **[*29]** had issued an in limine ruling which excluded evidence of damages released by the MSA. Accordingly, the court reduced Stephen's fee request by $116,633, and then applied Stephen's proposed apportionment of 46 percent. The result was an award of $221,292.82 in fees to Stephen.

## 3. The Trial Court Properly Interpreted "Action" in the MSA

Stephen contends the trial court erred in interpreting "action" to mean "less than the full lawsuit[.]" He asserts, "The word 'action' is unambiguous; it means a civil suit." In support, Stephen cites both the Code of Civil

Procedure[12] and Black's Law Dictionary.[13] Stephen also contends "the California Supreme Court has observed that 'an "action" is synonymous with a lawsuit,'" citing *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC (2017) 3 Cal.5th 744, 753, 220 Cal. Rptr. 3d 650, 398 P.3d 556*. After citing this consensus on the meaning of "action," Stephen argues the court here "did not give the word 'action' in the parties' contract its usual meaning. . . . In interpreting 'action' to mean only 'released claims,' the trial court committed error."

Stephen correctly asserts we must review the trial court's interpretation of the MSA's attorney fees provision de novo, given "there is no conflicting extrinsic evidence as to its meaning. [Citation.]" (*Brandwein v. Butler (2013) 218 Cal.App.4th 1485, 1497-1498, 161 Cal. Rptr. 3d 728*; accord, *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc. (2003) 109 Cal.App.4th 944, 955, 135 Cal. Rptr. 2d 505* ["when **[*30]** the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract"].) In our de novo review, we reach the same conclusion as the trial court.

Notwithstanding Stephen's assertion the attorney fees provision is "unambiguous," we note his interpretation depends on a subtle yet crucial rewriting of its terms. Stephen asserts, "Wendy and Stephen unambiguously agreed that if either party sued the other in a lawsuit *that included released claims*, the prty who sued would be liable for all fees reasonably incurred to defend that lawsuit." (Italics added.) Stephen's rewriting of the provision is telling; it betrays his comprehension the actual language of the MSA is more restrictive than he admits.

The MSA uses "action" twice in the same sentence, and the repeated use makes the intended meaning clear. "If either party brings *an action against the other concerning or otherwise trying to [enforce] a right, matter or claim being released hereunder*, then the moving party shall pay all reasonable attorney fees and costs of the other party to defend *such action*." (MSA, ¶

10, italics added.) The "action" the fees provision refers to is an action to enforce **[*31]** a released claim, not an action "that *include*[*s*] released claims," as Stephen contends. Consequently, we conclude the language of the contract itself reveals the parties' intention only attorney fees incurred in defending released claims are recoverable.

The extrinsic evidence of the parties' written negotiations over the wording of the attorney fees provision also supports this interpretation. The correspondence between counsel makes clear Wendy wanted to discourage Stephen from suing over released claims. In the letter in which Wendy's attorney, Elkin, first suggested the attorney fees provision, Elkin proposed, "[I]f Mr. Sawyer brings any civil suit against [Wendy], for any claim that arose or would arise as of the date of entry of the Judgment, he agrees to pay for her attorneys' fees in that suit." Though these claims certainly would be covered by the mutual release, Elkin explained Wendy wanted "this extra protection."

When Stephen responded by requesting the attorney fees provision be made mutual by including a "'prevailing party'" provision, Wendy refused and insisted on a "'moving party'" provision instead. In an e-mail, Elkin explained Wendy insisted the award be against the **[*32]** "'moving party,'" rather than for a "'prevailing party'" "to protect both our clients from the other one bringing any civil suit. The intent is that regardless of who prevails, it is the moving party who must pay for the other's fees."

Stephen argues this same e-mail exchange supports his expansive interpretation of "action." Stephen contends the exchange proves "the provision means that in a lawsuit *that included released claims*, the plaintiff would have to pay the defendant's fees regardless of who prevailed. [The parties] bargained for specific consequences if that happened: the plaintiff would have to pay all fees and costs the defendant reasonably incurred to defend *that lawsuit*." (Italics added.)

Again, Stephen's argument attempts a subtle rewrite of the provision in issue. Nowhere in the e-mail exchange is there a statement the "action," which would trigger an attorney fees award was an action "that *included* released claims," as opposed to an action to enforce released claims. Nonetheless, Stephen argues Wendy's insistence fees be awarded to the "moving party" rather than "prevailing party" proves the term "action" includes "a lawsuit with a mixture of released claims and future **[*33]** claims," and this proper interpretation of

---

[12] *Section 22 of the Code of Civil Procedure* defines "action" to mean "an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense."

[13] Stephen asserts, "Black's Law Dictionary . . . defines 'action' to mean '[a] civil or criminal judicial proceeding.' (ACTION, Black's Law Dict. (10th ed. 2014).)"

"action" entitles him to recover all his fees incurred in defending the *entire* action, not just released claims.

Here is Stephen's argument: "In a lawsuit with only released claims, with either phrase the defendant would be awarded attorney's fees and costs. The plaintiff in such a case would be the 'moving party' and would be responsible for fees. The claims would be barred by the release, making the defendant the prevailing party. So if they agreed to a 'prevailing party' provision, the defendant would be awarded attorney's fees and costs.

"In a lawsuit with only future claims, the release would not apply, and the fees provision would not be triggered. With either phrase, there would be no award of fees.

"*The difference between 'moving party' and 'prevailing party' would matter only in a case in which the plaintiff sued on both released claims and future claims.* In such a lawsuit, the defendant would be the 'prevailing party' only if the defendant defeated the future claims. Because of that, Wendy and her counsel did not want a 'prevailing party' fee provision—they wanted the plaintiff to be responsible for all attorney's fees and costs. [¶] **[\*34]** By choosing 'moving party,' there would be an award of fees regardless of who prevailed."[14] (Italics added.)

In other words, Stephen argues Wendy wanted a "moving party" provision to ensure Stephen would be held liable for the attorney fees she incurred to defend against released claims regardless of whether the action Stephen filed stated only released claims or stated a "mixture" of released claims and future claims. Stephen suggests Wendy feared a "prevailing party" provision would allow Stephen to evade the contractual penalty for suing her on released claims by including in the action future claims upon which he was sure to prevail.

Even if Stephen correctly intuits Wendy's motivation for insisting on the "moving party" provision, the parties agreement on that provision does not prove Stephen's contention the parties intended "that in a lawsuit that included released claims, . . . the plaintiff would have to pay all fees and costs the defendant reasonably

incurred to defend" the entire lawsuit. The extrinsic evidence actually supports the contrary conclusion that the attorney fees provision was intended to award only fees incurred to defend released **[\*35]** claims. As Elkin, Wendy's family law counsel, stated in her declaration, "There was no discussion nor intent that the Moving Party Clause cover any claims that would potentially arise AFTER the Judgment for Dissolution was entered."

We conclude, based on our de novo review of the contractual language and the extrinsic evidence, the attorney fees provision in the MSA did not entitle Stephen to recover all his fees and costs in defending the action. The trial court properly concluded Stephen was entitled to recover only those fees and costs related to his defense of released claims.

4. The Trial Court Did Not Abuse its Discretion in Excluding from the

Attorney Fees Award the Fees Incurred During Trial

Finally, Stephen argues that in the event we interpret the MSA as allowing the award of only fees and costs incurred in defending released claims (i.e., claims predating the June 4, 2013 divorce judgment), the trial court abused its discretion by the manner in which it calculated that award. Specifically, Stephen argues the court erred when it "excluded all attorney's fees incurred during trial." The argument lacks merit.

In calculating the attorney fees awarded as damages on the cross-complaint, **[\*36]** the trial court excluded Stephen's attorney fees incurred during trial. The court based that decision on its in limine ruling excluding evidence of damages released in the MSA upon entry of the divorce judgment. The court reasoned the "majority of time expended after" the date of the in limine ruling "was not reasonably incurred in the defense of released claims."

Stephen argues it was error to exclude those fees incurred during trial "because Wendy pursued the released claims throughout the trial." In support of this assertion, Stephen contends that although plaintiffs' damages expert prepared a new report in response to the court's ruling on Stephen's in limine motion, the revised report "still included amounts Jason took in 2013 and early 2014." Stephen further asserts, "Though claims based on acts in 2013 and early 2014 were released and should not have been sought under the trial court's ruling, Plaintiffs continued to seek them."

---

[14] Of course, Stephen's argument ignores the solution the trial court adopted here. In a case involving a "mixture" of released and future claims, a trial court could penalize the moving party for including the released claims in the case, *regardless of which side prevailed*, by awarding attorney fees for the defense of only the released claims based on an apportionment of fees between released and future claims.

The argument is entirely misleading. Stephen ignores the fact plaintiffs still had to litigate their damages claim against Jason and Sawyer & Sawyer. In his trial testimony, the expert explained his revised report segregated the amounts Jason owed from **[*37]** 2013 and early 2014, before entry of the divorce judgment, from the amounts Jason stole after the judgment, for which Stephen was potentially liable under plaintiffs' breach of fiduciary duties theory. Plaintiffs' counsel, in questioning the expert, made clear the purpose of segregating these amounts on the revised reports was to allow the jury to determine damages against Stephen separately from the damages the other defendants owed. Stephen is simply wrong in asserting plaintiffs continued to pursue against him at trial any released claims.

In his reply to the respondents' brief on the cross-appeal, Stephen raises an entirely new argument to show the trial court abused its discretion when it calculated the attorney fees award. Stephen asserts in his reply the court acted improperly "when it apportioned Stephen's fees between released and unreleased claims[,]" awarding him only 46 percent of the fees and costs he incurred in defending the entire action.

"'"[P]oints raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before . . . '" [Citations.]" (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc. (2000) 78 Cal.App.4th 847, 894, fn. 10, 93 Cal. Rptr. 2d 364*; see also *Bay World Trading, LTD. v. Nebraska Beef, Inc. (2002) 101 Cal.App.4th 135, 138, fn. 3, 123 Cal. Rptr. 2d 632*.) Stephen waived this additional argument by failing **[*38]** to raise it in his opening brief on the cross-appeal.

III

DISPOSITION

The judgment is affirmed. Stephen D. Sawyer, Jason Sawyer, and Sawyer & Sawyer are entitled to their costs on the appeal. Wendy Sawyer and her companies are entitled to their costs on the cross-appeal.

ARONSON, ACTING P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.

End of Document

# EXHIBIT 3

🔴 Warning
As of: December 16, 2020 8:08 PM Z

## *Stegman v. Bank of America*

Court of Appeal of California, Second Appellate District, Division Six

June 1, 1984

Civ. No. 68854.

### Reporter

203 Cal. Rptr. 103 *; 1984 Cal. App. LEXIS 2138 **; 156 Cal. App. 3d 843

RICHARD W. STEGMAN, Plaintiff and Appellant, v. BANK OF AMERICA et al., Defendants and Respondents.

**Notice:** NOT CITABLE - ORDERED NOT PUBLISHED

**Subsequent History: [**1]** Hg. den. Aug. 23, 1984, and reporter of Decisions directed not to publish this opn. in the Official Reports (*Cal. Const., art. VI, § 14*; *rule 976, Cal. Rules of Ct*.).

**Prior History:** Superior Court of Ventura County, No. 75563, Ben F. Ruffner, Judge.

## Core Terms

attorney's fees, trust deed, grantee, indebtedness, reciprocal, costs, nonassuming, default, prevailing party, foreclosure, provisions, signatory, unilateral, election, nonparty, notice, specifically provide, notice of default, personally liable, action to enjoin, statutory right, real property, court action, promissory, prevailed, successor, mortgage, reasons, cure

## Case Summary

### Procedural Posture

Appellant, owner of property subject to a note, sought review of the judgment of the Superior Court of Ventura County (California) in favor of appellant in appellant's action against respondents, successor payees and beneficiaries of the note, for an injunction to block a default on the note, based upon the trial court's denial of attorney's fees.

### Overview

Respondents, successor payees and beneficiaries of a note, filed a notice of default on the note, and an election to sell the property securing the note. Appellant, owner of the property subject to the note, sought a permanent injunction and declaration of rights on the note and trust deed. Finding that the amount due on the default notice was incorrect, the court ordered the notice null and void and awarded judgment to appellant, but denied appellant attorney's fees. The court affirmed the judgment and the denial of attorney's fees. In so ruling, the court rejected appellant's argument that he was entitled to attorney's fees as the prevailing party under *Cal. Civ. Code § 1717*. Recognizing that appellant acquired title to the property by quit claim deed, the court determined that he, as a non-assuming grantee, was not entitled to the benefit of the attorney's fees provision in the note. Moreover, respondents' filing of the notice of default was not "an action on the contract" within the meaning of *Cal. Civ. Code § 1717(a)*, because it was not an action initiated by a court.

### Outcome

203 Cal. Rptr. 103, *103; 1984 Cal. App. LEXIS 2138, **1

The court affirmed the judgment in favor of appellant in an action against respondents, successor payees and beneficiaries of a note, for an injunction to block a default on the note. Neither the promissory note, nor the civil statute governing attorney's fees, provided appellant with a right to attorney's fees as the prevailing party. The court ordered each party to bear their own attorney's fees and costs on appeal.

# LexisNexis® Headnotes

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

**HN1**[⬇] **Remedies, Costs & Attorney Fees**

See *Cal. Civ. Code § 1717(a)*.

Real Property Law > ... > Mortgages & Other Security Instruments > Transfers > Assumptions

Real Property Law > Deeds > General Overview

Real Property Law > ... > Mortgages & Other Security Instruments > Transfers > General Overview

**HN2**[⬇] **Transfers, Assumptions**

Upon the transfer of real property covered by a mortgage or a deed of trust as security for an indebtedness, the property remains subject to the secured indebtedness but the grantee is not personally liable for the indebtedness or to perform any of the obligations of the mortgage or trust deed unless his agreement to pay the indebtedness, or some note or memorandum thereof, is in writing and subscribed by him or his agent or his assumption of the indebtedness is specifically provided for in the conveyance.

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

Estate, Gift & Trust Law > ... > Private Trusts Characteristics > Trustees > General Overview

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

Estate, Gift & Trust Law > Trusts > General Overview

**HN3**[⬇] **Basis of Recovery, Statutory Awards**

Any right of a trustee or beneficiary to recover costs, including attorney fees, from a non-assuming grantee upon default and election to sell is derived not from contract but from a statute.

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

Legal Ethics > Client Relations > Attorney Fees > Fee Agreements

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

**HN4**[⬇] **Basis of Recovery, Statutory Awards**

Attorney fees are not allowable as costs unless authorized by statute or agreement. *Cal. Civ. Proc. Code § 1021*.

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

Estate, Gift & Trust Law > ... > Trustees > Duties & Powers > General Overview

Governments > Legislation > Statutory Remedies & Rights

Estate, Gift & Trust Law > Trusts > General Overview

Estate, Gift & Trust Law > ... > Private Trusts Characteristics > Trustees > General Overview

**HN5**[⬇] **Remedies, Costs & Attorney Fees**

*Cal. Civ. Code § 2924c(a)* gives a unilateral statutory right to trustees and beneficiaries to secure certain amounts for attorney fees upon cure of default,

independent of any contract provision.

**Counsel:** Edwin B. Stegman for Plaintiff and Appellant.

Peter J. Celeste for Defendants and Respondents.

**Opinion by:** ABBE

# Opinion

[*104]  ABBE, J.

Appeal from denial of attorney's fees to the prevailing party in an action to enjoin a foreclosure sale under a deed of trust and for declaratory relief. The sole issue is whether the court erred in denying attorney's fees claimed by appellant pursuant to *Civil Code section 1717, subdivision (a)*. We find no error and affirm.

Appellant acquired real property which was subject to a deed of trust securing a promissory note executed by his sellers. Respondents are successor payees and beneficiaries of the note and trust deed. Respondents filed and served a notice of default and election to sell pursuant to the deed of trust. Appellant filed a multicount complaint seeking to permanently enjoin foreclosure and for a declaration of rights and liabilities on the note and trust deed.

The trial court found the [**2]  amount claimed due on the note as stated in the notice of default was incorrect and the notice was, therefore, null and void.  It ordered respondents to rescind the notice of default. Appellant was awarded costs of suit but not attorney's fees.

Appellant claims attorney's fees as prevailing party by virtue of the provisions of *Civil Code section 1717*. [1]
*HN1*[⬆] That section provides in pertinent part: "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of that contract, shall

be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the prevailing party, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements."

The promissory note secured by the deed of trust in question contained an attorney fees provision as follows: "If action is instituted on this Note we [the buyers] promise to pay such sum as the Court may fix as attorney's fees." The trust deed also [**3]  contains an attorney's fee provision in favor of the beneficiary or trustee. Appellant acquired title by quit claim deed. He did not assume the secured indebtedness.

*HN2*[⬆] ] "Upon the transfer of real property covered by a mortgage or a deed of trust as security for an indebtedness, the property remains subject to the secured indebtedness but the grantee is not personally liable for the indebtedness or to perform any of the obligations of the mortgage or trust deed unless his agreement to pay the indebtedness, or some note or memorandum thereof, is in writing and subscribed by him or his agent or his assumption of the indebtedness is specifically provided for in the conveyance. . . ." ( *Cornelison v. Kornbluth (1975) 15 Cal.3d 590, 596-597 [125 Cal.Rptr. 557, 542 P.2d 981].*) Under *Cornelison* appellant can neither claim the benefit of nor become personally liable for the attorney's fees provided for in the note and deed of trust as he was not bound by the promises contained in the note or trust deed. Consequently he cannot claim the benefit of the reciprocity provisions of *section 1717*.

We acknowledge this holding is contrary to *Saucedo v. Mercury Sav. & Loan Assn. (1980) [**4]  111 Cal.App.3d 309 [168 Cal.Rptr. 552]*. In *Saucedo* the court allowed recovery of attorney fees pursuant to *section [*105] 1717* under similar circumstances. The court stated a nonassuming grantee would be subject to pay the attorney fees of the beneficiary and trustee if the latter had prevailed in grantee's action to enjoin foreclosure. Because the nonassuming grantee would have had to pay the secured debt, including attorney's fees, to prevent foreclosure, the court reasoned this "practical liability" was sufficient to trigger the remedial reciprocity under *section 1717*. ( *Id., p. 315.*) For the reasons set forth below, we respectfully disagree.

*HN3*[⬆] ] Any right of a trustee or beneficiary to recover costs, including attorney fees, from a nonassuming grantee upon default and election to sell is derived not

---

[1]  All further references are to this code unless otherwise specified.

from contract but from a statute. The court in *Saucedo* acknowledged this by reference to *section 2924c, subdivision (a)*. Therefore, while the practical effect may be to impose attorney's fee liability on the nonassuming grantee who attempts to cure the default on the property, the liability therefor does not arise from a contract obligation of the grantee, but from statute.

 [**5]  *Section 1717* makes unilateral attorney's fee provisions in a contract reciprocal as a matter of law where the suit is on the contract. ( *International Industries, Inc.  v. Olen (1978) 21 Cal.3d 218, 223 [145 Cal.Rptr. 691, 577 P.2d 1031]*.) This imposition of a reciprocal obligation to pay attorney fees incurred in court actions on the contract has been extended to nonparties to the contract. Attorney fee recovery under *section 1717* has been required where a nonparty is sued by a signatory alleging the nonparty is bound by the contract ( *Reynolds Metals Co.  v. Alperson (1979) 25 Cal.3d 124, 128 [158 Cal.Rptr. 1, 599 P.2d 83]*) and when a nonsignatory brings an action on the contract against a signatory. ( *Jones v. Drain (1983) 149 Cal.App.3d 484 [196 Cal.Rptr. 827]*.) In each instance the signatory party would be entitled to fees under the contract if the signatory prevailed. However, neither those rulings nor the reasons therefor entitled appellant to attorney's fees here.

The respondent's filing of the notice of default and election to sell is not "an action on the contract" within the meaning of *section 1717* which clearly contemplates only court action.  [**6]  Assuming arguendo appellant's suit is considered to be one "on the contract," appellant cannot claim a reciprocal right to attorney's fees under *section 1717*. To allow him to obtain attorney's fees as costs would give him a unilateral right not supported by the contract or statute.

*HN4*[⬆] Attorney fees are not allowable as costs unless authorized by statute or agreement. (*Code Civ. Proc., § 1021*; *Reynolds Metals Co. v. Alperson, supra, 25 Cal.3d 124, 127*.) As indicated, *supra,* appellant had no right to attorney fees under the agreement (note and trust deed) as a nonassuming grantee. *HN5*[⬆] *Section 2924c, subdivision (a)* gives a unilateral statutory right to trustees and beneficiaries to secure certain amounts for attorney fees upon cure of default, independent of any contract provision. (Also see new § 2924d.) Nothing in *section 1717* would allow its use to make reciprocal this statutory right of trustees and beneficiaries or extend the benefits of  *section 2924c,  [**7]  subdivision (a)* to trustors or their successors.

The orders are affirmed. Each party is to bear their own attorney fees and costs on appeal.

Stone, P. J., and Gilbert, J., concurred.

**End of Document**

# EXHIBIT 4

A Neutral

As of: December 16, 2020 8:10 PM Z

# Wallace v. Busch Entm't Corp.

United States District Court for the Southern District of California

January 25, 2013, Decided; January 28, 2013, Filed

Case No. 09-cv-2785-L(RBB)

**Reporter**
2013 U.S. Dist. LEXIS 11975 *

JOHN B. WALLACE, Plaintiff, v. BUSCH
ENTERTAINMENT CORP., et al., Defendants.

**Prior History:** Wallace v. Busch Entm't Corp., 2011
U.S. Dist. LEXIS 124655 (S.D. Cal., Oct. 25, 2011)

## Core Terms

Notice, want of prosecution, reconsideration motion,
justify relief, file a notice, reconsideration, discovery,
fails, exceptional circumstances, entry of judgment,
receive notice, new address, trial date, designated,
progress, surprise, entitle, invoked, severe, MOOT

**Counsel:** [*1] John B Wallace, Plaintiff, Pro se, c/o
Wallace & Madden, Los Angeles, CA.

For Seaworld Parks & Entertainment, LLC, formerly
known as Busch Entertainment Company, Defendant:
Kevin W Alexander, LEAD ATTORNEY, Gordon and
Rees, San Diego, CA; Renata Ortiz Bloom, LEAD
ATTORNEY, Gordon & Rees LLP, San Diego, CA.

**Judges:** M. James Lorenz, United States District Court
Judge.

**Opinion by:** M. James Lorenz

## Opinion

**ORDER DENYING PLAINTIFF'S MOTION FOR
RECONSIDERATION**

**[DOC. 66]**

On December 27, 2012, Plaintiff John B. Wallace, a
licensed attorney proceeding *pro se*, filed this motion
seeking a order from the Court (1) relieving Plaintiff from
the judgment of dismissal, (2) vacating judgment, and
(3) setting a trial. Plaintiff brings this motion in response
to the dismissal of this action for want of prosecution
under *Civil Local Rule 41.1* on October 29, 2012. The
Court issued a Notice of Hearing for Dismissal for Want
of Prosecution, following a six-month period of no
docket activity in this action. Consequently, on
November 11, 2012, the Court entered judgment and
dismissal without prejudice. Defendant Seaworld Parks
& Entertainment, LLC opposes the motion.

The Court found this motion suitable for determination
on the papers submitted **[*2]** and without oral
argument. *See Civ. L.R. 7.1(d)(1).* (Doc. 68.) For the
following reasons, the Court **DENIES** Plaintiff's motion
for reconsideration. (Doc. 66.)

### I. ANALYSIS

Once judgment has been entered, reconsideration may
be sought by filing a motion under *Federal Rule of Civil
Procedure 60(b)* (motion for relief from judgment). *See
Hinton v. Pac. Enter., 5 F.3d 391, 395 (9th Cir. 1993).
Rule 60(b)* provides for extraordinary relief and may be
invoked only upon a showing of exceptional
circumstances. *Engleson v. Burlington N.R. Co., 972*

*F.2d 1038, 1044 (9th Cir.1994)* (citing *Ben Sager Chem. Int'l v. E. Targosz & Co., 560 F.2d 805, 809 (7th Cir. 1977))*. Under *Rule 60(b)*, the court may grant reconsideration based on: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered before the court's decision; (3) fraud by the adverse party; (4) the judgment is void; (5) the judgment has been satisfied; or (6) any other reason justifying relief. *Fed. R. Civ. P. 60(b)*.

The gist of Plaintiff's arguments supporting his motion boil down to: (1) Plaintiff did not receive the Notice of Hearing for Dismissal for Want of Prosecution, **[*3]** and (2) dismissal is too severe of a sanction. Defendant responds by arguing, among other things, that Plaintiff fails to meet his burden for relief under *Rule 60(b)*, and Plaintiff's motion is moot because this action was properly dismissed for Plaintiff's failure to prosecute under *Civil Local Rule 41.1*. The Court agrees with Defendant.

### A. Plaintiff's Dismissal Is Not a Sanction.

*Civil Local Rule 41.1* states that

> Actions or proceedings which have been pending in this court for more than six months, without any proceeding or discovery having been taken therein during such period, may, after notice, be dismissed by the court for want of prosecution, at the calling of a calendar prepared for that purpose by the clerk. Such dismissal must be without prejudice, unless otherwise ordered.

*Civil Local Rule 83.1* provides the court with a vehicle to sanction attorneys or parties, which includes the power to sanction by dismissing any action. *Civ. L.R. 83.1(a)*. When the Court issued the Notice of Hearing for Want of Prosecution, it invoked *Rule 41.1* and not *Rule 83.1*. Consequently, the dismissal and entry of judgment were not sanctions against Plaintiff. Therefore, considering the severity of any **[*4]** sanction is not relevant because there was none.

On an issue related to *Rule 41.1*, Plaintiff contends that filing a Notice of Change of Address (Doc. 59) should be remove this action from the reach of *Rule 41.1*. In other words, filing the Notice of Change of Address is a proceeding under *Rule 41.1*. However, Plaintiff is wrong. Plaintiff's notice is not a proceeding. Black's Law Dictionary defines "proceeding" as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment." Plaintiff's notice did not in any way progress this action. Additionally, under the other prong of *Rule 41.1*—discovery—which may remove the action from the scope of *Rule 41.1*, Plaintiff fails to show there was any discovery during the six months leading up to the date when the Notice of Hearing was issued.

### B. Plaintiff Fails to Justify Relief Under *Rule 60(b)*.

Moving on, Plaintiff does not coherently articulate an argument that would entitle him to relief under *Rule 60(b)*. His explanation justifying relief under *Rule 60(b)* is that "Plaintiff was surprised by the dismissal because he did **not** receive this Court's Notice of the Hearing re **[*5]** Dismissal." (Pl.'s Mot. 8:1-2.) Plaintiff provides a document-by-document explanation that each exhibit attached to Defendant's opposition brief does not show service because these documents—several of which are documents issued by the Court—lack proofs of service. But all that effort is for naught.

On September 17, 2012, Plaintiff filed a Notice of Change of Address. (Doc. 59.) That notice designated Plaintiff's new address as follows: c/o Wallace & Madden, 444 South Flower Street, 30th Floor, Los Angeles, California 90071. The previous address had been c/o Rosen & Associates, P.C., 444 South Flower Street, Suite 602, Los Angeles, California 90071. The Court was fully aware of the new address when issuing the Notice of Hearing, and acted accordingly. When examining the receipt for the Notice of Hearing, it states that the notice was "served conventionally" to John B Wallace, c/o Wallace & Madden, 444 South Flower Street, 30th Floor, Los Angeles, CA 90071. (Doc. 60; *see also* Bloom Decl. ¶ 7, Ex. 6.) There is no doubt that the Notice of Hearing was sent to the address most recently designated by Plaintiff, and since the notice was not returned, there is a presumption that the notice **[*6]** was received. [1] It is not the Court's duty to ensure that the mailing address of an attorney or party is correct; that is the attorney's or party's responsibility. Thus, for all intents and purposes, Plaintiff received the Notice of Hearing for Dismissal for Want of Prosecution.

---

[1] Plaintiff included a self-addressed, stamped envelope in the package of materials accompanying his reply brief. Curiously, the address on that envelope is: John Wallace, c/o Rosen & Associates, P.C., 444 S. Flower Street, Suite 3010, Los Angeles, CA 90071. To the Court's knowledge, this address has never shown up in any of Plaintiff's filings in this action. A copy of that envelope is attached to this order.

Plaintiff does not give any further explanation related to *Rule 60(b)*. Accordingly, the Court finds that Plaintiff fails to show any exceptional circumstances to justify granting him relief under *Rule 60(b)*. See *Fed. R. Civ. P. 60(b)*; *Engleson, 972 F.2d at 1044*.

## II. CONCLUSION & ORDER

Because Plaintiff fails to demonstrate entitlement to reconsideration, the Court **DENIES** his motion for reconsideration in its entirety. (Doc. 66.) The Court also **DENIES AS MOOT** Plaintiff's request to set a trial date. A trial **[*7]** date is only set for a civil case during the Final Pretrial Conference, which has not occurred in this case.

**IT IS SO ORDERED.**

DATED: January 25, 2013

/s/ M. James Lorenz

M. James Lorenz

United States District Court Judge

---

*End of Document*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*):  **APPENDIX OF UNREPORTED DECISIONS IN SUPPORT OF LANDLORD'S FURTHER BRIEF IN OPPOSITION TO MOTION FOR ATTORNEY'S FEES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) December 29, 2020  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Katherine Bunker on behalf of U.S. Trustee United States Trustee (SV)
kate.bunker@usdoj.gov

Sandford L. Frey on behalf of Attorney Leech Tishman Fuscaldo & Lampl, Inc.
sfrey@leechtishman.com, lmoya@leechtishman.com;dmulvaney@leechtishman.com

Sandford L. Frey on behalf of Debtor Hawkeye Entertainment, LLC
sfrey@leechtishman.com, lmoya@leechtishman.com;dmulvaney@leechtishman.com

David S Kupetz on behalf of Interested Party Courtesy NEF
dkupetz@sulmeyerlaw.com, dperez@sulmeyerlaw.com;dperez@ecf.courtdrive.com;dkupetz@ecf.courtdrive.com

Jeffrey S Shinbrot on behalf of Interested Party W.E.R.M.Investments, LLC
jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com

David A Tilem on behalf of Interested Party Courtesy NEF
davidtilem@tilemlaw.com,
DavidTilem@ecf.inforuptcy.com;joanfidelson@tilemlaw.com;JoanFidelson@ecf.inforuptcy.com;DianaChau@tilemlaw.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Steven Werth on behalf of Creditor Smart Capital Investments I, LLC, Smart Capital Investments II, LLC, Smart Capital Investments III, LLC, Smart Capital Investments IV, LLC, and Smart Capital Investments V LLC
swerth@sulmeyerlaw.com, cblair@sulmeyerlaw.com;mviramontes@sulmeyerlaw.com;swerth@ecf.inforuptcy.com

Steven Werth on behalf of Interested Party Courtesy NEF
swerth@sulmeyerlaw.com, cblair@sulmeyerlaw.com;mviramontes@sulmeyerlaw.com;swerth@ecf.inforuptcy.com

☐ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

DAP 2708414v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


| December 29, 2020, | Debbie A. Perez | */s/ Debbie A. Perez* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

DAP 2708414v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                          **F 9013-3.1.PROOF.SERVICE**